UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) Criminal No. 21-cr-10035-GAO |
| v. | ) |
| | ) |
| (1) FAITH NEWTON | ) |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO REVOKE OR AMEND DETENTION ORDER

The United States submits this memorandum in opposition to the defendant's motion to revoke or amend the detention order issued by this Court, the District Court, and affirmed by the First Circuit Court of Appeals.

On January 28, 2021, a grand jury returned a fifteen-count indictment against defendants, Faith NEWTON and Winnie WARURU. NEWTON was arrested on January 31, 2021 at Logan Airport after returning from Kenya. On February 1, 2021, the United States moved to detain NEWTON under 18 U.S.C. § 3142(f)(2)(a) for being a flight risk. This Court held two detention hearings, reviewed substantial briefings and exhibits, and after taking the government's motion under advisement, this Court ordered NEWTON to be detained on March 11, 2021. Docket No. 31. The defendant filed a motion to revoke or amend the detention order pursuant to 18 U.S.C. § 3142(b) on April 16, 2021. Docket No. 43. The District Court conducted a *de novo* detention hearing and ordered NEWTON detained on July 8, 2021. Docket No. 62. NEWTON appealed the order to the First Circuit Court of Appeals, and after conducting an independent review of the record, the First Circuit affirmed the District Court's order on October 4, 2021. Docket No. 73. NEWTON renewed her motion on January 9, 2022 and January 22, 2022. Docket Nos. 87, 98.

### INTRODUCTION

The defendant operated Arbor Homecare ("Arbor") from 2013 until January 2017 when MassHealth suspended all payments to Arbor due to credible allegations of fraud. During that

time period, Arbor billed over $170 million in claims to MassHealth. As discussed below, the United States calculates the loss amount to be over $100 million, with a corresponding guideline range exceeding 24 years imprisonment with applicable enhancements. NEWTON and her husband paid themselves approximately $40 million out of Arbor's profits, and she and her husband sent over $14 million of that money overseas. NEWTON failed to inform Probation that she had assets abroad. The government has separately filed a civil action seeking restraint and forfeiture of many of NEWTON's domestic assets as well as those of her husband. *See United States v. 5 Real Properties, et. al*., 1:21-cv-10156-GAO.[1] Because a tremendous amount of money is overseas and/or unaccounted for, and that she is facing lengthy period of incarceration upon a conviction, NEWTON has little incentive not to flee.

As was the case before, there are no conditions that would ensure she remain in the United States and appear as required. Nothing has changed since the First Circuit affirmed NEWTON's detention order after conducting an independent review of the substantial proceedings below. The strength of the evidence is overwhelming—a fact that this Court found. Docket No. 31 at 3 ("It appears that the evidence against [NEWTON] is *overwhelming*.") (emphasis added). This Court also noted at the first detention hearing that she found it "pretty astonishing that literally millions and millions of dollars are being generated in a lawful way here." Detention Tr. (February 4, 2021) at 36:14-36:15.

The District Court found that "Newton poses a serious risk of flight and no condition or combination of conditions, including specifically her proposed conditions, would be sufficient to reasonably assure her appearance at trial." Docket No. 62 at 2. The District Court further found

---

[1] The government estimated the amount of restrained assets to be approximately $17 million at the time the case was charged one year ago; that estimate has not been updated to reflect the current value of the assets.

that "before her indictment, [the defendant] lived a lavish lifestyle. She and her husband owned real estate valued in the millions of dollars." *Id.* The court further found that "[a]lthough [the defendant] is a naturalized United States citizen, she maintained substantial ties to her birth country of Kenya" and that "the government has evidence that she and her husband have in recent years transferred approximately $14 million to Kenya." *Id.* Noting that the defendant "has declined to provide information about assets in Kenya," the District Court concluded that "Newton likely would have access to funds necessary to finance international travel, whether to Kenya or elsewhere." *Id.* The District Court also stated that "the charged conduct is serious and on conviction Newton would likely receive a substantial sentence of imprisonment" and that "[i]t appears likely that Newton would have access to funds sufficient to indemnify duped innocent real estate owners in the event of forfeiture of their properties should Newton abscond." *Id.* Finally, the court noted that "electronic monitoring is not failsafe" and that "it can, and has been, defeated to permit flight." *Id.*

The defendant has still not provided an accurate financial affidavit to the Court. The defendant continues to assert that the United States Probation Office has approved the withholding of information concerning her assets despite its explicit denial of that fact.

I.     ARGUMENT

The fraud at Arbor was sprawling and was carried out in countless ways. NEWTON, through Arbor, billed for services that were not provided. She billed for services that were not authorized by physicians. NEWTON paid kickbacks to patients and patient recruiters. She hired patient family members as sham home health aides as another way to recruit patients to Arbor. NEWTON manipulated patient assessments in order to make it appear as if patients required services. She directed office staff not to document complaints from patients that their nurse or home health aide was not showing up. She falsified nursing notes and signed off as a

3

supervising registered nurse ("RN") when others falsified nursing notes. She even enrolled purported patients for services without their knowledge, and who never needed, nor received, these services. The government's case is also rooted in documentary evidence, text messages, medical record, and billing data that in themselves will demonstrate that NEWTON was on top of this massive fraud scheme.

