UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                                )
UNITED STATES OF AMERICA,       )
                                )        Criminal Action
        Plaintiff,              )        No. 21-10035-ADB
                                )
v.                              )
                                )
FAITH NEWTON,                   )
                                )
        Defendant.              )
                                )
```

JURY TRIAL DAY SEVEN

BEFORE THE HONORABLE ALLISON D. BURROUGHS
UNITED STATES DISTRICT JUDGE

July 7, 2023

John J. Moakley United States Courthouse
Courtroom No. 17
One Courthouse Way
Boston, Massachusetts  02210

Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

1    APPEARANCES:

2    On Behalf of the Government:
     William B. Brady
3    Christopher R. Looney
     United States Attorney's Office MA
4    1 Courthouse Way
     Suite 9200
5    Boston, MA 02210
     617-748-3287
6    william.brady@usdoj.gov
     christopher.looney@usdoj.gov
7
     On Behalf of the Defendant:
8    George W. Vien
     Michelle R. Pascucci
9    Nathaniel R. B. Koslof
     Donnelly, Conroy & Gelhaar, LLP
10   260 Franklin Street
     Boston, MA 02110
11   617-720-2880
     Fax: 617-720-3554
12   gwv@dcglaw.com
     mrp@dcglaw.com
13   nrbk@dcglaw.com

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              (The following proceedings were held in open court
 3    before the Honorable Allison D. Burroughs, United States
 4    District Judge, United States District Court, District of
 5    Massachusetts, at the John J. Moakley United States Courthouse,
 6    One Courthouse Way, Courtroom 10, Boston, Massachusetts, on
 7    July 8, 2023.)
 8              THE COURT:  Mr. Sultan, thank you for bringing your
 9    client.  We worked out a narrative that I'm going to read to
10    the jury with regards to what happened.  So I would like your
11    client out of the courtroom if that's acceptable to you because
12    I don't want the jury to see that he's available here today.
13    But I would like him to be available until we get past this.
14              MR. SULTAN:  Your Honor, at some point will I be
15    excused?
16              THE COURT:  At some point you will be excused.  That
17    point is not now.
18              MR. SULTAN:  Thank you, Your Honor.  I understand.
19              THE COURT:  He's welcome to say in the courtroom now,
20    but once we bring the jury out, I would like him -- I mean, he
21    doesn't have to stay now.  That's between you and him.  The
22    jury is coming at 10:00, and we'll deal with this pretty
23    straight on.  And then once we're done with it and we're ready
24    to begin closing arguments, you and he can be excused, but I
25    would like to get through this and keep him here, okay?
```

```
 1              MR. SULTAN:  Thank you.
 2              THE COURT:  I am working off of, just so we all know,
 3      I have it up on my screen, and I'm working on the redlined
 4      version that we distributed yesterday.  Does that work for
 5      everybody?
 6              MR. VIEN:  Yes.
 7              MR. BRADY:  Yes, Your Honor.
 8              THE COURT:  Okay.  So we can either go through the
 9      redlines first or we can go through the whole document in
09:31 10      whatever order you wish to do it.  Let's started with you,
11      Ms. Pascucci.  I have no volunteers.  We'll start with you.
12      Give me a page number if you can.  I thought she was like the
13      jury instruction person.
14              MR. VIEN:  She's everything, and even she has her
15      limits.
16              THE COURT:  She seems like a legal scholar.
17              MR. VIEN:  Oh, there's no question about that, Your
18      Honor.  Frankly, Your Honor, I don't have that much.  Now, you
19      don't want us just to rehash the earlier objections we had.
09:32 20              THE COURT:  No.  You're going to have to make those
21      again.
22              MR. VIEN:  At the end?
23              THE COURT:  Yes, you'll have to make those again.
24              MR. VIEN:  I won't do that then.
25              THE COURT:  You can run through them now for me, so I
```

```
 1   can -- I also want to point out that when JCB needed a legal
 2   scholar, they had to hire a woman.
 3           MR. VIEN:  We have a long history of hiring women,
 4   Your Honor.
 5           THE COURT:  That's true.  You also have a long
 6   history --
 7           MR. VIEN:  That was a softball.  I don't think it's
 8   gender-specific, though.
 9           THE COURT:  I don't think the government has any idea
10   what we're even talking about so we'll let that all go.  You
11   can explain it to them after court.  Run through the specifics
12   and the generals for me.
13           MR. VIEN:  Page 3, I just want to renew, my last
14   sentence, last sentence I wanted to say "may" vote to convict
15   instead of "should" vote to convict.
16           THE COURT:  That comes right out of the pattern
17   instructions.
18           MR. VIEN:  I noticed on page 20 you took out Medicare,
19   Medicaid, Medicare.
20           THE COURT:  I thought we agreed to that on the record
21   yesterday.
22           MR. VIEN:  Yes; frankly, I don't object to that.  Page
23   23, the unanimity.
24           THE COURT:  I'm not sure that was page -- you're
25   right.  Yeah.  Sorry, you're right.  23.
```

1        MR. VIEN:  I just think I'm not even sure how to say

2   it, but I think as written it's pretty confusing.  I just don't

3   -- it's one of those I just don't understand.  I think if

4   you're going to say you have to be unanimous to find health

5   care fraud, then they have to be unanimous on what event

6   constituted health care fraud, given the extent of the time

7   period.

8        THE COURT:  Let me reread it.

9        Do you have a suggestion on making it more clear?  I

09:34 10   mean, I added in the second "beyond a reasonable doubt" which

11   probably does not help with clarity.

12        MR. VIEN:  We appreciate it, though.

13        THE COURT:  So let's see.  You must be unanimous --

14   with regards to health care fraud, "You do not need to be

15   unanimous about the way in which defendant defrauded

16   MassHealth."

17        MR. VIEN:  That's what I would like to strike.

18        THE COURT:  I know you'd like to strike that, but

19   that's a substantive issue, not a clarity issue.  I'm

09:35 20   disinclined to strike the substance, but I take the point on

21   clarity.

22        MR. VIEN:  Again, just to repeat what you just said,

23   I'm not sure what that means.

24        THE COURT:  How about, what if I do this, break it

25   into two sentences.  You do not need to be unanimous about the

1    way in which defendant defrauded MassHealth, meaning -- I'm

2    just going to write this down, "meaning, for example, whether

3    there was billing for appointments that were medically

4    unnecessary or treatment that was medically unnecessary or not

5    given at all.  But you must be unanimous."  Two sentences, does

6    that help?

7              MR. VIEN:  I think breaking it up is always better.

8    My point is that if you're going to convict on that, they have

9    to convict on an event.  They just can't convict on the general

09:36 10   part of the conspiracy that they committed billing fraud at

11   some time.  They have to look at it and say a specific instance

12   of billing fraud because it's a substantive count.

13             The problem with the count obviously is the time

14   period is too long, and it encompasses what could be a vast

15   number of events, and that's what we're trying to address and

16   say you can't say that at some time during this I think

17   three-year period there was some kind of health care fraud but

18   you don't really have to agree on which event it was.

19             THE COURT:  All right.  What about this.  "With

09:37 20   regards to health care fraud, you do not need to be unanimous

21   about the way in which defendant defrauded MassHealth.

22   Meaning, for example, whether there was billing for services

23   medically unnecessary or not provided at all.  But you must be

24   unanimous in finding that the government has proven each

25   element of the offense beyond a reasonable doubt.  This will

1    require you to find that the government proved beyond a

2    reasonable doubt that the defendant executed or aided and

3    abetted a scheme as charged in the indictment to defraud

4    MassHealth by means of false and fraudulent pretenses to find

5    her guilty."

6            MR. VIEN:  See, this is the -- I think this is the

7    problem, I think that allows the jury, if I'm a juror and think

8    on January 1, there was a false bill that's attributable to

9    Ms. Newton, and then three months later another juror doesn't

09:38 10   believe that but believes there was a false bill three months

11   later that is attributed to Ms. Newton but I don't agree with

12   that one, that's improper.

13           We have to agree on the same event, the same bill, and

14   also that they're guilty of this substantive offense, which is

15   charged over a three-year period, the way it's charged raises a

16   real problem.

17           THE COURT:  Well, I could also take out the whole

18   unanimity instruction and wait until they ask a question about

19   it.

09:38 20          MR. VIEN:  I'd prefer that, than the way it is now.

21           MR. BRADY:  Your Honor, we think it is important to

22   have this in here because it tells the jury, it tells them that

23   there are, as Your Honor, with the edits that Your Honor just

24   suggested, there are multiple ways that this fraud happened.

25           This fraud is charged as a scheme, and the element is

1  that they must find that there was a scheme to defraud.  They

2  don't need to find -- and this stands out in my mind like the

3  brute facts was the term in the case law, the underlying facts

4  about the way the fraud took place, the specific underlying

5  events.  That's not what they need to find.  They just need to

6  find that there was a scheme to defraud.  That's what they need

7  to be unanimous on because that's the element.

8        And the other parts of it, I think the law is pretty

9  clear.  They don't need to be unanimous on that, and I think

09:39 10  that is important for the jury to understand as they head in to

11  consider this in deliberations.

12        THE COURT:  With regards to the health care fraud, the

13  government asserts that the scheme involved multiple sorts of

14  fraudulent conduct.  You must be -- let's see.  "You do not

15  need to be unanimous about the way in which the defendant

16  defrauded MassHealth, but you must be unanimous in finding that

17  the government has proved each element of the offense beyond a

18  reasonable doubt, including that there was a scheme to defraud.

19  This will require you to find that the government proved beyond

09:42 20  a reasonable doubt that the defendant executed or aided and

21  abetted the scheme charged in the indictment, which is to

22  defraud MassHealth by means of false and fraudulent pretenses,

23  to find her guilty."

24        MR. BRADY:  That works for us, Your Honor.

25        MR. VIEN:  I don't want them to be able to find it.  I

```
 1    think they have to be unanimous on the underlying offense, and
 2    I want to make sure I preserve that objection, which is what
 3    I'm doing.
 4         THE COURT:  They have to be unanimous about what the
 5    scheme was.  I'm not sure they have to be unanimous about how
 6    the scheme was executed.
 7         MR. VIEN:  You may be right, Your Honor, but I want to
 8    object and preserve the objection.
 9         THE COURT:  Okay.  I have cross-outs all over this.
10    I'm going have to write this again.
11         Next, Mr. Vien.
12         MR. VIEN:  My next one is page 30, regarding money
13    laundering.  The last paragraph, this is the instruction that's
14    usually appropriate.
15         THE COURT:  I'm taking that out, wait -- no, I'm
16    sorry, that's not the one I'm taking out.  Did we ever circle
17    back on the instruction about, the one that ended "the scheme."
18    That's the one that I don't love.  I'll come back to page 30.
19    But page 25, I'd like to delete that last paragraph on 25.
20         MR. BRADY:  Your Honor, I think under the
21    circumstances here and given the proof, I think it would be
22    fair to include it, but I also take the court's point, and
23    we're not going to object if the court wants to take it out.
24         THE COURT:  I'm deleting the last paragraph on page
25    25.  Back to Mr. Vien on 30.  "The government does not need to
```

1    prove that the defendant knew that the money was derived from

2    health care fraud or a conspiracy to commit health care fraud

3    or that the defendant committed either of these offenses.  It

4    is enough that the defendant had general knowledge that the

5    money came or was derived from some kind of criminal offense."

6            MR. VIEN:  There's a typo, it should have been "came

7    from."  But the point is this is appropriate in those cases

8    where someone gets hired to pick up a suitcase full of money

9    from someone they never met before and take it to the bank.

09:45 10    That's where these cases come in.  Not here where the only game

11    in town, so to speak, is health care fraud.  So I don't want

12    the jury getting confused about something else because that's

13    all the evidence is in this case is health care fraud.  That's

14    the specified unlawful activity, and I want the instruction to

15    be clear on that.

16            THE COURT:  So it's a proper instruction.  He's right

17    that it's not truly applicable to this case.  Do you have any

18    objection to that being struck?

19            MR. BRADY:  I take the point.  I mean, she committed

09:45 20    the -- we're going to argue and we think the proof is that she

21    committed the underlying offense.

22            THE COURT:  You don't have a theory on money

23    laundering that's independent of the fraud I guess is the

24    point.

25            MR. BRADY:  That is true, Your Honor.  I mean, it is,

1    you know, I think for the statute our burden is lower on this,

2    right?  And I'm hesitant to let go of something that makes

3    clear that we need to show something less.

4         THE COURT:  Well, I'm not saying you have to prove

5    something more.  I'm just -- this doesn't change your proof.  I

6    don't think this instruction is really applicable to this case.

7    I'm going to strike it.

8         All right.  What else, Mr. Vien?

9         MR. VIEN:  Next one is on page 31 about punishment and

09:46 10   Ms. Waruru.

11        THE COURT:  Yes.

12        MR. VIEN:  I just want the language from the

13   guidelines.  We have the language you wrote about halfway down,

14   or the government wrote, I can't remember.

15        THE COURT:  This is mostly from -- this is not the

16   government's.  I made revisions to what you submitted.

17        MR. VIEN:  Okay.  It says "the amount of actual or

18   intended loss fairly attributable to the defendant."  The word

19   "fairly" is inserted.

09:47 20        THE COURT:  I'll take out "fairly."

21        MR. VIEN:  Okay.  And the other issue is that I think

22   we have to say is that, you know, I think we should follow the

23   guidelines under relevant conduct.  And the standard is, quite

24   clearly, what was reasonably foreseeable to the defendant in

25   connection with the criminal activity.  So I think you need to

1    put in and explain it's reasonably foreseeable is a standard

2    because that is the legal standard.

3           THE COURT:  "Attributable or reasonably foreseeable."

4    Does the government have any objection to that?

5           MR. VIEN:  I actually would like it a little

6    different, Your Honor.  "The amount of the actual intended loss

7    is based upon what is reasonably foreseeable to Ms. Waruru or

8    any other defendant."  However you want to say that is fine.

9    But I mean, you get the point.

09:48 10           THE COURT:  It says, "In a fraud case, the amount of

11    actual or intended loss attributable or reasonably foreseeable

12    to the defendant being sentenced."

13           MR. VIEN:  Yeah, I don't want "attributable or," the

14    disjunctive there.  I want it to say, "The amount of fraud loss

15    attributable to the defendant is determined by what is

16    reasonably foreseeable to that defendant in connection with the

17    criminal activity."  And that's the language out of the

18    guideline.

19           THE COURT:  Well, I don't have to give any description

09:49 20    on the guideline at all, right?  I think this is a pretty

21    fulsome one.  I mean, I'm inclined to leave in "attributable or

22    reasonably foreseeable."  But what's the government's view on

23    it?

24           MR. BRADY:  Your Honor.

25           THE COURT:  Or do you not care?

1       MR. BRADY:  Your Honor, we don't really -- well, I

2    care to the extent that this starts to get kind of confusing I

3    think for the jury when you start talking about the guidelines.

4    That is my concern here.  But, you know, this is something the

5    defense seems to care about, and I have to say I don't think we

6    really care either way.

7       THE COURT:  How about if I simplify it and say, "The

8    amount of loss reasonably foreseeable to the defendant"?

9       MR. VIEN:  That's consistent with what I would like,

09:49 10    Your Honor.

11       THE COURT:  Okay.  Anything else, Mr. Vien?

12       MR. VIEN:  Just on the next sentence, "Because of all

13    these variables, the calculation can vary even among people who

14    have committed the same or similar crimes."  I get it, it's

15    true, but it begs for more information, like why would it be --

16    you know, I just don't think we need the sentence, and I would

17    like you to take it out.

18       THE COURT:  I'm not going to take it out unless the

19    government -- look, this is an instruction that I'm adding at

09:50 20    your request.  It's setting up your argument on Waruru, and I

21    understand your argument.  It's fair to include some of this,

22    but I'm not going to make the argument for you, and I want to

23    make sure it's a balanced instruction.  And I think that that

24    balances it out so that it's fair to the government by saying

25    that Waruru can face one potential penalty and this defendant

1    can face another, and that's the way of the guidelines.

2    MR. VIEN:  Just so we're clear, we're not adverse to

3    your making arguments for us, Your Honor.

4    THE COURT:  What's the government's position on that

5    sentence?

6    MR. BRADY:  I think it's fine the way the court has

7    it, Your Honor.

8    THE COURT:  Okay.  I'm going to leave it in.  Anything

9    else, Mr. Vien?

09:51 10    MR. VIEN:  No, Your Honor.

11    THE COURT:  How about the government?

12    MR. BRADY:  Your Honor, just one thing.  On page --

13    actually, it's the page of my draft so it doesn't have the page

14    number.  But it falls between page 28 and 30.  It's the money

15    laundering Counts 8 through 10.

16    THE COURT:  I'm missing a pagination on that page.

17    MR. BRADY:  I guess it's page 29.

18    THE COURT:  Probably when I added the language I

19    probably somehow deleted the page number, but we'll go back and

09:51 20    fix that.  Go ahead.

21    MR. BRADY:  So, Your Honor, in the part of that

22    instruction, towards the bottom of the page:  "Affecting

23    interstate commerce," the second sentence reads, "For example,

24    a deposit in an FDIC-insured bank satisfies the requirement of

25    affecting interstate commerce."  I would suggest just

broadening "deposit" to "a transaction in an FDIC-insured bank

satisfies the requirement."  I think that's consistent with the

law.  I think that's a little bit clearer.

