```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS



                                )
UNITED STATES OF AMERICA,        )
                                )           Criminal Action
          Plaintiff,             )           No. 21-10035-ADB
                                )
v.                               )
                                )
FAITH NEWTON,                    )
                                )
          Defendant.             )
                                )




                    JURY TRIAL DAY SIX

          BEFORE THE HONORABLE ALLISON D. BURROUGHS
              UNITED STATES DISTRICT JUDGE


                    July 6, 2023


          John J. Moakley United States Courthouse
                    Courtroom No. 17
                    One Courthouse Way
              Boston, Massachusetts  02210




                              Kelly Mortellite, RMR, CRR
                              Jessica Leonard, RPR
                              Official Court Reporters
                              One Courthouse Way, Room 3200
                              Boston, Massachusetts  02210
                              mortellite@gmail.com
```

```
 1    APPEARANCES:

 2    On Behalf of the Government:
      William B. Brady
 3    Christopher R. Looney
      United States Attorney's Office MA
 4    1 Courthouse Way
      Suite 9200
 5    Boston, MA 02210
      617-748-3287
 6    william.brady@usdoj.gov
      christopher.looney@usdoj.gov
 7
      On Behalf of the Defendant:
 8    George W. Vien
      Michelle R. Pascucci
 9    Nathaniel R. B. Koslof
      Donnelly, Conroy & Gelhaar, LLP
10    260 Franklin Street
      Boston, MA 02110
11    617-720-2880
      Fax: 617-720-3554
12    gwv@dcglaw.com
      mrp@dcglaw.com
13    nrbk@dcglaw.com

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2                          CONTENTS

3   WITNESS                                          PAGE

4


5
    SCOTT WISNASKAS
6
        Direct Examination By Mr. Brady (Cont)          6
7        Cross-Examination By Mr. Vien                   64

8
    ASHLEIGH SERAFIM
9
        Direct Examination By Mr. Looney               77
10        Cross-Examination By Mr. Vien                   97
         Redirect Examination By Mr. Looney             108
11
    ROBERT WYMAN
12
        Direct Examination By Mr. Looney              109
13        Cross-Examination By Ms. Pascucci             121

14  STEPHEN DOHERTY

Direct Examination By Mr. Looney              123

16  BRIDGET HORAN

17        Direct Examination By Mr. Looney              129
         Cross-Examination By By Mr. Vien              173
18        Redirect Examination By Mr. Looney             177
         Recross-Examination By Mr. Vien               178
19

20

21

22

23

24

25

E X H I B I T S

Exhibit No.            Received

1

2

3      722                    11

4      715-01                 17

5      715-02                 19

6      715-03                 20

7      715-04                 22

8      715-05                 23

9      715-06                 24

10     715-07                 26

11     715-08                 27

12     715-09                 29

13     715-10                 30

14     715-11                 31

15     715-12                 34
       715-13
16     715-14
       715-15
17     715-16

18     907                    44

19     713                    46

20     706, 707,              59
       708, 709,
21     710, 720

22     721                    83

23     716                   112

24

25     (cont.)

| | Exhibit | Received |
|---|---|---|
| 1 | | |
| 2 | 92.01 | 114 |
| 3 | | |
| | 55.01 | 126 |
| 4 | | |
| | 712.01 | 132 |
| 5 | 712.03 | |
| | 712.05 | |
| 6 | 712.06 | |
| | 712.07 | |
| 7 | 712.08 | |
| | 712.09 | |
| 8 | 712.12 | |
| | 712.13 | |
| 9 | 712.14 | |
| | 712.15 | |
| 10 | 712.16 | |
| | 712.18 | |
| 11 | 712.19 | |
| | 712.20 | |
| 12 | 712.21 | |
| 13 | 94 | 134 |
| 14 | 70.1 | 156 |
| 15 | 908 | 160 |
| 16 | 92-03 | 164 |
| 17 | 55-02 | 166 |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

```
 1                    P R O C E E D I N G S
 2              (The following proceedings were held in open court
 3    before the Honorable Allison D. Burroughs, United States
 4    District Judge, United States District Court, District of
 5    Massachusetts, at the John J. Moakley United States Courthouse,
 6    One Courthouse Way, Courtroom 17, Boston, Massachusetts, on
 7    July 6, 2023.)
 8              (The jury entered the courtroom at 10:00 a.m.)
 9              THE CLERK:  Court is in session.  Please be seated.
10              THE COURT:  Welcome back, everyone.  One of the jurors
11    just handed me a question which I'll read and share with the
12    parties later on, but I'm going to get started before I do
13    that.  I'm going to remind you that you're under oath.
14              THE WITNESS:  Yes.
15              THE COURT:  And I forget who is questioning, but when
16    the Government is ready --
17              MR. BRADY:  It's me, Your Honor.
18              THE COURT:  When you're ready, Mr. Brady.
19                  SCOTT WISNASKAS, previously sworn
20    DIRECT EXAMINATION BY MR. BRADY (Cont):
21    Q.   Welcome back, Special Agent.
22    A.   Good morning.
23              MR. BRADY:  Ms. Apfel, could we pull up Exhibit 714,
24    please?
25    BY MR. BRADY:
```

1    Q.    Special Agent, do you recall when we left off yesterday,

2    we were walking through a chart of text messages that you had

3    put together?

4    A.    I do.

5    Q.    Now, the whole chart is going to be in evidence, I just

6    want to ask you to read just a handful more of these, okay?

7    A.    Sure.

8            MR. BRADY:  So if we could go to page 17.  Thank you.

9    BY MR. BRADY:

10   Q.    What's the date on these messages?

11   A.    It's November 30, 2016.

12   Q.    And who are these messages between?

13   A.    Faith Newton and Joan Kagendo.

14   Q.    And can you remind us who Joan Kagendo was?

15   A.    A nurse at Arbor.

16   Q.    Starting at the top, would you please read the messages

17   back and forth?

18   A.    "Faith Newton:  Wow, surprised now that you are high.  Let

19   me tell you something, MassHealth visited one of our patients

20   for double billing because stupid HHA has been writing notes

21   for dialysis patient while patient is at dialysis.  But the

22   good thing patient said during the dialysis the HHA goes in the

23   morning to get her ready and goes back in the evening to help

24   her after dialysis.  They promised to go back to visit her

25   again on unknown future days.

1      "Joan Kagendo:  Oh, Jesus.

2      "Faith Newton:  I know.

3      "Joan Kagendo:  I hope that's not the patient for Karanu,

4  because I asked her about it. One of the Karanus.  She even

5  responded with a schedule and where she goes to dialysis.

6          "Faith Newton:  No.  Joanna Karanu

7          "Joan Kagendo: Oh, Lord.  That's a different one.

8          "Faith Newton:  They had the HHA notes care plan.

9  They also wanted to see the shower chair. Thank God everything

10 was in place so we had more than one.

11         "Joan Kagendo:  Yeah, there was one for Karanu because

12 I even asked her to give me the name of the place patient goes

13 to dialysis.  And she even gave me the schedule to compare HHA

14 notes.  I told payroll to have HHA change the time of the

15 dialysis. Even another one for daycare HHA put in time of the

16 patient in that daycare. Crazy.  Patient goes 8 to 4 and HHA is

17 doing those like 7 to 11:00 a.m. or something like that.  Can

18 you imagine?

19         "Faith Newton:  Oh, my God. I hope they don't go

20 through them all.  That is critical."

21         MR. BRADY:  We can pop out of that?  And can we go to

22 page 20.

23         MR. VIEN:  Excuse me.  Do we -- wasn't there some left

24 off at the end there on the next page.

25         MR. BRADY:  Oh, I'm sorry, can we go back?

1    BY MR. BRADY:

2    Q.    That's right, can we go ahead and read those?

3    A.    Sure.

4          "Joan Kagendo:  No it's okay.  As long as you fix things

5    they see you've corrected the mistake they're fine.  Please can

6    you follow up tomorrow with payroll and ask them if all the

7    HHAs have the patient's sign sheet and if they're being faxed

8    or e-mailed by the HHAs.

9          "Faith Newton:  Okay.  Hurry up and come fix it.

10         "Joan Kagendo:  Yes, ma'am.  Ha-ha, okay."

11         MR. BRADY:  Can we jump ahead to page 20.

12   BY MR. BRADY:

13   Q.    Who are these messages between?

14   A.    Between Faith Newton and Vannak Kann.

15   Q.    Who is Vannak Kann?

16   A.    He was the president at Arbor at one time.

17   Q.    What are the dates on these messages?

18   A.    January 31, 2016.

19   Q.    And what did they write to each other?

20   A.    "Vannak Kann:  Hi guys.  Maestro offers 15 to 15.50 per

21   hour and kick bag, when I talked to a few people at Cambodian

22   center in Lynn.  Would we offer the same for new HHA in Lynn

23   and Revere.

24         "Faith Newton:  No way, that is illegal.

25         "Vannak Kann:  We are not giving the kick bag, but if

1    we want to be aggressive, we have to do something with rate."

2          MR. BRADY:  Let's jump ahead to page 25 of this chart.

3    BY MR. BRADY:

4    Q.   And who are these messages between?

5    A.   Between Faith Newton and Eunice Muiruri.

6    Q.   And who is Eunice Muiruri?

7    A.   She was a nurse at Arbor.

8    Q.   And what is the date on this?

9    A.   January 23, 2017.

10   Q.   What did they write?

11   A.   "Eunice Muiruri:  Ma, sorry to bother you.  The lady at

12   New England is sending HHA away, that they have to have a

13   certificate from the state.  Call me when you have time.

14          "Faith Newton:  Yes, they have to.

15          "Eunice Muiruri:  Okay."

16          MR. BRADY:  Let's go to the next page, which is page

17   26, please.  And who are these messages between?

18   A.   Between Faith Newton and Peninnah Muiruri.

19   Q.   You've also seen her referred to as Penny?

20   A.   Yes.

21   Q.   Who is that?

22   A.   A relative of Faith Newton.

23   Q.   What's the date on these messages?

24   A.   September 19, 2015.

25   Q.   Can you read the first message, please?

1    A.    Sure.  From Penny Muiruri to Faith Newton.  It's a link to

2    a "Boston Globe" article.

3            MR. BRADY:  Ms. Apfel, could we pull this exhibit

4    down, please, for a moment?  And if we could pull up just for

5    the witness and the Court.

6    BY MR. BRADY:

7    Q.    Exhibit 722.  Can you see Exhibit 722 on your screen?

8    A.    I can.

9    Q.    What is Exhibit 722?

10   A.    It's a "Boston Globe" article dated September 18, 2016.

11           MR. BRADY:  Your Honor, I offer Exhibit 722.

12           MR. VIEN:  No objection, Your Honor.

13           THE COURT:  Admitted.

14           (Exhibit 722 admitted into evidence.)

15   Q.    And in the text message you just read, Special Agent,

16   there was an internet link, a hyperlink, right?

17   A.    Yes.

18   Q.    Where does that link take you to?

19   A.    It appears to take you to this article.

20   Q.    What's the headline on this article?

21   A.    "Audit says home health care companies overbilled Mass

22   Medicaid by $23 million."

23   Q.    And what's the first paragraph of this say?

24   A.    "The state's Medicaid program was routinely billed for

25   home health care services that were never provided or were not

1   medically necessary.  Providers submitted documents with

2   missing dates and signatures.  Sometimes basic information like

3   a patient's medical history was nowhere to be found."

4   Q.   And what's the next paragraph say?

5   A.   "These and other alleged violations were uncovered in an

6   audit of nine agencies that do business with the state's

7   Medicaid program called MassHealth, part of an effort by

8   Governor Charlie Baker's administration to rein in soaring

9   spending on home health services."

10        MR. BRADY:  Can we go to the next page, please?

11  BY MR. BRADY:

12  Q.   And you see it identifies the name of a number of home

13  health agencies in here?

14  A.   Yes.

15  Q.   Arbor is not mentioned in here, is it?

16  A.   I don't believe so, no.

17        MR. BRADY:  Can we go to the next page of this?  Can I

18  ask you to blow up the bottom half?

19  BY MR. BRADY:

20  Q.   Can I ask you to read the paragraph that begins

21  "MassHealth officials said."

22  A.   "MassHealth officials said they are continuing to audit

23  other home health companies they suspect of violations.  They

24  point to a staggering increase in home health spending, 82%

25  over just two years as proof that spending must be studied and

1    controlled.  MassHealth, a $15 billion a year program that

2    covers 1.8 million residents spend more than $755 million on

3    home health services in the fiscal year that ended June 30."

4            MR. BRADY:  We can back out of that, and if we could

5    take that exhibit down, please, and go back to the text

6    messages, Exhibit 714 please.  And it was page 26.

7    BY MR. BRADY:

8    Q.  After that link was sent, could you please read the

9    messages that follow?

10   A.  "Faith Newton:  What the hell?  I'm shaking, God help us.

11          "Penny Muiruri:  I know.  They are crazy.

12       "Faith Newton:  Hope to God they don't come here.

13       "Penny Muiruri:  They better not.

14       "Faith Newton:  I know."

15           MR. BRADY:  You can back out of that.  And let's go to

16   page 27 which, I think, is the next one here.

17   BY MR. BRADY:

18   Q.  Who are these messages between on page 27 of this exhibit?

19   A.  Between Faith Newton and Lucy Muthoni Munyi.

20   Q.  And who is Lucy Muthoni Munyi?

21   A.  She's an HHA at Arbor.

22   Q.  What is the date?

23   A.  October 12, 2015.

24   Q.  What do these messages say?

25   A.  "Munyi: Is your husband home or at the office because of

1    the check.  I don't want to unbutton the one you gave me

2    because if I do I might spend it.

3          "Faith Newton: He is and your patient was just

4    complaining that you only go once per week. Only on Monday.

5          "Munyi:  Which one?

6          "Faith Newton:  Santiago.

7          "Munyi:  He's something.  I think he's confused. What

8    does he want?  Do overnights?

9          "Faith Newton:  He was with Adrianna.

10         "Munyi:  Okay.  Like, last week he was with Tay

11   thrice.  Like last week Tay went on the weekend.  She hasn't

12   left him alone.

13         "Faith Newton:  Come to the office and talk to Rosa."

14         MR. BRADY:  Can we jump ahead to page 40 of this

15   exhibit, please.

16   BY MR. BRADY:

17   Q.    Who are these text messages between?

18   A.    Between Faith Newton and Abraham Waruru.

19   Q.    And who is that?

20   A.    He was an LPN at Arbor, a nurse.

21   Q.    What was the date on these messages?

22   A.    February 19, 2014 spilling into February 20, 2014.

23   Q.    What do these messages say?

24   A.    "Waruru: Alfredo Vitini is not leaving.  Her daughter can

25   fill up the application and be the HHA.  Doris Vitini is

```
 1   leaving because her eye doctor only works with neighborhood

 2   health and that's what she had before.  She wants to keep her

 3   own eye doctor, she might come back.

 4        "Faith Newton:  Okay.  We will make him bid in eight hours

 5   HHA to make up for Doris.

 6        "Waruru:  LOL.  LOL.

 7        "Faith Newton:  I LOL like that.  Deals and deals.  That's

 8   how I roll.

 9        "Waruru:  I know how you roll, I told you I want to be

10   like you, remember?

11        "Faith Newton:  Yap, you are getting there.

12           MR. BRADY:  So we can take that down, and we can take

13   down the exhibit, please?

14   BY MR. BRADY:

15   Q.   Special Agent Wisnaskas, yesterday you described that one

16   of the things you did in connection with your testimony was

17   reviewing patient records from Axxess?

18   A.   That's correct.

19   Q.   And remind the jury why you did that?

20   A.   I was looking at the records for a number of patients to

21   see if there were identical note narratives from visit to visit

22   for a number of different patients.

23   Q.   And why were you looking for identical note narratives?

24   A.   To see whether or not, you know, the same note was being

25   used over and over and over again.
```

1    Q.    Did you create any summary charts?

2    A.    I did.

3    Q.    In connection with that?

4    A.    I did.

5          MR. BRADY:  Can we pull up just for the witness and

6    the Court first, please, Exhibit 715-01.

7    BY MR. BRADY:

8    Q.    Special Agent, can you see Exhibit 715-01 on the screen?

9    A.    I can.

10   Q.    What is Exhibit 715-01?

11   A.    So this is a summary I put together for -- after looking

12   at the oasis start of care narratives for two patients, Amber

13   Gardner and Oscar Ortiz.

14         MR. BRADY:  Your Honor, I offer Exhibit 715-01.

15         MR. VIEN:  No objection, Your Honor.

16         THE COURT:  Are there two exhibits marked 715-01?

17         THE CLERK:  There is already one.

18         THE COURT:  We didn't admit it, though.  But are we

19   going to?  In the binder.

20         MR. BRADY:  May I have a moment, Your Honor?

21         THE COURT:  Yes.  I'm happy to give you my binder if

22   that would help.

23         MR. BRADY:  May I approach just to take a look, Your

24   Honor to make sure everything's lining up?

25         THE COURT:  My husband is a corporate lawyer who calls

1    this version control which he thinks I'm not very good at.

2    Someone should tell him I was right on this.

3         MR. BRADY:  So, Your Honor, what we've done is to the

4    extent that we made changes to any of them, the changed ones

5    only are in the folder that I handed back to you with your

6    binder.

7         THE COURT:  Okay.

8         THE CLERK:  So this one is in now?

9         THE COURT:  Yes, admitted without objection.

10         (Exhibit 715-01 admitted into evidence.)

11         MR. BRADY:  Maybe, Ms. Apfel, we could blow up just

12    the top part of this.  That's great.  Thank you.

13    BY MR. BRADY:

14    Q.    Special Agent, how did you put this chart together?

15    A.    So in reviewing the start of care narratives for these two

16    patients, Amber Gardner and Oscar Ortiz, I noticed that other

17    than the first sentence, the narratives are identical for each

18    of these two, including Oscar Ortiz being referred to as "she"

19    multiple times and both patients with the scheduled doctor

20    appointments on the same date of January 16, 2014, but Oscar

21    Ortiz's form had a sign date of March 12, 2014.

22    Q.    And then what do you have in your chart below that?

23    A.    I took -- I extracted just the narrative portion from each

24    of their start of cares, their oasis forms and put them on this

25    form so you can see them more easily.

1          MR. BRADY:  Ms. Apfel, if we could zoom, can I go back

2    to the full page.

3    BY MR. BRADY:

4    Q.   Can you see below the narrative who signed what it says

5    next to signature and date?

6    A.   It was signed electronically by Faith Newton and the date

7    was January 12, 2014.

8          MR. BRADY:  We can take that one down, thank you.

9    BY MR. BRADY:

10   Q.   Now, Special Agent, as part of your review of Axxess

11   records, did you also look at nursing notes or notes from

12   nursing visits?

13   A.   I did.

14   Q.   And where did those notes come from?

15   A.   They were from Axxess.

16   Q.   And did you create any charts to summarize what you saw in

17   those records?

18   A.   I did.

19         MR. BRADY:  Can we pull up Exhibit 715-02, please?

20   BY MR. BRADY:

21   Q.   Special Agent, what is Exhibit 715-02?

22   A.   This was a review of skilled nurse visit notes for patient

23   Amber Gardner for Arbor nurse Winnie Waruru.

24         MR. BRADY:  Your Honor, I offer Exhibit 715-02.

25         MR. VIEN:  No objection, Your Honor.

1           THE COURT:  Admitted.

2           (Exhibit 715-02 admitted into evidence.)

3           MR. BRADY:  Ms. Apfel, could we blow up the top part

4    of that, please.

5    BY MR. BRADY:

6    Q.   Special Agent, how did you put this chart together?

7    A.   So in reviewing these notes, I noticed that a number of

8    the note narratives for different visits contained a variation

9    of a particular phrase, the phrase being "sn instructed patient

10   on positive self-talk, socializing with supportive friends or

11   taking a walk.  Patient instructed on benefits of daily

12   exercise and weight control." I found that that same -- a

13   variation of that phrase was used 184 times between the dates

14   of January 13, 2014, and May 22, 2014.

15   BY MR. BRADY:

16   Q.   Who was the nurse who signed these according to the

17   record?

18   A.   Winnie Waruru.

19   Q.   And if we could go to the next page of this chart, what

20   did you include after that?

21   A.   I included a handful of examples from the different notes

22   that had that phrase on there.

23           MR. BRADY:  And, Ms. Apfel, if we could just click

24   over to the next page?

25   BY MR. BRADY:

1    Q.    What did you include after that in your chart?

2    A.    I included the full page from the skilled nurse visit,

3    from the Axxess records, showing the narrative was there, so

4    you have all the information about the visit at the top as

5    well.

6          MR. BRADY:  And, Ms. Apfel, if we just click through a

7    couple more pages of this.  What are we looking at as we click

8    through here.

9    A.    These are just additional examples showing the full page

10   that contains the narrative and, in this case, the narrative

11   spilled over to a second page, so you'll see two pages for each

12   of these particular notes.

13         MR. BRADY:  Thank you, Ms. Apfel, we can take that one

14   down.  Can we please pull up just for the witness and the Court

15   Exhibit 715-03?

16   BY MR. BRADY:

17   Q.    What's this one?

18   A.    This is a review of skilled nurse visit notes for patient

19   Amber Gardner related to nurse Lorna Thagichu.

20   Q.    And that was another Arbor nurse based on the records?

21   A.    Correct.

22         MR. BRADY:  I offer Exhibit 715-03.

23         MR. VIEN:  No objection, Your Honor.

24         THE COURT:  It's admitted.

25         (Exhibit 715-03 admitted into evidence.)

 1          MR. BRADY:  Ms. Apfel, could we blow up the top again,

 2  please.

 3  BY MR. BRADY:

 4  Q.   Special Agent, how did you put together this chart?

 5  A.   For this set of notes, I noticed there were a number of

 6  identical note narratives all including a particular phrase,

 7  the phrase being "patient instructed on some measures aimed to

 8  controlling/managing depression such as encourage verbalization

 9  of feelings and allow her some degree of control, among

10  others."

11          MR. BRADY:  And if we can zoom out from that, please.

12  BY MR. BRADY:

13  Q.   What else did you include in your chart?

14  A.   I included a few examples of the narrative and teaching

15  sections from the notes I reviewed.

16          MR. BRADY:  We can pull that one down, and then can we

17  put up just for the witness Exhibit 715-04.

18  BY MR. BRADY:

19  Q.   Can you see Exhibit 715-04?

20  A.   I can.

21  Q.   What's that one?

22  A.   This is my review of some skilled nurse visit notes for

23  patient Jane Flanagan, the nurse being Faith Newton.

24  Q.   Your Honor, I offer Exhibit 715-04.

25          MR. VIEN:  No objection on that one, Your Honor.