      The fraud at Arbor exceeds $100 million. As a result, the United States calculates NEWTON's guideline sentencing range after trial at 292 to 365 months after applicable enhancements. The sentencing guidelines specifically provide that for federal health care offenses, "the aggregate dollar amount of the fraudulent bills submitted to the Government health care program *shall* constitute prima facie evidence of the amount of attended loss, *i.e.,* is evidence sufficient to establish the amount of the intended loss, if not rebutted." U.S.S.G. § 2B1.1, Application Note 3(F)(viii) (emphasis added).

      The United States will be able to establish by a preponderance of evidence that the home health aid program was a sham, and that it was also used as a method to pay kickbacks to patients and their family members. MassHealth personnel will testify at trial that it would not have paid any claims for purported HHA's who were not trained. The burden will then shift to the defendant to prove that particular claims are legitimate—namely, that the HHA's received the required training, that the services were necessary, and that they were actually rendered. In addition to witness testimony, the documentary evidence will establish that patients were frequently admitted on, for example, day 1, and a family member HHA began billing services on day 2—a fact pattern that would be quite literally impossible if the HHA actually received the required 75 hours of training, including 16 hours of supervised practical training. *See* 42 C.F.R § 484.36 (2012).

There are many other instances of blatant fraud losses that the government will be able to prove for guilt and for sentencing purposes. The government will be able to establish millions of dollars of fraud losses related to medically unnecessary visits, visits that were not performed, visits that were billed even though there was no plan of care signed by a patient, and even visits where patients never knew they were enrolled. The emphasis on the HHA program throughout the detention hearings is simply because it is the best vehicle for explaining why the United States is confident that, at sentencing, NEWTON will be firmly in the $65 million to $150 million loss range under the guidelines. *See* U.S.S.G. § 2B1.1(b)(1)(M). That is the properly calculated loss range.

In addition to the strength of the case against her, and her potential guideline sentencing range, NEWTON also has extensive financial and family ties to Kenya. She was born in KENYA in 1968. She regularly travels to Kenya and owns property, businesses, and bank accounts in Kenya. NEWTON and her husband have sent over $14.2 million to Kenya between 2014 and 2020. Newton alone sent $9,429,058 from her own bank accounts. In December 2020, NEWTON wired $680,000 to Kenya in order to purchase real property there. Detention Exhibits 4, 7 (hereinafter "Det. Ex."). NEWTON did not inform Probation of her financial holdings in Kenya. She continues to refuse to disclose her holdings here and abroad, notwithstanding the significance of those holdings to this very issue; the Court may infer that NEWTON chooses not to report this information to conceal the depth of her connections to Kenya should she be given an opportunity to abscond.

The government has only to prove risk of flight by a preponderance of the evidence. *United States v. Jackson,* 823 F.2d 4, 5 (2d Cir. 1987) (holding that the preponderance standard applies to the flight determination). The First Circuit, in *United States v. Patriarca*, determined that even a broad list of "innovative and extensive" conditions, including a $4 million secured

5

bond, home detention, electronic monitoring, and video surveillance, was *not* sufficient under the risk-of-flight prong because the court did not know the defendant's net worth. 948 F.2d 789, 795 (1st Cir. 1991) (remanding case for additional fact finding as to the defendant's net worth); *see also United States v. Arndt*, 329 F.Supp.2d 182, 198-199 (D. Mass. 2004) (government met its burden showing arrestee was a risk of flight that no conditions could overcome based on the lengthy term of incarceration he was facing; his history of frequent travel; and the evidence "suggest[ed] that the defendant may have access to large sums of money which would provide the means to flee.").

The defendant asserted that she was advised not to disclose her holdings in Kenya by counsel and that the Probation Officer explicitly agreed that she did not need to disclose her assets abroad. The United States respectfully refers the Court to Probation's memorandum to the Court in which it flatly disagrees with the defendant's assertion. Those very overseas holdings are plainly of significance to the instant motion and notwithstanding her initial interview by Probation, she has subsequently made the decision not to disclose the information for a year.

It is the government's position that the defendant must disclose her full financial holdings—including those in Kenya—before the Court can consider her release on any amount of a secured bond. *See Patriarca*, 948 F.2d at 789 (explaining that "[p]lainly contemplated by the [Bail Reform Act] is some exploration of the defendant's assets or net worth"). It has now been over almost a year since the defendant's arrest, and she has steadfastly refused to disclose her assets in Kenya despite the fact that there are financial records, most of which have already been produced in discovery, show at least $14 million dollars flowing from her account and the account of her husband to Kenya. The United States knows that NEWTON and her husband own property in Kenya, and own /invest substantially in businesses located there based on text

messages. The government simply has no idea as to the current value of those accounts and investments in Kenya.