THE COURT:  That's fine.  I'll make that change.

MR. BRADY:  Thank you, Your Honor.

THE COURT:  All right.

MR. VIEN:  There was one typo.  I don't know if you

even care.

THE COURT:  I do because I'm sending a copy of this

back to the jury.  I'm all about typos.

MR. VIEN:  On page 28, which is Count 7, money

laundering conspiracy, the fifth line down under the redline, I

think it should say "and must prove" instead of "most prove."

THE COURT:  Yes, you're right.  Thank you.  All right.

So these are all quite clear, except for the one where we've

been back and forth on.  So just to make sure, I'm going to

circulate another draft just to make sure you take a look at at

least that one instruction.  We'll take a break between

closings and the charge.

MR. BRADY:  Your Honor, do you think, just for that

page, do you think we'd -- I may want to just refer to it, and

I want to make sure I get it right if I refer to it in closing.

Do you think I might have a printout of that page before we

have to do closing with the jury?

THE COURT:  I mean, I have five minutes to do it.  I

```
 1    can try.
 2              MR. BRADY:  If it's a problem, it's not a big deal,
 3    Your Honor.
 4              THE COURT:  I'll start with that one, it's fine.
 5    Okay.  Why doesn't everyone take five minutes.
 6              Mr. Sultan, you will repair outside the courtroom and
 7    we'll let you know when we're starting closings.  Okay?
 8              MR. SULTAN:  Can I come back in here, Your Honor?
 9              THE COURT:  You can come back in here but stow your
10    client someplace.
11              MR. SULTAN:  He'll be right outside.
12              THE COURT:  That's fine.
13              Can I read this to you before we get the jury?  Then
14    I'll print it.  This would be that section.  "With regard to
15    the health care fraud, the government asserts that the scheme
16    involved multiple types of fraud, including, for example,
17    billing for medically unnecessary services and billing for
18    services not rendered.  You do not need to be unanimous about
19    the way in which defendant defrauded MassHealth, but you must
20    be unanimous in finding that the government has proved each
21    element of health care fraud beyond a reasonable doubt.  To
22    find the defendant guilty this will require you to find that
23    the government proved beyond a reasonable doubt that the
24    defendant executed or aided and abetted the execution of the
25    scheme charged in the indictment.  That is, a scheme to defraud
```

1    MassHealth by means of false and fraudulent pretenses."

2        MR. VIEN:  I don't think it solves the confusion

3    problem, Your Honor, and I don't like the lack of unanimity on

4    what they did to defraud MassHealth, that they actually

5    completed the crime, so I want to preserve those objections.

6        MR. BRADY:  Your Honor, we think it's fine and

7    consistent with the law.

8        THE COURT:  I'm giving you one more option.  Do you

9    want the unanimity charge included?

10:04 10        MR. BRADY:  Yes, please, Your Honor.

11        THE COURT:  All right.  Karen, I'm going to email you

12    this paragraph.  You can print it out.

13        (Clerk and Court discussion off the record.)

14        MR. VIEN:  Your Honor, excuse me.  When are you going

15    to address the Dr. Eaton issue?

16        THE COURT:  I'll do that first.

17        MR. VIEN:  I just wanted to confirm that.

18        THE COURT:  Thank you for reminding me.

19        MR. VIEN:  Thank you.

10:07 20        COURTROOM CLERK:  All rise for the jury.

21        (Jury enters the courtroom.)

22        COURTROOM CLERK:  Court is in session.  Please be

23    seated.

24        THE COURT:  Good morning, everybody.

25        THE JURY:  Good morning.

1          THE COURT:  Before we get to closing arguments, which

2     we're just about to do, you'll recall that Dr. Anthony Eaton

3     testified the other day.  There was information that should

4     have been made available to the defense before Mr. Eaton

5     testified that was not made available to them through no fault

6     of the prosecutors, Mr. Brady or Mr. Looney.  But that

7     information was not made available to them, and we needed to

8     sort out how to deal with that information once it came to all

9     of our attention.

10:08 10          So I am going to read you a statement regarding Dr.

11     Eaton.  To the extent that the evidence was closed yesterday,

12     I'm opening up it up for this, and this should be considered by

13     you as any other evidence and give it whatever weight you deem

14     appropriate.

15          The DEA, that's the Drug Enforcement Agency, began an

16     investigation of Dr. Anthony Eaton in November 2011 for

17     excessive prescribing of controlled substances and potential

18     diversion.  The DEA's investigation began after a source

19     provided information that an individual believed to be

10:08 20     illicitly distributing controlled substances had obtained those

21     controlled substances from Dr. Eaton.

22          As part of its investigation, the DEA reviewed and

23     analyzed several sets of data showing Dr. Eaton's prescription

24     history over different periods of time.  Among other things,

25     these datasets show that many of Dr. Eaton's patients received

1    prescriptions for high quantities of controlled substances.

2        The DEA performed surveillance of Dr. Eaton's office.

3    The DEA spoke to individuals to determine for whom Dr. Eaton

4    was writing controlled substance prescriptions in high

5    quantities and whether those individuals had a history of

6    substance abuse or had criminal histories that involved drug

7    offenses.

8        In September 2013, the DEA interviewed Dr. Eaton about

9    his prescribing history and their concerns about potential

10:09 10   diversion.  Dr. Eaton reported that he had taken on a large

11   number of pain management patients from a retiring doctor in

12   the area and that he had been working to taper down the amount

13   of controlled substances he was prescribing.  Investigators

14   warned Dr. Eaton at that time that criminal or civil penalties

15   could be imposed if he failed to address potential diversion

16   issues.

17       Dr. Eaton asked the DEA investigators for time to make

18   substantive changes to his medical practice in terms of

19   discharging patients and reducing the amount of controlled

10:10 20   substances he prescribed.  The report of the DEA's interview

21   with Dr. Eaton states that he agreed to make changes in his

22   medical practice and prescribing activity.  The report also

23   states that investigators were going to continue periodic

24   monitoring of data showing Dr. Eaton's prescribing activity and

25   that they would close the current case.

1          In May 2014, after the DEA investigators reviewed Dr.

2     Eaton's prescribing activity for the preceding 7.5 months, they

3     observed a 57 percent reduction in the number of prescriptions

4     for controlled substances that Dr. Eaton wrote and a reduction

5     of 36 percent in the number of patients receiving controlled

6     substances.

7          In January 2017, the DEA sent Dr. Eaton a letter of

8     admonition after learning that he had prescribed methadone to a

9     patient for opiate addiction.  In May 2017, Dr. Eaton responded

10    to the DEA's letter of admonition and confirmed that, since the

11    letter of admonition, he had not issued any prescriptions for

12    methadone treatment of opiate addiction since the January 2017

13    investigation.  The case was closed in May 2017.

14         Dr. Eaton's name arose in an investigation of the

15    Massachusetts Attorney General's Office conducted into Maestro

16    Connections Health Care Systems, a home health care agency.

17         The Mass. Attorney General's office resolved the

18    matter with Maestro Connections in late 2020.  The Mass. AG's

19    Office investigation concerned health care fraud surrounding

20    billing for home health care services.  Dr. Eaton, who was not

21    employed by Maestro, was not interviewed during that

22    investigation.  Dr. Eaton's name came up in several interviews

23    the Mass. Attorney General's office did where he was mentioned

24    as signing off on Plans of Care.

25         The Mass. Attorney General's Office had an

1   investigation into Dr. Eaton from July 2016 to September 2022

2   that was unrelated to home health care and that resulted in no

3   criminal charges or a civil settlement.

4        None of these investigations or interviews were made

5   public, and there is no evidence that Ms. Newton knew or should

6   have known about the investigations or the alleged underlying

7   conduct.

8        Satisfactory to the government?

9        MR. BRADY:  Yes, Your Honor.

10:12 10   THE COURT:  Mr. Vien?

11       MR. VIEN:  No, Your Honor.

12       THE COURT:  Do you want to be seen at sidebar?

13       MR. VIEN:  Yes, Your Honor.

14  **SIDEBAR:**

15       THE COURT:  Are you preserving your objection you want

16  the testimony struck or something specific about what I said?

17       MR. VIEN:  I always start talking too loud, so I'm

18  trying not to talk too loud.  I do of course want to preserve

19  my objection and strike his testimony, but further than that, I

10:22 20  don't want to disparage the prosecutors here in court with us

21  today, and I don't want you to call them out and say they did

22  anything wrong, but I think you went too far in saying there

23  was no fault by them because the government -- I'm not saying

24  these guys -- the government violated its discovery

25  obligations.  I don't think you should call them out by name or

1    say bad things about them.  But the way it makes it sound was

2    that it's just a kind of a one-off and they shouldn't have done

3    that.

4            THE COURT:  I understand.  Do you have an objection to

5    me telling the jury that there was another prosecution team

6    prior to you two and that the information should have been

7    turned over during the time that those people had the

8    investigation?  Just to give them a little bit of background

9    about it, to be clear, it was not these two prosecutors.  I

10:22 10   think it's fair because I don't want the jury to impute bad

11   conduct to you.  He's right, it's hard to do it without

12   explaining there were other people involved prior to you.

13           MR. LOONEY:  This is in part for my friends in the

14   appellate practice.  I want to say that we do not agree that

15   this information was Brady or it's material that was required

16   to be produced under those rules.  It certainly is within the

17   rules governing the office that we would have produced these,

18   so we don't agree that there was a discovery -- that there was

19   any violative conduct here.  I just want to be clear about

10:22 20   that.  So that's our position on that.

21           I don't think there is any need to press the fact that

22   there was a previous prosecution team and suggest that that

23   team made mistakes.  We're the government.

24           MR. BRADY:  It's not relevant.

25           MR. LOONEY:  We don't think it's a relevant issue, how

1    these things came up.

2        THE COURT:  Well, I don't want it imputed to you.  I

3    think it's unfairly prejudicial.

4        MR. VIEN:  If they don't think they made a mistake in

5    not turning this material over, then we've got a bigger problem

6    here.  They don't understand their discovery obligations.

7        MR. LOONEY:  That's not what I said.

8        MR. VIEN:  I understand the reference to the appellate

9    unit.  That's not an excuse --

10:22 10       MR. LOONEY:  That's not what I said.

11       MR. VIEN:  -- I have to make the appellate unit happy.

12   This was wrong not to turn this stuff over, and if they don't

13   know it, it's a bigger problem.  And I think you should say

14   clearly the government had an obligation to turn this material

15   over long ago and before Dr. Eaton testified.  I'm trying to

16   get along.  I don't want to make allegations, but this is

17   ridiculous that they don't think they have an obligation to

18   turn it over.

19       THE COURT:  The point is it was an investigation and

10:22 20  that nothing came of it, but it should have been turned over.

21   Let me think about how I'm going to do this.

22       MR. BRADY:  Your Honor, may I make one more point on

23   this, Your Honor?

24       THE COURT:  Yes.

25       MR. BRADY:  Especially at this point of the game, I am

1    focused -- I think we're all focused on what is relevant to the

2    jury, what do they need to know to decide this case either way.

3           And Your Honor, they have the information now, right?

4    We have provided the information.  And whatever issues there

5    may be, and I appreciate the concern around this, whatever

6    issues, it is not something that that the jury needs to know

7    about or hear about.  I appreciate that, you know, we're the

8    good guys, it wasn't us.  But we're the two guys sitting at the

9    table representing the government here.  That's our client.

10:22 10    And I mean, if the only reason, the only relevance to this

11    would be to bruise the government here and make the government

12    look bad, and just for what the jury has to decide here and

13    what's relevant to the jury, it's just not relevant to that,

14    Your Honor.

15           THE COURT:  Kelly, can you scroll back.

16           (Court reviews real-time transcript.)

17           THE COURT:  I think what I said is fair.  I'm going to

18    leave it at that.

19           MR. VIEN:  I'd object to that.  I just want to make it

10:22 20    clear that I object to that.

21           THE COURT:  It says it should have been and it wasn't.

22    I just exonerated these two from it.  I think I made clear that

23    it should have been --

24           MR. VIEN:  But you can't -- you went too far in

25    exonerating them because the obligation extends to them as

```
 1   well, and I don't want to accuse them of anything, but you
 2   can't say these guys didn't do anything wrong.  And again, I
 3   don't want to throw rocks.  They did do something wrong.  They
 4   didn't get the material and they didn't turn it over.
 5          Again, I don't want their names, I don't want them to
 6   be pointed out or anything.  But the truth is that everybody in
 7   the government has this obligation, and these guys took over
 8   the case and had this information and didn't turn it over.  And
 9   you went too far saying they didn't do anything wrong.
10          THE COURT:  I said that these two didn't do anything
11   wrong.
12          MR. VIEN:  I think that's --
13          THE COURT:  One clarifying sentence, and leave it at
14   that.
15          MR. VIEN:  Then you know the answer.  I think you
16   should say what happened.  You said it was a result of an
17   investigation and it makes it sound like it was no big deal,
18   but it was settled for $10 million, which made it a very
19   serious investigation, and I think you should say that.
20          MR. LOONEY:  There was an investigation into Maestro.
21   It's another party that's not here.  There's no findings as to
22   Dr. Eaton as --
23          MR. VIEN:  He was involved and the way you said it
24   made it sound like it was kind of, it was no big deal.  It was
25   a big deal.  It was a big investigation that resulted in a $10
```

 1 | million settlement.

 2 | MR. LOONEY:  The settlement with another party has

 3 | nothing to do with that issue.

 4 | THE COURT:  I'm going to say significant settlement,

 5 | but I'm not putting in the $10 million.  It was resolved.

 6 | (End of sidebar.)

 7 | THE COURT:  I'm going to try this again.  With regard

 8 | to the Maestro investigation, the Massachusetts Attorney

 9 | General's Office resolved the matter with Maestro Connections

10:22 10 | in late 2020 with a significant settlement against Maestro.

11 | Again, Dr. Eaton was not employed by Maestro at the time, was

12 | not interviewed during that investigation but his name did come

13 | up in several interviews done in connection with that

14 | investigation where he was mentioned as signing off on Plans of

15 | Care.  That's number one.

16 | Number two, I think I made this clear, but just in

17 | case I did not, the information that I'm conveying to you today

18 | should have been made available to the defense earlier than it

19 | was by the government.  I'm not impugning any bad conduct on

10:22 20 | the part of these two prosecutors but understand that this came

21 | up because the information was not timely provided to the

22 | defense.

23 | Government?

24 | MR. BRADY:  That's fine, Your Honor.

25 | MR. VIEN:  Same objections, Your Honor.

1            THE COURT:  Okay.  I'm going to leave it at that.

2            Is the government ready to close?

3            MR. BRADY:  Yes, Your Honor.  And could I reserve just

4    a few minutes for brief rebuttal as well?

5            THE COURT:  Yes.

6            MR. BRADY:  Thank you.  May I have a moment just to

7    move the computer screen around?

8            THE COURT:  Yes.

9            MR. BRADY:  We're going to get one of these screens to

10:23 10   work.

11           May I proceed, Your Honor?

12           THE COURT:  You may.

13           MR. BRADY:  Okay.  Good morning, everybody.

14           THE JURY:  Good morning.

15           MR. BRADY:  Free money.  That's how the defendant saw

16   MassHealth.  Free money and lots of it.  $160 million in less

17   than four years.  But you know what that money really was, who

18   that money really was for.  That was money that was set aside

19   for the neediest and most vulnerable people in Massachusetts;

10:25 20  set aside for home health care for people who really needed it;

21   set aside for home health care for people who really got it.

22           MassHealth set the rules, and Arbor promised

23   MassHealth that it would play by those rules.  And that promise

24   was key because MassHealth is based on trust.  Patients need

25   their services and legitimate providers need to get paid for

1  those services.  There isn't time to check every single claim.

2  So that's what Arbor promised MassHealth, that it knew the

3  rules and that it would follow them.

4  And you all have seen the contract.  For each claim

5  Arbor submitted to MassHealth, Arbor promised that the claim

6  was for services that were actually provided, that the claim

7  was for care that was medically necessary, that the claim was

8  for services that were provided by a trained and certified

9  aide, that there were no payments for referrals.

10:26 10  After hearing the evidence in this case you know that

11  Arbor, under the defendant's control and direction, broke all

12  of those rules and, in the process, broke federal law.  Because

13  if MassHealth had known the truth, if the defendant had not

14  concealed the truth, then MassHealth would not have paid those

15  claims.  Lies for money.  That is what this case is about.

16  Because for the defendant, it was all about the money.  You saw

17  that for yourselves.

18  You'll see on the screen, and I'm sure you remember

19  this, his and hers checks, $2 million each.  Just a fraction of

10:27 20  the $28 million that went into the defendant and her husband's

21  pockets, but it tells the story.  You know these checks were

22  written by the defendant dated December 24, 2016.  A Christmas

23  bonus, right?  Wrong.  Because you know what the defendant was

24  trying to hide.  She cut these checks in January of 2017 after

25  she learned that MassHealth had caught up to her, but she

1  backdated the checks to December.  Now, why do you suppose she

2  did that?  Because it was a fraud.  And if she had used the

3  real date, it would have been clear that she was trying to get

4  the fraud money out.  Just follow the money.  It all leads back

5  to the defendant.