```
 1              THE COURT:  Admitted.
 2              (Exhibit 715-04 admitted into evidence.)
 3              MR. BRADY:  Ms. Apfel, if we could just blow up the
 4     top half of that, please.
 5     BY MR. BRADY:
 6     Q.    Could you explain, Special Agent, how you put this one
 7     together?
 8     A.    In my review of this set of notes, I noticed that a number
 9     of identical note narratives were there containing the below
10     specific phrase "patient educated on Seroquel, which is an
11     anti-psychotic medication."
12     Q.    And what was the date range for those notes?
13     A.    December 7, 2013 through January 1, 2014.
14              MR. BRADY:  Okay, if we could back out of that,
15     please, and if you could blow up the bottom part of this,
16     example narratives.
17     BY MR. BRADY:
18     Q.    What did you include here in your chart?
19     A.    Again, these are just examples of the narrative and
20     teaching sections from those notes.
21     Q.    And you see there's part of this where it says clinician
22     signature?
23     A.    I see that.
24     Q.    What does it say next to that?
25     A.    Electronically signed by Faith Newton RN.
```

1    Q.   And what was the date on that?

2    A.   The first one was December 7, 2013, December 11, 2013.

3              MR. BRADY:  Can we back out of that?  Is there a

4    second page for this one?

5    BY MR. BRADY:

6    Q.   What follows on the pages after this?

7    A.   It's just other examples of the narrative and teaching

8    sections from those notes.

9              MR. BRADY:  So I think we can take this one down, and

10   let's put up just for the witness, please, Exhibit 715-05.

11   BY MR. BRADY:

12   Q.   Can you see Exhibit 715-05?

13   A.   I can.

14   Q.   What is it?

15   A.   These are review of notes for patient Jane Flanagan

16   showing the transition of care from Faith Newton to Winnie

17   Waruru.

18              MR. BRADY:  I offer Exhibit 715-05.

19              MR. VIEN:  No objection.

20              THE COURT:  It's admitted.

21              (Exhibit 715-05 admitted into evidence.)

22              MR. BRADY:  And again, Ms. Apfel, if we could blow up

23   the top half of that, please.

24   BY MR. BRADY:

25   Q.   How did you put this one together, Special Agent?

 1   A.   I noticed in this transition period that the notes -- the

 2   final notes that Faith Newton was -- the signatory on these

 3   notes, the note narratives were the same, and then as Winnie

 4   Waruru was then the signatory on the notes, pretty much the

 5   same narrative carried forth from there.

 6          MR. BRADY:  Okay.  And if we back out of that.

 7   BY MR. BRADY:

 8   Q.   What did you include in the rest of this chart?

 9   A.   I included the examples with Faith Newton as the

10   signatory.

11   Q.   And what did you include after that?

12   A.   Once you scroll through, you'll see where Winnie Waruru

13   picks up as the signatory.

14   Q.   Ms. Apfel, we can take that one down, please.  And moving

15   right along, can we pull up for the witness Exhibit 715-06.

16   Can you see Exhibit 715-06 on your screen?

17   A.   I can.

18   Q.   What is this exhibit?

19   A.   This was my review of additional skilled -- skilled nurse

20   visit notes for Jane Flanagan with nurse Winnie Waruru.

21          MR. BRADY:  Your Honor, I offer Exhibit 715-06.

22          MR. VIEN:  No objection to this one.

23          THE COURT:  Admitted.

24          (Exhibit 715-06 admitted into evidence.)

25          MR. BRADY:  Ms. Apfel, could we blow up that top half,

1    please?

2    BY MR. BRADY:

3    Q.    Special Agent, how did you put this one together?

4    A.    In my review of skilled nurse visit notes for Jane

5    Flanagan, I found that there were a number of notes that had

6    both of the below phrases.

7    Q.    How many notes did you see with that?

8    A.    181.

9    Q.    And what was the date range for those?

10    A.    January 14, 2014 through May 16, 2015.

11    Q.    And what were the repeated phrases you saw?

12    A.    "Inability to safely manage disease process and

13    medications as prescribed.  Patient instructed to positive

14    self-talk, socializing with supportive friends, exercising or

15    listening to music."

16         MR. BRADY:  And if we back out of that, Ms. Apfel, so

17    we can see the whole page.

18    BY MR. BRADY:

19    Q.    What did you include after that in your chart?

20    A.    I included examples of the narrative and teaching portions

21    of those notes.

22    Q.    If we click through, there's another two or three pages?

23    A.    Correct.

24    Q.    Fair to say, there were many more examples you didn't

25    include here?

1    A.    Correct.

2            MR. BRADY:  Let's take that one down, and if we could

3    put up Exhibit 715-07.

4    BY MR. BRADY:

5    Q.    Can you see Exhibit 715-07?

6    A.    I do.

7    Q.    What's this one?

8    A.    This was my review of more skilled nurse visit notes for

9    Jane Flanagan with nurse Winnie Waruru.

10            MR. BRADY:  Your Honor, I offer Exhibit 715-07.

11            MR. VIEN:  No objection.

12            THE COURT:  Admitted.

13            (Exhibit 715-07 admitted into evidence.)

14            MR. BRADY:  Ms. Apfel, if we could blow up that top

15    half, please.

16    BY MR. BRADY:

17    Q.    Now that we can see it, Special Agent, can you explain to

18    us how you put this one together?

19    A.    Sure.  In my review of these notes, I noticed that there

20    were two versions or either version of the below specific

21    phrase.  "Patient educated that good nutrition is one of the

22    keys to good health.  To make sure he regularly eats foods that

23    have a lot of vitamins and minerals in them." Alternatively,

24    there was a second version that included the word she as

25    opposed to he.  And I found either of those phrases occurring

 1  in 535 notes.

 2  Q.   What was the range for that?  The date range?

 3  A.   June 29, 2014, through May 27, 2015.

 4  Q.   Let's back out of that so we can see the whole page.  And

 5  what else did you include in your chart below that?

 6  A.   I again included examples of the narrative and teaching

 7  portions from several of those notes.

 8  Q.   And who was the nurse -- well, where it says clinician

 9  signature on these, what name showed up there?

10  A.   Winnie Waruru.

11       MR. BRADY:  We can take that one down, please, and

12  then can we pull up just for the witness Exhibit 715-08.

13  BY MR. BRADY:

14  Q.   Can you see this Exhibit 715-08?

15  A.   I can.

16  Q.   What is it?

17  A.   This was my review of skilled nurse visit notes for John

18  Enwright involving nurse Winnie Waruru.

19       MR. BRADY:  I offer Exhibit 715-08.

20       MR. VIEN:  No objection.

21       THE COURT:  It's admitted.

22       (Exhibit 715-08 admitted into evidence.)

23       MR. BRADY:  Ms. Apfel, could I ask you to blow up the

24  top part.

25  BY MR. BRADY:

```
 1   Q.   Special Agent, I'd ask you to just briefly explain how you
 2   put this one together?
 3   A.   Sure.  In my review of these notes, I found a number of
 4   notes with both of these particular phrases included.  "Skilled
 5   nurse flushed the expired medication in the toilet. Skilled
 6   nurse instructed patient on proper diet, to take more fiber and
 7   more intake of fluids to prevent constipation."
 8            MR. BRADY:  And if we can go to the full page, please.
 9   BY MR. BRADY:
10   Q.   Below that did you also include some examples?
11   A.   I did.
12   Q.   And if we click to page 2 of this and then onto page 3 of
13   your chart, what did you include here?
14   A.   I included just the page from the skilled nurse visit
15   notes showing the full narrative and the full page, including
16   the narrative.
17   Q.   And did you include a number of examples like that?
18   A.   I did.
19            MR. BRADY:  And Ms. Apfel, can we just click through
20   these?
21   BY MR. BRADY:
22   Q.   As we click through, Special Agent, what, if anything, do
23   you see changing across these notes?
24   A.   Primarily, you're seeing the visit date changing.  And
25   time.
```

1          MR. BRADY:  We can take that one down, please.  And

2     just for the witness, can we pull up Exhibit 715-09.

3     BY MR. BRADY:

4     Q.    What's this one?

5     A.    This was my review of skilled nurse visit notes for

6     patient Larry Logan with nurse Winnie Waruru.

7          MR. BRADY:  I offer Exhibit 715-09.

8          MR. VIEN:  No objection to this.

9          THE COURT:  It's admitted.

10          (Exhibit 715-09 admitted into evidence.)

11          MR. BRADY:  And, Ms. Apfel, if we just blow up the top

12     part.

13     BY MR. BRADY:

14     Q.    Same question, Special Agent.  How did you put this one

15     together?

16     A.    In my review, I found that there were a number of nearly

17     identical note narratives that all included this particular

18     phrase "patient educated that good nutrition is one of the keys

19     to good health.  To make sure he regularly eats foods that have

20     a lot of vitamins and minerals in them.  Reviewed diabetic."

21     Q.    How many times did you see that repeated?

22     A.    443 times.

23          MR. BRADY:  Let's back out of that one, and we can

24     take that down, and if we could pull up just for the witness

25     Exhibit 715-10, please.

 1   BY MR. BRADY:

 2   Q.   What's Exhibit 715-10?

 3   A.   It's my review of skilled nurse visit notes for patient

 4   Oscar Ortiz involving nurse Winnie Waruru.

 5           MR. BRADY:  I offer Exhibit 715-10.

 6           MR. VIEN:  No objection.

 7           THE COURT:  It's admitted.

 8           (Exhibit 715-10 admitted into evidence.)

 9           MR. BRADY:  And, Ms. Apfel, if we could blow up the

10   top part so we can all see that.

11   BY MR. BRADY:

12   Q.   What did you do to put together this chart?

13   A.   In my review of these records, I noted that -- or saw that

14   there were three particular phrases that were used over and

15   over again in a number of notes.  "Encouraged patient

16   compliance with med and to take them as ordered by MD.  Sn

17   instructed the patient on importance of staying in a clean

18   environment.  Instructed on positive self-talk, socializing

19   with supportive friends."

20           MR. BRADY:  And then if we could zoom out.

21   BY MR. BRADY:

22   Q.   Did you also provide some examples after that?

23   A.   I did.

24   Q.   Let's take that one down and go to Exhibit 715-11, please.

25   Can you see Exhibit 715-11?

1    A.    I can.

2    Q.    What is it?

3    A.    This was my review of additional skilled nurse visit notes

4    for patient Oscar Ortiz involving nurse Winnie Waruru.

5              MR. BRADY:  I offer Exhibit 715-11.

6              MR. VIEN:  No objection.

7              THE COURT:  It's admitted.

8              (Exhibit 715-11 admitted into evidence.)

9              MR. BRADY:  Thank you, Ms. Apfel.

10   BY MR. BRADY:

11   Q.    Explain to the jury what this one is?

12   A.    In my review of these notes, I found a number of notes

13   with nearly identical note narratives.

14   Q.    And how many of those did you find?

15   A.    202.

16   Q.    Over what date range?

17   A.    January 17, 2014 through May 22, 2014.

18   Q.    And then if we go to the full page and we click down a

19   page, what did you include after that?

20   A.    I included examples of the narratives from a number of

21   those notes.

22             MR. BRADY:  We can take that one down, and can we

23   please pull up Exhibit 715-12 for the witness.

24   BY MR. BRADY:

25   Q.    Can you see Exhibit 715-12?

1    A.    I can.

2    Q.    What is Exhibit 715-12?

3    A.    This was my review of skilled nurse visit notes again for

4    patient Oscar Ortiz, but in this case, involving nurse Adams

5    Kinyanjui.

6    Q.    So a different nurse?

7    A.    Correct.

8            MR. BRADY:  I offer Exhibit 715-12.

9            MR. VIEN:  Objection to these and some of the

10   following exhibits.  Maybe it would be efficient if we can

11   sidebar, Your Honor.

12           THE COURT:  Yes.

13           (A discussion was held at sidebar at 10:30 a.m.)

14           MR. VIEN:  Your Honor, the --

15           THE COURT:  Keep your voice down.

16           MR. VIEN:  I don't mean to.

17           THE COURT:  I'm not being critical.

18           MR. VIEN:  Anyway, the next several exhibits,

19   715.12, .13, .14, .15, and .16 all involve nurses that there's

20   been no evidence of and no link to Faith Newton or the

21   conspiracy other than the fact that they've been identified as

22   nurses.  That's different from the other examples that have

23   been admitted because those were linked, one with exception

24   that, frankly, I just made a mistake on, Exhibit 715-06.  But

25   all the other ones were linked to a nurse or -- who we've had

1    evidence about that was arguably part of the conspiracy, all we
2    have here are nursing notes by a nurse we've never heard of
3    before.  So for those reasons, I respect that the exhibit I've
4    identified be excluded.
5           THE COURT:  So first of all, I only have up to 715 in
6    my folder.  716 hasn't been revised.
7           MR. BRADY:  It has been revised to be redacted in the
8    way we discussed.  We'll correct that, Your Honor.
9           THE COURT:  I just want to make sure that's still in
10   play.
11          MR. VIEN:  Sorry about that, Your Honor.
12          THE COURT:  So these are all based out of the Arbor
13   Axxess records, so they've been admitted and they're relevant
14   and they're not overly prejudicial, so they can be included in
15   the chart, and you can cross-examine him or call the witnesses
16   as you see fit, but they're sufficiently linked to the
17   conspiracy and I'm going to admit them.
18          MR. VIEN:  I understand.
19          THE COURT:  That includes 7.16 which is I assume --
20          MR. BRADY:  Same flavor.
21          MR. VIEN:  What do I do to be the least burdensome
22   about preserving my objection with the offers?  Just saying
23   objection and we'll all know what we're talking about.
24          THE COURT:  Why don't I put on the record you're
25   objecting to all of them?

1          MR. VIEN:  Great.

2          THE COURT:  We'll do that.

3          (The sidebar ended at 10:42 a.m.)

4          THE COURT:  Just so the record is clear, Mr. Vien just

5     made an objection to 715-12.  I've overruled the objection and

6     that will be admitted.  As a matter of efficiency at sidebar he

7     made objections to 715-13, 14, 15 and 16.  I ruled on those at

8     sidebar also.  They're all going to be admitted but his

9     objection is preserved without him having to stand up and

10    object each time one of those exhibits is moved.

11         MR. BRADY:  And Your Honor should I just offer those

12    exhibits now?

13         THE COURT:  Why don't you do that?  Why don't you

14    offer all of them.  Hold on, do you need a foundation on all of

15    them other than the objection you made.

16         MR. VIEN:  No, I articulated the objection.

17         THE COURT:  715-12 through 16 are all admitted.

18         (Exhibit 715-12, 715-13, 715-14, 715-15, 715-16

19    admitted into evidence.)

20         MR. BRADY:  So, Ms. Apfel, if we could pull up 715-12,

21    please, and if we could blow up the top half.

22    BY MR. BRADY:

23    Q.   So Special Agent, what's this exhibit?

24    A.   This was my review of skilled nurse visit notes for

25    patient Oscar Ortiz involving Arbor nurse Adams Kinyanjui.

1    Q.    Same patient, different nurse?

2    A.    Correct.

3    Q.    What did you see in that review?

4    A.    I found that a number of the notes had near-identical note

5    narratives, 50 of them with a date range of May 23, 2014,

6    through June 18, 2014.

7             MR. BRADY:  And if we can go back to the full page.

8    BY MR. BRADY:

9    Q.    What did you include below that?

10   A.    I included some examples from the notes.

11            MR. BRADY:  And maybe we can take a look at one of

12   those.

13   BY MR. BRADY:

14   Q.    Is this one of the examples of the notes you saw?

15   A.    Yes.

16            MR. BRADY:  We can pull that down.

17   BY MR. BRADY:

18   Q.    And if we go to the next page of this, are those more

19   examples?

20   A.    Correct.

21   Q.    And more examples on the next page?

22   A.    Yes.

23   Q.    And where there more examples that you didn't include

24   here?

25   A.    I did, yes.

1          MR. BRADY:  We can take that one down, please, and if

2     we could pull up Exhibit 715-13, which is in evidence.  If we

3     could blow up the top half, please.

4     BY MR. BRADY:

5     Q.   What's this chart?

6     A.   This was my review of skilled nurse visit notes again for

7     patient Oscar Ortiz and again involving nurse Adams Kinyanjui.

8     Q.   And what -- can you walk us through what you found?

9     A.   Sure, I found a number of notes with identical note

10    narratives, 58 of them for the date range of June 21, 2014,

11    through July 27, 2014.

12          MR. BRADY:  And if we back out to see the whole page.

13    BY MR. BRADY:

14    Q.   Did you then include a bunch of examples of that?

15    A.   I did.

16    Q.   I will take that one down.  If we could go to Exhibit

17    715-14, please.  What's this one?

18    A.   This was my review of skilled nurse visit notes for

19    patient Rosemary Letellier regarding nurse Aloise Njenga.

20    Q.   And what did you summarize here on your chart?

21    A.   I found a number of notes containing a particular phrase,

22    that phrase being "patient was noted eating canned food high in

23    sodium, patient was educated the importance of eating food low

24    in sodium in order to control the HTN."

25    Q.   How many times did you see that repeated?

1    A.    422 times.

2          MR. BRADY:  And if we can go back to the full page.

3    BY MR. BRADY:

4    Q.    Did you include a couple examples of that on your chart,

5    too?

6    A.    I did.

7          MR. BRADY:  We can take that one down; can we put up

8    Exhibit 715-15, please?

9    BY MR. BRADY:

10   Q.    What is this exhibit?

11   A.    This was my review of skilled nurse visit notes for

12   patients Rosemary Letellier involving Arbor nurse Aloise

13   Njenga.

14   Q.    And did you see anything repeated as you looked through

15   those notes?

16   A.    I found the note narratives were repeated or identical,

17   also including the particular phrase beginning "patient had a

18   follow-up appointment with her PCP this morning."

19         MR. BRADY:  We can take that one down, please and

20   let's go to the last one, which is Exhibit 715-16.  Will you

21   blow up the top.

22   BY MR. BRADY:

23   Q.    Same question, Special Agent.  What's this chart?

24   A.    This was my review of skilled nurse visit notes for

25   Rosemary Letellier involving Arbor nurse Aloise Njenga.

1    Q.    And what are you summarizing on your chart here?

2    A.    I found a number of notes all with this particular phrase

3    "patient had a follow-up appointment with her PCP on 11/7/2014.

4    I found that there were 45 such notes after the date of

5    November 7, 2014.

6              MR. BRADY:  We can take that down.  Thank you.

7    BY MR. BRADY:

8    Q.    So just shifting gears slightly.  The other part -- you

9    described, I think, three parts yesterday of what you looked at

10   for your testimony, right?

11   A.    Yes.

12   Q.    One was the texts?

13   A.    Yes.

14   Q.    The other was reviewing the records from Axxess?

15   A.    Correct.

16   Q.    What was the third part?

17   A.    It was reviewing some MassHealth claims data for a number

18   of patients.

19   Q.    Did you prepare any charts to summarize the records that

20   you reviewed?

21   A.    I did.

22             MR. BRADY:  Can we pull up for the witness Exhibit

23   713, please.

24   BY MR. BRADY:

25   Q.    What is Exhibit 713?

1   A.    This is my chart for MassHealth paid claims and paid

2   amounts for patient Esmeralda Ayala.

3   Q.    And then it looks like this has 14 pages?

4   A.    Yes.

5   Q.    What's on the other pages?

6   A.    Each page will have a chart for a different patient.

7          MR. BRADY:  Your Honor, I offer Exhibit 713.

8          MR. VIEN:  I was going to object, but I thought you

9   were trying to say something.

10          THE COURT:  No.  I wasn't going to say anything.

11          MR. VIEN:  I don't want to make a speaking objection

12   so perhaps, again --

13          THE COURT:  Yes.  If you guys want to stand up and

14   stretch and get some water, go ahead.

15          (A discussion was held at sidebar at 10:50 a.m.)

16          MR. VIEN:  Your Honor, my objection to this is it

17   dovetails into the discovery situation we've been dealing with

18   throughout the case.  I made a little -- we made a little chart

19   of each witness and basically, part of the problem is that I

20   think the Court might remember during discovery we focused on

21   20 particular patients, and we focused on those and then what

22   happened was as the new trial date evolved, and then a lot of

23   things changed and what happened was some of these -- some of

24   the patients were not on the list of 20 that they were supposed

25   to focus on, and also their patient file, unless it's contained

1   in Axxess, isn't on the Government's witness list, and the

2   third column is that there's little, if any, contact with Faith

3   Newton, Winnie Waruru, or any other unindicted co-conspirator.

4   So for those reasons, we would ask to exclude this exhibit

5   because given the discovery situation we've dealt with, I don't

6   think it's fair to put all these in, and it's prejudicial to

7   the defendant.

8        THE COURT:  I'm looking at the chart.  There's six

9   witnesses in the same situation, and I assume you're going to

10  make the same objection as to those six?

11       MR. VIEN:  Yes, that's what I'm trying to do because

12  they're all contained in the same exhibit.

13       MR. BRADY: I think just so we're clear, the patients

14  are Betancourt, Longh, Porang, Small, and Ung?

15       MR. VIEN:  Correct.

16       MR. BRADY:  So on these six, Your Honor, they were not

17  on that list of patients but my understanding and my

18  understanding of the history of that was that was to identify

19  the patients in the Axxess files for the defense so they would

20  have those.  For these patients, we haven't offered their

21  Axxess files or those records, we haven't is used them.  The

22  reason why they're on this exhibit is because the jury has

23  already heard testimony about these patients from other

24  witnesses.

25       For example, there is Emilio Betancourt.  He was the

1    patient of Dr. Shoemaker who they heard about, and they heard
2    about how she responded to the plan of care for Emilio
3    Betancourt.  So what we intend to do with this exhibit -- a
4    draft of which was provided to the defense weeks ago with all
5    of these names on it, Your Honor -- what we intend to do is try
6    to tie that up for the jury to show the jury you've heard
7    evidence about this patient.  This is what was billed for that
8    patient.  So we're not going to get into their Axxess records
9    or anything like that.  We're not offering that.  That's not
10   why they're on here.  These other witnesses, Your Honor, Sav
11   Longh and Bin Porang, Danielle Small, those were all witnesses
12   in the Harvard Vanguard records that Paula Tyrell testified
13   about yesterday.

14        So, again, Your Honor, the reason why they're in here
15   is not because we need to go into all their Axxess records but
16   the show Arbor was billing for these patients just to connect
17   the evidence they've already heard about these patients to the
18   mass claims billing for those patients.  Similarly, Kevin Ung,
19   Your Honor, that's the patient who according to the records
20   from Customs and Border Protection was out of the country
21   during a period of time when Arbor provided or sent to his PCP
22   Plans of Care and then nursing notes were entered for the
23   witnesses.

24        THE COURT:  So these charts show what MassHealth paid
25   for each of these people?

1          MR. BRADY:  That's what summarizes what's in the

2    claims data.

3          THE COURT:  How was that information provided to them

4    during discovery?

5          MR. BRADY:  The underlying Excel spreadsheets was

6    provided in discovery to the defense, and they were identified

7    as exhibits, I think, from the earliest iteration.

8          MR. VIEN:  Your Honor, this goes back to discovery.

9    The discovery we've objected to and the procedures we've

10   objected to the problem was discovery was a massive document

11   dump, and then the first iteration of the exhibit list was

12   simply -- looked to me like it was taking returns on subpoenas

13   and putting numbers on them, and we've been working as hard as

14   we can to try to focus this.  And then -- so there was a

15   discovery problem, and it continues here because these people

16   are not on the 20-patient list that we focused on.  So I think

17   it's unfair and can't be linked to -- each payment can't be

18   linked, if you understand what I'm trying to say.

19         THE COURT:  When did they get this exhibit?

20         MR. BRADY:  They got this the week before trial

21   started, right?

22         MR. LOONEY:  Drafts the Thursday before trial began, I

23   believe that's the date.

24         MR. VIEN:  And I think there was -- at one point,

25   there was something like 800,000 pages in documents turned over

1   in discovery.  This is a real manifestation of discovery

2   problem and, again, just so we're clear, I'm not blaming these

3   two men right here.  That has plagued the case from the

4   beginning.  So that's why we object.  I don't think it's fair

5   to put in this exhibit without having been focused on it for a

6   longer period of time so we can actually do our work and check

7   everything.

8         MR. BRADY:  Your Honor, just on the discovery issues

9   and the list, we've been involved in this case for about a

10  little more than a month.  We have narrowed and narrowed

11  things.  We've narrowed our exhibit list, we've narrowed the

12  documents to the extent that we've identified other things,

13  we've provided them to the defense, and as with this draft

14  exhibit, the underlying data was provided to the defense and

15  this is 14 pages.

16        So this was a business that had about 1,000 patients.

17  We have narrowed this to 14 patients for the defense here, so

18  there has been a significant effort, Your Honor, to try not

19  to -- to narrowly focus this case but also to provide the

20  defense with just as much direction and notice as we could.

21        MR. VIEN:  I'm sure they made their efforts, Your

22  Honor, but they're the Government.  So I understand that these

23  two prosecutors have done a better job than their predecessors,

24  but, still, one Government and it was a complete mess and we

25  got this document, I think, in draft the Thursday before trial

 1    started.  That's not enough time given the volume of discovery

 2    and the failure to link these patients to the 20 and the

 3    failure to link all the payments to the exhibits, if you will.

 4    So that's why I object to this document.

 5              MR. BRADY:  Your Honor, the jury has already heard

 6    about these patients.

 7              THE COURT:  I'm going to let them have it.  What

 8    other -- do you want more time to do more investigation on

 9    those financial records?  Because we'll put off -- we've got an

10    extra week, so I'll recess and you can take the time you want.

11    It's not the Axxess records.  You're not going to touch the

12    Axxess records, right.

13              MR. BRADY:  We're done with all that.

14              MR. VIEN:  Let me decide that, Your Honor, but could I

15    mark this chart we prepared for identification so it's part of

16    the record?

17              THE COURT:  Yes.

18              MR. VIEN:  I don't know what number -- how we do it?

19              THE CLERK:  It's marked for identification, it's not

20    admitted.

21              THE CLERK:  907.

22              (Exhibit 907 admitted into evidence.)

23              THE COURT:  I appreciate the efforts you two have made

24    since you got on this case to pull this together.  I think we

25    can all agree that it was a mess, and it shouldn't have been a

1    mess two years after it was indicted, but that's the situation

2    that we were in and that you inherited.  I'm going to let you

3    have these.  They've had the exhibit list.  The patients have

4    been testified about so they're on notice that they were coming

5    in.  It's just the financial -- just a math problem on this

6    chart.  But he is going to make an issue of it and, you know,

7    the record is what it is on the discovery issues.

8            So decide whether you want to use these or not.  I'm

9    going to admit them, I think they're properly admitted.  I'm

10   going to give him extra time to do whatever research or

11   investigation or checking he wants to do on the underlying

12   data.  But think about what you want to do here.

13           MR. BRADY:  Your Honor, no objection to any additional

14   time, and as we said when we transmitted this information, to

15   the extent that we can be helpful to the defense, we are trying

16   to do that, Your Honor.

17           THE COURT:  So I'm going to give him -- I think it's

18   all okay, but he was pressed for time.  He hasn't had the time

19   or as fulsome an opportunity as he would like.  I'm going to

20   give him that time now if he wants it.

21           MR. VIEN:  I'm not asking for it right now.

22           THE COURT:  I understand.

23           MR. VIEN:  But at some point today, I'll respond to

24   your offer, Your Honor.

25           THE COURT:  Okay.

 1              MR. VIEN:  Thank you.

 2              (The sidebar ended at 11:00 a.m.)

 3          THE COURT:  The exhibit is admitted.

 4              (Exhibit 713 admitted into evidence.)

 5          MR. BRADY:  If we could just take it down for a

 6     moment, please.  If we could go to page 2 of Exhibit 713,

 7     please.

 8     BY MR. BRADY:

 9     Q.   So Special Agent Wisnaskas, remind us again what this

10     exhibit is?

11     A.   These are the number of paid claims from MassHealth to

12     Arbor as well as the paid amounts from MassHealth to Arbor.

13     Q.   And how did you put this together?

14     A.   I pulled the data from the MassHealth claims for this

15     particular patient, including the number of claims, the amount

16     paid for HHA services and skilled nursing services for the

17     years 2014 through 2016.

18              MR. BRADY: I'm sorry to interrupt, Your Honor, I just

19     want to make sure everybody's screens are working okay.

20     BY MR. BRADY:

21     Q.   And you did that for a number of patients?

22     A.   I did.

23     Q.   So which patient is this chart for?

24     A.   Emilio Betancourt.

25     Q.   And who was Emilio Betancourt?

1    A.    A patient of Dr. Elena Shoemaker.

2    Q.    And walk us -- if you can walk us through.

3         MR. BRADY:  I'm going ask, Ms. Apfel, can you blow up

4    the 2014 part?  Those rows, please?

5    BY MR. BRADY:

6    Q.    Can you explain to us how to read this chart?  How this

7    works?

8    A.    Sure.  So kind of the top section of this blown-up section

9    is the number of claims, and I should note that these are the

10   number of claims that were paid in those particular months, not

11   necessarily the dates of services.  Then the bottom section has

12   the amount that was paid in that month for those services.

13   Q.    May I interrupt you?

14   A.    Sure.

15   Q.    So month by month you can see the number of claims on top.

16   Is that right?

17   A.    Correct.

18   Q.    And below that is what MassHealth paid for those claims?

19   A.    Correct.

20   Q.    There are two rows for the claims and the money.  Do you

21   see that?

22   A.    I do.

23   Q.    What are those two rows for?  What do those mean?

24   A.    So those are -- the rows are for the home health aide

25   services and the skilled nursing services so they were two

1    billing codes that I looked at.

2    Q.    And then if you go all the way to the right, the column

3    that's at the end on the right-hand side, what does that show?

4    A.    That shows the yearly totals for the number of claims that

5    were paid for each of those two types of services as well as

6    the total amount that was paid for each of those two services.

7    Q.    So, for example, for this patient for 2014, how many HHA

8    visit claims did MassHealth pay?

9    A.    362.

10   Q.    And then for the skilled -- for sn, that's skilled

11   nursing?

12   A.    Correct.

13   Q.    How many claims were paid for this patient for that year?

14   A.    657.

15   Q.    And with 365 days in a year, what does that work out to

16   roughly?

17   A.    Just under two a day.

18   Q.    And so you did that for 2014?

19   A.    I did.

20         MR. BRADY:  And then if we back out, do you see -- can

21   we blow up the 2015 rows in the middle, please?

22   BY MR. BRADY:

23   Q.    You did the same thing for 2015?

24   A.    I did.

25   Q.    And I notice on your chart some of the boxes for some

 1    months are grayed out?

 2    A.    They're grayed out, yes.

 3    Q.    What did that mean?

 4    A.    That just means for whatever reason MassHealth didn't pay

 5    any claims in those particular months.

 6    Q.    You didn't see that in the data?

 7    A.    Correct.

 8          MR. BRADY:  Let's back out of that, please.

 9    BY MR. BRADY:

10    Q.    And did you do the same thing for 2016?

11    A.    I did.

12    Q.    And then did you add that up to get the total?

13    A.    I did.

14    Q.    So in total, how much did MassHealth pay Arbor for claims

15    for Mr. Betancourt?

16    A.    Just under $291,000.

17          MR. BRADY:  Can we -- thank you.  If we could go to

18    page 3.

19    BY MR. BRADY:

20    Q.    What's this chart summarizing?

21    A.    This is the same chart except for patient Ernest Cate,

22    again, showing the MassHealth paid claims and paid amounts for

23    the years 2013 to 2016.

24          MR. BRADY:  So if we could blow up 2015, those two

25    blocks.