As this Court recognized, defendants subject to electronic monitoring have absconded:

> I know it might be difficult to abscond, but I just think that people can cut off a bracelet and drive away. And I've had clients myself just cut off a bracelet and take off. And people do get caught these days because I think it's hard to hide, but one issue is she has a lot of assets that are kind of unaccounted for.

Detention Tr. (April 4, 2021) at 23:2-23:7. Accordingly, even electronic monitoring coupled with a secured bond would not ensure her appearance, in as much as defendants can—and do—remove monitoring bracelets and disappear. *See, e.g., United States v. Guerrero*, 17-cr-10388-LTS (defendant released on electronic monitoring removed bracelet and was extradited from the Dominican Republic after fifteen months); *United States v. Letourneau*, 15-cr-10156-DJC (defendant released on electronic monitoring with four third-party custodians removed bracelet and was fugitive for seventeen months before being apprehended in Colorado); *United States v. Albania Deleon*, 07-cr-10277-NMG, Docket No. 110 (defendant fled between conviction and sentencing and was arrested in the Dominican Republic eighteen months later); *United States v. David Wood*, 10-cr-10127-MLW.

As this Court, the District Court Judge found—and as affirmed by the First Circuit Court of Appeals after conducting an independent review—any amount of a secured bond, even coupled with additional conditions, could not assure NEWTON's presence at trial given the vast sums of money that she and her husband have access to abroad—and her continued decision not to disclose those assets to the Court.

        A.    **Access to Discovery**

The discovery in this case has been produced digitally with detailed indices. At the government's suggestion, and following discussions with the Court, defense counsel, Wyatt's

7

Program Director, and First Circuit Budgeting Officer, Mike Andrews, the defendant provided a laptop to the government, which the government loaded with discovery in a searchable database. Providing a detainee with their own individual laptop with discovery is rarely done according to officials at Wyatt.

As the Court is aware, Abor maintained electronic medical records using a third-party cloud-based vendor called Axxess (the "cloud database"). The United States provided defense counsel, as well as Arbor's corporate counsel, with access to the cloud database as part of its discovery productions. Wyatt will not permit detainees to access the internet, although they do have access to videoconference and tablets. NEWTON's counsel along with corporate counsel, have unfettered access to these materials. Her counsel can also communicate with NEWTON through videoconference (and normally—although not during the current surge in Covid—in person). They can, and have, based on comments in the most recent detention hearing, print materials from the cloud database. The government has offered to help facilitate adding those materials onto the laptop that NEWTON has at Wyatt without the investigation team learning which documents counsel had selected.

A defendant is not, as NEWTON suggests, required to be able to personally review each piece of electronic evidence to prepare for her defense. *See United States v. Kvashuk*, No. CR19-0143JLR, 2020 WL 569862, at *4 (W.D. Wash. Feb. 5, 2020); *United States v. Cecrle*, No. 2:12-CR-400-JAD-GWF, 2014 WL 31674, at *6 (D. Nev. Jan. 3, 2014) ("The fundamental constitutional right of access to the courts ... does not include a constitutional right to a personal computer. Nor does it require that access to materials be provided in any particular way." (citations omitted)); *United States v. Thompson*, No. 2:10-CR-200-DBH, 2013 WL 1809659, at *7 (D. Me. Apr. 29, 2013), *aff'd*, 851 F.3d 129 (1st Cir. 2017) ("I am aware of no case holding that the Constitution requires that a defendant represented by a lawyer must personally see all the

8

discovery that the government discloses to defense counsel or even the discovery that he asked to see."); *United States v. Faulkner*, No. 3:09-CR-249-D(02), 2011 WL 3962513, at *4 (N.D. Tex. Sept. 8, 2011) ("[The defendant's] personal review of the disclosed digital data prior to trial is *not* constitutionally required or otherwise legally mandated where, as here, Faulkner is represented by counsel who has had the ability to review the discovery before trial.").

The United States has offered to, and has, facilitated NEWTON's personal access to discovery materials. The United States has conferred with NEWTON's counsel a number of times. The government contacted Axxess to try to devise a solution where a subset of the materials can be downloaded onto the laptop she has access to at Wyatt, and has offered to continue those discussions with Axxess, defense counsel, and corporate counsel. The government identified for NEWTON twenty patients among Arbor's vast patient population that defense counsel should focus on; it has explained what documents to focus on and how to find them in the materials.

## **CONCLUSION**

Nothing has changed since the First Circuit affirmed the decision to detain NEWTON after reviewing the record before this Court, as well as the District Court. The government has exceeded its burden of establishing by a preponderance of evidence that the defendant is a flight risk. No amount of a secured bond, even coupled with electronic monitoring, could secure NEWTON's presence at trial given the vast amounts of money that she and her husband have access to abroad—which she continues to hide from Probation and the Court—and the period of imprisonment she is facing upon a conviction.

Accordingly, the United States respectfully urges the Court to deny the defendant's motion to modify or revoke the detention order that it issued in this case.

                                              Respectfully submitted,
                                              RACHAEL S. ROLLINS
                                              United States Attorney

By:   */s/ Rachel Y. Hemani*
        RACHEL Y. HEMANI
        Assistant U.S. Attorney