6          At the beginning of this case Mr. Looney stood here

7  and he told you that the evidence would prove beyond a

8  reasonable doubt that the defendant committed four crimes:

9  conspiracy to commit health care fraud, health care fraud,

10:29 10  conspiracy to commit money laundering, and money laundering.

11  And now that you have heard all of the evidence in this case,

12  you know that it proves exactly that.  So what I'm going to try

13  and do with my time is summarize that evidence and show how it

14  proves each of the elements for each of the crimes charged.

15          First, there is no question that there was a scheme to

16  defraud MassHealth at Arbor.  You heard evidence of that from

17  witness after witness.  They saw things they knew were wrong,

18  and when they spoke up about it, the defendant told them to

19  mind their own business.  As Rosa Gonzalez put it, "Keep your

10:30 20  nose out of it."

21          You heard from doctors and nurses how it's supposed to

22  work when a patient needs home health care.  Maybe the patient

23  is coming out of the hospital and they need a nurse to visit

24  their home.  Maybe their regular doctor decides the patient

25  could use a nurse at home and refers him to a home health

agency.  But at Arbor, that's not how it worked.  Instead, the patient is self-referred.  That's a term you probably learned during this trial.  And you know why they did that.  You heard from Helen Sech, who used to work at Arbor, that there was really only one requirement to be a patient at Arbor, a MassHealth membership.  If you had MassHealth, you were in.  If not, sorry, not the right place for you.

What was in it for the patients?  Free money for a family member who Arbor would pay to be the home health aide or HHA.  That was the pitch from Arbor's recruiters like Adriana O'Donoghue and Airanisse Quintana.  You also know how the defendant got the recruiters to find these patients, by paying the illegal referral fees.  Those were the $100-per-patient bonuses, referral bonuses, that you heard about from all the Arbor witnesses.

Now, you heard from Almas Dossa, our first witness from MassHealth, you heard from her that those types of payments are illegal and they always have been, because that's not how medical decisions are supposed to be made.  And you know that the defendant understood that it was illegal because you saw the text message yesterday as you were going through those where she said just that.

That's not all.  Ms. Quintana told you that at Arbor the receptionist would write the names for the referral fees on sticky notes and then give them to payroll so that Ms. Quintana

1   would know who to pay.  Now, Ms. Quintana also told you that

2   she created a document to go into the patient file showing who

3   got the referral bonus, but the defendant told Ms. Quintana to

4   take that page out of the files, and she told Ms. Quintana why:

5   So Arbor wouldn't get in trouble.  That is not someone who is

6   acting in good faith.  It was wrong to pay those referral

7   bonuses, and the defendant knew it.  That was how it worked.

8   Get as many MassHealth patients through the door as possible.

9         Now, in the defense opening and throughout this trial,

10:33 10   the defense has emphasized, and I'm sure you remember this,

11   emphasized Arbor grew really quickly.  And I guess the

12   suggestion is that things just got out of hand.  Maybe this was

13   just some big mistake.  But you know that growth didn't just

14   happen by accident.  It was by design.  It was how the scheme

15   worked.  And the defendant didn't seem to mind that growth back

16   when she was taking tens of millions of dollars out of this

17   company.

18         Now, once Arbor got the patients through the door, the

19   defendant used them to rip off MassHealth in three ways.

10:34 20   First, by billing MassHealth for visits that didn't happen;

21   second, by bill for visits that weren't medically necessary;

22   and third, by billing for visits by home health aides, HHAs,

23   who weren't trained and certified as required by MassHealth.

24         I'm going to walk through each of these.

25         So first, you know that the defendant billed

MassHealth for nursing visits that simply didn't happen.  You
heard from Helen Sech, who had to schedule the nurses to do the
visits, that multiple nurses at Arbor were scheduled for a
crazy number of visits, 90, sometimes 100 visits in a single
week.  That's like 14 visits a day, seven days a week.

Now, one of those nurses who was scheduled for those
visits was Joseph Muiruri.  That's a name you heard a couple of
times in this trial, right?  He claimed to do 100 visits a week
while also working in the office full time.  How is that even
possible?  That's also the same Joseph Muiruri who the
defendant brought in to Arbor to be the director of nursing,
and it's the same Joseph Muiruri who asked Helen Sech to go
into the system, to go into Axxess and to reassign incomplete
nursing notes for other nurses to him so that he could then go
back and fraudulently complete those nursing notes and make it
look like the nurses had actually done the visits.

Now, you know the defendant billed for visits that
didn't happen because you've seen all of those records from
Axxess.  You have several examples.  Let me point out perhaps
the most brazen one, for patient Kevin Ung.  You'll remember
him.  He was a patient of nurse practitioner, Chhan Touch, who
testified here.

And Mr. Touch told you that he knew, he remembered he
had patients who would go out of the country, and he'd know
about that, right?  That's why Mr. Touch was upset when he got

bogus Plans of Care from Arbor for home health services when

his patient was away.  You saw the official records from

Customs and Border Protection showing when Mr. Ung left and

entered the U.S., so you know he was literally on the other

side of the world when Arbor said he needed home health

services.  And you also saw the fraudulent nursing notes that

the Arbor nurse put in for those visits that simply didn't

happen, and we gave you a few examples.  And you also saw the

records showing that Arbor billed and got paid by MassHealth

for those bogus visits, copy-and-pasted notes for visits that

didn't happen.

        And members of the jury, it wasn't just one bad nurse,

or one bad apple.  It was standard operating procedure at

Arbor.  It was how the defendant trained them to do it.

        Now, the second way the fraud worked was billing for

medically unnecessary visits, visits that weren't needed or

weren't properly authorized by a doctor.  And the evidence of

that is overwhelming.  You heard from multiple doctors and

nurses who knew their patients and knew they did not need what

Arbor was billing for.

        Now, MassHealth was a victim of this scheme.  They

weren't the only ones impacted by the defendant's greed.

You'll remember Dr. Joel Gorn, the family doctor from Lawrence

who came to testify.  Do you remember what he said happened

when he refused to sign off on those bogus Plans of Care from

1    Arbor?  The patients left and they found a doctor who would.

2    Because that's how the scheme worked.  Corrupt the patients by

3    putting their families on the payroll, and then get those

4    patients to push and push the doctors.  Dr. Gorn told you that

5    Arbor and the other home health agencies doing this decimated

6    his practice.

7            Now, for the defendant, that made Dr. Gorn dangerous,

8    and you know that because you saw her text about him.  Do you

9    remember, the date is a little weird on these.  January 6,

10:40 10   2017, the defendant's friend Eleanor Connors:  Why were you

11   asking about Dr. Gorn yesterday?  Is everything okay?  And you

12   saw the response from the defendant:  Because he has been

13   reporting home cares to -- supposed to be Attorney General's

14   Office.  I hope doesn't call and report us.

15           Dr. Alena Shoemaker came here along with Nurse

16   Practitioner Touch and told you the same thing as Dr. Gorn.

17   And you know it's true because you've got the receipts.  You

18   heard the same thing from a nurse practitioner named Paula

19   Keefe Tyrrell.  Ms. Tyrrell, she worked at Harvard Vanguard.

10:41 20   She was a case manager there, nurse by training.  And you saw

21   what Nurse Tyrrell wrote on those bogus Plans of Care from

22   Arbor that she faxed right back to them.  Persistent, repeat

23   faxes.

24           Arbor continues to call and fax, also now sending

25   patients and family members to PCP office with papers to be

signed.  "No back authorizations."  Ms. Tyrrell explained to

you what that meant, why that's wrong.  "Patient active with

another VNA.  No auth given and no backdating orders."  Then

this one, "This is the newest auth trick."  And you saw what

Nurse Tyrrell wrote back to Arbor when they tried to get the

doctor to sign off on the Plan of Care for patient Sav Longh.

"Two times a day skilled nursing."  This was the patient where

the Arbor Plan of Care called for around-the-clock, 24 hours,

seven days a week home health aide care.  And Nurse Tyrrell

wrote back "HHA is not for 24 hours a day seven days," because

nobody needs that.

        But you also saw when Special Agent Wisnaskas was

testifying, going through all of his charts, you saw from the

MassHealth claims data how much money the defendant made off of

this patient, Sav Longh, more than $639,000 from this one

patient alone and more than $150,000 of that was for claims

after these faxes.

        Even Dr. Anthony Eaton, the defendant's hand-picked

medical director, admitted that what was in the Arbor Plans of

Care wasn't medically necessary, that it was different than

what he saw when he saw the patients himself.  And he admitted

that he broke the law, that he falsified Plans of Care, he

falsely certified Plans of Care.  And he told you that he made

the same mistake that MassHealth and others made.  He trusted

the defendant.

1          But even Dr. Eaton had lines he wouldn't cross.  He

2     told you that he got about $500 a month from the defendant and

3     that at one point the defendant offered him a check for $5,000,

4     $6,000, and Dr. Eaton didn't accept that check and he told you

5     why.  It was uncomfortable.  He knew it was wrong and so did

6     the defendant.

7          Now, the defense asked questions about whether Dr.

8     Eaton was charged with any crimes, and I expect when the

9     defense gets a chance to speak with you, Dr. Eaton is going to

10:44 10    be one of many people who gets blamed for what the defendant

11    did.  Let's be clear.  Dr. Eaton is not on trial here.  And the

12    millions and millions of dollars generated by this scheme

13    didn't go to Dr. Eaton.  Follow the money, because it went to

14    the defendant.

15         Now, that is more than enough to establish that Arbor

16    billed for medically unnecessary care, but you have even more

17    because you heard from Arbor insiders that the company was

18    billing for services that were not covered by a valid Plan of

19    Care.  Helen Sech, the scheduler, told you that she often saw

10:45 20    Plans of Care that weren't signed and Plans of Care for

21    services that had already been billed.  She told you that she

22    emailed the defendant about that, and she also told you what

23    she heard back.  "No emails.  Don't put it in writing."

24         Now, members of the jury, what kind of legitimate

25    business is so concerned about putting things in writing?  No

1    legitimate business and no legitimate business person.

2         That brings us to the third way that this fraud was

3    carried out:  Submitting false claims to MassHealth for visits

4    by HHAs who were not trained and certified.  And again, the

5    evidence is overwhelming.  Arbor never provided the 75 hours of

6    required training.  You heard that from every Arbor witness.

7         So what's the big deal about this HHA training?  I

8    expect you'll hear from the defense that it's not a crime to

9    violate a Massachusetts regulation.  That's true.  But that's

10:47 10   not what the defendant is charged with.  She's charged with

11   criminal fraud for concealing from MassHealth that Arbor did

12   not comply with the HHA training requirements.  Just listen to

13   the judge's instruction on this one.  I expect you're going to

14   hear that a violation of the regulations establishing when

15   someone is entitled to be reimbursed for services is not

16   criminal in and of itself, but false representations regarding

17   compliance with those regulations can be the basis for a guilty

18   finding if this and all of the other elements of the charged

19   offense are established by the government beyond a reasonable

10:47 20   doubt.

21        And that was the fraud here, at least this part,

22   misrepresenting that Arbor was complying with those HHA

23   training requirements.  And that was a big deal.  It mattered.

24   The legal term is "material."  It was material.  And you know

25   that's true for at least three reasons.

1          First, you know from Almas Dossa, the witness from

2    MassHealth, you know from her that if MassHealth had known the

3    truth, if MassHealth knew that none of the HHAs had that 75

4    hours of training, then MassHealth would not have paid a penny

5    of those claims for HHA services.  That's the evidence.  And we

6    are talking big bucks here:  $100 million of the claims paid

7    out to Arbor were for those HHA services.

8          Second, you know that the lack of training mattered

9    because it was key to the scheme.  That's how they got all of

10:48 10   the patients to come in through the door.  We'll put your

11   family and friends on the payroll as HHAs.  Now, you heard from

12   Amanda Muchioki, one of the earlier witnesses, who used to be

13   the head of HR at Arbor.  You heard from her and she was asked

14   was there anything, anything done to determine whether the HHAs

15   were actually able to perform the job.  Her answer, "Not that

16   I'm aware of."

17          In fact, there were only two things you needed to

18   become an HHA at Arbor:  One, a MassHealth member that Arbor

19   could bill for nursing and HHA visits and, two, a clean

10:49 20   criminal background check.  That's it.  But the scam only

21   worked because Arbor put the family members on the payroll

22   right away, skipping the training.  If Arbor had said to the

23   patients, "We're going to need your family member or your

24   friend to get 75 hours of training before we start paying them,

25   and, oh, by the way, they're going to have to pay for that

training, too," you know exactly what those patients would have

said. "See ya." It just didn't work that way. So the whole

scheme depended on breaking the rules on training. And you

heard from Ms. Dossa, you heard from Regina Arrey and others.

Those rules, those training requirements, they mattered. We're

talking about health care.

Now, third, the third reason why you know that the

lack of HHA training mattered is because you know the lengths

to which the defendant went to cover up the lack of it, all of

those fake training certificates for the HHAs. Now, you heard

from several witnesses who told you why those fake documents

were created: Because there was an audit coming and they

needed to fool the auditors. The defendant needed to make it

look like they had actually done and documented the training.

You saw the forged and backdated documents, paperwork signed by

the defendant claiming that she joined Adriana Donahue on a

visit that Ms. O'Donoghue testified never happened.

You saw and you have in evidence the sham HHA tests,

the ones where they gave the HHAs all of the answers. And you

saw all of those fake training certificates falsely claiming

that the HHA had completed the state requirements. That's the

75 hours. And every witness who testified about this told you

the same thing: that was not true, and these certificates were

false. And you also know there were hundreds more like these

because you heard from multiple witnesses who described stacks

1    of them, and you saw that the defendant herself signed these

2    fake certificates.  And you know why.  Because Nurse Regina

3    Arrey refused to.  And Ms. Arrey told you what happened after

4    that.  The defendant, her old friend, told her she heard she

5    wasn't cooperating, and then Ms. Arrey is gone.

6         So, members of the jury, you know there was a fraud

7    scheme, a scheme to rip off MassHealth.  You know it involved

8    billing for visits that didn't happen, services that weren't

9    needed, and HHAs who weren't trained or certified.  So really

10:53 10   the only question left is was the defendant part of this

11   scheme?  Is there any universe where this scheme, this fraud

12   happened at Arbor without the defendant's willful and knowing

13   participation?  You know the answer:  Of course not.

14        First, witness after witness came in here and pointed

15   the finger right at the defendant, and you know why.  Because

16   at Arbor, she was the boss.  She told the nurses what to do.

17   She oversaw the HHAs.  She decided who got hired and who got

18   fired.  Nothing at Arbor happened without the defendant saying

19   so.

10:54 20        Second, you know that the defendant was part of this

21   because she got all the money.  She controlled the accounts.

22   And you saw how she moved the millions, the millions that

23   rolled into Arbor from MassHealth, right into her own accounts

24   and then from there into expensive things for herself.  Now,

25   your common sense is probably telling you that the person who

1    got all the money from this fraud was the person behind this

2    fraud.  Listen to your common sense.

3              Third, you know that the defendant willfully joined in

4    the fraud scheme because her fingerprints are all over it.  We

5    already saw how the defendant falsified and backdated those HHA

6    documents.  That's not all, not even close.  You saw the OASIS

7    patient assessments from Axxess, those records that were false

8    that were prepared and signed by the defendant.  Airanisse

9    Quintana told you that the defendant told her to white out

10:56 10    where doctors wrote on a Plan of Care "Denied."  The defendant

11    told others not to put things in writing, things like

12    complaints from patients and family members that nurses weren't

13    showing up to the visits, and you saw how the defendant

14    backdated those $2 million checks to herself and her husband.

15    Members of the jury, that is not good faith.

16              You also saw the defendant's text messages, and those

17    show that she was right in the middle of this scheme.  She

18    orchestrated the illegal payments, the referral payments,

19    passing cash to recruiters and patients alike.  Now, that is

10:56 20    more than enough evidence to find that the defendant

21    participated willfully and knowingly participated in this fraud

22    scheme.

23              But there's even more.  You have the email that Joseph

24    Ouko sent to her way back in 2014.  That's Exhibit 320 in

25    evidence.  And that put the defendant on notice that only half

of Arbor's patients had Plans of Care, and it put her on notice
that the nurses were pretending to do visits and putting in
nursing notes for visits that weren't actually occurring.

Now, when the defendant did nothing to address this,
Mr. Ouko sent her another memo a few weeks later.  You have
that one, too.  That's Exhibit 322.  More notice to the
defendant that nurses were submitting notes for visits that
they weren't doing, notice to the defendant that one patient
wasn't even aware that she was signed on to a home health
agency because she had never received any visits from anybody
at Arbor.  What did the defendant do in response?  Rosa
Gonzalez told you.  Nothing.  And you know why.  Because the
defendant was behind the scheme from the beginning.

Now, the defense also told you in its opening that
there was a lot of turnover at Arbor.  And now you know why.
Arbor employees uncovered the fraud, and they spoke up about
it, and she drove them out, all to keep the fraud going.