```
 1   BY MR. BRADY:
 2   Q.   How many claims for skilled nursing were paid to Arbor for
 3   Mr. Cate in 2015?
 4   A.   695.
 5   Q.   And for the HHA?
 6   A.   354.
 7   Q.   And you showed the amounts that were paid out for those
 8   claims as well.  Right?
 9   A.   I did.
10   Q.   So if we zoom out full page, did you add up to get the
11   total paid by MassHealth for claims for Mr. Cate?
12   A.   I did.
13   Q.   And what did that add up to?
14   A.   Approximately $279,500.
15           MR. BRADY:  Ms. Apfel, can we go to page 4?
16   BY MR. BRADY:
17   Q.   What's this page summarizing?
18   A.   Same type of chart for patient John Enwright.
19   Q.   And for most of 2014, those are gray boxes?
20   A.   Correct.
21   Q.   What did that mean?
22   A.   It just means that in the data there were no paid claims
23   or paid claim amounts for those months.
24           MR. BRADY:  If we could blow up 2015, please.
25   BY MR. BRADY:
```

1   Q.   How many claims were paid to Arbor for HHA visits for

2   Mr. Enwright in 2015?

3   A.   340.

4   Q.   And how about for skilled nursing visits for Mr. Enwright?

5   A.   320.

6        MR. BRADY:  And if we could go out to the full page.

7   BY MR. BRADY:

8   Q.   What was the total paid in claims for John Enwright to

9   Arbor?

10  A.   Approximately $128,700.

11       MR. BRADY:  Let's go to the next page, please.

12  BY MR. BRADY:

13  Q.   This is page 5 of your exhibit?

14  A.   Yes.

15  Q.   Who is this for?

16  A.   This is for patient Jane Flanagan.

17  Q.   And this shows claims were paid in 2015 and early 2016?

18  A.   It does, as well as 2014.

19  Q.   Got it.  Okay.  In 2014, what types of claims were paid

20  for Jane Flanagan?

21  A.   Skilled nursing.

22  Q.   But not HHA?

23  A.   Correct.

24  Q.   Did you add up all the claims that were paid by MassHealth

25  to Arbor for this patient?

1    A.    I did.

2    Q.    What did that add up to?

3    A.    Approximately $118,000.

4          MR. BRADY:  Let's go to the next page, page 6.

5    BY MR. BRADY:

6    Q.    Who was the patient for this one?

7    A.    Amber Gardner.

8    Q.    And what types of claims were paid to Arbor according to

9    the data for her?

10   A.    Skilled nursing.

11   Q.    And when were those claims paid?

12   A.    In 2014.

13   Q.    What was the total paid in claims for Amber Gardner?

14   A.    Just over $43,000.

15         MR. BRADY:  Can we go to page 7, please?

16   BY MR. BRADY:

17   Q.    Who is the patient for this chart?

18   A.    Chea Hoa.

19   Q.    And do you know where his PCP doctor was?

20   A.    I believe it was at Harvard Vanguard medical associates.

21   Q.    And did you total up the amount paid to Arbor for claims

22   paid to this patient?

23   A.    I did.

24   Q.    What was the total?

25   A.    Just under $229,000.

1              MR. BRADY:  Can we go to the next page, please.

2    BY MR. BRADY:

3    Q.    Who is the patient for this one?

4    A.    Rosemary Letellier.

5              MR. BRADY:  And if we could blow up 2015, please.

6    BY MR. BRADY:

7    Q.    In the month of November, for example, how many skilled

8    nursing claims, according to the data, were paid to Arbor?

9    A.    71 were paid.

10   Q.    And in 2015, how many claims did Arbor pay out to --

11   sorry, did MassHealth pay to Arbor for this patient in 2015?

12   A.    For skilled nursing?

13   Q.    Yes.

14   A.    643.

15   Q.    And if we go to the full page, did you add up the total

16   for claims paid to Arbor for this patient?

17   A.    I did.

18   Q.    What did that add up to?

19   A.    Approximately $273,000.

20             MR. BRADY:  Let's go to the next page, please.

21   BY MR. BRADY:

22   Q.    Who was the patient for this one?

23   A.    Larry Logan.

24   Q.    And what types of claims did MassHealth pay Arbor for

25   Mr. Logan?

1   A.   Skilled nursing.

2   Q.   And did you add up what MassHealth paid Arbor for

3   Mr. Logan?

4   A.   I did.

5   Q.   What did that come to.

6   A.   Just under $103,000.

7        MR. BRADY:  Can we go to the next page, please?

8   BY MR. BRADY:

9   Q.   Who was the patient here?

10  A.   Sav Longh.

11  Q.   Another Harvard Vanguard patient?

12  A.   Correct.

13       MR. BRADY:  And if we blow up -- let's blow up 2015,

14  please.

15  BY MR. BRADY:

16  Q.   How many home health aide claims were paid to Arbor for

17  this patient in 2015?

18  A.   364.

19  Q.   And how much money was paid to Arbor for those claims by

20  MassHealth?

21  A.   Just over $212,000.

22  Q.   And how many skilled nursing visits were paid out from

23  MassHealth to this patient?

24  A.   728.

25       MR. BRADY:  If we could go to the full page, please.

```
1   BY MR. BRADY:

2   Q.   Did you add up how much MassHealth paid Arbor for this

3   patient?

4   A.   I did.

5   Q.   What did that add up to?

6   A.   Just over $639,000.

7        MR. BRADY:  Can we go to the next page, please?

8   BY MR. BRADY:

9   Q.   Who is this patient?

10  A.   Oscar Ortiz.

11  Q.   And what types of claims did MassHealth pay Arbor for

12  Mr. Ortiz?

13  A.   Skilled nursing.

14  Q.   And did you add up those claims?

15  A.   I did.

16  Q.   How much did MassHealth pay Arbor for claims for

17  Mr. Ortiz?

18  A.   Just over $36,000.

19       MR. BRADY:  Can we go to page 14, please?

20  BY MR. BRADY:

21  Q.   Who is the patient for this?

22  A.   Kevin Ung.

23  Q.   And who is Kevin Ung?

24  A.   He was a patient of nurse practitioner Chhan Touch.

25  Q.   Now, according to this from November, 2015, through April,
```

1    2016 --

2          MR. BRADY:  Can we blow that up, Ms. Apfel?

3    BY MR. BRADY:

4    Q.   So from November, 2015, to April of 2016, did MassHealth

5    pay claims to Arbor for care for Mr. Ung?

6    A.   It did.

7    Q.   And did you add up to total claims that Arbor billed for

8    Mr. Ung?

9    A.   I did.

10   Q.   What did that come to?

11   A.   Just over $102,000.

12         MR. BRADY:  Okay.  We can take that down, and can we

13   show just for the witness Exhibit 706.  Maybe we can blow up

14   the top half.

15   BY MR. BRADY:

16   Q.   What is Exhibit 706?

17   A.   This is a home health certification and Plan of Care for

18   patient Kevin Ung.

19         MR. BRADY:  Your Honor, I offer Exhibit 706.

20         MR. VIEN:  Objection based on the argument we had and

21   the chart.  If that -- I don't -- I know you don't want

22   speaking objection so --

23         THE COURT:  I don't want speaking objections, but I'm

24   not entirely clear what you mean.  I'm sorry, I need to see you

25   at sidebar.

1            (A discussion was held at sidebar at 11:15 a.m.)

2            MR. VIEN:  I'm sorry for doing this, but I have to

3     preserve the record.  So the next few exhibits we're basically

4     making the same objection as we made on Exhibit 907 for

5     identification.  This patient isn't one of the 20 patients, and

6     there's no connection to Faith Newton or Winnie Waruru so we

7     don't think there's enough connection.  I know you've already

8     articulated reasons to deny my objection, but I want to put it

9     on the record for the following next few exhibits.

10            THE COURT:  Well, I denied your objection on the

11     financial records.  I think this is a different record.

12            MR. BRADY:  Yes, Your Honor.  This was teed up and

13     they filed a motion on this that the jury heard the other day.

14     This was one of, I think, the eight records there was a motion

15     to exclude eight records, and these were among the records that

16     we dropped a couple out.  We wanted to stick with these, and we

17     think these are for patient Kevin Ung.  The story on him, Your

18     Honor, so Chhan Touch testified --

19            THE COURT:  He was the one who was out of the country.

20            MR. BRADY:  He was the one who was out of the country,

21     Your Honor.  So these records are -- and they consist of a

22     limited number of Plans of Care showing that basically there

23     were Plans of Care for those dates that he's out of the country

24     and the nursing notes that go along with that.

25            THE COURT:  These are the ones I ruled on, just the

1    eight I ruled on before.

2           MR. BRADY:  That's right, Your Honor.

3           THE COURT:  All right.

4           MR. VIEN:  Again, I hate to belabor it --

5           THE COURT:  Which ones are you putting in.

6           MR. BRADY:  It's 706, 707, 708, 709, 710, and then the

7    last record, Your Honor, is 720, which is the CBP record

8    showing departures and entries from the United States, and we

9    have a stipulation with the defense as to that, I believe.

10          MR. VIEN:  We stipulate that it's authentic and

11   admissible, and the only objection we have is relevancy so

12   we're making relevancy in this objection.

13          THE COURT:  So these seven will come in.  Now I was

14   working on the jury charge while you were going through this.

15   You skipped some of these.  Right?

16          MR. BRADY:  I did.  I skipped Ava, I did Betancourt, I

17   did Sadlaw and then I skipped Pare and Danielle Small and,

18   look, I think we can pull those pages from the exhibit before

19   it goes back just to narrow the field.

20          THE COURT:  I think that's a good decision.  Okay.  So

21   I note the objections, do you want to make a separate objection

22   on 720?

23          MR. VIEN:  Just for evidence, Your Honor.

24          THE COURT:  Do you want to make that when that comes

25   up.

1           MR. VIEN:  I'll just do it now, if that's okay.

2           (The sidebar ended at 11:30 a.m.)

3           THE COURT:  All right.  So in the interest of

4     efficiency, Mr. Vien just made a series of objections at

5     sidebar.  I've ruled on them all.  His objections are preserved

6     for the record and the following exhibits will be admitted:

7     706, 707, 708, 709, 710 and 720.

8           (Exhibits 706, 707, 708, 709, 710, 720 admitted into

9     evidence.)

10          MR. BRADY:  Thank you, Your Honor.  May I proceed.

11          THE COURT:  Yes.

12          MR. BRADY:  Can we pull up Exhibit 706, please?

13    And -- that's great, thank you.

14    BY MR. BRADY:

15    Q.   What is Exhibit 706?

16    A.   It's a home health certification and Plan of Care for

17    patient Kevin Ung.

18    Q.   And who is the provider listed on here?

19    A.   The provider is Arbor Homecare Services.

20    Q.   And box three, certification period, do you see that?

21    A.   I do.

22    Q.   What are the dates in there?

23    A.   December 20, 2015, through February 17, 2016.

24          MR. BRADY:  We can zoom out, Ms. Apfel.  Can we blow

25    up the bottom half, bottom couple boxes of this?

```
 1    BY MR. BRADY:

 2    Q.    What does it say in box 23?

 3    A.    Electronically signed by Karanja Kabuga, RN, BSN.

 4    Q.    Can we go to -- can we take that down and put up Exhibit

 5    707, which is in evidence; what's Exhibit 707?

 6    A.    It's a home health certification and Plan of Care for

 7    patient Kevin Ung.

 8    Q.    And what does it say in box three for the certification

 9    period?

10    A.    February 18, 2016, to April 17, 2016.

11    Q.    And who's the provider listed in box seven?

12    A.    Arbor Homecare services.

13         MR. BRADY:  If we could go full screen and then if we

14    could blow up box 23, please.

15    BY MR. BRADY:

16    Q.    What does it say in box 23?

17    A.    Electronically signed by Karanja Kabuga, RN.

18         MR. BRADY:  Can we pull up exhibit 708 in evidence,

19    please?  And can we blow up the top half of this?

20    BY MR. BRADY:

21    Q.    What's this?

22    A.    This is a skilled nurse visit note for patient Kevin Ung.

23    Q.    And what's the date for the visit?

24    A.    December 2, 2015.

25    Q.    Now, do you see there's a couple boxes below the top
```

1  starting with vital signs?

2  A.    I do.

3  Q.    What are the other boxes as you read across there?

4  A.    Pain profile, skin, respiratory.

5  Q.    Does it appear to have information included in there?

6  A.    It does.

7  Q.    And if we zoom out and we blow up the boxes below that,

8  please.  You see on the right-hand side there's a box it says

9  gastrointestinal?

10 A.    Yes.

11 Q.    And you see one of the headings is elimination?

12 A.    Yes.

13 Q.    What does it say there?

14 A.    Last BM is checked off.

15 Q.    And is there a date below that?

16 A.    There is.

17 Q.    What's the date?

18 A.    December 1, 2015.

19        MR. BRADY:  Now, if we zoom out here.  We can go

20 down --

21 BY MR. BRADY:

22 Q.    Before we move on, at the bottom of the page, can you

23 tell -- what does it say next to clinician signature?

24 A.    Electronically signed by Karanja Kabuga.

25        MR. BRADY:  Let's zoom out of that and go to the next

1   page, please.  Am I correct that the native and teaching

2   section begins at the bottom of 2.

3   A.    Yes.

4   Q.    And then if we go to page 3, does it continue on there?

5   A.    It does.

6          MR. BRADY:  Can we blow that up just briefly.

7   BY MR. BRADY:

8   Q.    That's what's in the narrative and teaching section for

9   this note?

10  A.    Correct.

11         MR. BRADY:  So we can take that down.  Let's go to

12  exhibit 709, please.  And can you blow up the top?

13  BY MR. BRADY:

14  Q.    What's this?

15  A.    This is a skilled nurse visit note for patient Kevin Ung

16  on December 3, 2015.

17         MR. BRADY:  And if we go back to the full page.

18  BY MR. BRADY:

19  Q.    Who signed this nursing note?

20  A.    Karanja Kabuga.

21         MR. BRADY:  Go to the next page, please, and then the

22  page after that.

23  BY MR. BRADY:

24  Q.    Does this also include a narrative and teaching section?

25  A.    It does.

```
 1          MR. BRADY:  Let's go out of that and pull up Exhibit
 2   710, please.
 3   BY MR. BRADY:
 4   Q.    What's Exhibit 710?
 5   A.    This is a skilled nurse visit note for patient Kevin Ung
 6   for visit date December 4, 2015.
 7   Q.    And if we zoom out of this, can you tell who signed this
 8   note?
 9   A.    Karanja Kabuga.
10   Q.    And does this also include under gastrointestinal a date
11   of the last bowel movement?
12   A.    It does.
13   Q.    And then if you go to the next page and then the page
14   after that, does this also include a narrative and teaching.
15   A.    It does.
16   Q.    And where did this note come out of?
17   A.    Axxess.
18   Q.    Did you look in the Axxess database for subsequent notes
19   in the days that followed?
20   A.    I did.
21   Q.    What did you see?
22   A.    It was very similar.
23          MR. BRADY:  Let's take that down.  Can you pull up
24   Exhibit 720?
25   BY MR. BRADY:
```

1    Q.    What is Exhibit 720?

2    A.    This is a US Customs and Border Protection TECS Person

3    Encounter List.

4    Q.    What is a US Customs and Border Protection TECS Person

5    Encounter List?

6    A.    They can keep track of individuals leaving and coming back

7    into the country.

8    Q.    This is an official Government record of who left the

9    country and when?

10    A.    It is.

11    Q.    Who is this record for?

12    A.    Kevin Ung.

13         MR. BRADY:  Can we blow up the heading in the top

14    three rows of this chart?

15    BY MR. BRADY:

16    Q.    Special Agent, according to this record, what happened on

17    November 22, 2015?

18    A.    Kevin Ung departed Boston, leaving the country.

19    Q.    And according to this, when was the next time Mr. Ung came

20    back into the United States?

21    A.    April 21, 2016.

22         MR. BRADY:  Nothing further, Your Honor.

23    CROSS-EXAMINATION BY MR. VIEN:

24    Q.    Good morning, Special Agent.

25    A.    Good morning.

1    Q.   I'll dispense with the introduction.  We know each other.

2    Correct?

3    A.   Yes.

4         MR. VIEN:  Could I ask Ms. Apfel to bring up Exhibit

5    722 and go to page 2 and 3?  Excuse me.  Maybe you can start

6    with 1, please.

7    BY MR. VIEN:

8    Q.   Special Agent, could you read the last paragraph on page 1

9    that starts the audit?

10   A.   Sure.  "The audit records say that Nizhoni Health Systems

11   of Somerville improperly billed the state for an estimated $8.7

12   million and Avenue Homecare Services of Lawrence overcharged by

13   nearly $4.6 million.  Worcester based Century Home Care wrongly

14   billed for $3.8 million and Maestro Connections Health Systems

15   of Auburn overcharged by more than 2.5 million, the records

16   show.  The state plans to recoup the other charges from each

17   company pending appeals."

18   Q.   And could we go to the second page?  And could you read

19   the paragraph that starts also cited?

20   A.   "Also cited for improper billing were Gentle Homecare

21   Services of Lawrence for about $700,000, Beyond Health Care

22   Agency of Andover for $381,000, Able Home Care of Lynn for

23   $269,000 and Comfort Home Care of Methuen for about $78,000."

24   Q.   Special Agent, did you become involved in the

25   investigation of any of those companies?

1    A.    No.

2    Q.    And under direct, when you were doing sort of the

3    beginning, you talked about the investigative team, the

4    different agencies that it included.  And what are those

5    agencies?

6    A.    FBI and IRS.

7    Q.    And could you be more specific about the IRS?

8    A.    Oh, it's the criminal investigations division.

9    Q.    And what do they do?

10   A.    Like us, they investigate allegations of crime, more

11   specifically dealing with, like, money.

12   Q.    And even more specifically dealing with criminal tax

13   crimes?

14   A.    They do, yup.

15   Q.    And they were involved in this investigation.  Correct?

16   A.    Yes.

17   Q.    But Ms. Newton isn't charged with any tax crimes, is that

18   correct?

19   A.    I'm not aware of tax crimes, no.

20   Q.    And when did you join the investigation?

21   A.    It was about May of 2022.

22   Q.    And was that after the indictment?

23   A.    Yes.

24   Q.    And who was the case agent before you from HHA?

25   A.    Special Agent Jeanette Hernandez.

1    Q.    What's her first name?

2    A.    Jeanette.

3    Q.    And what is she doing now?

4    A.    She's a -- she's still a Special Agent, but she is a

5    program manager within the inspector general's academy at the

6    federal law enforcement training center.  But she's still part

7    of HHA/OIG.

8    Q.    And she was the case agent?

9    A.    She was.

10    Q.    Can you explain to the jury what a case agent is?

11    A.    Just as it sounds, the case agent working on the

12    investigation, the primary agent on the investigation.

13    Q.    And I know her job is in Georgia, but she's been here

14    throughout the trial.  Correct?

15    A.    Throughout the trial, yes.

16    Q.    And how many years have you been working in federal law

17    enforcement?

18    A.    So I've been a sworn agent for 15 and a half years.

19    Q.    And based on your experience in federal law enforcement,

20    you know someone who's been -- who's in the country illegally

21    and been convicted of fraud is highly likely to get deported;

22    is that correct?

23            MR. BRADY:  Objection, Your Honor.

24            THE COURT:  Excuse me.

25            MR. BRADY:  Objection.

```
 1              THE COURT:  If he knows.
 2              THE WITNESS:  I'm really not sure.
 3    BY MR. VIEN:
 4    Q.    You're not sure?
 5    A.    I haven't experienced that in any of my investigations.
 6    Q.    You haven't worked with INS or customs?
 7    A.    I have not in most of my cases, I haven't come across
 8    those guys.
 9    Q.    So as a federal agent with 15 years' experience, your
10    testimony today is you don't know whether that person is highly
11    likely to get deported?
12    A.    They may get deported, I just don't know.  I mean I --
13    yeah, I'm not sure.
14    Q.    And when someone gets deported, they get deported back to
15    their home country.  Right?
16    A.    I would think so, yeah.
17    Q.    So someone whose home country is Kenya, they would get
18    deported back to Kenya.  Right?
19    A.    Yes.
20    Q.    And, obviously, you became involved in this case, it
21    involves Arbor Home Health Care.  Correct?
22    A.    Correct.
23    Q.    It's your understanding that the company grew rapidly?
24    A.    Yes.
25    Q.    And it had hundreds of home health aides?
```

1   A.    Yes.

2   Q.    And probably over a thousand patients?

3   A.    I've heard something close to that number, yeah, I think

4   so.

5   Q.    And in this business, patients come and go; is that right?

6   A.    As far as I know, yes.

7   Q.    And home health aides come and go.  Correct?

8   A.    Sure.

9   Q.    And nurses come and go?

10  A.    I don't know if nurses necessarily come and go as

11  frequently.  I'm not sure.

12  Q.    As part of your investigation, did you interview Joseph

13  Muiruri?

14  A.    No.

15  Q.    Okay, who is Joseph Muiruri?

16  A.    I believe at some point he became the director of nursing.

17  Q.    At Arbor?

18  A.    At Arbor.

19  Q.    But you didn't interview him?

20  A.    No.

21  Q.    And did you interview Syed Hussain?

22  A.    I think I was present for one interview of Syed Hussain.

23  Q.    And you understand that Joseph Muiruri and Syed Hussain

24  both opened or attempted to open their own home health care

25  businesses?

1   A.   Did you say Joseph Muiruri?

2   Q.   Joseph Muiruri.

3   A.   I'm not aware of that, of Joseph Muiruri opening -- I'm

4   not sure.

5   Q.   And what about Syed Hussain?

6   A.   I've heard of people saying he was going to, but I have no

7   idea if he did or not.

8   Q.   And did you interview Joseph -- I always mispronounce his

9   name.  Ouko?

10   A.   Yes.

11   Q.   And he and Syed Hussain both filed whistle-blower

12   lawsuits?

13   A.   Yes.

14   Q.   And in a whistle-blower lawsuit, there's a financial

15   recovery for the whistle-blower.  Is that true?

16   A.   That's true.

17   Q.   And it would help a lot for a whistle-blower's case if the

18   defendant in a whistle-blower case were convicted of fraud; is

19   that right?

20          MR. BRADY:  Objection, Your Honor.

21          THE COURT:  Basis?

22          MR. BRADY:  Relevance, also beyond the scope of his

23   direct.

24          THE COURT:  Overruled.

25          THE WITNESS:  Yeah, it could.

1    BY MR. VIEN:

2    Q.    So if you sue someone in a whistle-blower statute and

3    you're looking to collect money, it would be better if they

4    were convicted of fraud, right?

5    A.    Sure.

6    Q.    It would make your case better, correct?

7    A.    Yes.

8    Q.    And if your case is better, the chances are that you are

9    going to collect some or more money.  Right?

10   A.    True.

11   Q.    And is it fair to say -- I know you weren't around at that

12   time.  But is it fair to say Joseph Ouko is the one who came in

13   first to this investigation?

14              MR. BRADY:  Objection.

15              THE COURT:  If he knows.

16              THE WITNESS:  I think he did come in first.

17   BY MR. VIEN:

18   Q.    And is it fair to say he helped give the investigation

19   direction?

20   A.    I know he gave information.  I'm not sure where the

21   investigation was, if it was even happening before him, to be

22   honest.

23   Q.    And the agents followed -- use that information to further

24   investigate the case.  Right?

25   A.    Sure, we'll use any information we get to further, sure.