Helen Sech testified that a patient complained about a
nurse, Winnie Arungu.  There are a couple of Winnies in this
case.  Winnie Arungu was that nurse.  And the complaint was
that the nurse was not doing her visits.  Helen Sech brought
that complaint to Joseph Muiruri, who took Ms. Arungu off the
schedule, basically firing her.  Then the defendant stepped in
and she put Ms. Arungu back on the schedule so the scheme could
keep going, because it was the defendant's scheme from the

start.  All of that evidence is more than enough to convict the
defendant of health care fraud and health care fraud
conspiracy.  And that's before we even get to Winnie Waruru.

Now, Winnie Waruru's testimony is just more damning
evidence of the defendant's part in this fraud.  Ms. Waruru
told you that she agreed with the defendant to commit health
care fraud and she explained how it worked.  She told you that
she inherited a number of patients from the defendant and how
what the defendant put in the assessments for those patients
wasn't true.  And her testimony, Ms. Waruru's testimony is
fully corroborated by other witnesses and other documents.

Now, Ms. Waruru told you how she actually questioned,
she went to the defendant and questioned whether patients Amber
Gardner and Oscar Ortiz really needed a visiting nurse, and she
told you what the defendant said in response:  "You're not the
RN.  That's not your job."  And you know that's true because
other employees, other Arbor employees told you that the same
thing happened to them when they dared to question the
defendant.

Ms. Waruru also told you that the defendant gave her
envelopes of cash to give to patients Larry Logan, Jane
Flanagan and Larry Logan's girlfriend, Helen Troy.  And you
know that that's true because you saw Ms. Waruru's text
messages with the defendant about that.  Back in 2016, the
defendant to Winnie Waruru:  "Please tell your patient not to

1   come to the office looking for me."

2           Winnie Waruru:  "Which one?"

3           The defendant:  "Larry, Helen and Jane."

4           Winnie Waruru:  "Oh, my, what I offered, they

5   refused."

6           Winnie Waruru explained to you what was going on here.

7   The defendant paid off these patients to get the business off

8   the ground.  But once they outlived their usefulness and she

9   was going to cut off the money, it turned into, "Get those

11:02 10   patients away from me."

11          Now, Ms. Waruru told you that the defendant instructed

12   her to put in nursing notes for visits that never happened, and

13   you know that's true because you've seen the nursing notes

14   yourself.  We walked through a whole bunch of those, and I know

15   it was brutal to click through all of those records, but it was

16   important, because it was important to show how those

17   copy-and-pasted notes worked.  This wasn't just a case of

18   templates or auto-fill.  This was fraud.

19          Now, Helen Sech told you about the impossible numbers

11:03 20   she saw on the schedule, and multiple witnesses told you that

21   they fielded complaints from patients and family members about

22   the nurses who weren't showing up to visits.  Ms. Waruru also

23   told you that the HHA for one of her patients, a gentleman

24   named Santiago Velasquez, Ms. Waruru told you that HHA wasn't

25   doing her visits and she told you how she knew that.  Ms.

1    Waruru would find Mr. Velasquez soiled after the HHA was

2    supposed to be there.  Part of the job was cleaning up the

3    patient.  And Ms. Waruru also told you who that HHA was:  Lucy

4    Munyi, the defendant's sister.  And you know that that's true

5    because you saw the defendant text with Ms. Munyi about the

6    fact that Ms. Munyi wasn't doing the visits.

7         Ms. Waruru testified that the defendant told her to do

8    the fake notes to cover up visits that didn't happen, and you

9    know that's true because you know it wasn't just Ms. Waruru

11:04 10   doing those fake copy-and-pasted notes.  You saw when Special

11   Agent Wisnaskas was walking you through his charts, you saw

12   examples of other Arbor nurses doing the same thing, submitting

13   obviously fake nursing notes with copy-and-pasted lines about

14   things like the importance of eating food that's low in sodium.

15        Now, Ms. Waruru has accepted responsibility and

16   pleaded guilty for her role in the fraud scheme.  There was a

17   whole bunch of business you might remember about how much of

18   the fraud Ms. Waruru pled to compared to the $100 million fraud

19   that's charged in the indictment here.  Now, Ms. Waruru agreed

11:05 20   to commit the fraud with the defendant, but they had different

21   roles.  It was obvious.  The defendant's role was larger.  She

22   oversaw the whole operation, and the defendant profited

23   accordingly.

24        Now, Ms. Waruru testified pursuant to a cooperation

25   agreement, which you also saw during the trial, and Ms. Waruru

told you what she understood her job was:  to tell the truth.
But as the judge will instruct you, you should consider the
testimony of Ms. Waruru with particular caution.  As you do so,
consider how it fits together with all of the other evidence
that you've heard, because all it all lines up.

Now, you also heard evidence of what the defendant did
with the proceeds of the fraud.  Now, the defense told you in
its opening that it's not a crime to spend money on fancy
things, and of course that's true.  But when you knowingly use
money from a crime to buy those same things, that's when it
crosses the line.  An FBI forensic accountant, Bridget Horan,
walked throughout bank statements and all the financial records
and traced the money from MassHealth to the defendant.
Millions and millions of dollars.

You saw the defendant's texts from September of 2016
with Nurse Joan Kagendo, and they were texting here about
billing by an HHA while a patient was away on vacation,
claiming that they were doing visits when the patient wasn't
around.  And you saw what the defendant said about that.
That's the last text here.  "That is bad.  That is what they
are nailing people on."  That's what she wrote.  That's what
she was thinking back in September 2016.

Also in September of 2016, you saw the defendant send
these texts about an article in The Boston Globe mand you saw
that article, too.  That was about the audit of all the home

1    health agencies.  And what that article showed was that

2    MassHealth was cracking down on fraud and abuse in the home

3    health industry.  And you saw what the defendant said.  "What

4    the hell?  I'm shaking.  God help us.  Hope to God they don't

5    come here."  What do you think she meant by that?

6         You saw what happened next.  Within weeks on October

7    3, 2016, the defendant made two big purchases.  It's grainy but

8    you can make it out.  First, a $50,000 check for the Maserati

9    and, second, a $2 million wire for the purchase of that house,

11:08 10  the mansion in North Andover.  Get the fraud money out and

11   spend it.  Both of those transactions were crimes:  money

12   laundering.

13        Now, you know that in early January of 2017,

14   MassHealth finally stopped the payments to Arbor.  You saw that

15   letter.  And then days later, another money laundering

16   transaction.  Again, it's a grainy image, but not too grainy to

17   make out the signature and the amount.  And you know that this

18   was a $100,000 check for improvements to the North Andover

19   mansion, and this was on January 17, 2017.  And you also know

11:10 20  that the defendant did not do this alone.  Just look at this.

21   More than $28 million sucked out of this company in less than

22   four years.  The defendant agreed with her husband to spend and

23   move the money out of the Arbor account, an account that they

24   controlled together.

25        So, members of the jury, that is the evidence that

1    proves that the defendant committed each of the crimes she's

2    charged with.

3            Before I wrap up, I just want to briefly review the

4    elements of the crimes and the questions that you're going to

5    have to answer to reach a your verdict.  Now, the judge is

6    going to instruct you on the law.  So if anything I say is

7    inconsistent with what the judge says about the law, of course

8    follow the judge.

9            Counts 1 and 2 here charge the defendant with

11:11 10   conspiracy to commit health care fraud and health care fraud.

11   I'm going to take those out of order.  I'm going to address

12   Count 2 first.  That's the health care fraud.  You're going to

13   be instructed that there are three elements that the government

14   has to prove for that.

15           The first element is that there was a scheme

16   substantially as charged in the indictment to defraud a health

17   benefit program by means of false or fraudulent pretenses,

18   representations or promises.  And members of the jury, you know

19   there was a scheme to defraud here.  That's all the evidence we

11:11 20   already reviewed.  And it's the same scheme charged in the

21   indictment.

22           Now, I want to point out one thing I expect the court

23   is going to instruct you on.  I want to make sure I get it

24   right so I'm going to try and read it here.  I expect the court

25   is going to instruct that you do not need to be unanimous about

 1   the way in which the defendant defrauded MassHealth, but you

 2   must be unanimous in finding that the government has proved

 3   each element of health care fraud beyond a reasonable doubt.

 4        You'll get other instructions on this from the judge.

 5   But the point I want to leave you with is that you have

 6   evidence that there were multiple ways in which the defendant

 7   carried out this fraud, but you only need one.  And you just

 8   need to agree that there was a scheme to defraud, and there

 9   clearly was one here.

11:12 10        Now, the second element is that the defendant

 11   knowingly and willfully participated in this scheme with the

 12   intent to defraud.  And we reviewed all of this evidence as

 13   well, proving the defendant's criminal intent.  She got reports

 14   identifying fraud and ignored them and fired the truth-tellers.

 15   You have the forged documents.  You have the cover-up.  You

 16   have the fact that she took all of the money.  Again, members

 17   of the jury, this was not a good faith mistake.

 18        Now, the third element for health care fraud, the

 19   third and final element for health care fraud is that the

11:13 20   scheme was in connection with the delivery of or payment for

 21   health care benefits, items or services.  And this one is

 22   pretty easy because the whole scheme was to steal money from

 23   MassHealth.

 24        All of the elements of health care fraud have been

 25   proven here.  So when you get your verdict form, there's going

1    to be a space for Count 2, and you should check "guilty" for

2    that one.

3         Let me turn next to Count 1, and that's health care

4    fraud conspiracy.  And I took these out of order because, as

5    you'll learn from the judge and as you may remember from the

6    beginning of the trial, conspiracy is simply an agreement to do

7    something illegal.  And here, that something was to commit the

8    health care fraud, to defraud MassHealth from those millions of

9    dollars.

11:14 10       The judge is going to instruct you that this crime,

11   health care fraud conspiracy, has two elements.  First, that at

12   least two people agreed to commit health care fraud and,

13   second, that the defendant willfully joined that agreement,

14   intending that health care fraud be committed.

15        Now for this count, the crime is complete with the

16   agreement.  Health care fraud doesn't even have to happen,

17   although you know it did here.  And the agreement doesn't have

18   to be anything written down or anything formal.  In fact,

19   criminals usually don't write this stuff down.  And you know

11:15 20   from all the evidence in this case that's how this defendant

21   operated, because you had witnesses who took the stand and told

22   you the defendant told them not to write things down.  "Don't

23   email about it."

24        But you know there was an agreement to commit health

25   care fraud because the defendant did not do this alone.  She

1    did it with Winnie Waruru, who testified that she agreed to

2    commit health care fraud with the defendant.  She did it with

3    her husband, who on paper was the CEO and reaped the benefits.

4    She did it with Joseph Muiruri, who did her bidding to keep the

5    fraud going.  And you know that the defendant willfully joined

6    that agreement for all the reasons we've already been over.  So

7    for Count 1 on your verdict form, you should check off

8    "Guilty."

9            So let me turn briefly to the remaining counts, Counts

11:16 10   8, 9 and 10.  And by the way, the numbers are funky here.  They

11   jump around.  The judge is going to instruct you that doesn't

12   matter.

13           We go to Counts 8, 9 and 10.  Those charge the

14   defendant with the crime of money laundering.  Count 8 is for

15   the $50,000 check to buy the Maserati.  Count 9 is for the $2

16   million wire to buy the North Andover mansion.  And Count 10 is

17   for the $100,000 check for work on that same property.

18           As the court will instruct you, there are four

19   elements for this crime.  I'm going to really quickly walk

11:17 20   through each of them.

21           The first element is that the defendant engaged in a

22   monetary transaction over $10,000 by, through or to a financial

23   institution affecting interstate commerce.  And for each of

24   these counts this element is proven.  The defendant engaged in

25   each transaction, and they were each over $10,000.  The

transactions were checks or a wire through Bank of America,
which was insured by the Federal Deposit Insurance Corporation,
FDIC.  Why does that matter?  Because that proves that it
affected interstate commerce.

In fact, the court is going to instruct you that that
is sufficient, to show that Bank of America was a financial
institution affecting interstate commerce.  So that first
element, it's satisfied.

Now, the second element is that the defendant knew the
money came from some kind of criminal scheme.  And here, the
defendant knew that this was dirty money because she committed
the fraud that generated it.

The third element is that the money was in fact
criminally derived from a specified unlawful activity.  And
here, that's conspiracy to commit health care fraud or health
care fraud.  And this element has been proven as well.  It just
means the money has to actually come from fraud.  And you know
that because FBI forensic accountant Bridget Horan walked you
through all the financials that showed how the money flowed
through here.  She showed you how the $100 million came in from
MassHealth for all of those bogus HHA claims.

And the fourth and final element for this money
laundering charge is that the monetary transaction took place
in the United States.  This one is pretty straightforward.
It's proven here because the checks, the wires, they were cut

1  and sent here in the United States, and they were cleared

2  through Bank of America, which is also based here in the United

3  States.  So, because all of these elements are met, you should

4  mark "guilty" next to Counts 8, 9, and 10 of your verdict form.

5       That brings us to the last count, the home stretch,

6  Count 7 for conspiracy to commit money laundering.  And this

7  one is also pretty straightforward.  Did the defendant agree

8  with at least one other person to carry out the types of

9  transactions that are charged in Counts 8, 9 and 10.  And you

11:20 10  know that she did.  There was a cosigner on these accounts, her

11  husband, Ben.  And he was clearly in on it.  It's no accident

12  that he got a backdated $2 million check.  That was part of

13  their agreement.  So for Count 7 on your verdict form, you

14  should check "guilty" as well.

15       In a minute I'm going to sit down and then the defense

16  is going to have a turn to speak to you.  After that,

17  Mr. Looney is going to have a brief opportunity to offer brief

18  rebuttal on behalf of the government.  Then we're done and the

19  case is yours.  Well, the judge is going to instruct you and

11:20 20  then the case is yours.

21       I want to thank you for your time and your attention

22  throughout this trial.  I realize it's not an easy time to be

23  called in for jury service, especially with the holiday in the

24  middle of this, so we all appreciate that.

25       When you go back to deliberate, you're going to have

all of the evidence, all of the exhibits.  You're going to have

the judge's instructions.  You're going to have your common

sense.  That's really all you need here.  This was a massive

fraud, stealing money that was supposed to go to people who

really needed it.  And you know exactly who took that money.

Just follow the money.  It leads to only one conclusion:  that

the defendant is guilty beyond a reasonable doubt on all

counts.  Thank you.

THE COURT:  Mr. Vien, Ms. Pascucci.

MS. PASCUCCI:  The Power Point we created should be

coming in on Trial Director.  There we go.

COURTROOM CLERK:  I didn't know what you were hooked

into.

MS. PASCUCCI:  No problem at all.  Thank you.

Good morning.  First off, I want to thank you, thank

you for being here, for your commitment, and for taking this

case seriously.

For you to find Ms. Newton guilty of any count in the

indictment, you need to find that the government has proven

every element of that count beyond a reasonable doubt.  Judge

Burroughs, she's going to explain to you what that means, so

for now, all I'm going to say is that beyond a reasonable doubt

is a high burden.  It's the highest burden in our legal system.

The government, and the government alone, carries that burden.

So let's talk about what the government has tried to

prove, and let's start off by talking about what's not a crime.
It's not a crime, it's not even a violation of Massachusetts
regulation to self-refer for home health care or to have family
as home health aides.  Ms. Quintana told you she was a home
health aide for her grandmothers before she even worked at
Arbor.

And getting Massachusetts regulations wrong, that's
not a crime.  You can go back to the jury room.  You can say to
yourself, Arbor, it should have done better making sure it was
compliant with Mass. regs.  No one here is going to argue about
that.  But that's not a crime.  And it's not a crime for a
company to be disorganized or mismanaged.  Arbor grew quickly.
It grew too quickly for anyone to manage.  And when a home
health agency is mismanaged, when it gets regulations wrong,
its claims for reimbursement should be denied.  That is what
happened here.

In 2017, MassHealth stopped paying claims and Arbor
closed.  And let's be clear, prior to this time Arbor was
providing care to patients.  And whether it complied with the
MassHealth contract, that's a question of contract.  If
MassHealth thinks Arbor didn't comply with that contract,
that's a civil case.  End of story.

But it's not the end of the story because four years
after Arbor closes, Ms. Newton is charged in an indictment.
Count 1 of the indictment charges Ms. Newton with health care

fraud conspiracy and Count 2 charges her with health care

fraud.  The health care fraud conspiracy count alleges that

from 2013 to 2017, Ms. Newton conspired to defraud MassHealth.

For you to find Ms. Newton guilty of health care fraud

conspiracy, it's not enough for you to think something wrong

was happening at Arbor.  You need to find Ms. Newton guilty of

the conspiracy that is charged in the indictment, not some

other conspiracy, during the timeframe that is alleged in the

indictment.

For both the health care fraud and the health care

fraud conspiracy counts, you must also find that Ms. Newton

acted knowingly, willfully and with the intent to defraud.  You

must find all of this beyond a reasonable doubt.  And that's

important.  It means you must find that at the time that this

was going on, she knew what she was doing was in violation of

the law.  It's not enough that she messed up.  It's not enough

that she wasn't paying attention.  If she thought that she was

providing MassHealth the services, there is no fraud.  The

question of whether she complied with the contract is a civil

issue.  It's not a criminal one.