```
 1            MR. VIEN:  Ms. Apfel, could you put up Exhibit 906,
 2    and I think the Bates number on the page I want is -- could we
 3    go to page 893 on the USAO number?  Thank you.
 4    BY MR. VIEN:
 5    Q.    Could you tell us what this is, Special Agent?
 6    A.    These are text messages between Faith Newton and Eunice
 7    Muiruri.
 8    Q.    Between Faith Newton and who is Eunice?
 9    A.    She's a nurse at Arbor, or was a nurse at OSHA.
10    Q.    And could you read what Faith Newton wrote and what Eunice
11    responded?
12    A.    Sure.
13          "Faith Newton:  Yes, multiple times.  A lot of the visits
14    we only billed a max of 16 hours, but a few slipped by us.  So
15    on a lot that we billed correctly at 16 hours, you still paid
16    out for 27 hours to the employee.  Why are people not honest
17    and say they were overpaid?  Even this week when we will bill,
18    there are a lot of hours being entered that don't follow the
19    Plan of Care and we will only bill off the Plan of Care, so
20    you're paying more than you should.  We are going to send these
21    lists out every week.
22          "Eunice Muiruri:  Oh, my God.  He should have caught this
23    before.  Don't worry, God is in control.  We'll keep on
24    praying.
25          "Faith Newton, I know."
```

 1  Q.   And based on your investigation in this investigation,
 2  what are they talking about there?
 3  A.   They're talking about billing for additional hours of
 4  services.
 5  Q.   That the home health care aides are billing for additional
 6  hours?
 7  A.   That's what this is saying, correct.
 8  Q.   And that the company would pay the home health care aides
 9  for more hours than actually the company got compensated for.
10  Right?
11  A.   That's what this is indicating.
12  Q.   And could we move to 920, please?  USAO 920.
13       MR. VIEN:  Thank you, Ms. Apfel.
14  BY MR. VIEN:
15  Q.   And can you tell the jury what this text is?
16  A.   Text messages between Faith Newton and Joan Kagendo.
17  Q.   And who is Joan Kagendo?
18  A.   She was a nurse at Arbor.
19  Q.   And could you read that exchange to the jury please?
20  A.   Sure.
21       "Kagendo:  Even if he calls, nothing will happen, please,
22  and I'm sure haters will be so happy to hear that.  Honestly I
23  don't feel scared.  Imagine our patients are happy and
24  justified if Avenue is okay I don't see why Arbor will have a
25  problem.

1          "Faith Newton, I know.

2          "Kagendo:  God is there.  A lot of people relying on this

3     job with their families so God knows that.

4          "Faith Newton:  Amen.

5          "Kagendo:  You wait and see.  Nothing will happen.

6          "Faith Newton:  I know and trust in God.

7          "Kagendo:  Of course."

8     Q.   And let me direct you to the second entry that begins

9     honestly.  Do you know what I'm talking about?

10    A.   Yup, I see that.

11    Q.   And what's Avenue?

12    A.   I believe it was another home health agency.

13              MR. VIEN:  And if I could move to USAO Number 962.

14    Thank you.

15    BY MR. VIEN:

16    Q.   And, Special Agent, could you tell us who this exchange is

17    between?

18    A.   Between Faith Newton and Joseph Muiruri.

19    Q.   And he's the Joseph Muiruri that you spoke about before,

20    correct?

21    A.   Yes, correct.

22    Q.   Do you mind reading this exchange for the jury?

23    A.   Sure.

24         "Faith Newton:  If you look at the scheduled half

25    visits -- sorry.  If you look at the scheduled January 2 visit,

1    it's marked as December 21, 6:00 a.m. to 6:00 p.m. and the

2    scheduled January 5 it's marked as December 21, 6:00 a.m. to

3    2:00 p.m. how is the same HHA Rosa seeing the same patient for

4    20 hours?  You're paying her 20 hours and the patient can only

5    be seen for eight hours.  The things being entered are not

6    correct.  So this one patient has three HHA visits entered for

7    December 21, a total of 28 hours for this HHA.  Scheduled

8    December 21 visit, eight hours scheduled.  January second

9    visit, December 21, eight hours scheduled.  January fifth

10   visit, December 21, 12 hours.  You have a major problem with

11   all the entries at Axxess.

12       "Joseph Muiruri:  Technicality errors, most likely Axxess.

13   I don't trust this software.

14       "Faith Newton:  Oh, Lord, help us.  I wanted to let you

15   know that I found a few claims billed in 2015 that were 112

16   units.  I looked into the visits in Axxess and they were put in

17   that way.  The staff member put p.m. when it should have been

18   a.m., which increased the visits by a lot.  It was a few weeks,

19   but the visits were entered like this.  I told you to go meet

20   with MassHealth and ask for an overpayment letter for the

21   claims they know were paid at more than 96 units.  The only

22   issue is, this patient's orders show max of 64 units per day,

23   so they should reduce from 112 units to a payment of 64 units.

24       "Joseph Muiruri:  I don't understand how this billing

25   company did not overcheck all these before sending for payment

1    to MassHealth.  Arbor is innocent.  You should sue this billing

2    company for sleeping at the job.

3         "Faith Newton:  Let's just pray that MassHealth will

4    understand and we will return the money instead of giving up

5    our Medicare license."

6              MR. VIEN:  Could we turn to exhibit 318-01?  And can

7    you move through it so the Special Agent can see what we're

8    talking about.

9    BY MR. VIEN:

10   Q.   Are you familiar with this, Special Agent?

11   A.   Yes.

12   Q.   And it's a contract?

13   A.   It's the provider contract.

14   Q.   Between whom?

15   A.   Between MassHealth and the provider which, in this case,

16   is Arbor Homecare services.

17   Q.   And who signed on behalf of Arbor Homecare services?

18   A.   Benjamin Muiruri.

19   Q.   And do you know who Benjamin Muiruri is?

20   A.   Faith Newton's husband and I think he was the CEO of Arbor

21   Homecare.

22             MR. VIEN:  Thank you, Your Honor, I don't have

23   anything further.

24             MR. BRADY:  No redirect, Your Honor.

25             THE COURT:  You're excused.

1          MR. LOONEY:  The Government calls Ashleigh Serafim,

2     formerly known as Ashleigh Marrier.

3               (The witness was sworn.)

4          THE CLERK:  Can you please state your name and spell

5     your last name for the record.

6          THE WITNESS:  Ashleigh Serafim, S-E-R-A-F-I-M.

7                ASHLEIGH SERAFIM, sworn

8     DIRECT EXAMINATION BY MR. LOONEY:

9     Q.   Good morning, Ms. Serafim.  Can you just introduce

10    yourself to the jury, tell them your name?

11    A.   Ashleigh Serafim.

12    Q.   Where do you work?

13    A.   ATIIS, LLC.

14    Q.   What kind of business is ATIIS?

15    A.   It's a medical billing company.

16    Q.   Who owns ATIIS?

17    A.   I do.

18    Q.   Is it owned only by you, or do you have a partner in the

19    business?

20    A.   I had a partner previously, but now it's just me.

21    Q.   Who was that partner?

22    A.   David Marrier.

23    Q.   Were you formerly married to Mr. Marrier?

24    A.   I was.

25    Q.   So he was your husband and business partner?

```
 1    A.    Correct.

 2    Q.    And did you used to go by Ashleigh Marrier?

 3    A.    Yes.

 4    Q.    So what kind of business is ATIIS?

 5    A.    It's a medical billing company.  We process claims to

 6    insurance companies.

 7    Q.    Do you focus on a specific kind of medical practice?

 8    A.    Primarily home health agencies.

 9    Q.    When did you start ATIIS?

10    A.    In 2012.

11    Q.    And what were you doing before that?

12    A.    I was an in-house biller for a home health agency.

13    Q.    What home health agency?

14    A.    That was Comfort Home Care.

15    Q.    And sorry, what was the date you started ATIIS?

16    A.    May, 2012.

17    Q.    Do you know a person named Faith Newton?

18    A.    Yes.

19    Q.    How do you know her?

20    A.    She was part of an agency that signed up for services

21    through my company.

22    Q.    What was the name of that agency?

23    A.    Arbor Homecare.

24    Q.    How did your company come to work with Arbor?

25    A.    I had another company that was signed up and the owner of
```

 1    that company introduced me to Faith stating she needed services

 2    that I was providing to him.

 3    Q.    What was the name of that company?

 4    A.    Maestro Home Care.

 5    Q.    And then you were introduced through the owner of Maestro

 6    to Faith Newton?

 7    A.    Yes.

 8    Q.    How did you -- how did the relationship progress from

 9    there?

10    A.    Well, I spoke on the phone with the provider, and then I

11    went in and had a face-to-face meeting with both owners of the

12    agency, went other the services that we provided, how we do

13    things.  We agreed that they liked that process, and we signed

14    a contract and then we went to work.  I have staff, so we audit

15    and we go through and we just process things that are

16    completed.

17            MR. LOONEY:  Can you pull the microphone closer.

18            THE COURT:  The whole stand pulls closer.

19    BY MR. LOONEY:

20    Q.    You said you met with the owners of the company, who were

21    the owners?

22    A.    Faith Newton and Ben M.  Not sure how to pronounce his

23    last name.

24    Q.    Who did you deal with more in your relationship with

25    Arbor?

1  A.   Faith.

2  Q.   You talked about briefly the services you provided to

3  Arbor.  What did you do for Arbor?

4  A.   We were a third party, so we were brought in to go through

5  their system, Axxess, that held all of their completed visits

6  that their staff, you know, went out and did.  So we were hired

7  to go in and look at the visits that were marked completed in

8  what they call a billing center.  For us as a billing company

9  and we process everything that was marked completed and ready

10 to go.

11 Q.   Let me take that step by step.  So you were granted access

12 to the Axxess platform or database?

13 A.   Yes.

14 Q.   And you went in there to get information that had been

15 inputted by someone else?

16 A.   Yeah, weekly.

17 Q.   On a weekly basis?

18 A.   Yes.

19 Q.   And the records that you obtained the information for,

20 were those records that had been marked as completed, I think

21 you said?

22 A.   Yes.  Typically a scheduler schedules visits and then that

23 staff member will go out and do that visit.  They'll enter

24 those notes in and then somebody internally, a QA team, will

25 review those notes, make sure they're timed, dated, signed, and

1    then it will be marked completed to be billed by me.

2    Q.   And once you got those records, what did you -- to whom --

3    what did you do next in the process?

4    A.   We process out the visits to the primary payer for those

5    particular patients, and then every Friday, a report goes out

6    to both named owners of every provider, and they get a report

7    of every patient that was billed, dates of service, the amount

8    they can expect to get in.  And then we also do -- we would

9    send a discrepancy report of anything that came up while we

10   were billing that we would want them to know about.

11   Q.   So when you went into Axxess, there was the recorded

12   patient visits, you created claims based on that were submitted

13   to the payer?

14   A.   Yes.

15   Q.   And who is the payer for Arbor health care?

16   A.   MassHealth.

17   Q.   And at the same time you generated a report of claims that

18   were sent to the owners of the provider?

19   A.   Correct.

20   Q.   So to Ms. Newton and Mr. Muiruri?

21   A.   Yes.

22   Q.   Did you ever receive responses to those reports or

23   questions about the reports you provided to Ms. Newton or

24   Mr. Muiruri?

25   A.   No, because I have managers, so my managers would have

```
 1    been the ones sending those directly.  So I really only came in
 2    when there was, you know, a real question or something with one
 3    of the owners.  It came from other people internally.
 4    Q.   Were there any issues raised to you --
 5    A.   No.
 6    Q.   -- by Ms. Newton?
 7    A.   No.
 8    Q.   And you mentioned a discrepancy report.  What's that?
 9    A.   Well, we're hired to go in and, you know, process visits
10    that are completed.  The way that they're put in.  So if we see
11    anything as far as maybe people had a -- some people were seen
12    double times -- like two patients were seen at the same time,
13    or if visits were dated incorrectly, or if hours were over or
14    exceeding the frequency, those would be all on that report that
15    we sent.
16    Q.   To whom did you send reports like that?
17    A.   They go with a weekly report to both Ben and Faith.
18    Q.   So if there were any issues, those issues were flagged and
19    sent to the providers, in this case Ben Muiruri and Faith
20    Newton?
21    A.   Uh-huh, yes.
22    Q.   Did you get any feedback on those discrepancy from those
23    reports?
24    A.   No.
25    Q.   You mentioned when you met Faith Newton and Ben Muiruri
```

1    that you walked through the services, and then I think you said

2    you signed a contract?

3    A.    Yes OAU.

4            MR. LOONEY:  Could we bring up for the witness what's

5    marked as 721.

6    BY MR. LOONEY:

7    Q.    Do you see this document on the screen?

8    A.    Yes.

9            MR. LOONEY:  Maybe we can scroll through the pages for

10   the witness.

11   BY MR. LOONEY:

12   Q.    Do you recognize this document?

13   A.    Yes.

14   Q.    And what is it?

15   A.    This was the service agreement between ATIIS and Arbor

16   Homecare.

17           MR. LOONEY:  I ask that Exhibit 721 be admitted.

18           MR. VIEN:  No objection, Your Honor.

19           THE COURT:  It's admitted.

20           (Exhibit 721 admitted into evidence.)

21   Q.    So you said this is a contract existing between ATIIS,

22   LLC, your company and Arbor Homecare services?

23   A.    Yes.

24   Q.    And what's the date of this agreement?

25   A.    August 29, 2013.

1    Q.    And who signed this agreement?

2    A.    This was Ben and David Marrier, my business partner.

3    Q.    Is he currently your business partner or former business

4    partner?

5    A.    Former.

6              MR. LOONEY:  Could we go back to the first page,

7    please?  Can we blow up the first section?

8    BY MR. LOONEY:

9    Q.    And the first paragraph reads, "this agreement dated

10   August 29, 2013, between ATIIS, LLC and Arbor Homecare

11   Services, LLC.  ATIIS, LLC and the company have agreed that

12   ATIIS, LLC will provide to the company the billing and related

13   support services to the licensed certified home health care

14   company.  Did I read that correctly?

15   A.    Yes.

16   Q.    And what did that mean?

17   A.    We were hired to provide billing services, go in and

18   complete the notes that were submitted and process them

19   accordingly.

20   Q.    So this is the contract for services you just described?

21   A.    Yes.

22   Q.    And then the next section below that is titled duties,

23   correct?

24   A.    Yes.

25   Q.    And can you just read the first sentence of that?

1 A. "The company shall provide Axxess to required information

2 such as but not limited to 485s, doctors' orders, insurance

3 information, recertification document, any explanation of

4 benefit statements and any other necessary documentation for

5 ATIIS, LLC to perform its duties."

6 Q. And what the does the company refer to?

7 A. The company would be Arbor.

8 Q. This paragraph states that Arbor will provide information

9 such as 485s, doctors' orders, et cetera?

10 A. Yes.

11 Q. Was there an expectation that information be accurate?

12 A. Yes.

13 Q. Can you read the next sentence?

14 A. "The company attests that the information represents

15 accurate and valid visits provided to the patients named on the

16 documents according to the Commonwealth of Massachusetts and

17 federal home health care regulations and requirements and to

18 the accuracy of the visit documentation with supporting

19 physician orders prior to ATIIS claim submission on behalf of

20 the company."

21 Q. So that was about services accurately provided to the

22 patients?

23 A. Yes.

24   MR. VIEN:  Objection.  It speaks for itself.

25   THE COURT:  Overruled.

```
 1            MR. LOONEY:  I think she answered yes.  And can we
 2    zoom out.  And could we blow up the portion beginning "Arbor
 3    Homecare Services, LLC shall supply/perform."
 4    BY MR. LOONEY:
 5    Q.   And can you read from the top through the first three
 6    numbered sentence statements?
 7    A.   Yes.  "All patient care -- Arbor shall perform, supply all
 8    patient care services, timely, accurate and complete
 9    information to ATIIS, LLC to allow for proper and compliant
10    billing to all payers, verification that all appropriate
11    documentation per regulatory, legal and Governmental bodies is
12    in order prior to billing."
13            MR. LOONEY:  Can we zoom out?  And can we go to page 6
14    of this document and blow up Section 13, please.
15    BY MR. LOONEY:
16    Q.   Can you read this section?
17    A.   "The parties acknowledge that pursuant to their
18    relationship here under that they have affirmed to obligation
19    to comply with Massachusetts federal and state laws,
20    regulations and guidance."
21            MR. LOONEY:  Can we zoom out and just go to the top
22    page?  Thank you.
23            THE WITNESS:  "Regarding the practice of medical
24    billing and collection practices, the parties agreed to abide
25    by and comply with all such federal and state laws, regulations
```

1  and other guidance."

2  BY MR. LOONEY:

3  Q.   And are those promises that were made on behalf of Arbor

4  Homecare to ATIIS?

5  A.   Yes.

6  Q.   When you went into or your company went into the Axxess

7  database and retrieved information on patient visits, did you

8  check to tell whether the visits had actually been performed?

9  A.   No, because they're in the billing center, and they've

10  already gone through a one or a two-step process internally.

11  Q.   But that's not a process that you do?

12  A.   No.

13  Q.   You rely on the medical service provider to do that?

14  A.   Yes.

15  Q.   In this case that's Arbor?

16  A.   Yes.

17  Q.   Is there any way that ATIIS could tell whether or not

18  patient visits were actually taking place?

19  A.   No, because it's an electronic system.

20  Q.   Did ATIIS rely on the information provided by Arbor?

21  A.   Yes.

22  Q.   Did you communicate frequently with Faith Newton during

23  the course of your relationship?

24  A.   I think yes, as an owner/owner relationship making sure

25  that things are processing correctly.  But other than that,

1    that was it.

2    Q.    During the course of your relationship, did she raise any

3    particular concerns or issues about the accuracy of your

4    processes?

5    A.    No.

6              MR. LOONEY:    Could we bring up exhibit 719, please,

7    which is previously admitted?

8    BY MR. LOONEY:

9    Q.    Do you recognize this document?

10   A.    Yes.

11   Q.    And what is it?

12   A.    This was a notice the provider got.  I believe it's a

13   sanction that they're -- MassHealth was cutting funds.

14   Q.    And it's addressed to Arbor Homecare Services?

15   A.    Yes.

16   Q.    And it's from MassHealth?

17   A.    Yes.

18   Q.    And the title of the document is notice of withholding of

19   payments?

20   A.    Yes.

21   Q.    And what's the date on it?

22   A.    January 3, 2017.

23   Q.    When did you first see this document?

24   A.    I was sent a copy by Faith I would say a week maybe after.

25   Somewhere around that time of the letter.

1  Q.   So around the time that it's dated, you received a copy

2  from Faith Newton?

3  A.   Yes.

4  Q.   Do you recall how you received it?

5  A.   Through text message.

6  Q.   Did you discuss the contests with Ms. Newton?

7  A.   Yes, briefly.

8  Q.   Briefly?

9  A.   Yeah.

10 Q.   What did she -- what was her reaction to this letter?

11 A.   I believe I was sent a copy to find out what it was and

12 what it meant so it was more of an urgent, like -- you know,

13 what's going on?  So that was really the only conversation

14 until I could read it more and understand what it was.

15 Q.   Did you talk with her about what problems might have

16 caused MassHealth to issue this letter?

17 A.   Just the bullets in the letter.

18 Q.   Just what was contained in the letter?

19 A.   Yeah.

20 Q.   What did she tell you about those?

21 A.   I believe what was stated in the letter was things about

22 home health aide units, they were being submitted more than

23 they should have been in a daily, a 24 hour period.  I believe

24 that was one of the major accusations in the letter.

25 Q.   So that this were more units of home health care units

```
 1   billed per day than was permitted?
 2   A.   Correct.
 3           THE COURT:  Is this a good stopping point, Mr. Loony.
 4           MR. LOONEY:  I have, like, two more questions.
 5           THE COURT:  Go ahead.
 6   BY MR. LOONEY:
 7   Q.   Did she identify other problems that might have caused the
 8   issuance of this letter to her?
 9   A.   No.
10   Q.   Didn't raise with you whether nurses have been providing
11   visits that -- or had been billing for services that hadn't
12   been provided?
13   A.   No, none of that was made aware until much later.
14           MR. LOONEY:  I have nothing further with this witness.
15           THE COURT:  We'll break for lunch, and then we'll do
16   cross.
17           (The hearing recessed 12:01 p.m. - 12:37 p.m.)
18           THE COURT:  So the jurors' lunch did not come up
19   today, so we reordered it when we broke, but we're never going
20   to start on time this afternoon.  So I'm hoping we can finish
21   talking about the charge, if everyone has had a chance to go
22   through it.  If you haven't, that's all right, and we won't.
23   Just, if we can.
24           And here is this question.  I'm happy to have you take
25   a picture of it or keep a copy of it if you want.  It's signed
```

1    by Harold Henry.  Let's just see who Mr. Henry is.  Harold

2    Henry, alternate number 1.  And here is his question.  His

3    handwriting is tough:

4         "The defense lawyer asked Dr. Eaton if he knows that

5    having his patients cared for at an HCA that he's a medical

6    director of is illegal.  Dr. Eaton said he didn't know.  My

7    question is if that is one of the regulations and should I be

8    concerned about it?  Does it go to the 'truth of the matter'?

9    Thanks.  Harold Henry, Juror."

10        Do you want to see it?

11        MR. VIEN:  I don't think there's allegations that

12   that's part of the fraud, and the point of the question

13   obviously was to try to establish that even a medical doctor

14   didn't know all the rules.  So I think we can say he doesn't

15   have to be concerned about it.

16        MR. BRADY:  I'm sorry, Your Honor.  Can I get the

17   substance of it just one more time just to make sure I can

18   process it?

19        THE COURT:  You can take a picture of it, too.

20        "The defense lawyer asked Dr. Eaton if he knows that

21   having his patients cared for at an HCA that he is a medical

22   director of is illegal.  Dr. Eaton says he didn't know.  My

23   question is if that is one of the regulations and should I be

24   concerned about it.  Does it go to the 'truth of the matter'?"

25        We could just ignore it.  I'm not sure if he's trying

1   to assess Eaton's credibility or he wants to know if it's

2   relevant.

3        MR. VIEN:  It's got to be one of those two things,

4   Your Honor.  It's got to -- you know, I'm such a great lawyer.

5   I wanted it for the third point, which is the rules are

6   complicated.

7        THE COURT:  I don't think that's what he's asking.

8   Maybe it is.  Who knows?

9        MR. VIEN:  How do we respond, if at all?

10       THE COURT:  I think we should just ignore it but tell

11  him we're going to ignore it.

12       MR. BRADY:  Either that or something like, "You as the

13  jurors are" -- something -- "You're the finder of facts and you

14  are to give it whatever weight you deem appropriate."

15       MR. VIEN:  I'd just ignore it.

16       MR. LOONEY:  We're fine not answering.

17       MR. BRADY:  That seems fair, Your Honor.

18       THE COURT:  During civil trials I give them an option,

19  I give the parties an option of letting the jurors ask

20  questions.  I don't do it during a criminal trial.

21       MR. BRADY:  Of witnesses?

22       THE COURT:  No.  Just, they give their questions to

23  me.  Sometimes it's like stuff they want to know.  Usually it's

24  not actually a question.  I can't always answer them while the

25  witness is on the stand.  So if they hand me a question on the

1    way out to lunch, I don't get to talk to the parties about it

2    until the next break, so there's always a gap, but I don't do

3    it during the criminal cases.

4         All right.  So Karen will go up and check and see when

5    they're ready.

6         MR. VIEN:  One other thing we can accomplish is

7    responding to the court's question about delaying the case.

8    I've spoken to my client about it, and we do not want to delay

9    the trial.

10         THE COURT:  Okay.  Karen, how far along are they?

11         COURTROOM CLERK:  I haven't gone back up yet again.

12         THE COURT:  Have you all had a chance to look at the

13    jury instructions or no?

14         MR. VIEN:  I'm just looking at them now, Your Honor.

15         MR. BRADY:  In the same boat, Your Honor.  Just

16    briefly.  I see they're redlined, Your Honor.  I think from our

17    perspective we could have a productive conversation.

18         THE COURT:  I didn't want to rush anybody on the jury

19    instructions, so I'll give you the time.

20         I don't know where -- how does the government think

21    we're doing on time?

22         MR. LOONEY:  I think we're still on schedule to finish

23    today.  If I were to guess what time, 3:00.

24         THE COURT:  Okay.  So I'd like to, depending on where

25    we are, I'm going to try and do at least the first 16 pages of

1    the charge, which is up to the charge that's captioned

2    "Indictment."  Then we just do the substantive part tomorrow.

3           Since we have a few minutes, I want to colloquy

4    Ms. Newton on testifying.  Is it all right to do that now?

5           MR. VIEN:  You may do it now, Your Honor, as far as

6    I'm concerned.

7           THE COURT:  I will.  The government's dog isn't really

8    hunting here.

9           Ms. Newton, I just want to make sure you understand.

10   You have a right to testify, and you have a right to put on

11   witnesses, and you have a right to put on evidence beyond just

12   responding to the government's case.

13          You also don't have to testify.  You don't have to put

14   on evidence.  You don't have to do anything beyond argue that

15   they haven't met their burden of proof.  But I'm hearing from

16   your lawyers that you're not intending on testifying, and I

17   just want to make sure that you understand that you do have the

18   right to testify and that you're choosing not to.  So do you

19   understand you have the right to testify?

20          THE DEFENDANT:  Yes, I do, Your Honor.

21          THE COURT:  Have you talked your lawyers about whether

22   or not you're going to testify?

23          THE DEFENDANT:  Yes.

24          THE COURT:  And do you have any questions about your

25   right to testify or what it would involve?

1           THE DEFENDANT:  No, I don't.

2           THE COURT:  Is that correct that you do not intend on

3    testifying?

4           THE DEFENDANT:  No, I don't want to testify.

5           THE COURT:  And do you understand that if you change

6    your mind, at the time the government rests and it's your

7    lawyers' turn to put on the case, if you have changed your

8    mind, you just let us know, and you can take the stand.  All

9    right?

10          THE DEFENDANT:  Okay.  Thank you.

11          THE COURT:  Does the government want anything else on

12   that?

13          MR. BRADY:  No, Your Honor.

14          THE COURT:  Mr. Vien or Ms. Pascucci?

15          MR. VIEN:  No, Your Honor.  Your Honor --

16          THE COURT:  Do you want to go ahead without him?

17          MR. LOONEY:  I think we are okay.

18          MR. VIEN:  I don't have time to read these now.  The

19   government dropped off 17 DEA reports regarding Dr. Eaton.

20   Maybe we can submit a set to the court as well, just so you

21   have them.  I'll read them after court today.

22          THE COURT:  I'll read them after court today, too.

23          MR. LOONEY:  We have a set available.

24          THE COURT:  The good Lord does not want me to give a

25   substantive charge today.  Since we're going to finish the

 1    charge tomorrow anyway, we can deal with it tomorrow.

 2              MR. VIEN:  We'll do the first 16 pages, like you said.

 3              MR. LOONEY:  We have three witnesses this afternoon.

 4    We're going to rest.  I don't know if it's appropriate to rest,

 5    given this possible open issue.

 6              THE COURT:  I'm going to let you do it anyway.

 7              MR. LOONEY:  What's that?

 8              THE COURT:  I'm going to let you rest, with the

 9    understanding that we may need to reopen.

10              MR. LOONEY:  Okay.  That works.

11              MR. VIEN:  Do you have a set for the court?

12              MR. LOONEY:  Yes, this is a set of those reports for

13    the court.

14              THE COURT:  Mr. Looney, have you read these yet?

15              MR. LOONEY:  I have not had a chance to read them yet.

16              THE COURT:  All right.

17              MR. LOONEY:  You asked if I had a chance to read them.

18    I haven't yet.  I'm reading them now.  I wanted to know if

19    there's a specific issue.

20              THE COURT:  I haven't read them either.  I was just

21    looking to see what a -- now I'm reading them.  I'm halfway

22    through them.  I will read it on my own.

23              MR. LOONEY:  You're ahead of me.

24              COURTROOM CLERK:  All rise for the jury.

25              (Jury enters the courtroom.)