And it doesn't matter what she or anyone else in the

conspiracy knows sitting here today or anyone else that

testified, excuse me, knows here today.  If you can't find that

she acted with knowledge during the alleged conspiracy, you

must acquit.

1          The remaining counts charge Ms. Newton with money

2    laundering and money laundering conspiracy.  As Judge Burroughs

3    is going to instruct you, Count 7, that's the money laundering

4    conspiracy count, requires an agreement to engage in money

5    laundering.  You saw plenty of spreadsheets regarding transfers

6    of funds from and to Arbor.  But you haven't seen any evidence

7    regarding an agreement as to those funds.  You haven't seen a

8    conversation.  You haven't seen a text message, not even an

9    email regarding disbursement of those funds.

11:27 10          The government is asking you to assume an agreement

11    based on the fact that Ms. Newton and Mr. Muiruri are husband

12    and wife.  But you cannot be guilty by virtue of being

13    someone's spouse.  And you simply cannot face a criminal

14    conviction which is beyond a reasonable doubt on an assumption

15    that, because they're husband and wife, they must have agreed.

16          For charges 8 through 10, these are the substantive

17    money laundering charges, you've heard evidence that Arbor made

18    money.  Ms. Newton bought a home that had been abandoned for a

19    few years.  She also bought a used sports car, a Maserati.

11:28 20    It's not a crime to make money.  The government must prove

21    beyond a reasonable doubt that the money for those transactions

22    was derived from health care fraud and that she knew that.  But

23    if there's no health care fraud, there cannot be money

24    laundering.

25          So all that being said, let's walk through some of the

1    specific allegations.

2        The government says the training program at Arbor

3    wasn't enough.  But remember, for you to find Ms. Newton guilty

4    of health care fraud conspiracy and health care fraud, it's not

5    enough that home health care aides aren't getting required

6    training.  Ms. Newton needs to know that the training was

7    wrong, and she must have had intended to defraud MassHealth as

8    is alleged in the indictment.  Again, if Ms. Newton thought

9    Arbor was giving MassHealth services, there is no crime.

11:29 10        So Airanisse Quintana testified that Ms. Newton had

11    worked at Compassionate Home Care before Arbor.  She had been a

12    nurse there, not a manager.  You heard about the exams with

13    answers.  Those were at Compassionate Home Care.  In fact, all

14    the hiring paperwork and training that was at Arbor was adopted

15    from Compassionate Home Care.  Ms. Newton had no reason to

16    think that what Compassionate Home Care was doing was wrong.

17    Ms. Newton also never did the training.  You've never heard any

18    evidence that she even sat in on a training session.  She

19    always delegated to others, Amanda Muchioki, Regina Arrey,

11:30 20    Ms. Quintana, other nurses that you never even heard from.

21        At times Ms. Muchioki and Ms. Arrey tell Ms. Newton

22    they think she should be doing more.  She doesn't fire them.

23    She doesn't say, "Don't tell MassHealth."  She says and she

24    thinks, it's fine.  Ms. Muchioki, who is running the training

25    program, put Ms. Newton's signature on certificates saying that

home health aides are properly trained.  You have one of those

certificates in front of you now.  Ms. Newton has no problem

with her own signature being put on those certificates.  There

were many people working at Arbor at that time but she says,

"Use my signature."  And when Ms. Muchioki is asked to do this,

she doesn't quit.  She doesn't refuse to certify the

certificates.  She stays at Arbor until 2017.  And she's not

charged with a crime.

    You also heard from Ms. Arrey.  She had a decade of

experience as a registered nurse, and she did training as well.

She testified that she did two to three days of training for

new home health aides with regular intake sessions in between.

She signed some of the training certificates, too, one of the

training certificates that's in front of you right now.  But no

one is suggesting that she was complicit in any fraud.

    And when Ms. Arrey says she doesn't want to sign the

certificates, she isn't fired.  When Ms. Arrey left Arbor, it

wasn't because she thought Ms. Newton was engaged in fraud.

She testified to you, "I have no problem with Ms. Newton."  The

reason that she left was because of Joseph Muiruri.

    When these witnesses spoke to you about Arbor's

training program, their perspective was also limited.  They

were only present for in-person, on-site trainings.

Ms. Quintana testified to you about online training that Arbor

had implemented.  No one was counting those hours when they

1    testified to you about that training.  And no one, not

2    Ms. Arrey, not Ms. Muchioki, not Ms. Quintana, could speak to

3    training in the field.  That would have been in addition to the

4    classroom hours and in addition to any online training.

5        The only person who testified to you that there was no

6    training was Ms. O'Donoghue.  But Ms. O'Donoghue's testimony

7    about what she did and about what she signed was very different

8    when she testified in front of the grand jury under oath three

9    years ago.  She either lied to you or she lied in front of the

11:33 10   grand jury, and you simply cannot base a criminal conviction

11   for Ms. Newton on anything Ms. O'Donoghue told you.

12       So the government also says, "Let's look at the

13   referral payments."  Importantly, Ms. Newton, she's not charged

14   with kickbacks.  Ms. Waruru, however, is.  For these payments

15   to be illegal, Ms. Newton had to know that they were wrong at

16   the time she was making those payments, but no one else seemed

17   to think these payments were wrong at the time.  For goodness

18   sake, the check that is in front of you right now, drawn from

19   an Arbor account, signed by Ben Muiruri, says "referral" on it.

11:33 20       No one is trying to hide this.  The only witness who

21   seemed to suggest that there was something wrong with payments

22   at the time was Ms. Waruru, who pleaded guilty to a kickbacks

23   conspiracy.  She first told federal agents that these payments

24   were a gift to early patients at Arbor to thank them for

25   helping Arbor get its feet on the ground.  And she said she had

no idea at the time that these were illegal but this was

consistent with a Kenyan practice of giving small gifts like

this.  But after she pleaded guilty in her -- what was it --

fifth time talking to federal agents, she said for the first

time she knew at the time they were legal.

MassHealth itself seemed to realize there was

confusion about payments because it wasn't until 2022, after

this case is charged, that they implement a regulation that's

specific to home health aides saying you can't make these type

of payments.

Now, Mr. Brady pointed out a text message.  It's a

text message between Vannak Kann and Ms. Newton from 2016,

where Mr. Kann says, "How about we pay home health aides?"  And

Ms. Newton says, "No.  We can't pay for them for referrals,

it's illegal."  Look at the timing on this text message.  It's

2016.  And if you look at the text messages, that referral

payments, those are from 2013 and 2014.  In other words,

Ms. Newton eventually learns that she shouldn't do this and she

stops.  That's what we want people to do.

And there is no reason for there to be any story other

than this.  So, had she known the payments were wrong all

along, there is no reason to write "referral" on a check and

have text messages regarding referral payments at the same time

that you're texting Mr. Kann, "No, we can't do this, it's

illegal."

1          Likewise, the evidence is just all over the place on

2     who is directing who at Arbor and what Ms. Newton's knowledge

3     and role even was.  Judge Burroughs is going to instruct you

4     that a reasonable doubt can stem from a lack of evidence.

5     Ms. O'Donoghue testified she didn't have contact with

6     Ms. Newton after 2014.  And Ms. O'Donoghue, when she sued Arbor

7     in 2019, didn't even mention Ms. Newton in the complaint.

8          It wasn't until agents start talking to her that

9     Ms. O'Donoghue says, "Oh, yes, Ms. Newton did have a central

11:36 10   role at Arbor."  But when Ms. O'Donoghue is looking for a

11    payout, who is the head of the company?  It's Ben Muiruri, not

12    the CEO of Arbor, who is not charged with a crime.  And again,

13    Ms. Newton can't be guilty by virtue of being his wife.

14         Ms. O'Donoghue also said she billed for all the

15    patient visits even if she didn't do them.  But she's not

16    charged with a crime.  And she never said that Ms. Newton told

17    her to do that.  And Ms. Quintana also testified that

18    Ms. Newton was in management.  But when she was deposed in 2016

19    as part of an unrelated civil lawsuit, the people she

11:37 20   identified as managing Arbor were Ben Muiruri and Joseph

21    Muiruri.  It wasn't until she spoke to federal agents five

22    times that her memory changes.

23         You also heard a lot about Joseph Muiruri.  He was the

24    director of nursing.  Ms. Quintana said Joseph Muiruri, not

25    Faith Newton, told her not to put patient complaints in

writing.  Helen Sech said she left Arbor because Joseph
Muiruri, not Faith Newton, yelled at her for changing the
schedule when two nurses were billing for the same patient
visits.  Joseph Muiruri is on the ground at Arbor, running the
show, and mistreating employees.  He is not charged with a
crime.

The government wants to say Ms. Newton, she gave him
those directions.  But what's the evidence on this?  You saw
plenty of text messages.  Where is the text message where Ms.
Newton tells Mr. Muiruri to commit fraud?  If it existed, you
would have seen it.  Mr. Muiruri wasn't here to testify.  He
wasn't even interviewed in this investigation.

The government is asking you to rely on an assumption,
Faith must have told you -- must have told him.  But when the
standard is beyond a reasonable doubt, you simply can't rely on
an assumption.  And that is why I am asking you, in the jury
room, think hard about what you didn't hear and what you didn't
see.  Because, again, reasonable doubt can be based on an
absence of evidence.

You haven't heard any evidence that nurses or doctors
face disciplinary action for working at or with Arbor.  Dr.
Eaton signed off on many Plans of Care and he's never going to
face any charges in this case.  You've heard a little bit about
two individuals who brought a civil lawsuit against Arbor, Syed
Hussain and Joseph Ouko.  Mr. Ouko worked for Arbor for less

than six months.  The government showed you an email or a memo
where he said what he thought was wrong about Arbor.  And
despite Mr. Ouko sending his concerns to Ms. Sech and
Ms. Gonzalez, neither of them left Arbor then and there.  They
stayed a while.  So you may be wondering, why didn't Mr. Ouko
and Mr. Hussain testify?  You should wonder that.

Mr. Ouko goes to the government and a Special Agent
Wisnaskas told you he gave direction to the investigation, but
the government doesn't want you to hear from him.  You also
heard a bunch of text messages between Ms. Newton and home
health aides and patients, but most of those people didn't even
testify to tell you what they were talking about in those
messages.  Rosa Gonzalez, who did testify, wasn't even asked
about her text messages with Ms. Newton.

I want you to consider the number of text messages or
emails you've sent that sound like you're saying one thing but
you're really saying something else.  And let me give you an
example.  You saw a text message where it appears that
Ms. Newton and Joan Kagengo are talking about what Ms. Quintana
can put in writing, and you've heard a lot from Mr. Brady
regarding people being asked not to put things in writing.
Ms. Kagengo is a nurse who worked at Arbor, not charged with a
crime, didn't testify.

The government wants you to read this and think, Oh,
they don't want them to document what's wrong at Arbor.  But

these text messages coincide with the overtime compensation

lawsuit, a lawsuit that has nothing to do with anything you've

heard about in this case.  And if you look further at this same

text exchange, Ms. Kagendo says Ms. Quintana was sending very

unprofessional emails regarding payroll.  That seems like a

pretty good reason to want people to be cautious about what

they put in writing if they're writing things that are

unprofessional.

You also saw in the closing a text message regarding

Santiago where Ms. Newton is saying to Lucy, "Hey, what's going

on?  You should be seeing this patient."  And if you look

further down that same text exchange, she says, "You need to

talk to Rosa."  In other words, she's addressing a lack of

patient visits if you look deep into the text message.

So let's turn back to who was here at the trial who is

charged with a crime.  In this entire case with a company

literally employing hundreds of people, two people are charged

with a crime:  Ms. Newton, the wife of the CEO, and Ms. Waruru,

a nurse.  Absolutely no doctors, the ones who are signing off

on the Plans of Care are charged.  The actual CEO is not

charged.

The indictment says that Ms. Waruru and Ms. Newton

together devised a scheme to defraud.  Yet the consequences

that they are facing are very different.  The government is

saying that Ms. Newton is responsible for fraud of 100 million.

1    Ms. Waruru is responsible for fraud of less than 1.5 million, a

2    fraction of that.  This just doesn't make sense.

3         The government now says that these different numbers

4    are because Ms. Newton had an ownership stake in Arbor, whereas

5    Ms. Waruru did not.  But the indictment says that together they

6    devised a scheme to defraud.  The legal standard in determining

7    loss is a reasonable foreseeable harm that resulted from the

8    offense.  It is not who has an ownership stake and who doesn't.

9         Now, Ms. Waruru, she's between a rock and a tough

11:44 10   place.  Just like Ms. Newton, she has family here, and she does

11    not want to go to jail.  And there is a difference between a

12    criminal sentence for someone who is held responsible for a

13    fraud of 100 million and a criminal sentence for someone who

14    faces a fraud of 1.5 million.  And Ms. Waruru knows if

15    prosecutors are happy with her, she could get an even better

16    sentence.  Maybe no sentence at all.  She is well aware that

17    she may be deported and she is praying there is a way she can

18    stay in the United States.  Only the United States government

19    can help her stay in the United States.

11:44 20        So let's turn back to the government's argument that

21    Arbor had a sham home health aide program.  Again, the question

22    is whether Ms. Newton intended to defraud MassHealth.  Even if

23    she got the regulations wrong, if she thought she was providing

24    the services to MassHealth, there is no fraud.  And we know

25    that patient visits happened.  Ms. Arrey saw patients.  She was

1    adamant she never billed for visits she didn't do.

2    Ms. O'Donoghue told you that she saw her patients every day.

3    These individuals were referred from Lowell Elder Care, and

4    Ms. O'Donoghue agreed that they had high needs.

5          Now, Ms. O'Donoghue also testified that she billed for

6    visits that she didn't do.  But long before today's trial, she

7    submitted a signed, under-oath affidavit that she typically saw

8    patients 12 hours per day, seven days a week, when she worked

9    at Arbor.  I think you'd agree with me that it's very hard for

11:46 10   both of those things to be true.

11          This also brings me back to the money laundering

12   conspiracy and money laundering charges.  Like I said, there's

13   no health care fraud, so there's no money laundering.  But look

14   closer at the money laundering charges because there's another

15   problem on those counts.

16          We know that there were visits that were happening

17   where patients were receiving valid services.  We know that

18   because Ms. Arrey told us, Ms. O'Donoghue told us, even Ms.

19   Waruru told us.  The government has said money from Arbor went

11:46 20   to Ben's and Faith's bank accounts and then was used to make

21   purchases.  But how can you know whether those specific

22   transactions came from visits that supposedly didn't happen or

23   visits that did happen?  The short answer is you can't.  All

24   you know is that money came from Arbor.  The government didn't

25   do the work to trace which funds from Arbor came from which

visits.  Without that tracing, there is no way to find beyond a
reasonable doubt that the funds and the money laundering
transactions were from unlawful activity, and there is no way
to find Ms. Newton guilty of money laundering.

So let's turn back to patient visits.  Again, if Ms.
Newton thinks she's providing MassHealth services, there can be
no intent to defraud.  The government says these visits didn't
happen because notes were copied and pasted.  Ms. Waruru
testified that she was told to copy and paste notes by
Ms. Newton for visits she didn't do.  But Ms. Waruru has every
reason to say what the government wants to hear.  No one else
from Arbor testified that they were told to copy and paste
notes.

Further, Ms. Waruru and every nurse and every home
health aide at Arbor submitted their own notes, and Ms. Newton,
she wasn't reviewing every note that was on the Axxess
database.  How could she?  There were hundreds of nurses and a
thousand patients.  Ms. Waruru also told you visits are
repetitive.  Patients may need the same treatment and the same
instructions day after day.  Vitals can be similar day after
day.  The notes indicate that sometimes patients are reminded
again and again about the benefits of exercise and healthy
eating.  And some patients do need those reminders again and
again.  Even Dr. Shoemaker testified about having to warn
residents about sloppy paste because of the danger of using the

1    same narrative in electronic case management systems.

2         Some of the notes you saw yesterday were from Lorna

3    Thagichu, Adams Kinyanjui, Aloise Njenga.  You don't know these

4    names because these people never came to testify and nobody

5    testified about these individuals.  They couldn't tell you

6    whether they just copied a note to save time and weren't paying

7    enough attention.  They can't tell that you they were just

8    seeing the same patient and doing the same thing on a regular

9    basis.  And the Kevin Ung note, again, that wasn't by Faith

11:49 10   Newton.  That was by a nurse who never testified.

11        Even if these nurses were skipping visits, there is

12   absolutely no evidence that in a company with hundreds of

13   employees, Ms. Newton was somehow responsible for their visits

14   or directing them to do so.

15        And the witnesses who discussed receiving Plans of

16   Care from Arbor, Dr. Gorn, Dr. Shoemaker, Nurse Touch, Nurse

17   Tyrrell, none of them knew who Faith Newton was.  All they knew

18   is that they sent and received faxes from Arbor.  There is no

19   way to know who sent those faxes and who received those faxes

11:50 20   in a company with hundreds of employees.  And Arbor was one of

21   many home health agencies that they received Plans of Care

22   from.  Even today, Nurse Touch denies Plans of Care from home

23   health agencies.  It does not mean that those home health

24   agencies are engaged in fraud.