```
 1              COURTROOM CLERK:  Court is back in session.  Please be

 2    seated.

 3              THE COURT:  That came under the category of there's

 4    always something.  Sorry about the extra long lunch.  I'm sorry

 5    it didn't come up in time.  I guess sometimes that happens.

 6    We're going to resume.

 7              One of the jurors handed Karen or me a question this

 8    morning.  There's some questions we can answer and some we

 9    can't.  You'll hear instructions on the law from me.  You'll

10    hear closing argument from the parties.  But beyond that,

11    that's not a question we're going to be responding to.

12              Cross-examination, Mr. Vien.

13              MR. VIEN:  Thank you, Your Honor.

14    CROSS-EXAMINATION BY MR. VIEN:

15    Q.   Good afternoon, Ms. Serafim.

16    A.   Hi.

17    Q.   You prefer Serafin [sic]?

18    A.   It's Serafim, with an "M".

19    Q.   Excuse me.  Anyway, my name is George Vien.  Along with

20    Michelle Pascucci, we represent Faith Newton in this case.  Do

21    you understand that?

22    A.   Yes.

23    Q.   Okay.  And you started off working in this field for

24    Comfort Home Care?

25    A.   Correct.
```

1    Q.    And you worked there as a biller?

2    A.    Yes.

3    Q.    And then after you left Comfort Home Care, you went to

4    another home care business and worked there; is that right?

5    A.    Yes, slightly, yes.

6    Q.    Which one was that?

7    A.    That was, I believe it was Boston Home Health Aides.

8    Q.    Okay.  And you remember seeing the contract.  I guess we

9    could pull that up.  It's Exhibit 721.

10          Is this the contract with Arbor?

11   A.    Yes.

12   Q.    And who signed it on behalf of Arbor?

13   A.    Ben.

14   Q.    And that's Ben Muiruru?

15   A.    Yes.

16   Q.    While you were doing business with Arbor, you gained

17   access to their Axxess database, or whatever you want to call

18   it; is that correct?

19   A.    Yes.

20   Q.    Had you used Axxess before?

21   A.    Yes.

22   Q.    Okay.  With what other companies?

23   A.    I think -- I don't know.  A few others.  But I hadn't used

24   it for a year prior, I believe.

25   Q.    It's pretty common in the home health care --

1   A.   Yes, yeah.

2   Q.   -- business?

3        Again, I don't care, but I know the court reporter is

4   trying to take down what we both say.  So if you could wait for

5   me to finish --

6   A.   Sorry.

7   Q.   -- and then I'll wait for to you finish, and that way she

8   can get it down.  Okay?

9   A.   Sure.

10  Q.   So anyway, let me just try to ask that again.  So you've

11  worked with Axxess before; is that correct?

12  A.   Yes.

13  Q.   And it's not uncommon for the home health care business or

14  industry to use Axxess, right?

15  A.   Correct.

16  Q.   Okay.  And what you did is you took the information from

17  Axxess, and you submitted the bills to MassHealth, correct?

18  A.   Yes.

19  Q.   And MassHealth could pay the bill, deny it, or even

20  suspend payments like we saw in this case, right?

21  A.   Yes, but they pay 90 percent.  They only deny if it's an

22  insurance issue.  But mostly everything you submit will be

23  paid, yes.

24  Q.   And when you say only an insurance issue, meaning if

25  you're not really covered by MassHealth?

1   A.   Correct.  They could have a lapse for a few days, a week,

2   a month, change to a different payor, and that would be where

3   we would submit the claim.

4   Q.   But usually they pay everything up front and then go back

5   and try and get their money back at the end?

6   A.   Yes.

7   Q.   Okay.  Now, I'm sorry, but it's ATIIS?

8   A.   Mm-hmm.

9   Q.   Where does that come from, by the way?

10  A.   My former business partner came up with the name.

11  Q.   You did not bill for visits in excess of what was written

12  on the 485 or the Plan of Care; is that correct?

13  A.   That is not correct.

14  Q.   You did?

15  A.   We do not verify visits versus 485.  So they could be

16  approved for three visits and could send us six, and we will

17  process the six.

18  Q.   I'm sorry.  Okay.  Maybe I can get back to it, but you're

19  aware that -- so you would bill in -- you didn't check the Plan

20  of Care?

21  A.   No, we would not.  Typically the provider, when they

22  scheduled the visits, they have QA.  That QA person is supposed

23  to make sure those visits that are turned in in that frequency

24  matched the frequency.

25  Q.   So that's a MassHealth --

1   A.   It would be -- no.  Sorry.

2   Q.   Go ahead.

3   A.   That's on the provider internally.

4   Q.   Okay.

5   A.   Once the visits are completed and submitted, they're to be

6   reviewed and then marked completed for billing.  So somebody,

7   two or three people already are supposed to review that

8   internally before it comes to the third party.

9   Q.   By the provider?

10   A.   Yes.

11   Q.   Okay.  Based on your experience at Comfort Home Care, you

12   were aware that frequently doctors did not sign Plans of Care;

13   is that correct?

14   A.   No, I'm not aware of that.

15   Q.   Okay.

16        MR. VIEN:  May I approach, Your Honor?

17        THE COURT:  Of course.

18   Q.   I'm going to place a report in front of you, and I'm going

19   to leave it there and ask you to look at it.  You can read it

20   to yourself and I'll ask you if it refreshes your recollection.

21   Bottom of page 2 going on to page 3.

22   A.   Okay.  (Witness reviews document).  All that's

23   highlighted?

24   Q.   Yes.  Have you had an opportunity to read it?

25   A.   Yes.

1    Q.    Okay.  Does that refresh your recollection that you told

2    the agents that doctors frequently refused to sign Plans of

3    Care?

4    A.    I know that providers can have issues, but they have 30,

5    45 days to get those orders signed.

6    Q.    So they could bill for services and then get the Plans of

7    Care --

8    A.    Yes.

9    Q.    -- signed up to 45 days afterwards?

10   A.    You're able to bill on a verbal order.  So as soon as the

11   provider gets a referral on that Plan of Care that they submit

12   to the doctor, prior to it being signed, there's a verbal order

13   date.

14   Q.    But you don't remember telling the agents that frequently

15   visits change for a patient and you're aware of instances where

16   doctors refused to sign a Plan of Care, and you told them you

17   were familiar with these instances and they occurred

18   frequently?

19   A.    Physicians may --

20   Q.    No, that's not the question.

21         Do you remember telling the agents that?

22   A.    No.

23   Q.    Okay.  When you checked Axxess, it's true that the Plans

24   of Care within the system were not signed, isn't that true?

25   A.    Say that again.  I'm sorry.

1    Q.    When you checked Axxess, correct -- are you with me?

2    A.    Yes.

3    Q.    -- and you look and you see Plans of Care within Axxess,

4    those Plans of Care were not signed.  Is that true?

5    A.    We do not view those.  They'll say if they're sent out for

6    signature, but a lot of times if the signature comes back,

7    providers will not even scan those in.

8    Q.    Right.  So you could have a Plan of Care, but the way it

9    would get into Axxess is a Plan of Care would be sent to the

10   doctor's office, the doctor would have to sign it, fax it back

11   to the home health care provider, and then the home health care

12   provider would have to scan it and upload it into Axxess,

13   correct?

14   A.    Yes.

15   Q.    And if the home health care provider didn't do that, then

16   the Plan of Care that was in Axxess would not be signed?

17   A.    I wouldn't know that, but probably.  We don't look at

18   that.  Anything for us to bill comes to the billing center.

19   Q.    Okay.

20   A.    As far as signatures and things of that nature, that's not

21   something that we would review or know.

22   Q.    Okay.  But the way it would get done would be the home

23   health care provider would have to scan it into Axxess,

24   correct?

25   A.    Right.

```
 1              MR. VIEN:  Could we have Exhibit 722 up, please.  It's

 2    The Globe article.

 3    Q.   Let me direct your attention to the last paragraph on this

 4    page.  And could you read that, just read it to yourself.

 5    A.   Okay.  (Witness reviews document)  Okay.

 6    Q.   Did you work for any of those companies?

 7    A.   Yes.

 8    Q.   Which ones?

 9    A.   Avenue Home Care and Maestro Connections.

10    Q.   Okay.  And if we could change to the next page, please,

11    and there's some more companies listed there at the top in the

12    top paragraph.  Did you work for any of those?

13    A.   I did, Comfort Home Care.

14    Q.   So I think, what is it, you worked for three companies

15    that were named in this article?

16    A.   Yes.

17    Q.   And did they sign a similar contract that Arbor signed?

18    A.   Well, Comfort Home Care, they were -- I was an employee.

19    So whatever audit that was done for them was after, so I had

20    nothing to do with that.  But Avenue and Maestro, yes, they

21    were both signed up for my company.  But this article isn't

22    accurate.  I was part of those audits, and those amounts listed

23    are not accurate.

24    Q.   But did they sign the --

25    A.   They had contracts at the time.  They're no longer signed
```

1    at this point.

2    Q.    Are the contracts similar --

3    A.    Yes.

4    Q.    -- to the one Arbor signed?

5    A.    Yes.

6    Q.    And when you say the article is inaccurate, how is it

7    inaccurate?

8    A.    I just know from Maestro that they had an audit done and

9    they failed that audit, and it was a certain amount of money.

10   So then the state I believe just multiplied that by their

11   census to like come up with like an amount that they thought

12   that they improperly had processed.

13   Q.    Okay.  So just, it's the number that's inaccurate?

14   A.    Yeah, yes.

15   Q.    Okay.  But do you still work for Maestro?

16   A.    No, I don't.  And that wasn't a billing-related issue.

17   Those were, yes, the claims were billed, but those providers

18   didn't secure documents that were supposed to be signed and

19   different things, I believe, like time in and out and things

20   that were missing from an audit that was done.

21   Q.    You sound like you were deeply involved in the audit at

22   Maestro?

23   A.    Well, yes, when any agency gets a sanction or some sort of

24   audit, they ask for assistance with documents to send.

25   Q.    But nonetheless, they were audited and they had to pay

1   money to MassHealth or to the state, correct?

2   A.   I don't know.

3   Q.   You don't know if they had to pay, but you know that

4   the --

5   A.   I know that they were audited, but I don't know anything

6   about how much money they had to pay back for anything after

7   this.

8   Q.   It wasn't -- it's the amount of money that you're unsure

9   of; is that correct?

10  A.   I don't know anything about those cases.  I just know that

11  when they got letters in, they asked me for help sending

12  certain information in.  So whatever things were found after, I

13  don't know anything about that.

14  Q.   So you don't know how much money, if any, they actually

15  paid, right?

16  A.   No, I don't.

17          MR. LOONEY:  Objection.

18          THE COURT:  Basis?

19          MR. LOONEY:  Relevance.

20          THE WITNESS:  Right.

21          THE COURT:  She already answered the question.  She

22  said no.

23          MR. VIEN:  Okay.

24  Q.   You don't know how much money they paid, but you know the

25  article is not true?

1           MR. LOONEY:  Objection.

2           THE COURT:  Basis?

3           MR. LOONEY:  Relevance.

4           THE COURT:  Sustained.

5   Q.   All right.  Now, with Arbor, you're a little upset with

6   Arbor because you heard that they were blaming you for their

7   problems, correct?

8   A.   No, not upset.

9   Q.   Let me show you another document.  If you could just read

10  paragraph 6 to yourself.

11  A.   (Witness reviews document)  Okay.

12  Q.   Didn't you tell the agents that you communicated with

13  Newton at first and then things turned sour, and then you said

14  you heard Newton told people that Arbor was suspended because

15  ATIIS was not following regulations or was overbilling

16  MassHealth, which was not true?

17  A.   Yes, at the time.

18  Q.   Right.  So you were upset with --

19  A.   I was upset because when she got the sanction, we provided

20  service for many months for free, and then she was stating the

21  things that were inaccurate.  So yeah, I was upset when I heard

22  it, but I wasn't upset after that or now.

23  Q.   Just momentarily you were upset --

24  A.   Yes.

25  Q.   -- that she was blaming ATIIS for the problem?

1    A.    Correct.

2    Q.    Okay.  But you're not upset now?

3    A.    No.  That was a long time ago.

4         MR. VIEN:  I don't have anything further, Your Honor.

5         THE COURT:  Redirect?

6         MR. LOONEY:  Briefly.

7    REDIRECT EXAMINATION BY MR. LOONEY:

8    Q.    I just want to ask I think just one follow-up about the

9    process through which you generated claims that are submitted

10   to MassHealth.

11   A.    Mm-hmm.

12   Q.    Those claims, were they based upon records of patient

13   visits as they existed in the Axxess database?

14   A.    Yes.

15   Q.    Okay.  You were asked some questions about whether you

16   were upset because Ms. Newton blamed ATIIS --

17   A.    Yes.

18   Q.    -- for the notice of suspension of payment.  Did she blame

19   you or ATIIS for that?

20   A.    Not directly to me but to other providers, yes.

21   Q.    She told other providers it was ATIIS' fault?

22   A.    That her funds were terminated, that she had the sanction.

23   Q.    Did she blame anyone else for the suspension of payment?

24   A.    No.

25   Q.    Did you hear her talk about other problems?

```
1    A.    No.

2    Q.    Did she ever say, "Maybe I did something wrong"?

3    A.    No.

4              MR. LOONEY:  Nothing further.

5              THE COURT:  Recross?

6              MR. VIEN:  No, Your Honor.

7              THE COURT:  You're excused.  Thank you.

8              THE WITNESS:  Thank you.

9              MR. LOONEY:  The government calls Robert Wyman.

10             ROBERT WYMAN, Sworn

11             THE WITNESS:  Good afternoon, Your Honor.

12             COURTROOM CLERK:  Can you please state your name and

13   spell your last name for the record.

14             THE WITNESS:  Yes, Robert, the last name is Wyman,

15   W-y-m-a-n.

16   DIRECT EXAMINATION BY MR. LOONEY:

17   Q.    Good morning.

18   A.    Good morning, counsel.

19             THE COURT:  I think it's afternoon.

20   A.    Good afternoon, counsel.

21   Q.    It's been both a long and a short day.

22        Could you introduce yourself to the jury.  Just tell them

23   your name.

24   A.    Good afternoon, everybody.  My name is Robert Wyman.

25   Q.    Where do you live?
```

```
 1    A.    Portsmouth, New Hampshire.

 2    Q.    What do you do?

 3    A.    I'm an attorney.

 4    Q.    What kind of law?

 5    A.    So now I'm corporate.

 6    Q.    And what does that mean?

 7    A.    So I'm general counsel for a publicly traded company.

 8    Q.    Okay.  How long have you been doing that?

 9    A.    Two years.

10    Q.    What did you do before then?

11    A.    I had my own practice.

12    Q.    Okay.  And what kind of practice was that?

13    A.    So it was a general practice.  We did real estate,

14    criminal work and civil work as well, so civil suits as well.

15    Q.    Okay.  How long did you have your own practice?

16    A.    About 25 years.

17    Q.    25 years.  Where did you go to law school?

18    A.    New England Law in Boston.

19    Q.    All right.  Are you familiar with an individual named

20    Faith Newton?

21    A.    Yes.

22    Q.    How did you come to meet her?

23    A.    I was introduced to Faith and her husband in I think

24    around 2015, and I was introduced to them by a real estate

25    broker.
```

1    Q.    Okay.  Do you recall the name of the real estate broker?

2    A.    Yes.

3    Q.    Who is that?

4    A.    Eleanor Connors.

5    Q.    Okay.  Did you become involved in any business with

6    Ms. Newton?

7    A.    Yes.

8    Q.    What type?

9    A.    So both Faith and her husband, Ben, would use my firm to

10   both purchase and sell items of real estate.

11   Q.    Okay.  About how many transactions were you involved in

12   with them?

13   A.    So over a five-and-a-half-year period, it was probably 13

14   transactions.  I would say out of the 13, about five were

15   purchases and eight were sales, sales of real estate.

16   Q.    Five purchases, eight sales.  All right.

17         I want to discuss one in particular.  Are you familiar

18   with a property located at 440 Great Pond Road, North Andover,

19   Massachusetts?

20   A.    Yes.

21   Q.    Okay.  How did you become familiar with that property?

22   A.    So even before Faith and Ben came to me to potentially

23   purchase that property, I had a practice.  One of my offices

24   was in Andover, Massachusetts.  My primary practice was in

25   Chelmsford, Mass., so that property was known to me even before

1    they showed a potential interest to purchase it.

2         It was a big mansion on Lake Quannapowitt in North

3    Andover, so it was a prominent property.

4    Q.   Okay.  If I showed you -- did you visit that property?

5    A.   I didn't visit it when I was representing Faith and Ben to

6    buy the property.  I might have visited it before.

7    Q.   Would you recognize it if you saw an image?

8    A.   Yeah, I probably would recognize it.

9         MR. LOONEY:  Okay.  Could you pull up for the witness

10   Exhibit 716.

11   Q.   Do you recognize the property on there?

12   A.   I do.

13   Q.   And what is it?

14   A.   Yeah, that's 440 Great Pond Road in North Andover.

15   Q.   The property we were just discussing?

16   A.   Yes.

17        MR. LOONEY:  I ask that be admitted and published for

18   the jury.

19        MS. PASCUCCI:  No objection, Your Honor.

20        THE COURT:  It's admitted.

21        (Exhibit 716 admitted into evidence.)

22   Q.   So tell the jury again just what this property is.

23   A.   It's a very large residential property on a fairly large

24   parcel of land in North Andover, and it's right on Lake

25   Quannapowitt, so it's a beautiful property.

1    Q.    Okay.  And were you involved in a transaction involving

2    this property?

3    A.    Yes.

4    Q.    Were you retained by someone to represent them in

5    connection with the purchase?

6    A.    Yes.

7    Q.    Who?

8    A.    By Faith Newton and Ben...

9    Q.    Muiruru?

10   A.    Muiruru, yes.

11   Q.    Was that transaction completed?

12   A.    Yes.

13   Q.    What side of the transaction were Ms. Newton and

14   Mr. Muiruru on?  Were they purchasers or sellers?

15   A.    They were buying the property.

16          MR. LOONEY:  Okay.  Could we take this down and bring

17   up for Mr. Wyman and the court Exhibit 92.01.  If we could just

18   scroll through so he can take a look at all the pages.

19   Q.    As I'm scrolling, the question I'm going to ask you is do

20   you recognize this document?

21   A.    I do.

22   Q.    Okay.  And what is it?

23   A.    That's the Purchase and Sale Agreement to buy 440 Great

24   Pond Road in North Andover.

25          MR. LOONEY:  I would ask this document be admitted

1    into evidence.

2                MS. PASCUCCI:  No objection, Your Honor.

3                THE COURT:  It's admitted.

4                (Exhibit 92.01 admitted into evidence.)

5    Q.    So just tell the jury again, what is this document?

6    A.    It's a Purchase and Sale Agreement.  When you buy or sell

7    real estate, there's a common contract that buyers and sellers

8    enter into that is negotiated.  It contains a description of

9    the property, the price that's going to be paid, and the

10   parties that are purchasing or selling the property, those are

11   the primary items, and the date of performance, when the

12   closing is going to occur.

13   Q.    Okay.

14               MR. LOONEY:  Could we blow up the first two paragraphs

15   of this, please, Ms. Apfel.

16   Q.    And who are the parties identified in this agreement?

17   A.    So the seller is a woman by the name of Suzanne Thompson,

18   and the buyers listed here are the trustees of this trust

19   called the Manor Realty Trust, and the buyers who are trustees

20   are Lucy Munyi and Samuel Kimungu.

21   Q.    When there is a trust, is there someone who is a

22   beneficiary of the trust?

23   A.    Yes.

24   Q.    What does that mean, to be the beneficiary of the trust?

25   A.    So it's the true owner of the property.  The trustees are

1   in essence the managers of the property.  They pay the bills,

2   tax bills, maintenance of the property.  The beneficiaries are

3   the owners of the property.

4   Q.   Okay.  Do you know who the beneficiaries of this trust

5   were?

6   A.   Yes.

7   Q.   Who?

8   A.   The primary beneficiary was Faith Newton and secondary

9   beneficiary was Ben, her husband.

10  Q.   Okay.  Under "Description," is that the identification of

11  the property that's the subject of the Purchase and Sale?

12  A.   Yes.

13  Q.   And what property is identified here?

14  A.   440 Great Pond Road in North Andover.

15  Q.   The property we just saw a photo of?

16  A.   Yes.

17         MR. LOONEY:  Could we zoom out and then go to

18  paragraph 7, the purchase price.

19  Q.   What was the purchase price for this property?

20  A.   $2 million.

21  Q.   Okay.

22         MR. LOONEY:  We could zoom out and go to page 5 of

23  this document.  Sorry, one page back.  One page forward.  That

24  was the correct page.  All right.

25  Q.   These are signatures of the purchasers?

1   A.   Yes.

2   Q.   And who signed as purchasers?

3   A.   Lucy Munyi and Sam Kimungu as trustees of that trust.

4   Q.   And the beneficiary of the trust was Faith Newton?

5   A.   Yes.

6        MR. LOONEY:  We can take this down.

7   Q.   Are you familiar with something called a HUD Statement or

8   HUD Settlement Statement?

9   A.   Yes.

10  Q.   What is that?

11  A.   So it's like a balance sheet.  It describes the purchase

12  price for the property, but it's divided into two sides, a

13  buyer's side and a seller's side.  And the buyer's side will

14  have the purchase price and all the costs that the buyer is

15  paying to purchase the property, and it will be the same thing

16  on the seller's side, the price and all the costs that the

17  seller is paying, broker's commission, recording fees, tax

18  stamps.

19  Q.   Okay.  Did you prepare a HUD Settlement Statement for the

20  purchase of 440 Great Pond Avenue by the Manor Realty Trust?

21  A.   Yes.

22       MR. LOONEY:  Could we bring up what has been marked as

23  Exhibit 92.02.

24  Q.   Do you recognize this document?

25  A.   I do.

```
 1    Q.    What is it?

 2    A.    That's the HUD Settlement Statement.

 3          MR. LOONEY:  Okay.  Could we blow up the top section,

 4    please, Ms. Apfel.

 5    Q.    Okay.  And I just want to go through a few of the boxes.

 6    There is one that's labeled Name and Address of Borrower, then

 7    it's Manor Realty Trust?

 8    A.    Yes.

 9    Q.    What does that box refer to?

10    A.    It's the buyer of the property.  The form doesn't allow

11    you to accommodate if it's a cash purchase.  So the buyer is

12    referred to as the borrower on that form.

13    Q.    Okay.  So it says for borrower if in the case someone was

14    taking out a loan to purchase the property.  But was there a

15    loan associated with the purchase?