25        Now, Winnie said -- Ms. Waruru, excuse me, said not

1    all the patients needed the treatments they received.  But you

2    also heard evidence that one of Ms. Waruru's patients, John

3    Enwright, suffered from alcohol and needed pain medication,

4    Percocet.  She kept his pain medication in a lockbox so he

5    couldn't overdose.  Perhaps reasonable minds can differ over

6    how many visits he needed, but I don't think anyone in this

7    courtroom is going to dispute that overdoses of pain medication

8    can kill.  And, Ms. Waruru had an important job taking care of

9    him.

11:51 10        There is obviously a difference between what

11    Ms. Newton thought patients needed and what Ms. Waruru thought

12    patients needed.  But differences in professional judgment

13    happen every day.  So what is the easiest way for you to

14    resolve what the patients actually needed?  The patients should

15    have told you, the jurors, what they needed.  The government

16    called not one single patient.  Not a single patient told you

17    they didn't need the services they were given.  Not a single

18    patient told that you Arbor home health aides and nurses did a

19    bad job.  Dr. Eaton sent his own mother to Arbor.  Not a single

11:52 20    patient said, "I did not get services."  And of thousand

21    patients at Arbor, you would think that if it was so clear that

22    Arbor was doing a fraud, one patient would have sat in that

23    witness chair and told you so.  They didn't.

24        The government is trying to make a criminal case from

25    a civil question of whether state regulations were followed.

1    These are not the same things.

2         The government has the last word here.  They're going

3    to respond to my argument, and I'm not going to have a chance

4    to respond to them.  They have said in their closing, I'm sure

5    they're going to say it in the rebuttal, the evidence was

6    overwhelming.  But their saying so does not make it so.  It

7    does not explain why the only home health aide who testified of

8    hundreds of home health aides who worked at Arbor,

9    Ms. O'Donoghue, said she saw her patients every day and had a

11:53 10    signed under-oath affidavit that she worked 12 hours a day,

11    seven days a week.  It does not explain why not a single

12    patient came here to tell you that Arbor was a fraud.  And it

13    does not explain how Ms. Newton came to be sitting alone at the

14    defense table in a company with literally hundreds of employees

15    and a thousand patients.

16         The government has not carried its burden.  The proper

17    verdict is not guilty on all counts.  Thank you.

18         THE COURT:  Mr. Looney.

19         MR. LOONEY:  Good morning.  I'm going to start with

11:54 20    something that both Mr. Brady said and Ms. Pascucci said, which

21    is thank you for your time and your attention.  The work we've

22    done in the past two weeks is important, and the work you're

23    about to do is important.

24         I'm going to respond just briefly to a few things that

25    Ms. Pascucci addressed.  I can't hope to respond to all of it.

1          I think Mr. Brady laid out the evidence, and I think

2     it is, I submit to you, that it is overwhelming.

3          One thing that Ms. Pascucci addressed was that these

4     are just civil violations and that if Ms. Newton thought that

5     the services were being provided, then it's okay.  That's not

6     quite right.  I'll ask you to listen to Judge Burroughs when

7     she provides you an instruction.  She'll tell you that

8     violations of civil rules, civil regulations, MassHealth rules

9     can be a basis for a criminal violation if the elements are

11:55 10     otherwise satisfied, the elements of the offense are proven

11     beyond a reasonable doubt.  And here I'm going to talk about

12     why those rules were important, why those regulations are

13     important.

14          First, Arbor promised to obey those rules.  If you

15     look at what's Exhibit 318, it's the contract that exists

16     between MassHealth and Arbor.  In part of that, I wrote it

17     down, in part of that, Arbor promised to comply with all

18     federal and state laws, regulations, and rules applicable to

19     the provider's participation.  That's a promise that Arbor made

11:55 20     and that Ms. Newton broke.  Those were important promises.

21          Second, Ms. Dossa explained why those rules were

22     important.  She told you that if services were provided by an

23     HHA who was not trained and certified, they would not have paid

24     for those claims.  If services weren't provided, they would not

25     have paid those claims.  If there was no Plan of Care,

MassHealth would not have paid those claims.  Those rules were important.

Finally, I'll ask you this question:  If those rules weren't important, then why did Faith Newton go to such lengths to cover up the noncompliance with those rules?  I want to go back.  You saw the falsified patient notes.  It wasn't just Ms. Waruru.  It was other notes copied and pasted sometimes hundreds of times with identical notes to cover up for visits that weren't taking place.

And those fake certificates you saw for training that occurred, you heard over and over the training was never provided at Arbor.  And then when there was an audit being conducted, those certificates needed to be treated to look as if Arbor was following the rules when it wasn't.  So those certificates were created, they were backdated to the date the HHAs were hired, so it looked as if the services they were providing were comporting with the laws and were legitimate, were in compliance with the regulations, when they weren't.  The fact that Ms. Newton felt the need to cover this up tells you all you need to know about the importance of these rules and regulations.

Another thing that Ms. Pascucci argued was that maybe she didn't know it was wrong.  I go back to that same point, maybe she didn't know what she was doing was wrong.  Again, why do you cover things up if you don't know it's wrong?  Why do

1    you generate fake notes?  Why do you create the fake

2    certificates?  Why, when complaints are received, you tell

3    people, "Don't write them down"?  Why, when two employees

4    identify problems, raise concerns about whether patients are

5    receiving visits about whether Plans of Care exist, do you tell

6    people to "keep their nose out of it," and then those guys are

7    gone?  The problems don't change, but the complaints are

8    hidden.  Why do you cover things up if what you're doing is

9    fine?

11:58 10    And that goes right to those checks you saw at the

11   end.  That cover-up shows that she knew what she was doing was

12   wrong, just like those two checks written on January 12 or 13,

13   deposited -- sorry, written around January 12, deposited on

14   January 12 but backdated three weeks earlier, because what she

15   was doing was wrong.

16    There's also a lot of finger-pointing at other people

17   doing things wrong.  Joseph Muiruri, nurses, all of that.  Here

18   I just ask you to recall the testimony.  What did witnesses

19   tell you about who was in charge, over and over, when important

11:59 20   decisions were being made?  The answer is Faith Newton.  And

21   not just in general, about specific fraudulent conduct.

22    Ms. Muchioki described making those certificates and

23   then she was asked, "Who told you to do that?"  The answer was

24   "Faith Newton."  Winnie Waruru talked about making all the

25   patient notes and was asked, "Who taught you how to do that?"

1   The answer was "Faith Newton."  Airanisse Quintana, "Who told

2   you to white out the word 'denied' on a Plan of Care?"  "Faith

3   Newton."

4          Thinking about who did this, who is responsible for

5   the conduct, where did all that money go?  More than $18

6   million to Faith Newton, more than $28 million to Faith Newton

7   and Ben Muiruri combined.  The business was permeated with

8   fraud, and Faith Newton was the person who would benefit.  Use

9   your common sense.  What does that tell you?

12:00 10         One other point that was raised was the money

11   laundering counts, that the government needs to prove that the

12   transactions were accomplished using funds that were derived

13   from proceeds of criminal activity.  And Ms. Pascucci said the

14   government hasn't shown that, hasn't traced it.  But you heard

15   from Almas Dossa that they would not have paid for claims for

16   services supposedly provided by HHAs who were not trained,

17   certified and qualified.  And you heard throughout that Arbor

18   never provided training to HHAs.  So all of those claims, $100

19   million worth of claims, the vast majority of the money that

12:00 20   Arbor received from MassHealth would not have been paid but for

21   the fraudulent representations that Arbor was complying with

22   MassHealth rules and that HHAs were properly trained, properly

23   certified.  That's the tracing of the money right there.

24          You heard also that sometimes nurses did provide good

25   service.  The government has never argued otherwise.  We have

never said that some services were not provided.  That's not

the issue for today.  The issue is whether Ms. Newton

intentionally violated the law by billing for maybe some

services were provided but services were not, services that

were provided by home health aides who weren't trained and

certified, services provided for patients who didn't need it,

all of which Ms. Dossa said MassHealth never would have paid

for.  That's the issue for you.

Much the same, you heard a lot about what wasn't

presented, people who weren't here.  Joseph Ouko Hussain, here

I would urge you to look at the evidence that was presented.

What does it show?  What does it tell you?  Over two weeks you

heard from approximately 20 witnesses.  The story was

consistent, I submit to you.

I'm about to sit down.  I want to say, before I do,

use your common sense here.  Like counsel very ably picked the

different pieces of evidence, I would urge you to look at how

it all fits together.  All the parts make sense, fit together

when you use your common sense.  The payments made to get

patients in the door, the no-training job for relatives as an

inducement, the lack of medical necessity for patients so that

nurses wouldn't have to do the visits and more and more could

get enrolled.  You heard from some doctors who wouldn't sign

off on Plans of Care, and you heard from some doctors who did,

who signed for Plans of Care regardless of whether the patient

1    needed it.

2          Then all of this was covered up by all that paperwork

3    we talked about, the certificates, fake training records, the

4    false patient notes, patient notes with the same entry repeated

5    over and over.  Then finally, this all generated a cascade of

6    money for Ms. Newton.  And then when the spigot was turned off,

7    June 12, 2017, after she learned that MassHealth wasn't going

8    to pay any more, what does she do?  One final cover-up, to get

9    $4 million fraud proceeds out with a backdated check three

12:03 10   weeks earlier.  It is all one picture, one scheme, and it's

11   permeated by fraud.

12          Thank you for your time.  Thank you for your

13   attention.

14          THE COURT:  All right.  You've been sitting for a long

15   time.  Lunch is at 1:00 today.  I'm going to give you a

16   ten-minute break now, stretch, drink, bathroom.  We'll come

17   back for the charge at 12:15.  That should take us up to 1:00.

18   Ten-minute break.

19          COURTROOM CLERK:  All rise for the jury.

12:04 20        (Jury exits the courtroom.)

21          (Recess, 12:03 p.m. - 12:17 p.m.)

22          COURTROOM CLERK:  All rise for the jury.

23          Court is in session.  Please be seated.

24          THE COURT:  Home stretch.  As I think you all

25   understand by now, what I say is vetted by the parties in

1   advance when I can, and because you're going to have a written

2   copy of these instructions, I once again have to more or less

3   read them to you, but I will try and be animated and

4   interesting.  I'll do my best.

5          It is your duty as jurors to find the facts from the

6   evidence submitted in this case.  You will then apply the law

7   as I give it to you to the facts as you find them.  You must

8   follow the law as I explain it to you, whether you agree with

9   the law or not.  Regardless of any opinion you may have as to

12:18 10   what the law should be, it would violate your sworn duty as

11   jurors in this case to base the verdict on any view of the law

12   other than that given in my instructions.  You must not be

13   influenced by any personal likes or dislikes, prejudice or

14   sympathy.  You must decide the case solely on the evidence

15   before you and according to the law.

16          Counsel and witnesses may have quite properly referred

17   to some of the applicable rules of law in the course of the

18   trial and may have done so again during closing arguments.  If,

19   however, any difference appears to you between the law as

12:18 20   stated by counsel and the law as stated by me, you are to be

21   governed by the instructions given to you by me.

22          In following my instructions, you must follow all of

23   them and not single out some and ignore others.  They're all

24   important.  You must not interpret these instructions or

25   anything I may have said or done during this trial as a

1    suggestion by me as to what verdict you should return.  That is

2    a matter entirely for you to decide.

3         Every person accused of a crime is presumed to be

4    innocent unless and until her guilt is proved beyond a

5    reasonable doubt.  The presumption is not a mere formality.  It

6    is a fundamental principle of our system of justice.  The

7    presumption of innocence means that the burden of proof is

8    always on the government to prove that a defendant is guilty of

9    the crime with which she is charged beyond a reasonable doubt.

12:19 10         The burden never shifts to a defendant.  It is always

11   the government's burden to prove each of the elements of the

12   crime charged beyond a reasonable doubt.  A defendant does not

13   have to prove that she's innocent or even present any evidence.

14   The presumption of innocence alone may be sufficient to raise a

15   reasonable doubt and to require the acquittal of a defendant.

16   So you may not convict the defendant here of a crime charged

17   against her if the government fails or is unable to prove every

18   element of that crime beyond a reasonable doubt.

19         A reasonable doubt is a doubt that a reasonable person

12:19 20  has after carefully weighing all of the evidence.  It is the

21   doubt that would cause a reasonable person to hesitate to act

22   in a matter of importance in his or her personal life.  Proof

23   beyond a reasonable doubt must therefore be proof of a

24   convincing character that a reasonable person would not

25   hesitate to rely upon in making an important decision.

1           A reasonable doubt may arise not only from the

2    evidence produced but also from a lack of evidence.  Reasonable

3    doubt exists when, after weighing and considering all of the

4    evidence, using reason and common sense, jurors cannot say that

5    they have a settled conviction of the truth of a charge.  You

6    may not convict the defendant based on speculation or

7    conjecture.  Again, to convict the defendant, you must find

8    that the government has proven each element of an offense

9    charged against her beyond a reasonable doubt.

12:20 10          You may not convict the defendant if you decide that

11    it is equally likely that she is guilty or not guilty.  If you

12    decide that the evidence would reasonably permit either of two

13    conclusions, either that the defendant is guilty as charged or

14    that she is not guilty, you must find her not guilty.

15          You may not convict the defendant if you decide that

16    it is only probable or even strongly probable that she is

17    guilty.  A mere probability of guilt is not guilt beyond a

18    reasonable doubt.  The law does not require, however, that the

19    government prove guilty beyond all possible doubt.  Proof

12:21 20    beyond a reasonable doubt is sufficient to convict.  There are

21    very few things in this world that we know with absolute

22    certainty, and in criminal cases the law does not require proof

23    that overcomes every possible doubt.

24          Again, the defendant is presumed to be innocent, and

25    the government bears the burden of proving her guilt beyond a

1    reasonable doubt.  If, after fair and impartial consideration

2    of all the evidence, you have a reasonable doubt as to the

3    defendant's guilt, it is your duty to acquit her.  On the other

4    hand, if after fair and impartial consideration of all the

5    evidence you are satisfied beyond a reasonable doubt as to her

6    guilt, you should vote to convict her.

7         Your verdict must be unanimous on each count.  In

8    other words, all of you must agree that the defendant is guilty

9    or not guilty in order to convict her or acquit her of the

12:21 10   crime under consideration.

11        Like all defendants, Ms. Newton has a constitutional

12   right not to testify.  No inference of guilty or anything else

13   may be drawn from the fact that she did not testify, nor may

14   the fact that she did not testify be discussed or considered by

15   you in any way in arriving at your verdict.  There are many

16   reasons why a defendant would choose not to testify, and you

17   should not speculate why the defendant in this case chose not

18   to testify or give it any consideration.  To discuss or

19   consider her choice not to testify would violate her rights and

12:22 20   your oath as a juror.

21        As I indicated at the beginning of the trial, you've

22   been permitted to take notes, but some caution applies.  You

23   should bear in mind that not everything that is written down is

24   necessarily what was said.  When you return to the jury room to

25   discuss the case, do not assume simply because something

appears in somebody's notes that it necessarily took place in
court.  Notes are an aid to recollection, nothing more.  The
fact that something is written down does not mean that it is
necessarily accurate.

The evidence in this case consists of the sworn
testimony of witnesses, both on direct and cross-examination,
the exhibits that have been received into evidence, and any
facts to which the parties have agreed or stipulated.  A
stipulation again means simply that the government and the
defendant accept the truth of a particular proposition or fact.
Since there's no disagreement, there's no need for evidence
apart from the stipulation.  You must accept the stipulation as
fact to be given whatever weight you choose.

You should consider all of the evidence, no matter
what form it takes and no matter which party introduced it.
Whether the government has sustained its burden of proof does
not depend upon the number of witnesses it has called or upon
the number of exhibits it has offered but instead upon the
nature and quality of the evidence presented.

The numbers assigned to the exhibits are for
convenience in order to ensure an orderly procedure.  You
should draw no inference from the fact that a particular
exhibit was assigned a particular number or there that may be
gaps in the number sequence.  Similarly, you should not concern
yourself with the fact that you are only being asked to

1    consider certain counts of the indictment.

2          Certain things are not evidence.  Arguments and

3    statements by the lawyers are not evidence.  The lawyers are

4    not witnesses.  What they said in their opening statements or

5    what they said in their closing statements and at other times

6    is intended to help you interpret the evidence, but it is not

7    evidence.  If the facts as you remember them from the evidence

8    differ from the way the lawyers have stated them during

9    openings, closings or at any other point, your memory of the

12:24 10    facts should control.

11          Questions by lawyers standing alone are not evidence.

12    Again, the lawyers are not witnesses.  The question and the

13    answer taken together are the evidence.  Objections by lawyers

14    are not evidence.  Lawyers have a duty to their clients to

15    object when they believe a question or an exhibit is improper

16    under the rules of evidence.  You should not be influenced by

17    any objection or by my ruling on it, and you should not

18    speculate or guess what the answer might have been or about

19    what an exhibit might have said.

12:24 20          Anything I've struck or instructed you to disregard is

21    not evidence.  The indictment is not evidence.  Anything you

22    may have seen or heard when court was not in session, and I

23    hope there wasn't anything like that, but if there was, it is

24    not evidence.  You must decide the case solely on the evidence

25    received at trial.

1           Now, although you may consider only the evidence

2     presented in this case, you are not limited to the plain

3     statements made by the witnesses or contained in the documents.