16    A.    No.

17    Q.    This was a cash purchase?

18    A.    Yes.

19    Q.    And then right below that there is Location of the

20    Property?

21    A.    Yes.

22    Q.    And that identifies the property?

23    A.    Yes.

24    Q.    What property is identified there?

25    A.    440 Great Pond Road in North Andover.
```

1    Q.    Okay.  And then there is Name and Address of the Seller.

2    A.    Yes.

3    Q.    And who is identified there?

4    A.    Suzanne Thompson, the same woman in the purchase and sale

5    agreement.

6    Q.    Okay.  Who is identified as the settlement agent?

7    A.    Myself.

8    Q.    What does it mean to be the settlement agent?

9    A.    So I'm the one that basically acts as the intermediary to

10   collect the deed from the seller, to pay the seller the

11   proceeds of the sale, to pay the seller's attorney.  And then

12   it's my responsibility, I collect the tax stamps and the

13   recording fees.  I record the deed.

14        So there is a process that we do as the settlement agent

15   to act on behalf of both the buyer and seller as part of the

16   transaction.

17   Q.    Okay.  In the transaction, who receives and then disburses

18   the funds?

19   A.    I do as settlement agent.

20   Q.    Okay.  That's one of the roles of a settlement agent?

21   A.    Yes.

22   Q.    What's the settlement date for this transaction?

23   A.    It was October 4 of 2018.  I think it's 2016.  It looks

24   like an 8 on that.  October 4 of 2016.

25   Q.    Okay.

1          MR. LOONEY:  Can we back out.

2    Q.    You described the two sides of a HUD Settlement Statement.

3          MR. LOONEY:  Can we zoom out, pop out the document.

4    Q.    What is indicated on the left side?

5    A.    Those are the buyer's figures as part of the transaction.

6    Q.    Okay.  And is there a part of this that indicates the

7    amount due from the buyer?

8    A.    Yes.

9    Q.    Okay.  And where is that?

10   A.    It's in line 303 at the very bottom.

11   Q.    Okay.  So to complete this transaction, the purchase of

12   440 Great Pond Avenue, how much was the buyer required to pay?

13   A.    $2,012,187.82.

14   Q.    Was this transaction completed?

15   A.    Yes.

16   Q.    Do you recall about when?

17   A.    I think it was mid October of 2016.

18   Q.    Okay.  From whom did you receive the payment to complete

19   the transaction; do you recall?

20   A.    Yes, from Faith Newton.

21   Q.    Do you remember how the money came in?

22   A.    Yeah, on a large transaction like this, I wouldn't accept

23   a check usually.  It was wired into my IOLTA account.

24   Q.    Okay.

25          MR. LOONEY:  Can we take down this document and show

1  just to the witness Exhibit 92.03.

2  Q.   Do you recognize this document?

3  A.   I do.

4  Q.   And what is it?

5  A.   This is the front page of my IOLTA, my interest or lawyer

6  trust account or client funds account bank statement.

7  Q.   Okay.  What's an IOLTA account?  Just to explain it to the

8  jury.

9  A.   Yes.  So any transaction you do, you can't have the money

10  put in or wired into your personal account, my operating

11  account with the law firm.  You have a separate client funds

12  trust account that the money is transferred in that you keep

13  the firm's money segregated from client money.  And that's what

14  this exhibit is.

15  Q.   Okay.  Starting with -- what's the date of this statement?

16  A.   October 31 of 2016.

17  Q.   Okay.  And this account, on the first line --

18         MR. LOONEY:  If we could blow up the statement

19  portion, the account activity portion.  There we go.

20  Q.   It indicates a beginning balance in this account.

21  A.   Yes.

22  Q.   And what amount is that?

23  A.   So I had in that account $503,000 and change.

24  Q.   Okay.  What's the first transaction listed on there?

25  A.   It is the closing wire coming in for 440 Great Pond Road

1    in North Andover.

2    Q.    Okay.  And you actually received that wire transfer?

3    A.    Yes.

4    Q.    And what's the date of that transfer?

5    A.    The transfer occurred on October 3 of 2016.

6    Q.    Okay.  One thing I noticed, if you compared this figure to

7    the figure on the prior HUD Settlement Statement, it is $10

8    less.  Do you know why?

9    A.    I don't know why.  It could have been a recording fee or

10   some other small fee that was adjusted on the HUD Settlement

11   Statement.  And if there was a difference, I don't believe I

12   collected it back.  We would have accounted for that.  That

13   would have come off of a legal fee or another fee to

14   counter-balance that, because we have to balance this account

15   monthly down to zero.

16   Q.    Okay.  But no precise explanation for the $10 difference?

17   A.    No.  The correct fee of what was owed would have been the

18   amount on the settlement statement.

19   Q.    Okay.  But the amount of the wire you received was

20   $2,012,177.82?

21   A.    Yes.

22          MR. LOONEY:  Nothing further.

23          THE COURT:  Cross.

24   CROSS-EXAMINATION BY MS. PASCUCCI:

25   Q.    Good afternoon, Mr. Wyman.  I'm Michelle Pascucci.  I'm

1    here with my colleague, George Vien, and we represent Faith

2    Newton.

3    A.    Hi, counsel.

4    Q.    The owner of the home of 440 Great Pond Road, before

5    Ms. Newton bought it, he had a car, right?

6    A.    So the owner was Suzanne Thompson of record.  It was a

7    female.  So are you asking me if she had a car?

8    Q.    Was there a man named Francesco Solia who was involved in

9    the transaction?

10    A.    I think there was.  I think it was Suzanne Thompson's

11    boyfriend, if I can remember correctly.

12    Q.    He had a car and he offered to Ms. Newton that, if she

13    bought the home, he'd throw in the car, isn't that correct?

14    A.    I don't remember that.  I don't remember that, counsel.

15    Q.    Okay.  And you started working for Faith Newton and Ben

16    Muiruru around 2014; is that correct?

17    A.    It was probably mid-2015 I think is the first transaction

18    that I did for them.

19    Q.    Sure.  And on direct you said you did about 12

20    transactions or 13 transactions over the course of five and a

21    half years?

22    A.    Yes.

23    Q.    And you said that eight of those transactions were sales,

24    correct?

25    A.    Yes, yes.

```
 1   Q.   So representing them in the sale of real estate.  So what
 2   would you say on average each of those properties was worth?
 3   A.   So it varied.  I would say, I can give you some prices
 4   that come into my mind off the top of my head.
 5   Q.   If you want to just give a neighborhood.
 6   A.   I would say around 200 to $250,000.
 7   Q.   So during this five-year period starting in 2015, they're
 8   getting income from properties that they're selling, correct?
 9   A.   Yes.
10        MS. PASCUCCI:  Okay.  No further questions, Your
11   Honor.  Thank you, Mr. Wyman.
12        THE WITNESS:  Thank you, counsel.
13        THE COURT:  Redirect?
14        MR. LOONEY:  No, Your Honor.
15        THE COURT:  You're excused.
16        THE WITNESS:  Thank you, Judge.
17        MR. LOONEY:  The government calls Stephen Doherty.
18        STEPHEN DOHERTY, Sworn
19        COURTROOM CLERK:  Can you please state your name and
20   spell your last name for the record.
21        THE WITNESS:  My name is Stephen Doherty.  It's
22   D-o-h-e-r-t-y.
23   DIRECT EXAMINATION BY MR. LOONEY:
24   Q.   Good afternoon, Mr. Doherty.
25   A.   Good afternoon.
```

Q.    Could you just introduce yourself, tell your name to the
jury.

A.    My name is Stephen Doherty.

Q.    And where do you live, Mr. Doherty?

A.    I live in 39 Sawtelle Road, Windham, New Hampshire.

Q.    What do you do for work?

A.    We do real estate development and excavation.

Q.    Okay.  Are you familiar with a property located at 440
Great Pond in North Andover, Massachusetts?

A.    I am.

Q.    Okay.  How did you become familiar with that property?

A.    At one time I made an offer to buy the property, and we
had a verbal agreement, me and the previous owner.  And then
the next day he called me and said that he got a full price
offer, and they would close within 30 days, no contingencies;
that I could have the building if I wanted to go under those
scenarios, and I just said that I need a contingency for what I
wanted to do with the property.  So we just let it go.

Q.    Was that the end of your dealing with 440 Great Pond?

A.    No, it was not.

Q.    What happened?

A.    So what happened was, ultimately the property had closed
and the previous owner asked me if I would be interested in
bidding on completing the job, and I said yes, I would be, and
I did.

1   Q.   What do you mean by "completing the job"?

2   A.   Well, the house was, pretty much it's been abandoned for

3   roughly ten years, maybe a little more.  And it was

4   weather-tight for all intents and purposes.  And it had some

5   electrical stuff was done.  Some HVAC stuff was done.  It was

6   in various stages of work that needed to be completed.

7   Q.   Okay.  So it was half completed and you were asked if you

8   would do the work completing the --

9   A.   Correct.

10  Q.   All right.  Did you end up working on it?

11  A.   Yes, we did.

12  Q.   Okay.  Did you negotiate a contract for the construction?

13  A.   Yes, we did.

14  Q.   Okay.

15          MR. LOONEY:  Could we bring up for the witness Exhibit

16  55.01.  Maybe we can just scroll through this, the first few

17  pages, to show the witness.

18  A.   Is this a touchscreen?

19  Q.   No, no.  I just want you to take a look --

20  A.   Okay.

21  Q.   -- to see if you recognize this document.  We can stop

22  there.

23  A.   Yeah.

24  Q.   Do you recognize this document?

25  A.   Yes, I do.

1  Q.   And what is it?

2  A.   This is the contract that we had signed to do the work at

3  440 Great Pond Road.

4  Q.   Okay.  And did you sign it yourself?

5  A.   I signed it as the manager for DC Development and

6  Construction LLC.

7       MR. LOONEY:  Could we go back to that signature page,

8  Ms. Apfel.

9  Q.   And who signed on behalf of the purchaser?

10 A.   It's a Faith Newton.

11 Q.   The owner?

12 A.   The owner, yes.

13      MR. LOONEY:  I'd ask that 55.01 be admitted into

14 evidence.

15      MS. PASCUCCI:  No objection.

16      THE COURT:  It's admitted.

17      (Exhibit 55.01 admitted into evidence.)

18      MR. LOONEY:  And published for the jury.  You can zoom

19 out.

20 Q.   All right.  So this document we're looking at is the

21 contract for construction or completion of the work at 440

22 Great Pond?

23 A.   Yes, it is.

24 Q.   Okay.  Does it set forth payment terms?

25 A.   Sorry, I didn't hear that.

1    Q.    Does it set forth payment terms, the amount you were to be

2    paid under this contract or how you were to be paid?

3    A.    Yes, yes, it does.

4         MR. LOONEY:  Ms. Apfel, can we go to page 3 and scroll

5    down and get the bottom half where it has price and payment

6    list.  If we could zoom that up.

7    Q.    How was the price calculated for this contract?

8    A.    How it was calculated?  We had come up with like a

9    ballpark estimate of what it would be to complete the work.

10   And then we turned around and decided that we would do this as

11   a ballpark estimate, but we were doing a cost-plus job; so that

12   whatever the costs were, DC Development and Construction LLC

13   would receive 20 percent over and above the cost in labor.

14   Q.    Okay.  And what did you estimate the cost of the contract

15   to be?

16   A.    I believe the cost was roughly 2 million 150-something

17   thousand.

18   Q.    Okay.  Did you require an upfront payment to begin work?

19   A.    Yes, we required $100,000 deposit up front.

20        MR. LOONEY:  Can we zoom out and go to page 2, please.

21   There's a section titled Down Payment.  Can we zoom in on that.

22   Q.    Could you just read that section of the agreement.

23   A.    It says, "Down payment.  Owner shall pay contractor a down

24   payment of $100,000 prior to the commencement of work.  The

25   down payment shall be credited against the cost of work

1    beginning with the contractor's first progress payment.  Owner

2    has sufficient funds either personal or through lending

3    financing in the amount equal to the estimated project cost."

4    Q.    Did you actually receive that down payment?

5    A.    Yes, I did.

6    Q.    Do you recall how you were paid?

7    A.    It would be a check.

8          MR. LOONEY:  Can we zoom out of this and bring up

9    Exhibit 55.02 for the witness.

10   Q.    Do you recognize this document, Mr. Doherty?

11   A.    Well, it's a check made out for $100,000 to DC Development

12   and Construction LLC.

13   Q.    Okay.  Can you see what account or what business this

14   check is drawn on?

15   A.    Arbor Homecare Services LLC.

16   Q.    Do you know what that business was?

17   A.    No.  I'm assuming they were in the health care business,

18   so I'm assuming it was from there.

19   Q.    Okay.  Can you tell who signed this check?

20   A.    It looks like it's F. Newton.

21   Q.    F. Newton?

22   A.    Yeah, that's what it looks like to me.

23   Q.    Do you recall how you received this check?

24   A.    You know, I don't.  My office could have went and picked

25   it up.  I really don't recall how I received that, if it was

1    mailed or not.

2    Q.   With whom did you negotiate this construction contract?

3    A.   I negotiated this with Faith and her husband, Ben.

4    Q.   And by?

5         Faith," do you mean Faith Newton.

6    A.   Yes.

7         MR. LOONEY:  Nothing further.

8         MS. PASCUCCI:  Nothing from the defense, Your Honor.

9         THE COURT:  You're excused.

10        THE WITNESS:  Thank you.

11        MR. LOONEY:  No cross?

12        MS. PASCUCCI:  No.

13        MR. LOONEY:  The government calls Bridget Horan.

14        BRIDGET HORAN, Sworn

15        COURTROOM CLERK:  Can you please state your name and

16   spell your last name for the record.

17        THE WITNESS:  Bridget Horan, H-o-r-a-n.

18   DIRECT EXAMINATION BY MR. LOONEY:

19   Q.   Good afternoon, Ms. Horan.

20   A.   Good afternoon.

21   Q.   Can we start, if you could tell your name to the jury.

22   A.   Bridget Horan.

23   Q.   All right.  Where do you work?

24   A.   I work at the FBI.

25   Q.   And what do you do there?

1   A.    I am a forensic accountant.

2   Q.    How long have you been in that position?

3   A.    Seven years.

4   Q.    Could you walk us through your educational background

5   prior to that job.

6   A.    Yes.  I have a bachelor's of science in business

7   administration with a concentration in accounting and finance,

8   and I also have a master's of science in accounting.

9   Q.    Do you hold any accounting certifications?

10  A.    I do.

11  Q.    What are they?

12  A.    I am CPA, Certified Public Accountant in the state of

13  Massachusetts, and I am also a certified fraud examiner through

14  the Association of Certified Fraud Examiners.

15  Q.    Prior to working as a forensic accountant for the FBI,

16  what did you do before then?

17  A.    I was an auditor at a public accounting firm, PWC,

18  PriceWaterhouseCoopers, in their health industries audit

19  practice.

20  Q.    What are your responsibilities as an FBI forensic

21  accountant?

22  A.    My responsibilities are to, briefly, to review, analyze

23  and summarize financial information in relation to

24  investigations.  Specifically I work health care fraud

25  investigations.

1    Q.    Have you testified at trial in your capacity as an

2    accountant before?

3    A.    Yes.

4    Q.    How many times?

5    A.    Twice.

6    Q.    When did you become involved in this case?

7    A.    One week ago.

8    Q.    Welcome.

9    A.    Thank you.

10    Q.    How did that come to pass?

11    A.    There was an IRS Special Agent who was originally going to

12    speak to these financial records, but they had an emergency and

13    they were unavailable, so I was asked to fill in.

14    Q.    What did you do to get ready for your testimony today?

15    A.    I reviewed bank records, MassHealth records, business

16    records, as well as charts and graphs, tables, to confirm the

17    information in them.

18    Q.    Okay.  You might want to check this because I took a few

19    turns, but can you check to see whether those charts that you

20    described are within the binders in front of you?

21    A.    Yes.

22    Q.    Did you do anything to confirm the accuracy of the

23    information within those charts and tables in front of you?

24    A.    Yes.

25    Q.    And what is that?

1  A.   So for each of the charts and tables, I verified the

2  information presented in them to the source records, so the

3  bank records, the health care claims records, and any other

4  business records as necessary.

5  Q.   Okay.

6        MR. LOONEY:  I would ask that the exhibits in those

7  binders be admitted into evidence.  I can read the exhibit

8  numbers if you'd like.

9        MR. VIEN:  I'm not sure which exhibits.  712.1

10 through --

11       MR. LOONEY:  I can read the numbers.

12       MR. VIEN:  -- 712.21, I think --

13       THE COURT:  Some are missing, right?

14       MR. LOONEY:  Yes.  Do you want me to read them aloud?

15       MR. VIEN:  Yes.  I just wanted to know which ones

16 we're talking about.

17       MR. LOONEY:  Sure.  It's Exhibits 712.01, 712.03,

18 712.05, 712.06, 712.07, 712.08, 712.09, 712.12, 712.13, 712.14,

19 712.15, 712.16, 712.18, 712.19, 712.20, 712.21.

20       MR. VIEN:  The only objection I have, Your Honor, is

21 403.

22       THE COURT:  That's overruled.

23       (Exhibits 712.01, 712.03, 712.05, 712.06, 712.07,

24 712.08, 712.09, 712.12, 712.13, 712.14, 712.15, 712.16, 712.18,

25 712.19, 712.20, 712.21 admitted into evidence.)

1  Q.   Tell me again what the source or the foundation of these

2  records in -- of the tables in these binders are.

3  A.   They are the bank account records and the MassHealth

4  claims records and a few business records as well.

5  Q.   Okay.

6           MR. LOONEY:  Can we pull up to start the exhibit

7  that's been marked as 712.19 and display this for the jury as

8  well.

9  Q.   Can you tell us what the table in this screen in front of

10 you is?

11 A.   It is a table listing the accounts, the bank accounts that

12 I reviewed for Arbor Homecare Services, LLC, Faith Newton and

13 Ben Muiruru.

14 Q.   Okay.  And it looks like there are three accounts in the

15 name of Arbor Homecare Services, LLC, correct?

16 A.   Yes.

17 Q.   Can you identify them just for us?

18 A.   Yes.  There are three bank accounts held at Bank of

19 America, the first being account number ending 7768, which is

20 referred to as the operating account; account ending 7700,

21 which is known as the payroll account; and account ending 5931,

22 which is a savings account.

23 Q.   And there are two accounts held in the name of Faith

24 Newton; is that correct?

25 A.   Yes.

1   Q.   Can you identify those two accounts?

2   A.   Yes.  There is a checking account ending 9723 and a

3   savings account ending 9723.

4   Q.   Okay.  And then there are two accounts held in the name of

5   Ben Muiruru.  Can you identify those two accounts?

6   A.   Yes.  There is a checking account ending 6118 and a

7   savings account ending 6118.

8   Q.   All right.

9        MR. LOONEY:  Could we take this down and bring up for

10  the witness Exhibit 94.

11  Q.   Do you recognize this document?

12  A.   I do.

13  Q.   What is it?

14  A.   It is a Bank of America signature card for account ending

15  7768 in the name of Arbor Homecare Services, LLC with the title

16  Operating Account.

17       MR. LOONEY:  I would ask this document be admitted and

18  published for the jury.

19       MR. VIEN:  No objection, Your Honor.

20       THE COURT:  It's admitted.

21       (Exhibit 94 admitted into evidence.)

22  Q.   You told us this was a signature card for Arbor Homecare

23  Services, LLC operating account?

24  A.   Correct.

25  Q.   Is that one of the accounts you identified in the prior

1    slide?

2    A.    Yes.

3    Q.    And did you review records related to this account?

4    A.    I did.

5          MR. LOONEY:  Could we just blow up the bottom section,

6    please.

7    Q.    And who appear as the names of signatories on this

8    account?

9    A.    Benjamin Muiruru and Faith Newton.

10          MR. LOONEY:  If we could take this down and bring up

11    Exhibit 712.01.

12    Q.    Do you recognize this page?

13    A.    I do.

14    Q.    And what is it?

15    A.    It is a -- the first page of four of a table listing

16    deposits from MassHealth to Arbor Homecare Services, LLC

17    operating account ending 7768.

18    Q.    Okay.  So the account for which we just saw the signature

19    card?

20    A.    Yes.

21          MR. LOONEY:  Ms. Apfel, could we scroll through to

22    show the four pages down to the bottom.

23    Q.    Can you tell us going column by column what information is

24    depicted in this chart?

25    A.    The first column is the date that the transaction

1    occurred, so the money was transferred from MassHealth to the

2    Arbor operating account.

3        The second column is the amount of the transfer of funds,

4    and then the third amount or third column is the amount of that

5    total deposit amount that relates to MassHealth claims for

6    services billed as CPT code G0156.

7    Q.   Can you tell us what CPT code G0156 is for?

8    A.   It's for home health aide services.

9    Q.   Okay.  Did you do anything -- what is the source data of

10   this chart?

11   A.   It is the MassHealth claims data.

12   Q.   And that's data on payments from MassHealth?

13   A.   Yes.

14   Q.   Did you do anything to verify the accuracy of this payment

15   data?

16   A.   I did.

17   Q.   And what was that?

18   A.   The deposit amount and the date I compared to the bank

19   statements and confirmed that the date and the amount matched

20   the bank statements.

21   Q.   Okay.  And what bank statements are you referring to, just

22   so we're totally clear?

23   A.   The Arbor Homecare Services, LLC operating account ending

24   7768 at Bank of America.

25   Q.   You looked at -- the payment data had a payment amount and

1   you looked at the bank account records and verified the same

2   amount was received in --

3   A.   Correct.

4        MR. LOONEY:  Could we go back up to the first page for

5   a moment.

6   Q.   What time period is captured in this table?  What's the

7   date of the first payment reflected on here?

8   A.   The first payment is January 6, 2014.

9   Q.   Okay.

10       MR. LOONEY:  Can we go to the bottom.

11  Q.   What's the date of the last payment on here?

12  A.   January 9, 2017.

13  Q.   Okay.

14       MR. LOONEY:  Let's go to the bottom, and if we could

15  highlight the totals.

16  Q.   What information is reflected in the total line at the

17  bottom?

18  A.   The total amount of funds transferred from Arbor -- from

19  MassHealth to Arbor's operating account is $162,118,182.72, and

20  the amount of -- the subset of that amount that's related to

21  Home Health Services CPT code G0156 is $99,734,517.50.

22  Q.   That's over a period just a little longer than three

23  years?

24  A.   Correct.

25       MR. LOONEY:  Can we take this down and move to Exhibit

1    712.03.

2    Q.    What's depicted in this exhibit?

3    A.    This exhibit shows all of the deposits into the Arbor

4    operating account at Bank of America ending 7768 for the period

5    of January 2014 through January 2017.

6    Q.    Okay.  So it refers to the same account we were just

7    looking at?

8    A.    Correct.

9    Q.    That last chart was only payments from MassHealth?

10    A.    Correct.

11    Q.    And that is all sources of inflow into the account?

12    A.    Correct.

13    Q.    Could you walk us through the columns?  The first one is

14    year.  The second one is month.  What's the third?

15    A.    The third one is total deposit.  So that is the total

16    amount of funds that were deposited into the account in that

17    particular month and year.

18    Q.    What's that total amount over the period we're looking at

19    here?

20    A.    $178,303,244.11.

21    Q.    Okay.  And then what information is reflected in the next

22    column?

23    A.    This is the amount of deposits from MassHealth into the

24    account.

25    Q.    Okay.  So it's the same total we saw on the column -- saw

1    on the last chart?

2    A.    Correct.

3    Q.    Okay.  What's the next column over?

4    A.    The next column is transfers received from the Arbor

5    Homecare Services' savings account ending 5931.

6    Q.    So those are transfers not from an external source but

7    from another internal Arbor account?

8    A.    Correct.  It is another account in the name of Arbor

9    Homecare Services.

10   Q.    Okay.  What's the next column over?

11   A.    It's titled Funding Deposit FDES-NNF.

12   Q.    Okay.  And it looks like there's only one entry in this

13   column.

14   A.    Correct.

15   Q.    Did you look at that transaction?

16   A.    Yes, it was two transactions.

17   Q.    Two transactions.  What were they?

18   A.    It was a refund of two transfers that were sent from this

19   7768 account to an associated credit card for the associated

20   entities, and then the funds were returned.

21        So there were two transfers earlier in December of 2016 to

22   the credit card, each one a penny shy of a million dollars.

23   And then a week and a half later, the funds were returned as

24   two transactions, both a penny shy of a million dollars.

25   Q.    Okay.  So this is listed as an inflow into this account,

1    but it's in fact a wash transaction or two wash transactions?

2    A.   Yes, it's the return of funds that were transferred out

3    and then just transferred back in.

4    Q.   Okay.  What's in the next column?

5    A.   ATM deposits.

6    Q.   Okay.  And what was the total amount of the ATM deposits

7    into the account?

8    A.   $103,216.33.

9    Q.   Okay.  Can you go through the next three columns as well.

10   A.   The next one is counter credit.  That's if you go to a

11   branch and you walk up to the counter and deposit funds.  The

12   next column is Pmc Paygo LLC, which is a particular company.

13   And then the last one is just an assortment of miscellaneous

14   credits, miscellaneous deposits.

15   Q.   Can I go back to the column labeled Transfer From Arbor,

16   5931.

17   A.   Okay.

18   Q.   That's transfers from another Arbor account?

19   A.   Yes.

20   Q.   Did you examine financial record related to that account

21   as well?

22   A.   I did.

23   Q.   Was there any source of external flows that is not from

24   other Arbor accounts into the 5931 account?

25   A.   The vast majority of the funds that are deposited into the