4     In other words, you are not limited solely to what you saw and

5     heard as the witness testified.  You are permitted to draw

6     reasonable inferences from the facts if you believe those

7     inferences are justified in light of common sense and personal

8     experience.

9           An inference is simply a deduction or conclusion that

12:25 10     may be drawn from the facts you find have been proven.  Any

11     inferences you draw must be reasonable and based on the facts

12     as you find them.  Inferences may not be based on speculation

13     or conjecture.  Evidence may take the form of either direct

14     evidence or circumstantial evidence.

15           Direct evidence is direct proof of a fact, such as

16     testimony from an eyewitness that the witness saw something.

17     Circumstantial evidence is indirect evidence that is proof of a

18     fact or facts from which you could draw a reasonable inference

19     that another fact exists, even though it has not been proven

12:25 20     directly.

21           You are entitled to consider both direct and

22     circumstantial evidence.  The law permits you to give equal

23     weight to both.  It is for you to decide how much weight to

24     give any particular piece of evidence, whether direct or

25     circumstantial.

1        I'm just going to go back to my chocolate chip cookie

2    example.  Seeing your kid eat a chocolate chip cookie is direct

3    evidence that the kid ate the cookie.  Seeing the kid's mouth

4    smeared with chocolate and the cookie gone, even if you haven't

5    seen him eat it is circumstantial evidence that the kid ate it,

6    and you draw the inference that the kid ate it from the

7    circumstantial evidence.

8        On the other hand, if your kid hates chocolate and you

9    see a happy dog and a clean kid, you may not well draw the

12:26 10    inference that the kid ate the cookie.  A more reasonable

11    inference may be that the dog ate the cookie.

12        Particular items of evidence were sometimes received

13    only for a limited purpose, but evidence can be used by you

14    only for that particular purpose and not for any other purpose.

15    I've told you when that occurred and instructed you on the

16    purposes for which the item can and cannot be used.

17        You do not have to accept the testimony of any witness

18    if you find that the witness is not credible.  You must decide

19    which witnesses to believe considering all of the evidence and

12:26 20    drawing upon your common sense and personal experience.  You

21    may believe all of the testimony of a witness or some of it or

22    none of it.  You alone are the judges of the witnesses'

23    credibility.

24        In deciding whether to believe the testimony of the

25    witnesses, you may want to take into account, you may want to

1  take into consideration such factors as their conduct and

2  demeanor while testifying; any apparent fairness or unfairness

3  they may have displayed; any interest they may have in the

4  outcome of the case; any benefit they have received or

5  potential benefit they stand to receive; any prejudice or bias

6  they may have shown; their opportunities for seeing and knowing

7  the things about which they have testified; the reasonableness

8  or unreasonableness of the events they have related to you in

9  their testimony; and any other evidence that tends to support

12:27 10  or contradict their versions of the events.

11          You've also heard the testimony of a witness, Ms.

12  Waruru, who has a cooperation agreement with the government and

13  who may have participated in the crime charged against the

14  defendant, and Dr. Eaton, who may have also participated in a

15  crime.  The testimony of someone who is immunized, cooperating

16  or may have participated in the crime charged against a

17  defendant should be considered by you with particular caution.

18  Some people in these positions are entirely truthful in

19  testifying.

12:28 20          That being said, a witness who hopes to avoid

21  prosecution, gain a lighter sentence or obtain other benefits

22  from the government may have had a reason or a motive to make

23  up stories or exaggerate what others did because they want to

24  help themselves.  You must determine whether the testimony of

25  Ms. Waruru or Dr. Eaton has been affected by any interest they

1    may have in the outcome of this case, any prejudice for or

2    against the defendant, or by any benefits they've received or

3    may hope to receive from the government as a result of

4    cooperating.  You may consider Ms. Waruru's guilty plea in

5    assessing her credibility, but you are not to consider her

6    guilty plea as evidence against Ms. Newton in any way.  A

7    guilty plea speaks only to the guilt of the person that pled

8    guilty.

9          As with any witness, it is for you to decide whether

12:28 10    to accept the testimony of any cooperating witness and what

11    weight, if any, to give that testimony.

12          The testimony of a witness may be discredited or

13    impeached by showing that he or she previously made statements

14    that are inconsistent with his or her present testimony.  If a

15    witness made inconsistent statements about any significant

16    matter, you have a right to distrust the testimony of that

17    witness in other respects.  You may reject all the testimony of

18    that witness or give it such credibility as you think it

19    deserves.

12:29 20          Sometimes, of course, people make innocent mistakes,

21    particularly as to unimportant details.  Not every

22    contradiction or inconsistency is necessarily important.  You

23    may also consider how the passage of time can affect memory as

24    well as any other factors that you find have impacted the

25    testimony of a witness.  Again, you alone are the judge of the

1    witnesses' credibility.

2        You've heard the testimony of law enforcement

3    officials.  The fact that a witness may be employed by the

4    government as a law enforcement official does not mean that his

5    or her testimony is necessarily deserving of more or less

6    consideration or greater or less weight than that of any other

7    witness.  You should not accept nor should you reject testimony

8    based solely on such employment.  It is your decision, after

9    reviewing all the evidence, whether to receive the testimony of

12:29 10    a law enforcement witness and to give that testimony whatever

11    weight, if any, you find it deserves.

12        This case, like most criminal cases, began with an

13    indictment.  The indictment is not evidence or proof of guilt.

14    The indictment is simply an accusation.  It is the means by

15    which a defendant is charged with a crime and brought before

16    this court.

17        Count 1 of the indictment charges the defendant with

18    conspiring to commit health care fraud.  In Count 2 of the

19    indictment she is charged with committing and aiding and

12:30 20    abetting health care fraud.  In Count 7 she is charged with

21    conspiring to money launder, and in Counts 8 to 10, she is

22    charged with money laundering.

23        The indictment alleges that some of the charged

24    offenses were committed on or about a certain date.  It is not

25    necessary for the government to prove that the offense was

1    committed precisely on the date charged.  The law only requires

2    a substantial similarity between the dates alleged in the

3    indictment and the dates established by testimony or exhibits.

4         The defendant in this case is not on trial for any act

5    or any conduct not specifically charged in the indictment.

6    Again, you should not concern yourself about the fact that you

7    are not being instructed on or asked to decide every count of

8    the indictment.

9         I'm now going to give you some more specific

12:30 10    instructions on the crimes charged in the indictment and the

11    elements of the offenses.  For you to find the defendant

12    guilty, the government must prove each element of each offense

13    beyond a reasonable doubt.

14         Count 1 charges the defendant with conspiring to

15    commit health care fraud.  I will first instruct you on the

16    elements of conspiracy as they apply here, and then I will

17    instruct you on the elements of the substantive crime of health

18    care fraud so that you may fairly evaluate whether a defendant

19    conspired to commit that crime.

12:31 20         As you may understand by now, with a conspiracy, the

21    crime is the agreement to commit the substantive offense rather

22    than the commission of the substantive offense.  So here, the

23    crime is the agreement to commit health care fraud rather than

24    the actual commission of health care fraud.

25         To find the defendant guilty of Count 1, you must

1   unanimously find that the government has proved each of the

2   following elements beyond a reasonable doubt.

3          First, that at least two people agreed to commit

4   health care fraud, and, second, that the defendant willfully

5   joined the agreement intending that health care fraud be

6   committed.  A conspiracy is an agreement, spoken or unspoken.

7   The conspiracy does not have to be a formal agreement or plan

8   in which everyone involved sat down together and worked out all

9   the details.  But the government must prove beyond a reasonable

12:32 10   doubt that those who were involved shared a general

11   understanding about the crime.  Mere similarity of conduct

12   among various people or the fact that they may have associated

13   with each other or discussed common aims and interests does not

14   necessarily establish proof of the existence of a conspiracy,

15   but you may consider such factors.

16          To act willfully means to act voluntarily and

17   intelligently and with the specific intent that the underlying

18   crime be committed.  That is to say, with bad purpose, either

19   to disobey or disregard the law, not to act by ignorance,

12:32 20   accident or mistake.  The government must prove two types of

21   intent beyond a reasonable doubt before a defendant can be said

22   to have willfully joined the conspiracy:  an intent to agree

23   and an intent, whether reasonable or not, that the underlying

24   crime be committed.  Mere presence at the scene of a crime is

25   not alone enough, but you may consider it among other factors.

1    Intent may be inferred from the surrounding circumstances.

2            Proof that the defendant willfully joined in the

3    agreement must be based upon evidence of her own words and/or

4    actions.  You need not find that the defendant agreed

5    specifically to or knew about all the details of the crime or

6    knew every other co-conspirator or that she participated in

7    each act of the agreement or played a major role, but the

8    government must prove beyond a reasonable doubt that she knew

9    the essential features and general aims of the venture.  Even

12:33 10   if the defendant was not part of the agreement at the very

11    start, she can be found guilty of conspiracy if the government

12    proved that she willfully joined the agreement later on.  On

13    the other hand, a person who has no knowledge of a conspiracy

14    but simply happens to act in a way that furthers some object or

15    purpose of the conspiracy does not thereby become a

16    co-conspirator.  The government does not have to prove that the

17    conspiracy succeeded or was achieved.  The crime of conspiracy

18    is complete upon the agreement to commit the underlying crime.

19            Here, the indictment alleges that this conspiracy

12:33 20   began in January 2013 and continued until January 2017 and that

21    it had one object, to commit health care fraud, that is, to use

22    materially false and fraudulent statements in connection with

23    health care benefits to obtain payments from MassHealth.  The

24    government must prove the existence of the conspiracy and not

25    some other conspiracy beyond a reasonable doubt and that the

1    defendant joined this conspiracy and not some other conspiracy

2    also beyond a reasonable doubt.

3         To help you evaluate this conspiracy charge, I will

4    instruct you on the law concerning the underlying substantive

5    charge.

6         The government does not have to prove the underlying

7    conduct.  All that must be proven for Count 1 beyond a

8    reasonable doubt are the elements of the conspiracy charge, in

9    other words the agreement to commit health care fraud, rather

12:34 10    than the offense of health care fraud itself.

11         As I mentioned, the object of the conspiracy alleged

12    in Count 1 is health care fraud.  Count 2 of the indictment

13    charges the defendant with the substantive offense of health

14    care fraud.  In other words, going beyond agreeing to commit

15    the crime to actually committing it.

16         The indictment alleges the scheme to defraud

17    MassHealth from in or about January 2013 to in or about January

18    2017, by means of materially false and fraudulent pretenses,

19    representations, and promises in connection with the delivery

12:35 20    of and payment for health care benefits, items and services by

21    submitting and causing to be submitted false and fraudulent

22    claims for services.

23         I will instruct you now on the law of health care

24    fraud.  You will need to consider the elements of health care

25    fraud when considering both Count 1, the conspiracy count, and

1    Count 2, the substantive count.

2         For Count 2, health care fraud, the government must

3    prove the following elements:  First, that there was the scheme

4    substantially as charged in the indictment to defraud a health

5    care benefit program or to take any money owned by or under the

6    custody or control of such a program by means of false and

7    fraudulent pretenses, representations, or promises.

8         Second, that the defendant knowingly and willfully

9    participated in the scheme with the intent to defraud.  And

12:35 10   third, that the scheme was in connection with the delivery of

11   or payment for health care benefits, items or services.

12        A scheme includes any plan, pattern, or course of

13   action.  It is not necessary that the government prove all of

14   the details alleged in the indictment concerning the precise

15   nature and purpose of the scheme or that the alleged scheme

16   actually succeeded in defrauding anyone, but the government

17   must prove beyond a reasonable doubt that the scheme was

18   substantially as charged in the indictment.

19        The term "defraud" means to deceive another in order

12:36 20   to obtain money or property by misrepresenting or concealing a

21   material fact.  With regards to health care fraud, the

22   government asserts that the scheme here involved multiple types

23   of fraud, including, for example, billing for medically

24   unnecessary services and billing for services not rendered.

25   You do not have to be unanimous about the way in which

defendant defrauded MassHealth, but you must be unanimous in
finding that the government has proved each element of health
care fraud beyond a reasonable doubt.

To find the defendant guilty, this will require you to
find that the government proved beyond a reasonable doubt that
the defendant executed or aided and abetted the execution of
the scheme charged in the indictment, that is, a scheme to
defraud MassHealth by means of false and fraudulent pretenses.

A "health care benefit program" is any public or
private plan or contract affecting commerce under which any
medical benefit, item or service is provided to any individual.
I instruct you that MassHealth is a health care benefit
program.

The term "false or fraudulent pretenses" means any
false statements or assertions that were either known to be
untrue when made or were made with reckless indifference to
their truth and that were made with the intent to defraud.  The
term includes actual, direct false statements as well as
half-truths and the knowing concealment of facts.  The false or
fraudulent representations at issue must be material.

A "material" fact or matter is one that has a natural
tendency to influence or be capable of influencing the decision
of a decision-maker to whom it was addressed.  Here, the
government contends that the material facts concern allegedly
false -- allegedly false and fraudulent pretenses and

1  representations made to MassHealth with regards to

2  reimbursement for services.  A violation of the regulations

3  establishing when someone is entitled to be reimbursed for

4  services is not criminal in and of itself, but false

5  representations regarding compliance with those regulations can

6  be the basis of a guilty finding if this and all the other

7  elements of the charged offense are established by the

8  government beyond a reasonable doubt.

9       The defendant acted knowingly if she was conscious and

12:38 10  aware of her actions and realized what she was doing and what

11  was happening around her and did not act because of ignorance,

12  mistake or accident.  In deciding whether the defendant acted

13  knowingly, you may infer that the defendant had knowledge of a

14  fact if you find that she deliberately closed her eyes or was

15  willfully blind to a fact that would have otherwise been

16  obvious to her.

17       In order to infer knowledge, you must find that two

18  things have been established:  First, that the defendant was

19  aware of a high probability of the fact in question.  Second,

12:38 20  that the defendant consciously and deliberately avoided

21  learning of the fact.  That is to say, defendant willfully made

22  herself blind to that fact.  It is entirely up to you to

23  determine whether she deliberately closed her eyes to the fact

24  and, if so, what inference, if any, should be drawn.  However,

25  it is important to bear in mind that mere negligence or mistake

 1    in failing to learn the fact is not sufficient.  There must be

 2    a deliberate effort to remain ignorant of the fact.

 3          An act or failure to act is willful if done

 4    voluntarily and intentionally with specific intent to do

 5    something the law forbids or with the specific intent to fail

 6    to do something the law requires to be done, that is to say

 7    with bad purpose either to disobey or disregard the law.  Thus,

 8    if defendant acted in good faith, she cannot be guilty of the

 9    crime.  This means that if the defendant had a good faith

12:39 10    belief that she was not violating the law, even if that belief

11    was mistaken, she did not have the necessary intent to commit

12    the crime.  A defendant's good faith is a complete defense

13    because good faith is simply inconsistent with the element of

14    willfulness.  The law punishes only those people who act

15    willfully and with an intent to violate the law.

16          The burden to prove intent, as with all other elements

17    of the crime, rests with the government.  Intent or knowledge

18    may not ordinarily be proven directly because there's no way of

19    directly scrutinizing the workings of the human mind.  In

12:39 20    determining what the defendant knew or intended at a particular

21    time, you may consider any statements made or acts done or

22    omitted by the defendant and all other facts and circumstances

23    received in evidence that may aide in your determination of the

24    defendant's knowledge or intent.  You may infer but are not

25    required to infer that a person intends the natural and

probable consequence of acts knowingly done or knowingly
committed -- knowingly omitted.  It is entirely up to you,
however, to decide what facts are proven by the evidence
received during this trial.

You have heard testimony and evidence concerning
certain civil rules and/or regulations which govern the conduct
of providers of home health aide services.  Again, the
violation of any of these rules and regulations is not a crime
in and of itself and is not determinative of a defendant's
guilt or innocence.  The fact that certain civil rules and
regulations may have been violated can, however, be used by you
to assist you, as you may find useful, in determining Ms.
Newton's motive or intent as to the crimes charged in the
indictment.

In Count 2, the defendant has been charged with a
substantive charge of health care fraud, both as a principal
and an aider or abettor.  I just instructed you on the elements
of health care fraud that need to be proven beyond a reasonable
doubt for to you find the defendant guilty as a principal.  I
will now instruct you on what must be proven beyond a
reasonable doubt for you to find the defendant guilty as an
aider or abettor.

To aid or abet means to intentionally help someone
else commit an offense.  For you to find the defendant guilty
as an aider or abettor, you must unanimously find that the

government has proved each of the following beyond a reasonable doubt:  First, that someone else committed the charged offense; second, that the defendant took an affirmative act in furtherance of that offense; and third, that the defendant did so intending to facilitate the commission of the offense.

To be guilty of aiding or abetting, the defendant need not have participated in each of the elements of the offense, so long as she facilitated, or assisted, some part of it by words, acts, encouragement, support, or presence.  She must, however, have participated in the offense as something she wished to bring about.  Mere association with the principal or mere presence at the scene of the crime, even when combined with knowledge that a crime will be committed, is not sufficient to establish aiding and abetting.