```
 1   5931 account, approximately 99 percent came from this 7768
 2   account.
 3   Q.   Okay.  So those transfers from the 5931 account into this
 4   account are basically return of funds that came out of this
 5   account?
 6   A.   Correct.
 7   Q.   All right.  So is it accurate to say that we can conclude
 8   that nearly all of the funds deposited into the 7768 account
 9   either were received from MassHealth or from internal Arbor
10   transfers --
11   A.   Correct.
12   Q.   -- of money that originated from MassHealth?
13   A.   Correct.
14   Q.   Okay.  Can you put a percentage on that?  I don't want to
15   make you do math on the spot, but a ballpark.
16   A.   Approximately 99 percent.
17   Q.   Approximately 99 percent of the funds in the 7768 account
18   originated from MassHealth?
19   A.   Correct.
20   Q.   Okay.
21        MR. LOONEY:  Can we take this down and bring up
22   Exhibit 712.05.
23   Q.   What does this document show?
24   A.   This document is the flow of funds from the 7768 operating
25   account out of that account to either the two other Arbor
```

1    accounts or Mr. Muiruru's checking account and Ms. Newton's

2    savings or checking account.

3    Q.    Looking at the left two columns, what date is contained in

4    there?  Not the date column but the next two.  Sorry.

5    A.    The next two columns are transfers out of the 7768

6    account, the operating account, to the Arbor account ending

7    7700, which is the payroll account.

8         The next column is transfers out of the operating account

9    into the 5931 account, which is the savings account.

10   Q.    Okay.  And what pattern did you observe in those two

11   columns, in the transfers reflected in those two columns?

12   A.    There are regular consistent payments, you know,

13   approximately once a week of large amounts being transferred

14   out of the operating account into these other accounts.

15   Q.    Okay.  And then going to the three columns on the right,

16   what's observed in those columns?

17   A.    There are less frequent, more periodic transfers.  We're

18   only showing page 1, but on other pages there are some larger

19   dollar value payments that are less consistent in frequency.

20   Q.    Okay.  And let's scroll through, but we'll start on this

21   page for a moment.  What do you observe in April of 2014?

22   Let's focus on the three right-hand columns.

23   A.    On April 14, 2014, there was a $500,000 transfer from this

24   operating account to Ms. Newton's savings account.

25   Q.    Okay.

1           MR. LOONEY:  Can we move a couple of pages forward to

2    2016, please.  One more page.  All right.

3    Q.    What do we see on this page in March of 2016?

4    A.    In March of 2016, on March 14, 2016, there is a $1.3

5    million transfer from this operating account to Ms. Newton's

6    savings account.

7    Q.    Okay.  And then what do we see in May of 2016?

8    A.    In May, on May 16, 2016, there is a $3.5 million transfer

9    to Ms. Newton's checking account.

10   Q.    And what do we see in June of 2016?

11   A.    On June 1 of 2016 there is a $2 million transfer from the

12   operating account into Mr. Muiruru's checking account.

13          MR. LOONEY:  Can we go to the next page, please.

14   Q.    And what do we see in September of 2016 on this next page?

15   A.    On September 15, 2016, there is a $2 million transfer from

16   this account to Ms. Newton's checking account.

17   Q.    Okay.  And then what is reflected in the total line on the

18   bottom here?

19          MR. LOONEY:  Maybe we can highlight those.

20   Q.    Starting from the left, just please walk us through.

21   A.    Over the period reflected, the operating account

22   transferred $97,469,999.99 to the Arbor payroll account.  There

23   was $35,846,088.94 transferred to the Arbor savings account.

24   Mr. Muiruru's checking account received transfers of

25   $2,002,000.  Ms. Newton's checking account received transfers

1    of $5,806,270, and Ms. Newton's savings account received

2    $1,800,000.

3    Q.    Okay.  And combining the two accounts held in the name of

4    Ms. Newton, what's the total amount of those deposits into

5    those accounts?

6    A.    $7,606,270.

7    Q.    Okay.  And before we leave this chart, it reflects that

8    roughly 97.5 million was transferred from the 7768 operating

9    account to the 7700 payroll account; is that right?

10   A.    Yes.

11   Q.    On both Arbor accounts?

12   A.    Yes.

13   Q.    Did you review records relating to the 7700 payroll

14   account?

15   A.    I did.

16   Q.    Aside from money coming from the Arbor operating account

17   into the 7700 account, were there significant sources of

18   inflows into the 7700 account other than what's reflected in

19   this table?

20   A.    The only other significant transfers were transfers in

21   from the 5931 savings account.

22   Q.    Okay.  Were there external sources of funds outside of

23   Arbor deposited?

24   A.    Yes.

25   Q.    Outside of Arbor?

1    A.    Yes.

2    Q.    What was the sources outside of Arbor?

3    A.    They related to payroll transactions.

4    Q.    Inflows into the account related to payroll?

5    A.    Yes.

6             MR. LOONEY:  Can we turn now to Exhibit 712.09.

7    Q.    And what is this, what does this document indicate?

8    A.    This document is showing the flow of funds from Arbor

9    Homecare Services, LLC account ending 7700, which is the

10   payroll account, to Mr. Muiruru or Ms. Newton's checking and

11   savings accounts.

12   Q.    We just looked at 7768 to 7700; this is now the en route

13   flow from 7700?

14   A.    Correct.

15   Q.    What's reflected in this table?  Walk through the columns.

16   A.    Obviously the date column is the date of the transaction.

17   The second column is amounts that were transferred to

18   Mr. Muiruru's checking account ending 6118.  The next column

19   are transfers to Mr. Muiruru's savings account ending 6118.

20   The following column are transfers to Ms. Newton's 7723

21   checking account, and the final column is transfers to

22   Ms. Newton's savings account ending 9723.

23   Q.    Okay.  All right.  So what does that -- not the date

24   column but the next column over, what transfers does it reflect

25   there?

1  A.    There are two transfers, one in 2015, one in 2017,

2  totaling $2.5 million.

3  Q.    Okay.  And the one in 2017 is for $2 million on January

4  12, 2017, correct?

5  A.    Yes.

6  Q.    All right.  Let's go to the next column.  What transfer is

7  reflected there?

8  A.    The next column, there is a $500,000 transfer at the end

9  of 2015.

10 Q.    And then what transfers are reflected in the column for

11 Faith Newton's Bank of America 9723 checking account?

12 A.    Same date and same amount as Mr. Muiruru's checking

13 account transfers.  There's a $500,000 transfer in January of

14 2015 and a $2 million transfer in January of 2017 for a total

15 of $2.5 million.

16 Q.    Okay.  And then what's in the final column?

17 A.    The final column has two transfers, one in December of

18 2015 similar to Mr. Muiruru's -- transferred to Mr. Muiruru's

19 savings account.  And then there's an additional transfer in

20 January of 2017 of $500,000 for a total of a million dollars.

21 Q.    And what is the total amount as reflected in this chart

22 transferred from the 7700 account to Mr. Muiruru's checking and

23 savings account?

24 A.    $3 million.

25 Q.    What is the total amount transferred from the 7700 account

1    to Faith Newton's accounts?

2    A.    $3.5 million.

3    Q.    We saw in an earlier chart that 7.6 million had been

4    transferred from the 7768 account to Faith Newton's accounts?

5    A.    Yes.

6    Q.    Is the $3.5 million reflected in this table, is that a

7    part of those earlier transfers, or is this separate and in

8    addition to those transfers?

9    A.    This is separate and in addition to.

10          MR. LOONEY:  Can we turn now to Exhibit 712.07.

11   Q.    What information is reflected in this chart?

12   A.    This is a summary of the transfers, the flow of funds from

13   Arbor's 5931 savings account to Mr. Muiruru and Ms. Faith

14   Newton.

15   Q.    Okay.  So we've looked at how money went from MassHealth

16   to the 7768 account, how money was transferred from the 7768

17   account to the 7700 account, 5391 account, and then the

18   accounts in the names of Faith Newton and Ben Muiruru, correct?

19   A.    Yes.

20   Q.    Then we looked at how money further flowed from the 7700

21   account to Faith Newton and Ben Muiruru's accounts?

22   A.    Yes.

23   Q.    This is the flow of money further from the 5931 account to

24   Faith Newton and Ben Muiruru's accounts, correct?

25   A.    Yes.

1    Q.    Okay.  Rather than have you walk through each of the

2    transactions, can you tell us what's reflected in the total

3    line of each of these columns, and give us date range for those

4    transfers.

5    A.    So the total date range in the chart is March of 2014

6    through July of 2017.  Mr. Muiruru's checking account received

7    a total of $1,050,000; Mr. Muiruru's savings account ending

8    6118 received $2.5 million; Ms. Newton's checking account

9    received $2,181,000, and Ms. Newton's savings account ending

10   9723 received $4,650,000.

11   Q.    Okay.  And then below that there are total figures.  What

12   is the total figure received in Mr. Muiruru's checking and

13   savings combined?

14   A.    $3,550,000.

15   Q.    And what's the total amount received in Faith Newton's

16   checking and savings account combined 5931 account?

17   A.    6,831,000.

18         MR. LOONEY:  Could we take this down and go to Exhibit

19   712.21.

20   Q.    And what does this document reflect?

21   A.    This document is a summary of payroll deposits from Arbor

22   to Mr. Muiruru and Ms. Newton's personal checking and savings

23   accounts.

24   Q.    Okay.  So this is the salary they received from Arbor?

25   A.    Yes, this is the direct deposit that went through payroll.

1   Q.   Okay.  And are these amounts included as a subset of the

2   previous payment amounts, or are these separate and addition to

3   those payments?

4   A.   Separate and in addition to.

5   Q.   Okay.  For the years 2014 through 2017, what is the total

6   amount of direct deposit payments that Ben Muiruru received?

7   A.   $814,018.18.

8   Q.   Okay.  And how much did Faith Newton receive?

9   A.   $838,432.33.

10       MR. LOONEY:  If we could take that down.  I'm going to

11  get some water.

12  Q.   That was a lot of tables and charts.  Did you create any

13  graphical summaries to make it easier to digest that

14  information?

15  A.   Yes.

16       MR. LOONEY:  All right.  Could we bring up what's

17  marked as Exhibit 712.12, pictures.

18  Q.   What is this document?

19  A.   This document is showing the distribution of money to

20  Ms. Newton from the various Arbor Homecare Services bank

21  accounts.

22       MR. LOONEY:  Okay.  And this is three slides long.

23  Can you click through them quickly and then return to the first

24  page.

25  Q.   Starting with the first, and perhaps starting on the left,

1    could you walk us through what's illustrated on this chart?

2    A.    Yes.  The leftmost bubble is the Arbor Homecare Services

3    operating account ending 7768, and it depicts transfers to the

4    other two Arbor accounts as well as directly to Ms. Newton's

5    personal checking and savings accounts.

6    Q.    Okay.  And starting with that left bubble, I think you

7    said that's the account that received payments from MassHealth,

8    correct?

9    A.    Yes.

10   Q.    And I think you said something on the order of 99 percent

11   of the funds in that account came from, originated from

12   MassHealth payments; is that right?

13   A.    Yes, 99 percent of the external funds came from

14   MassHealth.

15   Q.    Okay.  And then on this chart, how much of that went

16   directly into Faith Newton's personal checking and savings

17   accounts?

18   A.    Directly between the operating account 7768 to

19   Ms. Newton's checking and savings accounts, the total is

20   7,606,270.

21   Q.    Okay.  How much went indirectly from the 7768 account

22   through the 5931 account to Faith Newton's personal and

23   checking?

24   A.    6,831,000.

25   Q.    And then it looks like there are two routes that went

1    indirectly through the 7700 account?

2    A.    Correct.

3    Q.    Can you tell us how much went from the 7768 account

4    through the 7700 account in those two routes?

5    A.    Yes.  The 3.5 million was transferred directly from the

6    7700 account, the payroll account, to Ms. Newton's checking and

7    savings accounts.  And then the payroll direct deposit amount,

8    which was processed through a third party, that that was paid

9    by the 7700 account, that amount is 838,432.33.

10          MR. LOONEY:  Can we move to the next slide.

11   Q.    What does this illustrate?

12   A.    This is money distributed from Arbor Homecare Services to

13   Mr. Muiruru from all of the Arbor accounts.

14   Q.    Okay.  Same chart as we just saw but for Ben Muiruru

15   instead of Faith Newton?

16   A.    Correct.

17   Q.    Okay.  Could you walk us through how much was -- start

18   with how much was transferred directly from the 7768 account to

19   Mr. Muiruru's personal checking and savings accounts?

20   A.    $2,002,000.

21   Q.    And how much was transferred directly through the 5931

22   account?

23   A.    $3,550,000.

24   Q.    Okay.  And how much was transferred directly through the

25   7700 account into those two means you discussed?

1  A.   $3 million was directly transferred from the payroll

2  account 7700 to the checking and savings accounts ending 6118.

3  And then again the direct deposits that were funded by 7700

4  processed through a payroll processor and then deposited into

5  Mr. Muiruru's accounts was 814,018.18.

6        MR. LOONEY:  Can we go to the next slide.

7  Q.   Okay.  What's depicted in this slide?

8  A.   This depicts the total amount of money combined from all

9  of the Arbor accounts that went to Mr. Muiruru's accounts or

10  Ms. Faith Newton's accounts as well as a total for the combined

11  amount.

12  Q.   Okay.  How much of the MassHealth money that was initially

13  paid into the 7768 account flowed from there into Faith

14  Newton's personal checking and savings accounts?

15  A.   Ms. Newton received 18,775,702.33.

16  Q.   And how much of the money that was initially paid by

17  MassHealth into the 7768 account flowed to Ben Muiruru's

18  personal checking and savings accounts?

19  A.   Mr. Muiruru's checking and savings accounts ending 6118

20  received $9,367,463.57.

21  Q.   And how much of the money that was paid by MassHealth made

22  it to Faith Newton and Ben Muiruru's checking and savings

23  accounts combined?

24  A.   $28,143,165.90.

25        MR. LOONEY:  Can we go to Exhibit 712.20.

1    Q.   What does that chart illustrate?

2    A.   This chart illustrates the deposits, combined deposits

3    into Ms. Newton's personal checking and savings accounts ending

4    9723.

5    Q.   Okay.  Starting with the column marked Total Deposits,

6    what does that reflect?

7    A.   That reflects the total amount of money that was deposited

8    in that year with the exception of the first line being the

9    beginning balance as of January 1, 2014.

10   Q.   Okay.  And the next column is that beginning balance,

11   correct?

12   A.   Yes.

13   Q.   And then what's the following column?

14   A.   The next column is transfers from Arbor 7768, 5931 and

15   7700, so the three Arbor bank accounts, deposits from those

16   accounts into Ms. Newton's checking and savings accounts.

17   Q.   Okay.  I see.  And the total for that line is

18   $18,770,149.33, correct?

19   A.   Correct.

20   Q.   I notice that is slightly different, maybe less than

21   $1,500 difference from the total on the prior slide we just

22   looked at?

23   A.   Correct.

24   Q.   Do you know why that is?

25   A.   Yes.  There was one check that was deposited into

1    Ms. Newton's account from Arbor that is outside of the period

2    that we are looking at.

3    Q.    Okay.  So that's included in this figure but not in the

4    prior slide; is that right?

5    A.    Correct.  It's a deposit into the account from those

6    accounts, but it is not included due to the timeframe, correct.

7    Q.    Okay.  Because you were just looking at from the first

8    payment we saw on that Exhibit 712.01, which was January 6?

9    A.    Correct.

10    Q.    Okay.  Understood.  Thank you.

11        I'm going to ask you to do a little math on the fly.  I

12    apologize.

13        Is it accurate that approximately 98 percent of the funds

14    that went into Ms. Newton's account in the years 2014 through

15    2017 were from Arbor's accounts?

16    A.    Correct.

17    Q.    Flows from Arbor were approximately 98 percent of what

18    made its way to Ms. Newton's account?

19    A.    Yes, the 18 million transferred in is approximately 98

20    percent of the money that flowed into the account, the total of

21    19 million.

22    Q.    Okay.  Having traced the flow of funds from MassHealth to

23    accounts held by Arbor into accounts held in the name of Faith

24    Newton and Benjamin Muiruru, did you prepare charts depicting

25    transactions executed using these funds?

1    A.    Yes.

2         MR. LOONEY:  Can we bring up Exhibit 712.13.

3    Q.    And what does this document reflect?

4    A.    This slide reflects a check which was for the purchase of

5    a 2013 Maserati Gran Turismo.

6    Q.    Just walking through the information on the check, what

7    account is this check drawn on?

8    A.    This check is drawn on Ms. Newton's checking account

9    ending 9723.

10   Q.    And who signed this check?

11   A.    Ms. Newton.

12   Q.    Whose signature appears?

13   A.    It appears to be Ms. Newton's signature.

14   Q.    What's the date of the check?

15   A.    October 1, 2016.

16   Q.    What's the amount?

17   A.    $50,000.

18   Q.    And what does it say on the memo line?

19   A.    "Balance on 2013 Maserati."

20        MR. LOONEY:  If we could take this down and bring up

21   only for the witness and the court Exhibit 70.1, please.

22   Q.    Do you recognize this document?

23   A.    I do.

24   Q.    And what is it?

25   A.    It's a Certificate of Title from the Massachusetts

1    Department of Transportation.

2         MR. LOONEY:  I would ask that Exhibit 70.1 be admitted

3    into evidence.

4         MR. VIEN:  No objection.

5         THE COURT:  It's admitted.

6         (Exhibit 70.1 admitted into evidence.)

7    Q.   Can you tell us again what this document is?

8    A.   It is a Certificate of Title from the Massachusetts

9    Department of Transportation.

10   Q.   Okay.

11        MR. LOONEY:  Can we blow up the information on the top

12   half of this, please, Ms. Apfel.

13   Q.   And what is the make of the car identified in this

14   Certificate of Title?

15   A.   It says "MASE," which stands for Maserati.

16   Q.   Okay.  What's the model name?

17   A.   It says "GranTu," which stands for Gran Turismo.

18   Q.   What is the purchase date indicated on here?

19   A.   October 1, 2016.

20   Q.   Does that match the date on the check we just looked at?

21   A.   It does.

22   Q.   And who is identified as the owner of this vehicle?

23   A.   Ms. Faith Newton.

24        MR. LOONEY:  Okay.  Can we take this down and can we

25   bring up Exhibit 712.14.

1    Q.   What does this slide reflect?

2    A.   This slide reflects a transaction for the purchase of a

3    property at 440 Great Pond Ave., North Andover, Mass.

4    Q.   Okay.  What is the date of the payment for that property?

5    A.   The transaction out of Ms. Newton's account occurred on

6    October 3, 2016.

7    Q.   And what's the amount of that payment?

8    A.   $2,012,177.82.

9         MR. LOONEY:  I think this is admitted into evidence.

10   Can we put it up for jury.

11        COURTROOM CLERK:  Yes.

12        MR. LOONEY:  Thank you.

13   Q.   All right.  I apologize.  So this slide that we're all

14   looking at now relates to the purchase of 440 Great Pond

15   Avenue?

16   A.   Correct.

17   Q.   Okay.  And sorry to make you do this again.  What was the

18   date of that purchase?

19   A.   October 3, 2016, was the date of the transaction leaving

20   Ms. Newton's account.

21   Q.   Okay.  And how much was paid?

22   A.   $2,012,177.82.

23        MR. VIEN:  Your Honor, just housekeeping, I don't

24   think this was admitted.  I don't object it to coming in, just

25   so the record is clear.

```
 1              COURTROOM CLERK:  Yes, it was with that group.
 2              THE COURT:  Karen says it was admitted.  Just in case
 3    it wasn't, it's admitted now without objection.
 4              MR. LOONEY:  It was one of the ones I intended to read
 5    off at the beginning for admission.  I'd ask that be admitted.
 6              THE COURT:  I just admitted it.
 7              (Exhibit 712.14 was previously admitted.)
 8              MR. LOONEY:  Okay.  Thank you.
 9              THE COURT:  If it wasn't already admitted.
10              MR. LOONEY:  Okay.  Having admitted it, I think we are
11    done with it.  I just want to check one thing.
12              THE COURT:  How much more do you have with this
13    witness, Mr. Looney?
14              MR. LOONEY:  15 minutes.
15              THE COURT:  All right.
16              MR. LOONEY:  This would be a good time for a break.
17              THE COURT:  I'm taking a break a little late because
18    we came back from lunch a little late, but I think it's time.
19              COURTROOM CLERK:  All rise for the jury.
20              (Jury exits the courtroom.)
21              THE COURT:  Do you want to break or do you want to
22    talk about the DEA records?
23              MR. VIEN:  We can do a little of both.  Is that okay?
24              THE COURT:  Yes.  I'm also still hoping to give them
25    the first half of the charge today.  The only one of those that
```

 1    I edited is the one on cooperating witness instructions, which

 2    I think is on page 14 if anybody wants to look at that.

 3            All right.  I read over the DEA records.  I don't know

 4    if anybody else has.

 5            MR. VIEN:  I have not.

 6            THE COURT:  Did Mr. Looney read them?  I thought he

 7    was reading them.

 8            MR. LOONEY:  I made it about half.

 9            THE COURT:  All right.  I mean, we can revisit this

10    when you've all had a chance to look at it, but the gist of it

11    is, was that he was investigated in like the 2011, 2012

12    timeframe.  High rate of prescriptions to drug addicts and

13    people with criminal records.

14            They spoke to him about it.  He said he took over the

15    practice of somebody else and he made some mistakes but he was

16    cleaning it up.  They gave him three months to clean it up, and

17    it looks like he did clean it up and that shut down.

18            They looked at him again later, maybe 2017 when

19    somebody reported something about him, I forget the details of

20    it, and that also did not amount to anything.

21            So there's nothing there to really put into a

22    stipulation, but there might have been some stuff for you to

23    cross-examine him on.  So do you want to try and get him back?

24            MR. VIEN:  No, Your Honor.  Obviously, I appreciate

25    you offering, and I know we have to offer it, but it would only

1    hurt our case to have him back for that purpose.  So given the
2    timing and the disclosure, no, the decision is I don't want him
3    back.  But I don't think that solves the problem.  And before I
4    forget, could we have those marked for identification and made
5    part of the record?

6         THE COURT:  We'll mark them as a group for the next --
7    you gave them to me in some order.  I reorganized them by date,
8    and I'm going to move them in in the order that I now have them
9    in, so they don't look quite like yours but they're the same.

10        COURTROOM CLERK:  908.

11        (Exhibit 908 admitted into evidence.)

12        THE COURT:  So I don't know what you want to do about
13   these.  He was never charged.  There's smoke but no fire, I'd
14   say.

15        MR. VIEN:  But it would have been used for
16   cross-examination, obviously, and I think I'm at a disadvantage
17   if I were to call him back just to cross-examine him on that.

18        Maybe we could just get the chronology of what
19   happened so it's clear on the record, like, why weren't these
20   disclosed earlier.  And again, so they don't get upset, I'm not
21   accusing anyone of misconduct.  I just would like to know what
22   happened and why they weren't turned over in a timely fashion.

23        THE COURT:  So we can read something into the record
24   that sort of encapsulates the gist of what he would have
25   crossed on, right; that he was investigated, he was

1    interviewed, he said these things.  They closed it out.  He got

2    a complaint in 2017.  So you get like a factual recitation

3    which is probably maybe even more than you would have gotten on

4    cross.

5              MR. LOONEY:  Could I raise one additional issue?

6              In the course of reviewing and looking into this

7    issue, it was identified that there was also an investigation

8    conducted by the Attorney General of Massachusetts into

9    Maestro, the Maestro agency.  And my understanding just relayed

10   to me is that, in the course of that, he was not interviewed

11   but his name appeared on signed Plans of Care of much the same

12   way his name appeared on signed Plans of Care in this

13   investigation.

14             THE COURT:  You got to figure out.  Do you want to

15   strike his testimony in its entirety?  Do you want to prepare

16   something that can be read to the jury?  You can call him back

17   as an option.

18             MR. VIEN:  I move to strike his testimony in its

19   entirety with an explanation.

20             THE COURT:  So I can't charge them with this like

21   hanging out there.  So maybe we should just put off the whole

22   charge until tomorrow and decide what we're going to do about

23   this.  But striking his testimony is an option.

24             MR. VIEN:  Again, I'm still trying to get my head

25   around what happened.  Again, I know they're sensitive, sorry

1    for touching you --

2         THE COURT:  Nobody is accusing anybody of any

3    misbehavior.  It's just, now we have a situation that needs to

4    be dealt with, so we're going to deal with it.

5         MR. VIEN:  One way to start dealing with it is just to

6    have a factual record of what happened.  How did these things

7    come to light?  Why weren't they turned over in a timely

8    fashion?  Again, I'm not accusing anyone of anything.  I just

9    would like to know how did this happen.

10        THE COURT:  So, I mean, I'm not averse to that.  I'm

11   not sure at this point that's really sort of the critical

12   inquiry.  But why don't you let him know what happened.  I'm

13   more focused on what we're going to do about it.

14        MR. VIEN:  I guess we have until tomorrow to figure it

15   out.

16        THE COURT:  Yes, but we don't have beyond that.

17        MR. LOONEY:  We don't believe striking his testimony

18   is appropriate.  I think either an instruction on these issues,

19   a stipulation of some kind about what these facts are, what the

20   nature of the investigations against him are, it would be

21   appropriate for recalling him and having him be subject to

22   cross-examination, would alleviate this.

23        THE COURT:  Start lining up your ducks and come in

24   tomorrow morning and let me know which of those things we're

25   going to do.

1             MR. LOONEY:  Okay.

2             MR. VIEN:  Could we also, as part of that, get an

3     explanation of how it happened?

4             THE COURT:  Yes.

5             MR. VIEN:  I know it's not the primary concern, but

6     I'd like to know.

7             THE COURT:  Why?

8             MR. VIEN:  Well, we just started looking at this one

9     and then something else came up.  So I think maybe if we get a

10    chronology, maybe other issues will come to light.  This guy

11    seems to have a lot of issues.  I'm not talking about the

12    AUSAs.  I'm talking about Dr. Eaton.

13            THE COURT:  Right.

14            MR. LOONEY:  We don't disagree at all that he had a

15    lot of issues.  We feel that's why --

16            MR. VIEN:  Don't we all, though?

17            THE COURT:  Speak for yourself.

18            MR. LOONEY:  I will figure out a proposal for dealing

19    with it.

20            THE COURT:  So you have five minutes left of your

21    break.  We'll figure out scheduling when we break for the day

22    here, which looks like it will be before 4:00.  You can take a

23    break.  You don't need to sit.

24            (Recess, 2:39 p.m. - 2:54 p.m.)

25    Q.   Welcome back, Ms. Horan.

1    A.    Thank you.

2          MR. LOONEY:  Ms. Apfel, could you bring back Exhibit

3    712-14, just to reorient us where we were.

4    BY MR. LOONEY:

5    Q.    Okay, we were talking about a transfer of $2,012,177 for

6    the purchase of 440 Great Pond Avenue.  Correct?

7    A.    Correct.

8    Q.    To whom was that wire transfer directed?

9    A.    An attorney, Mr. Robert Wyman.

10          MR. LOONEY:  Could we take down Exhibit 712-14 and

11    bring up Exhibit 92-03?  Just for the witness.

12    BY MR. LOONEY:

13    Q.    Do you recognize this document?

14    A.    I do.

15    Q.    Is it one of the documents you reviewed during the course

16    of preparing for your testimony?

17    A.    Yes.

18    Q.    And what is it?

19    A.    It is a bank statement for attorney Robert Wyman, Robert

20    Wyman, Esq., it's an IOLTA account that holds client funds.

21          MR. LOONEY:  I ask that it be admitted into evidence.

22          MR. VIEN:  No objection.

23          THE COURT:  Admitted.

24          (Exhibit 92-03 admitted into evidence.)

25    Q.    You said it's an IOLTA account held in the name of Robert

```
 1   Wyman for client funds.  Correct?

 2   A.   Correct.

 3   Q.   What's the date of this account statement?

 4   A.   This account statement is October 1, 2016, through October

 5   31, 2016.