Where, as here, the defendant is charged both as a principal and as an aider or abettor, you may find her guilty if you unanimously conclude beyond a reasonable doubt that she was either a principal, an aider or abettor, or both.  You need not be unanimous as to whether she was a principal as opposed to an aider or abettor.  To find her guilty of health care fraud each of you must conclude that the government has proved beyond a reasonable doubt that she committed the offense herself or as an aider or abettor.

In Count 7 the defendant is charged with another conspiracy:  Conspiracy to commit money laundering.  Here, the

1  indictment alleges that this conspiracy began in January 2013

2  and continued until August 2018.  As with Count 1, the

3  government must prove the existence of this conspiracy and not

4  some other conspiracy and that the defendant joined this

5  conspiracy and not some other conspiracy and must prove both of

6  these things beyond a reasonable doubt.

7        As before, I will instruct you on the conspiracy law

8  that applies to this count and then instruct you on the

9  substantive crime of money laundering that is the alleged

12:43 10  object of the conspiracy.  Again, with a conspiracy, the crime

11  is the agreement to commit the substantive offense, here money

12  laundering, rather than the commission of the substantive

13  offense.

14        To prove the conspiracy charged in Count 7, the

15  government must prove, first, that there was an agreement

16  between two or more persons to commit the crime of money

17  laundering, and, second, that the defendant willfully joined in

18  that agreement.  As I mentioned, the object of the conspiracy

19  alleged in Count 7 is money laundering.  Counts 8 through 10 of

12:43 20  the indictment charge the defendant with substantive money

21  laundering.  In each of these three counts -- each of these

22  three counts references a specific transaction that took place

23  on a certain date and each involved a different bank account.

24        To help you evaluate the conspiracy charge in Count 7

25  and for the money laundering charges in Counts 8 through 10, I

will instruct you on the law of money laundering.  For Counts 8 through 10, the government must prove the following elements: First, that the defendant engaged in a monetary transaction over $10,000 by, through, or to a financial institution affecting interstate commerce on or about the date specified in the indictment.

Second, that the defendant knew that the money came from some kind of criminal activity.  Third, that the money was in fact criminally derived from a specified unlawful activity, which in this case means health care fraud or conspiracy to commit health care fraud.  Fourth, that the monetary transaction took place in the United States or was engaged in by a person in the United States.

Affecting interstate commerce means that the transaction affected commerce in any way or degree.  A minimal effect is sufficient.  For example, a transaction in an FDIC-insured bank satisfies the requirement of affecting interstate commerce.

To prove that the money in a money laundering transaction is criminally derived property, the government can either trace the money directly to an unlawful activity or, in certain cases, may rely on a presumption that the money is criminally deprived property.  Sometimes, an alleged money laundering transaction is a transfer from a commingled account. A commingled account is an account containing both money that

was not criminally derived and money that was criminally

derived.  When the money involved in an alleged money

laundering transaction comes from a commingled account, the

government may not rely on a presumption that the money

involved in the transaction was criminally derived unless the

amount of money involved in the transaction exceeded the amount

of non-criminally-derived money in the account.

If you find that the amount of money in the

transaction was less than the amount of non-criminally-derived

money or clean money in the account, you must find the

defendant not guilty of that charge of money laundering unless

the government can trace the money involved in the transaction

directly to the criminal activity.

The question of possible punishment of a defendant

should not in any sense enter into or influence your

deliberations.  The duty of imposing sentence rests exclusively

with me.  Your function is to weigh the evidence in the case to

determine whether or not the defendant is guilty beyond a

reasonable doubt based solely on the evidence that you have

heard or seen during this trial in this courtroom.

You saw Ms. Waruru's plea agreement and heard

testimony about the federal sentencing guidelines and how they

might apply to her case.  The sentencing guidelines are a set

of non-binding or advisory rules that help a judge determine an

appropriate sentence in any given case.  The sentencing

1    guideline calculation takes into account a defendant's personal

2    characteristics, the crime or crimes they committed that led to

3    the sentencing, their criminal history and, in a fraud case,

4    the amount of loss reasonably foreseeable to the defendant

5    being sentenced.  Because of all of these variables, the

6    calculations can vary even among people who committed the same

7    or similar crimes.  The potential sentence facing Ms. Waruru

8    can be used by you to help assess her credibility, but should

9    not be considered by you in determining whether or not the

12:46 10   government has met its burden of proof beyond a reasonable

11   doubt in this case against this defendant.

12        All right.  All that's left is a couple instructions

13   about your deliberations, but first I'm going to talk to the

14   parties at sidebar and let them make any objections they have

15   to the instructions that I just gave.

16   **SIDEBAR:**

17        MR. VIEN:  Should I go first, Your Honor?

18        THE COURT:  Sure.

19        MR. VIEN:  I just want to renew my objection, on page

12:51 20   3 instead of "should," I want "may."  I understand Your Honor

21   overruled.  And the next one is 23 on unanimity.  I've already

22   articulated the basis for it, and I know you ruled against me,

23   but I want to preserve it.

24        On page 26 I have a slightly new objection that I

25   didn't bring up before.  I just missed it.  Because Count 2 is

1    a scheme, alleges a scheme, and aiding and abetting is

2    inappropriate for that, it should be, it's like aiding and

3    abetting a conspiracy, which gets us into all kinds of

4    problems.  So I would ask that you strike the aiding and

5    abetting charge regarding Count 2.

6            And page 31, I understand what you tried to

7    accomplish, and I appreciate it, about reasonable

8    foreseeability.  But I think the next sentence undermines it,

9    "Because of all these variables, the calculation can vary among

12:51 10   people who have committed the same or similar crimes."  So it

11   kind of conflates the reasonably foreseeable calculation, which

12   was what we focused on, the amount of the loss -- the overall

13   assessment of the defendant's sentence and calculation of the

14   guidelines.  Our point throughout the trial has been that the

15   government gave Ms. Waruru a tremendous break by saying that

16   what was reasonably foreseeable to her was 1.5 million even

17   though they allege in the indictment she devised the scheme

18   which resulted or tried to result in a $100 million loss.  So I

19   wanted to make sure that I objected to that.

12:51 20          THE COURT:  Okay.  So that instruction on punishment

21   says that one of the factors is the amount of loss reasonably

22   foreseeable to the defendant being sentenced.  So I understand

23   the objection, but I think it's been fairly covered.  All the

24   other things were preserved for the record, with the exception

25   of the aiding and abetting.

1          So, first, any corrections by the government?  Then

2     I'll hear you on aiding and abetting.

3          MR. BRADY:  No corrections, Your Honor.

4          THE COURT:  So I'll hear you on aiding and abetting.

5          MR. BRADY:  Your Honor, if I may have a moment, I just

6     want to have it in front of me.  Your Honor, I'm not aware of

7     any authority to support the claim that it's somehow impossible

8     for a defendant to aid and abet in health care fraud where it

9     is charged as it is here, as a scheme.  I think in the absence

12:51 10     of any authority on this, I don't think there's any need to

11     change or correct this instruction.  It's consistent with I

12     think our understanding of the law and appropriate here.

13          THE COURT:  Okay.  I'm not aware of anything either,

14     and I think that you can aid and abet in health care fraud.  So

15     I'm going to leave it, unless the government wants to withdraw

16     the aiding and abetting theory.

17          MR. BRADY:  I think at this stage of the game, I'm not

18     inclined to monkey around with it.

19          THE COURT:  So I don't have need to give any further

12:51 20     instruction.

21          MR. VIEN:  I just want to make it clear we're treating

22     it like a substantive offense instead of a scheme.  That's the

23     point of my objection.  I just want to be clear.  I understand

24     your ruling.  I'm not arguing with you.  I just wanted to make

25     it clear.

1          THE COURT:  I think their case has been primarily has

2     been principal, aider, in any event.  Okay.

3     (End of sidebar.)

4          THE COURT:  It's now time for you to start your

5     deliberations.  Let me say a few words about those

6     deliberations.  Each of you must decide the case for yourself,

7     but you should do so only after considering all of the evidence

8     and listening to the views of your fellow jurors.  You should

9     not hesitate to reconsider your views from time to time and to

12:51 10   change them if you're persuaded that this is appropriate.

11          You do not come to a decision simply because other

12     jurors insist that it is right, and do not surrender an honest

13     belief about the weight and effect of the evidence just to

14     reach a verdict.  Your verdict must be unanimous as to each of

15     the questions I'm going to ask you to answer on the verdict

16     form.

17          I am going to ask juror number 4 -- right, that's you?

18     No, don't look sideways -- right there, to serve as the

19     foreperson.  The foreperson will have the same voice and the

12:51 20   same vote as the other deliberating jurors.  The fact that one

21     of you is the foreperson does not give that person special

22     status in your deliberations.  You're all equal.

23          The foreperson will act to the extent helpful as the

24     moderator of the discussion and will serve as the jury

25     spokesperson.  The foreperson's most important obligation is to

1    ensure that any juror who wishes to be heard on any material

2    issue has a full and fair opportunity to be heard by his or her

3    fellow jurors.  If you as a group decide to take a recess

4    during your deliberations, you stop discussing the case until

5    the recess is over.  Do not discuss the case during a recess

6    when not all the jurors are present.

7          If it becomes necessary during your deliberations to

8    communicate with me, you may do so by sending a note to the

9    court officer.  No member of the jury should ever attempt to

12:52 10    communicate with me, except by such a signed note.  If you do

11    communicate with me, do not tell me in the note how you stand

12    numerically or otherwise on any issue before you until after

13    you have reached a verdict.  You are not to communicate with

14    anyone but me about the case outside of the jury room and then

15    only in writing.  In turn, I will communicate with you only in

16    writing or orally here in open court on anything concerning the

17    case.

18          On matters touching on things like the arrangement for

19    your meals, schedules, convenience, you're free to communicate

12:53 20    with the court officer or Karen orally rather than in writing.

21          When you reach your verdict, your answers will be

22    recorded by your foreperson on what is called the verdict slip

23    or verdict form.  That is simply the written notice of the

24    decision you reach in this case.  After you've reached

25    unanimous agreement on the verdict, your foreperson will fill

          1    in the verdict form, sign and date it and advise the court

          2    officer outside your door that you're ready to return to the

          3    courtroom.

          4         After you return to the courtroom, your foreperson

          5    will deliver the completed verdict form as directed in open

          6    court.  This is the verdict form.  I'm going to start with

          7    giving you a few copies.  If you want more of them, let us

          8    know.  But the first page is blank.  It just says "Verdict

          9    Form."  So when you're walking around with it, nobody can see

12:53    10    your vote.  It's like a cover page.  Then there's two more

         11    pages.  You'll see there's one question for each count.  So,

         12    for example, Count 1 says, "Do you the jury find the defendant

         13    not guilty or guilty of conspiring to commit health care fraud

         14    as charged in Count 1?"  And you check off "Guilty" or "Not

         15    guilty," and just march right through those all the way to the

         16    end.  And then at the very end, the foreperson will date and

         17    sign it and let us know that you're ready to come back.

         18         Just a few little details about the mechanics.  We're

         19    going to send up the evidence, which will be available to you

12:54    20    electronically up in the jury room, except I think there's --

         21    the Excel spreadsheets should come up on a laptop, right?

         22         COURTROOM CLERK:  Yes.

         23         THE COURT:  The Excel spreadsheets don't load into

         24    that electronic court system, so we're sending those up on a

         25    separate laptop or iPad so you can look at those.

1          So you'll have the verdict form.  You'll have several

2    copies of the jury instructions right now.  We'll bring up a

3    few more as soon as they finish being copied.  You'll have the

4    verdict form.

5          The schedule is completely up to you.  So as I said,

6    your lunch will be up at 1:00.  You may want to eat lunch

7    before you get to work on this, which will give us a chance to

8    bring everything else up to you.  How long you stay today, when

9    you come back on Monday, that is all up to you.  We will poke

12:55 10   our heads in at some time in the afternoon, probably about

11   4:00, to find out if you want to stay here through dinner.

12   Because if you want to stay here through dinner, we need to

13   make arrangements for that.  So that question is not meant to

14   rush or hurry you in any way.  It's just the logistics of

15   making sure we can feed you if you decide to stay.

16          We won't bring you into the courtroom at the beginning

17   of the day or at the end of the day.  You all will decide -- if

18   you're coming back on Monday, you'll decide today what time you

19   want to meet.  You'll meet up there.  You won't start

12:55 20   deliberating until everybody is there, but as soon as everybody

21   is there, you can start deliberating.  And you can leave any

22   time you want today or on Monday.  The only thing I would ask

23   is that you let somebody know that you are leaving so all the

24   rest of us aren't hanging around thinking that you're still up

25   there, just to let us know where you are.

 1          I think that covers it.  Anything else?  Does the

 2    government want to be heard on anything I've said since we last

 3    convened?

 4          MR. BRADY:  No, thank you, Your Honor.

 5          THE COURT:  Mr. Vien?

 6          MR. VIEN:  No, Your Honor.

 7          THE COURT:  So four of you are alternates.  We're

 8    going to peel you off right now.  You're going to sit in a

 9    separate room, but I want you to go up and get your food before

12:56 10    you go into your separate room.  The four alternates are the

 11    four of you sitting in the last four chairs.  Separate room for

 12    you.  We'll get you what you need to keep yourself occupied,

 13    but I want you to go up and get your food before you go to your

 14    separate room.  Okay?

 15          THE JUROR:  Just a point of clarification, the last

 16    four chairs in the back row or the last two on each row?

 17          THE COURT:  The last four chairs in the back row.  One

 18    of the four of you just raise your hand to make sure we're all

 19    on the same page.  Yes, so they know who they are.

12:56 20          THE JUROR:  Just wanted to make sure.

 21          THE COURT:  I'm not going to apologize for that.

 22          COURTROOM CLERK:  All rise for the jury.

 23          (Jury exits the courtroom.)

 24          THE COURT:  I just want to say before the jury comes

 25    back and we know what they think about the case, I really want

1    to compliment everybody on a superb job done in this case.

2         For the government lawyers, I know you all stepped in

3    sort of at the last minute and you did a very competent and

4    professional job doing it.  You worked well with the other

5    team, and I appreciate that.

6         Mr. Vien and Ms. Pascucci, your defense of your

7    client, however this turns out, has really been exemplary.

8    It's been careful, it's been thorough, it's been thoughtful,

9    and I really commend you for that.

12:58 10        So, you know, when a verdict comes back, it is

11   unlikely that everybody is going to be happy, and I just don't

12   want our knowledge of how this turns out to in any way impact

13   the force of what I'm saying about the quality of

14   representation in this case.  I really want to thank you all

15   for it.  It wasn't an easy case to try for various reasons, but

16   to the extent possible, you made my job as easy as it could be.

17   And so I want to thank you, and I want to compliment you on

18   that.  All right.

19        MR. BRADY:  Appreciate that, Your Honor.

12:58 20        THE COURT:  We will keep you posted on what the jury

21   is doing.  If there are any exhibit issues to work out, Karen

22   is sitting here now.  We have two copies of the instructions to

23   send up to them now, and some of them, we'll send up another

24   ten copies.  I'm going to stop in and tell the alternates, just

25   let them know why they're staying in case they need to sub in

1    for anybody.

2        COURTROOM CLERK:  I was going to go get them in a

3    little bit.  They're just getting their food.

4        THE COURT:  Do you want me to bring them back in the

5    courtroom to tell them that?

6        MR. BRADY:  I don't think so.

7        THE COURT:  Just because she was asking if she could

8    go made me realize --

9        MR. VIEN:  Your Honor, just two very brief comments.

12:59 10    One, we sincerely appreciate the comments about how we did.

11    Second, I've tried to discuss -- we have discussed with the

12    government an issue under 3143, and I just wanted to raise that

13    for you so you were thinking about it.  Obviously we disagree.

14    I'm going to apprise my client about what 3143 says, but I

15    wanted to bring that to your attention so it wasn't a surprise

16    if we ever get there.

17        THE COURT:  Yes, it has also been on my mind under the

18    circumstances of this case.

19        MR. BRADY:  On that, Your Honor, we've had plenty to

12:59 20    think about to get to this moment.  It's something we will give

21    thought to in the meantime as well.

22        THE COURT:  Okay.  On my mind is what's come before.

23        MR. BRADY:  Understood.

24        MR. VIEN:  Thank you, Your Honor.  I just wanted to

25    raise it for you.

1          THE COURT:  I usually require people to stay like

2     within ten minutes of the courthouse.  I like to think they're

3     going to have lunch, so if you're gone from 1:00 to 2:00,

4     that's fine, but then they will be hanging around.

5          MR. VIEN:  We'll probably stay.

6          THE COURT:  That's fine.

7          MR. BRADY:  Just for the government, we had an

8     opportunity to review the exhibit log provided by the clerk,

9     and based on our review, we're comfortable that this is correct

01:05 10     and have no further objection or issue with them.

11          MS. PASCUCCI:  We agree these are the correct

12     exhibits.  Thank you.

13          (Adjourned, 1:00 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                   CERTIFICATE OF OFFICIAL REPORTER

2

3           I, Kelly Mortellite, Registered Merit Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter to the best of my skill and ability.

9                   Dated this 10th day of July, 2023.

10

11                  /s/ Kelly Mortellite

12                  _____

13                  Kelly Mortellite, RMR, CRR

14                  Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25