 6            MR. LOONEY:  Can you blow up the section labelled

 7   account activity?

 8   BY MR. LOONEY:

 9   Q.   And this lists the beginning balance October 1, 2016.

10   Correct?

11   A.   Correct.

12   Q.   What's that amount?

13   A.   $503,552.55.

14   Q.   And what's the first transaction illustrated on here?

15   A.   On October 3, 2016, the description of the transaction is

16   "incoming wire, Faith Newton," and the amount of is

17   $2,012,177.82.

18            MR. LOONEY:  Thank you.  We can take that down and

19   bring up Exhibit 712-15?

20   BY MR. LOONEY:

21   Q.   And what does this slide depict?

22   A.   This slide depicts the deposit for construction services

23   on the 440 Great Pond Ave., North Andover, Mass. property.

24   Q.   What the amount of the check?

25   A.   $100,000.
```

1    Q.   To whom is it written?

2    A.   DC Development and Construction, LLC.

3    Q.   And who signed the check?

4    A.   The signature appears to be Ms. Faith Newton.

5         MR. LOONEY:  Can we take that down and bring up

6    Exhibit 55-02 just for the witness.

7    BY MR. LOONEY:

8    Q.   Do you recognize this?

9    A.   I do.

10   Q.   And what is it?

11   A.   It's the same check image that was on the previous slide.

12        MR. LOONEY:  I'd ask Exhibit 55-02 be admitted into

13   evidence.

14        MR. VIEN:  No objection.

15        THE COURT:  Admitted.

16        (Exhibit 55-02 admitted into evidence.)

17   Q.   Do you know the date that this check was deposited?

18   A.   I do not recall.

19        MR. LOONEY:  Can we take this down and let's look at

20   one more transaction.  And can we start by looking at Exhibit

21   712-09, please?

22   BY MR. LOONEY:

23   Q.   At the bottom of this table there are two transactions,

24   both dated January 12, 2017.  Correct?

25   A.   Correct.

1    Q.   And where did the money come from and go to in those two

2    transactions?

3    A.   The money came from the 7700 payroll account, and the $2

4    million each went -- one check payment when to Mr. Muiruri's

5    checking account ending 6118 and another $2 million check went

6    to Ms. Newton's checking account, 9723.

7    Q.   Did you look into the financial records surrounding this

8    transaction in particular?

9    A.   I did.

10   Q.   Did you create some charts concerning these transactions?

11   A.   I did.

12          MR. LOONEY:  Could you bring up Exhibit 712-01,

13   please, Ms. Apfel?  Thank you.  And I believe this is in

14   evidence as well.

15   BY MR. LOONEY:

16   Q.   Could you tell us what is illustrated on this chart?  And

17   maybe we can start with the upper right and blow up that check

18   in the upper right.  So what is this?

19   A.   This is a check from Arbor Homecare Services, LLC account

20   ending 7700, the payroll account, to Mr. Ben Muiruri.

21   Q.   Who signed this check?

22   A.   The signature appears to be Ms. Faith Newton.

23   Q.   And what is the date written into this check?

24   A.   The date written is December 24, 2016.

25   Q.   Christmas Eve?

1    A.    Yes.

2    Q.    And what's in the memo line?

3    A.    "Bonus."

4            MR. LOONEY:  If we could back out of that and then

5    bring up the check on the lower right.

6    BY MR. LOONEY:

7    Q.    Who is this check to?

8    A.    Ms. Faith Newton.

9    Q.    And who signed this check?

10   A.    The signature appears to be Ms. Faith Newton.

11   Q.    And what is the date of this check?

12   A.    The same as Mr. Muiruri's check, it is December 24, 2016.

13   Q.    And what's in the memo line?

14   A.    Bonus.

15   Q.    And what's the check number on this one?

16   A.    3527.

17   Q.    So these two checks were written in sequence:  3526, 3527?

18   A.    Yes.

19           MR. LOONEY:  Can we move to the center of the slide

20   and maybe blow up that portion?

21   BY MR. LOONEY:

22   Q.    What is the blown-up image?

23   A.    This section is one page of a many-page-long bank

24   statement for Bank of America account ending 7700, the Arbor

25   Homecare payroll account.  Particularly, this is images of

1   checks that were cashed against the account in January of 2017.

2   Q.    And are the two million checks we just looked at among

3   those checks?

4   A.    Yes.

5   Q.    How are the checks organized on this image?

6   A.    They are in sequential order based on the check number.

7   Q.    And Mr. Muiruri and -- Ms. Newton's checks are in the

8   center?

9   A.    Correct.

10  Q.    So there's four checks preceding those two checks in check

11  order and four checks after in check order?

12  A.    Yes.

13          MR. LOONEY:  Can we move to the table on the left side

14  now?

15  BY MR. LOONEY:

16  Q.    What does this illustrate?

17  A.    This illustrates the -- the first column is the check

18  numbers for each of the checks that appear on this page and the

19  second column is the date that was written on the check.

20  Q.    What are those dates as they run down?  The check order,

21  sequence?

22  A.    So check 3521 has a date written of January 12, 2017.  The

23  second check has a date of January 12, 2017.  The third check

24  has a date of January 12, 2017.  The fourth check has a date of

25  January 13, 2017.  The next two checks that we've been

1    discussing, 3526 and 3527, both have dates of December 24,

2    2016.  And then the following four checks all had dates written

3    in that were January 13, 2017.

4    Q.    Accurate to say they all run in sequence from January 12

5    through 13 except for the two checks written for two million

6    each for Faith Newton and Ben Muiruri?

7    A.    Yes.

8           MR. LOONEY:  Can we go to Exhibit 712-18?

9    BY MR. LOONEY:

10   Q.    What's this?

11   A.    So this is a broader sample of the checks.  We were

12   looking at one page.  This table is depicting a broader sample

13   of checks.  So check 3500 through 3540.  And it's just a table

14   depicting it.

15   Q.    So it's -- contains information concerning about 40 odd

16   checks from 3500 to 3540 check numbers?

17   A.    Correct.

18   Q.    And what information is contained in each column?

19   A.    The first column is the check number.  The second column

20   is the payee name, so the person the check was written to.  The

21   next column is the amount that was written on the check.  The

22   third column is the date -- sorry, excuse me.  The fourth

23   column is the date the check was written -- the date written on

24   the check.  And the final column is if there was any memo

25   contained on the check.

```
 1    Q.   And the checks are ordered in sequence of check number
 2    going down?
 3    A.   Correct.  Sequential order from 3500 to 3540.
 4    Q.   What pattern do you see in the date column?
 5    A.   The dates are sequential starting on January 5, 2017, up
 6    through check 3524, which is -- has a date of January 13, 2017.
 7    And then those two checks we've referred to are out of
 8    sequence.  They are December 24, 2016, and then the remaining
 9    checks are all dated January 13, 2017.
10    Q.   Turning back to these two checks numbered 3526, 3527 for
11    $2 million each, do you know whether they were deposited or
12    cashed?
13    A.   Yes.
14    Q.   Do you know what date they were deposited or cashed?
15    A.   They were deposited into Mr. Muiruri and Ms. Faith
16    Newton's accounts on January 12, 2017.
17    Q.   So approximately -- close to the date of the sequence in
18    which these checks appear?
19    A.   Correct.
20    Q.   But three weeks after the date that is written into the
21    date on the dateline?
22    A.   Correct.
23    Q.   I want to ask some questions about the significance of
24    those dates.  What was the date of the last payment received by
25    Arbor from MassHealth?
```

1    A.    The last payment received by Arbor from MassHealth was

2    January 9, 2017.

3    Q.    So a few days before the date that these checks were

4    deposited?

5    A.    Correct.

6    Q.    And a few days before the date of -- written on the checks

7    that appear before and after these two checks in the check

8    sequence?

9    A.    Correct.

10            MR. LOONEY:  And can we bring up previously admitted

11   Exhibit 719?

12   BY MR. LOONEY:

13   Q.    Do you recognize this document?

14   A.    I do.

15   Q.    And what is it?

16   A.    It is a letter from MassHealth to Arbor Homecare Services

17   dated January 3, 2017.  The header is "notice of withholding of

18   payments."

19   Q.    And then can you just read that last paragraph -- or the

20   first sentence in that last paragraph beginning with the word

21   MassHealth?

22   A.    "MassHealth is withholding 100% of all payments from you

23   effective immediately as of January 3, 2017, unless MassHealth

24   issues further notice or determines there is insufficient

25   evidence of fraud."

1    Q.   And the date there is January 3, 2017.  Correct?

2    A.   Correct.

3         MR. LOONEY:  Can we pull back up Exhibit 712-16?

4    BY MR. LOONEY:

5    Q.   So the date on these two large checks written in is prior

6    to that notice of suspension of payment.  Correct?

7    A.   Yes.

8    Q.   But they were deposited ten days after that letter is

9    dated?  Nine days after?

10   A.   Yes.

11   Q.   And they appear among checks all dated after the notice of

12   payment suspension from MassHealth?

13   A.   Correct.

14        MR. LOONEY:  Nothing further.

15   CROSS-EXAMINATION BY BY MR. VIEN:

16   Q.   Good afternoon.  My name is George Vien.  Along with

17   Pascucci, we represent the defendant Faith Newton, do you

18   understand that?

19   A.   Yes.

20   Q.   I just have a few questions for you.  You took over

21   because the IRS agent or analyst had an emergency and couldn't

22   testify; is that correct?

23   A.   Correct.

24   Q.   And it's your understanding that IRS criminal

25   investigation division was involved in this investigation from

1    the beginning; is that correct?

2    A.    I do not know when they joined the investigation, whether

3    or not it was the beginning of the investigation.

4    Q.    Okay.  But they were involved before you.  Correct?

5    A.    Yes.

6    Q.    And they had access to all the same documents and

7    information, and actually more than you've had access to; is

8    that correct?

9    A.    Yes.

10   Q.    And do you know that there are no tax charges in the

11   indictment?

12   A.    I believe so.  I actually have not read the indictment.

13   Q.    Now, during your work, you track the -- I'll just use

14   general terms.  You track the money from the Arbor accounts to

15   the personal accounts; is that correct?

16   A.    Yes.

17   Q.    Did you check for other deposits, non-Arbor deposits, into

18   the personal accounts?

19   A.    I did a brief review simply to classify it as -- you know,

20   there was a couple miscellaneous deposits as shown on the

21   exhibit with Ms. Newton's personal accounts.  There was a

22   column for miscellaneous credits.  So I reviewed for -- those

23   are other external sources not from Arbor.

24   Q.    Okay.  Did you summarize all the non-Arbor deposits into

25   the personal accounts or not?

1    A.    I'm not sure what you mean by "summarize."

2    Q.    A lot of what you've done is you looked at the Arbor

3    accounts, which I'm using a general term for the Arbor

4    accounts, and you looked at Faith Newton and her husband's

5    personal accounts.  Correct?

6    A.    Correct.

7    Q.    And you tracked the money from the Arbor accounts to the

8    personal accounts.  Correct?

9    A.    Yes.

10   Q.    And did you track other deposits, non-Arbor deposits, into

11   the personal accounts?

12   A.    I'd identified that there were deposits that were not from

13   Arbor.  I did not do a detailed review of those deposits other

14   than to total it up.

15   Q.    And some of them were what I consider fairly substantial,

16   like $500,000?

17   A.    In Ms. Newton's account, I do not recall a $500,000 from

18   an external source.

19   Q.    But you didn't tally it all up.  Correct?

20   A.    I tallied up for the relevant time period the deposits

21   into the -- her personal account and that was displayed in the

22   exhibit.

23   Q.    And what was the relevant time period for you?

24   A.    January 6, 2017, through July 6, 2017 -- sorry, January 6,

25   2014, through July 6, 2017.

1    Q.    So you didn't look at deposits made prior to those?

2    A.    No.

3    Q.    I always --

4    A.    Other than the -- there was a January 3 deposit from Arbor

5    in 2014, but other than that, I do not recall any -- I did not

6    review any other deposits prior to 2014.

7    Q.    You didn't review other deposits and you didn't review

8    other deposits outside the time period.  Correct?

9    A.    Correct.

10   Q.    And as you said in your direct testimony, you only became

11   involved in this case about a week ago?

12   A.    Correct.

13   Q.    You have done a tremendous amount of work in a week.  I

14   don't know if that's a question, but you have worked very hard

15   on it.  But you looked at purely the financial aspect of the

16   case.  Right?

17   A.    Correct.

18   Q.    You didn't interview any witnesses?

19   A.    No.

20   Q.    And as you sit here today you have no idea who, for

21   example, Joseph Muiruri is.  Correct?

22   A.    I've heard the name before, but I do not recall the exact

23   relation.

24   Q.    So the scope of your knowledge is what you've testified to

25   today?

1    A.    Yes.

2          MR. VIEN:  Thank you, Your Honor, I don't have

3    anything else.

4          THE COURT:  Do you want me to read the stipulation?

5          MR. LOONEY:  I have a very brief redirect and then

6    yes.  Could you bring up Exhibit 712-20.

7    REDIRECT EXAMINATION BY MR. LOONEY:

8    Q.    Ms. Horan, do you see before you Exhibit 712.20?

9    A.    I do.

10   Q.    You were asked some questions about whether you looked at

11   deposits into Ms. Newton's accounts prior to 2014.  Right?

12   A.    Correct.

13   Q.    And you had not?

14   A.    No.

15   Q.    But you did examine -- this chart does reflect the balance

16   as of when?

17   A.    The -- there's a row.  The very first row of the table

18   reflects the beginning balance as of January 1, 2014.

19   Q.    So before January 1, 2014, there was $367,567.67 in

20   Ms. Newton's personal checking and savings accounts?

21   A.    Yes.  As of the end of 2014, that was the balance.

22   Q.    As of the end --

23   A.    Sorry, at the end of 2014.

24   Q.    And then this table reflects -- is it all deposits from

25   all sources captured in here into that account for these years?

1  A.   It is all deposits from January 1, 2014, through July 6,
2  2017.
3  Q.   But it includes all sources?
4  A.   Yes.
5  Q.   There isn't some large $500,000 deposit that was deposited
6  into Ms. Newton's accounts during this time period that's not
7  reflected on here?
8  A.   Correct.
9  Q.   Not a $500,000 deposit from some source other than Arbor?
10  A.   Correct.
11       MR. LOONEY:  Nothing further.
12       MR. VIEN:  Your Honor, may I very briefly?  I'm just
13  going to show her US Attorney's office -- this document.
14       MR. LOONEY:  Can I have a copy of that?
15       MR. VIEN:  I'll give it to you after she looks at it.
16  RECROSS-EXAMINATION BY MR. VIEN:
17  Q.   I've placed before you a document.  Do you recognize what
18  this is?
19  A.   I do.
20  Q.   What is it?
21  A.   It is Ms. Newton's -- Ms. Newton's savings account ending
22  9723.
23  Q.   And doesn't it indicate a deposit of $500,000?
24  A.   It indicates a $500,000 deposit.  It does not specify that
25  it's other than Arbor

```
1    Q.   But doesn't it say MATHR transfer?  What does that mean?
2    A.   It says MATLR transfer which, my understanding of Bank of
3    America bank statements, means a Massachusetts teletransfer.
4    Q.   So it might be Arbor; it might not be.  You don't know
5    from this document?
6    A.   I referred transfers and paired them with the Arbor
7    transfers.  So there is a transfer out of an Arbor account on
8    the same day for the same amount.
9         MR. VIEN:  Okay, thank you.  I have nothing further,
10   Your Honor.
11        THE COURT:  You're excused, thank you.
12        (The witness stepped down at 3:15 p.m.)
13        THE COURT:  Stipulations?
14        MR. LOONEY: Yes, please.
15        THE COURT:  I'm going to read a stipulation.  A
16   stipulation is something that the two parties agree is true, so
17   you accept it as fact and you give it whatever weight you deem
18   appropriate when you're considering the evidence.  Here's the
19   stipulation:  There was an exhibit, 909, "United States and
20   defendant Faith Newton hereby stipulate and agree that at all
21   times relevant to the indictment Bank of America NA was an
22   institution ensured by the Federal Deposit Insurance
23   Corporation, also known as the FDIC."  909.  Over to you.
24        MR. BRADY:  Your Honor, we've called our last witness.
25   I think, in light of our discussion before, I think we'll maybe
```

1   leave it there for the moment before formally --

2        THE COURT:  Okay.  So I am going to deem you rested

3   and I will reopen the evidence if need be or it's appropriate.

4   Over to the defendant.

5        MR. VIEN:  We have a motion, Your Honor.

6        THE COURT:  Defer on the motion until after we let the

7   jury go for today.

8        MR. VIEN:  We're not going to call anyone.

9        THE COURT:  All right.  Both sides have rested.  It

10  was my hope -- so what we have left is my charge and the two

11  closing arguments and we'll begin to deliberate.  So you'll

12  have the case tomorrow.

13        Listening to me read you the law and closing arguments

14  can be a long day, so it has been my hope that we could do the

15  charge today, so we just have to closing arguments for

16  tomorrow, but a couple of things have come up and I think we

17  all deemed it prudent to hold off on the charge until tomorrow

18  morning.          So tomorrow I think we'll do the closings

19  first, although we can discuss that.  You'll probably hear the

20  closings first, then my charge, then you'll begin your

21  deliberations.  It's a Friday in July, I'm well aware of that.

22  You can stay as long as you want to deliberate tomorrow.  I

23  don't want you to feel rushed.  I don't want you to feel under

24  any pressure deliberating.  So if you decide you don't want to

25  finish tomorrow, you're more than welcome to come back on

1    Monday.  You set the schedule.  But please don't feel like

2    there's any time pressure on getting this done.  We finished

3    the case much quicker than we thought we would, and we have

4    time to do this, and I just don't want anybody to feel that

5    Friday-in-July pressure, either, to leave early or get it done

6    or whatever.  So you'll have all the time you want, but you

7    will be responsible for the schedule tomorrow.

8            Because we have these few other things to sort out, we

9    can't start before 10:00.  So we'll have you all at 10:00;

10   we'll do closings and charge; you'll have the case; we'll send

11   up lunch.  It will be up to you at that point.  You've heard

12   the end of the evidence, but you haven't heard the law and you

13   haven't heard the closing arguments.

14           This is one of those places where it's super important

15   that you listen to the instructions that I give you every

16   night.  Keep an open mind until you've heard the law and the

17   closings.  Don't talk to anybody about the case and no

18   extracurricular research, okay?  I know there may be things now

19   that you wish you heard or you're wondering about.  You cannot

20   go and look that up now, even though in all likelihood you

21   won't hear it through the evidence unless I have to reopen

22   tomorrow.  So open mind.  No discussion or social media or

23   anything like that.  No extracurricular research.  See you all

24   at 10:00 tomorrow morning.

25           (The jury exited at 3:19 p.m.)

1          THE COURT:  I have a long list here.  I marked the

2     stipulations and exhibits, so it will go back with the jurors

3     unless somebody tells me that they don't want it to go back.

4          We have to deal with Eaton.  We're going to let that

5     ride overnight and you'll probably tell me what you want to do

6     in the morning.  You need to figure what, if anything, you want

7     to do about a redacted indictment.  It was my intent to put

8     enough about the indictment and the dates into the charge that

9     we don't have to send back the indictment, but I'll leave that

10    to you all.  But if it is going back, it's going to be very

11    redacted.  I don't want a whole story going back there, which

12    is why I don't send them out to begin with.

13         We need to decide what to do on the co-conspirator

14    statements by -- now, did anything come in?  I was trying to

15    think -- I don't think -- nothing came in on the money

16    laundering conspiracy.  Right?

17         MR. LOONEY:  Correct.

18         THE COURT:  No co-conspirator statements.

19         MR. LOONEY:  With the caveat that, in order for them

20    to be proceeds of unlawful activity, we have to prove the whole

21    health care fraud part.  Everything that comes into the health

22    care fraud is -- drives the money laundering.

23         THE COURT:  Okay.  So Mr. Vien or Ms. Pascucci, I'll

24    hear you on it.  I think that they've -- I think I'm prepared

25    to make the Petrozziello findings that they've demonstrated --

 1    they've made an adequate showing on the fact that there was a

 2    conspiracy and that the statements that I've admitted were made

 3    in furtherance of a conspiracy by a co-conspirator.  I'll hear

 4    you on it, but assuming that to be true for the moment, do you

 5    want a charge on it or -- the trouble is, I tried to work on a

 6    charge here today.  It's hard to come up with a charge that

 7    doesn't use the word "co-conspirators," which I feel is sort of

 8    prejudicial unto itself.

 9            So why don't you think about that overnight as well,

10    about what you want me to do with that.  We gave you a draft of

11    the verdict form today, so you should be reviewing that.  And

12    then whatever final edits there are to the charge.  That's my

13    list.  And I have Mr. Vien's motion.

14            MR. LOONEY:  Did we get that draft verdict form via

15    e-mail?

16            THE COURT:  It got left on your table via e-mail.  Did

17    it not get distributed?  I might have it up here.  Did you put

18    it on my desk?  She's going to get you others.  They could be

19    right here.  Hold on.  I've got them, sorry.  Okay.  So that's

20    my list, then we have Mr. Vien's motion.  Is there anything

21    else?

22            MR. LOONEY:  In relation to Mr. -- Dr. Eaton, I know

23    we're mostly passing off to tomorrow.  The one thing is one

24    solution would be bringing him back.  If we want to do that,

25    I'd want to get on that right now and have him here tomorrow.

 1          THE COURT:  Well, if I was going -- or I you, and I'm

 2    not, I would speak to Mr. Sultan about having him available for

 3    tomorrow in case that's what they want.  I would also speak to

 4    Mr. Sultan about how he got to this position, because he might

 5    be a place to start on all this.

 6          MR. VIEN:  Your Honor, you know, we don't want him to

 7    be recalled, but we would like some kind of explanation about

 8    what happened with this and with the AG's -- the Attorney

 9    General's office just so we can put it in the record and it's

10    clear as day.  And, frankly, once they start asking those

11    questions and start really driving people, to be precise, I --

12    you know, who knows what else could come up.

13          THE COURT:  So what I don't want to happen is for you

14    to decide tomorrow morning that you want to recall him when you

15    get all this information and he's not available and then you

16    want a mistrial on it.  I want to do everything I can to avoid

17    having to mis-try this because of his availability or

18    non-availability.  So it's going to be what it's going to be,

19    but I'm going to try to make sure that he's available, even if

20    I need to colloquy him.  I just want to make sure that we can

21    get him if we need him.

22          MR. LOONEY:  That's a question for -- do we want him

23    here?  Should we bring him here tomorrow?

24          THE COURT:  Well, I might have him close by.  I mean,

25    unless you two definitively want to work out some other

1   solution to this tonight.  But I don't want to be in the

2   position where I can't charge, we can't close because he's not

3   here and something develops that requires us to hear from him.

4         MR. LOONEY:  We will do everything we can to get him

5   here unless I hear otherwise from Mr. Vien.

6         THE COURT:  Do you want a material witness warrant?

7         MR. VIEN:  I love those.

8         THE COURT:  I'm just saying get him here.

9         MR. VIEN:  Get a warrant.

10        MR. LOONEY:  Yes.

11        THE COURT:  Really?

12        MR. LOONEY:  If he's got to be here; he's got to be

13  here.

14        THE COURT:  If he has to take the stand --

15        MR. LOONEY:  I mean, I just don't want to be in a

16  situation where 9:00 tonight I can't find Dr. Eaton.

17        THE COURT:  You should get on the phone with

18  Mr. Sultan.  Because if he's going to take the stand and we

19  have to cross-examine him on the fact that we had him arrested

20  to bring him here, that's not a good thing for the Government.

21        MR. LOONEY:  I'm not saying that I want the execute

22  the material witness warrant.  I just want to make sure that we

23  can if we need to.

24        THE COURT:  Talk amongst yourselves.  I'm around.  I

25  happen to also be on emergency duty this week, so you'll find

1    me if you need me.  Or work it out tonight.

2           MR. LOONEY:  Thank you.

3           THE COURT:  So I had six things on my -- well, I had

4    six things on my list, but I took care of the stipulation and

5    got to cross that off.  Eaton, the redacted indictment,

6    co-conspirators, verdict form, charge.  Let's hear your motion,

7    Mr. Vien.  Do you want to do it orally or pass something up in

8    writing?

9           MR. VIEN:  I'll just pass it up, Your Honor.

10          MS. PASCUCCI:  That's a 7.1 conference but --

11          THE COURT:  You can file it.  If you don't want to

12   pass it up, go ahead.

13          MR. VIEN:  I will just file it when we get back to the

14   office.  Thank you.

15          THE COURT:  What time do you think we need to get

16   started to have all of this done by 10:00?

17          MR. VIEN:  I don't think we need to start before 9:00.

18          MR. BRADY:  It seems safe to me, Your Honor.

19          THE COURT:  Famous last words.  Okay, 9:00.  And I

20   like to use the time and I think it can be helpful to charge

21   them before closings, but I don't like to charge them and then

22   go into closings because I'm afraid by the time they get to the

23   last closing, they've had enough sitting.  So I think we'll

24   flip it, have you guys close, take a short break, and then I'll

25   charge.  Does that make sense to everybody?

1           MR. VIEN:  It does to us, Your Honor.

2           MR. BRADY:  That's fine, Your Honor.

3           THE COURT:  Okay.  Anything else for today?

4           MR. VIEN:  No, Your Honor.

5           MR. BRADY:  That's all for us, Your Honor.

6           THE COURT:  It's been a day and it's only 3:30.  All

7     right.  Everyone can take their ease.

8           (The hearing adjourned at 3:28 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3              Kelly Mortellite and Jessica Leonard, Registered

4    Merit Reporters and Certified Realtime Reporters, in and for

5    the United States District Court for the District of

6    Massachusetts, do hereby certify that the foregoing transcript

7    is a true and correct transcript of the stenographically

8    reported proceedings held in the above-entitled matter to the

9    best of our skill and ability.

10                      Dated this 6th day of July, 2023.

11

12              /s/ Kelly Mortellite

13              /s/ Jessica Leonard

14

15

16

17

18

19

20

21

22

23

24

25