UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Criminal Action |
| Plaintiff, | ) | No. 21-10035-ADB |
| | ) | |
| v. | ) | |
| | ) | |
| FAITH NEWTON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |


* * * * * E X C E R P T * * * * *

JURY TRIAL DAY 3


TESTIMONY OF AMANDA MUCHIOKI


BEFORE THE HONORABLE ALLISON D. BURROUGHS
UNITED STATES DISTRICT JUDGE


July 10, 2024


John J. Moakley United States Courthouse
Courtroom No. 17
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

1    APPEARANCES:

2    On behalf of the Government:
     William B. Brady
3    Christopher R. Looney
     United States Attorney's Office MA
4    1 Courthouse Way
     Suite 9200
5    Boston, MA 02210
     617-748-3287
6    william.brady@usdoj.gov
     christopher.looney@usdoj.gov
7
     Standby counsel on behalf of Pro Se Defendant:
8    Thomas J. Iovieno
     345 Neponset Street
9    Canton, MA 02021
     617-464-3300
10   tjilaw@yahoo.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

AMANDA MUCHIOKI, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION BY MR. LOONEY:

Q.   Good morning, Ms. Muchioki.  How are you?

A.   I'm doing okay.

Q.   All right.  I'm just going to ask you a couple of questions to introduce yourself.  Could you start with just telling the jury where you live.

A.   I live in Rochester, New York.

Q.   Okay.  Are you presently working?

A.   Yes.

Q.   And right now what do you do for work?

A.   I'm a store manager for the UPS store.

Q.   Okay.  And just to do a little more background, could you tell us about your educational background, starting post high school.

A.   I went to Rutgers University for about five years.

Q.   Did you obtain a degree?

A.   I have an associate's degree.

Q.   Okay.  Did you do any other education?

A.   Yes.  I went to Phoenix, and that was remotely.  It was Phoenix University.

Q.   All right.  Are you familiar with an individual named Faith Newton?

1    A.    Yes.

2    Q.    And how do you know Ms. Newton?

3    A.    She's my cousin.

4    Q.    Okay.  Do you see Ms. Newton in the courtroom?

5    A.    Yes, I do.

6    Q.    Could you identify her by pointing her out, maybe

7    identifying what she's swearing.

8    A.    She's wearing the black top with the yellow dress.

9    Q.    And how do you know Ms. Newton?

11:54 10    A.    She's my cousin.

11    Q.    Okay.  How long have you known her?

12    A.    For a long time.  I want to say, I'm 45, so 30, 40 years.

13    Q.    30 or 40 years?

14    A.    Mm-hmm.

15    Q.    At some point in time did you come to work for Ms. Newton?

16    A.    Yes.

17    Q.    When was that?

18    A.    That was the end of June in 2014.

19    Q.    Okay.  So June 2014?

11:55 20    A.    Yes.

21    Q.    How did that happen?

22    A.    Well, I was made aware that she needed assistance with the

23    HR department in her office.

24    Q.    Okay.  How were you made aware of that?

25    A.    Through my father.

1   Q.   Okay.  So your father somehow learned that she needed help

2   in the HR department and told you?

3   A.   Yes.

4   Q.   Okay.  Did you eventually go to work for her?

5   A.   Yes.

6   Q.   Okay.  And was that June 2014?

7   A.   Yeah.

8   Q.   When you went to work for her, what company or

9   organization were you working for?

11:55 10   A.   Arbor Homecare.

11   Q.   And where was Arbor Homecare located?

12   A.   In Lowell, Massachusetts on Chelmsford Street.

13   Q.   Okay.  Do you know when it was founded?

14   A.   Not that I'm aware of.

15   Q.   You're not sure?

16   A.   They had already been open for at least a year or two

17   before I started going there.

18   Q.   So at the time you started in June it had already been

19   open for at least a year or so?

11:56 20   A.   Yes.

21   Q.   Okay.  What kind of company was Arbor?

22   A.   A home health care agency.  They provided skilled nursing

23   to patients in home as well as home health aide services.

24   Q.   Okay.  Who owned Arbor Homecare?

25   A.   Ben Muiruri and Faith Newton.

```
 1    Q.    Who ran the business on a day-to-day basis when you
 2    started there?
 3    A.    When I started there it was Syed Hussain, he was the
 4    administrator, and Rosa Gonzalez, who was the office manager.
 5    Q.    Okay.  Those are the people who ran it on a day-to-day
 6    basis?
 7    A.    Yes.
 8    Q.    Okay.  Who supervised them or sat above them in the
 9    organization?
10    A.    Faith Newton and Ben Muiruri.
11    Q.    Okay.  Were there individuals employed at Arbor as home
12    health aides?
13    A.    Yes.
14    Q.    Okay.  And what is a home health aide, what's your
15    understanding of that role?
16    A.    Home health aide is someone who assists patients in their
17    home, doing daily tasks such as cleaning, going grocery
18    shopping, helping them bathe, taking care of them as far as
19    medications and everything.  They're taking care of them to
20    make sure they're going along with the Plan of Care.
21    Q.    At the time you began at Arbor, about how many home health
22    aides were employed there?
23    A.    There were between 300 to 400.
24    Q.    300 to 400 home health aides working at Arbor?
25    A.    Yes.
```

```
 1    Q.   Okay.  Did Arbor also employ nurses?

 2    A.   Yes.

 3    Q.   Do you recall about how many nurses were employed there at

 4    the time you began?

 5    A.   At the time I began I want to say between 20 and 30.

 6    Q.   20 and 30.  At the time you began do you know how many

 7    patients were enrolled at Arbor?

 8    A.   I want to say about 500.

 9    Q.   How long did you stay at Arbor?

10    A.   I was there until Arbor closed in February of 2017.

11    Q.   Okay.  So you stayed from June 2014 to February 2017?

12    A.   Yes.

13    Q.   Okay.  At the end of your time at Arbor, do you have a

14    sense of how many home health aides were employed?

15    A.   Yeah.  We had about 800 home health aides.

16    Q.   So it roughly doubled in the time you were there?

17    A.   Yes.

18    Q.   You said earlier that you were informed that Arbor needed

19    help in the HR department; is that right?

20    A.   Yes.

21    Q.   What were you initially hired at Arbor to do?

22    A.   I was hired as an HR assistant and tasked to get the files

23    together.  The employee files I mean.

24    Q.   Okay.  So there were existing files at Arbor and it was

25    your job to somehow manage or organize that.  Is that fair?
```

1  A.   Yes.

2  Q.   Okay.  Who hired you at Arbor?  Who brought you on?

3  A.   Faith Newton.

4  Q.   Okay.  And who told you that this was going to be your

5  task?

6  A.   Faith Newton.

7  Q.   Okay.  Did she tell you how to do that task and what

8  needed to be done?

9  A.   Yes.  What they initially did was they showed me a video

11:59 10  so I would know how to go through the files and find out what

11  needed to be in the files.

12  Q.   Okay.  So you were given information about what each HR

13  file was required to contain?

14  A.   Yes.

15  Q.   Okay.  And then what were you told to do?

16  A.   To go through the files, make sure everything was in

17  there.  And then what we did was we ended up getting cabinets

18  and ordered to alphabetize them so they would be easier

19  reviewed.

12:00 20  Q.   Okay.  Who told you to do that?

21  A.   Faith Newton.

22  Q.   Okay.  And when you arrived at Arbor, what was the state

23  of the files?  How were they kept?  How were they maintained?

24  What was --

25  A.   At that time there were no cabinets.  They were on the

1  floor and in just piles.

2  Q.   And were these personnel files, did they include files for

3  those 300 to 400 home health aides that were employed at Arbor?

4  A.   Yes.

5  Q.   So the employee files were 300 or so files stacked around

6  the floor?

7  A.   Around the floor in what would become the HR office as

8  well as in Rosa Gonzalez's office and Syed Hussain's office, so

9  we had to gather everything together.

12:00 10  Q.   Okay.  And you were instructed to ensure that each file

11  had the required documents in there, correct?

12  A.   Correct.

13  Q.   And it was Faith Newton, the defendant, who told you to do

14  that?

15  A.   Yes.

16  Q.   Okay.  I want to be careful just because I know there's a

17  hard copy in the jury box.  But in the binder in front of you,

18  there are a number of tabbed documents, correct?

19  A.   Yes.

12:01 20  Q.   Can you go first to tab 363.

21       THE COURT:  Okay.  The jurors with the hard copy, you

22  won't open it until it shows up on the other jurors' screens.

23       MR. BRADY:  Your Honor, I think that might be the

24  wrong binder from the last witness.

25       MR. LOONEY:  Sorry.  I thought I swapped that out.

|      | That is definitely not the binder for this witness. |
|------|------|
| 1    | That is definitely not the binder for this witness. |
| 2    | A.    So 363. |
| 3    | Q.    You've got it there.  Sorry about the confusion. |
| 4    | A.    Mm-hmm. |
| 5    | Q.    And this is a multipage document.  It has several dozen |
| 6    | pages, correct? |
| 7    | A.    Yes. |
| 8    | Q.    Okay.  Do you recognize this document?  I'm not referring |
| 9    | just to the first page but the full document. |
| 12:02 10 | A.    Yes. |
| 11   | Q.    Okay.  And what is it? |
| 12   | A.    It's the personal management checklist. |
| 13   | Q.    Okay.  So the first page is a checklist? |
| 14   | A.    Yes. |
| 15   | Q.    Okay.  And is it for a specific type -- is this one of the |
| 16   | HR documents that you maintained? |
| 17   | A.    Yes. |
| 18   | Q.    Okay.  For what type of employee? |
| 19   | A.    This is for a home health aide. |
| 12:02 20 | Q.    Okay.  And is this a document that you kept in the |
| 21   | ordinary course of Arbor's business? |
| 22   | A.    Yes. |
| 23   | Q.    And you were responsible for maintaining it? |
| 24   | A.    Yes. |
| 25   | Q.    Okay.  And i think you said that you got cabinets that you |

1    kept at Arbor?

2    A.    Yes.

3    Q.    And is that where this document was kept?

4    A.    Yes.

5    Q.    Okay.  I'd ask that this be admitted as Exhibit 363.

6            THE COURT:  Any objection?

7            THE DEFENDANT:  I just receive it.  I just have to

8    look quick.  No objection.

9            THE COURT:  It's admitted.

12:03 10         (Exhibit 363 admitted into evidence.)

11   Q.    All right.  So this document, I'm not just referring to

12   the first page but the full document, is the personnel file for

13   an individual named Adriana Kam O'Donoghue, correct?

14   A.    Correct.

15   Q.    Starting with this first page, what is this specific page?

16   A.    This specific page explains what needs to be in the HR

17   file, so you have the manila folder which has their

18   application, their CORI processing, educational background and

19   everything, their reference letters, W-4, and then all the

12:04 20   things needed when they're in the process of getting hired.

21   Q.    Okay.  And then if we go to the next section, that red

22   folder, could you tell us what types of documents are contained

23   in that portion of the personnel file?

24   A.    Right.  The red folder contains their licensing or

25   certificate if they have any, diploma or transcripts, job

1    description for the position that is offered on what they were

2    coming in for, list of do's and don'ts for their position,

3    orientation checklists for all employees as well as an

4    orientation list for patient care of employees.

5         This document pretty much shows that they've signed for

6    the HIPAA and they've taken the HIPAA test.  They have an

7    in-service record and evaluations and skilled checklists for

8    every position.

9    Q.    So generally did the documents in the red folder concern

12:05  10   the training and competence of the home health aide or the

11   employee?

12   A.    Yes.

13   Q.    And in the third section, what's in the blue folder?

14   A.    The blue folder is just making sure that they have their

15   current TB to be around for a year.  If they had a positive TB

16   test, they need to complete a TB questionnaire and HB

17   questionnaire.  That pretty much means that their health

18   documents need to be up to date.

19   Q.    Okay.  And at the bottom there is a section, CORI Request

12:06  20   Form.  What's that?

21   A.    The CORI is the background check for the home health aide

22   to make sure they're able to work with a patient legally.

23   Q.    Okay.

24   A.    So they require two forms of ID, and if not born in the

25   U.S., they would have to also have a resident card.

1    Q.   Okay.  And the CORI background check, is that a criminal

2    offense record check?

3    A.   Yes.  It is a background check to make sure that there is

4    no criminal offenses in their background in order to have them

5    work with patients.

6    Q.   Okay.  So taken together, does this checklist reflect or

7    list all of the documentation that was supposed to be included

8    in any employee's personnel file?

9    A.   Yes.

12:07 10    Q.   Okay.  And looking at this specific one in the upper

11    right, there are a bunch of boxes, and the one for HHA is

12    checked.  What does that mean?

13    A.   Home health aide.  That means that they were applying for

14    home health aide.

15    Q.   So this is a personnel file for home health aide?

16    A.   Yes.

17    Q.   And then what's right below that, DOH?  What is that?

18    A.   Date of hire.

19    Q.   And what date is indicated on this one for Ms. O'Donoghue?

12:07 20    A.   March 3, 2014.

21    Q.   Okay.  Now, I think you said earlier that when you

22    arrived, the files were kind of everywhere on the floor, and

23    they were missing some documentation; is that right?

24    A.   Correct.

25    Q.   What sort of documentation was missing from the files?

```
 1    A.    There might have been missing tests, missing TB.  There
 2    could have been missing even, you know, current government
 3    issued photo ID that we need to keep in place.
 4    Q.    Were you instructed to do something about this?
 5    A.    Yes.
 6    Q.    And what was that?
 7    A.    I was instructed to have the files completed in order to
 8    make sure that they were good to go for an audit.
 9    Q.    Okay.  From whom did you receive that instruction?
10    A.    Faith Newton.
11    Q.    Okay.  And you said it was prepared for an audit.  What
12    does that mean?
13    A.    Well, what happens is MassHealth or Massachusetts health
14    care system, the state would come in and double-check the files
15    to make sure that they were complete.
16    Q.    Okay.  So in order -- so Arbor needed to be able to show
17    MassHealth that it had complete personnel files for each
18    employee?
19    A.    Yes.
20    Q.    I think you said you were instructed to make sure they
21    were complete.  How were you instructed to do that?
22    A.    That I would have to call in the employees any way
23    possible to get them to come and complete the files that
24    anything was missing.
25    Q.    Okay.  Ms. Apfel, can we move to page 26 and 27 of this
```

1  document, side by side.

2      Do you recognize these two documents, these two pages?

3  A.    Yes.  The orientation documents that are signed for after

4  orientation.

5  Q.    Okay.  Were these among the documents that you had to

6  collect as part of your job or ensure they were in the file?

7  A.    Yes.

8  Q.    And if a document like this was missing, what did you do?

9  A.    We would have to recreate the document and have them sign

12:09 10  on it.

11  Q.    Tell me more about how you recreated this document and had

12  them sign on it.

13  A.    Okay.  So we would have the employee come in and re-sign

14  down at the bottom, and then we would have them also sign all

15  of these items on the side, the dates and initials, that

16  matched with their hiring date.

17  Q.    You had to ensure that there was one of these forms dated

18  and signed?

19  A.    Yes.

12:10 20  Q.    And when they came in -- you said you weren't hired until

21  June 2014?

22  A.    Yes.

23  Q.    When you came in did you put the dates on these documents

24  of the dates that they actually came into the office?  Or what

25  date did you put on these documents?

         1    A.    We would put the date of hire.

         2    Q.    Okay.  So you would backdate these documents?

         3    A.    Yes.

         4    Q.    So that it would appear that the person received the

         5    training on the day of their hire?

         6    A.    Correct.

         7    Q.    When these personnel came in, did they actually receive

         8    the training indicated on these checklists?

         9    A.    That I'm not aware of.

12:11   10    Q.    You didn't provide the training when they came in to sign

        11    off on these?

        12    A.    No.

        13    Q.    Did you see anybody provide that training?

        14    A.    No.  This was before I was hired.

        15    Q.    Okay.  The date you put on these documents was before you

        16    were hired, so you wouldn't have been around?

        17    A.    Right.  So when they came in to complete the paperwork, we

        18    would let them know the date of hire, and that's what they

        19    would have to initial and put as dates.

12:11   20    Q.    Okay.  So they would fill in the paperwork dated to the

        21    date of hire but no training was provided?

        22    A.    I cannot say yes or no.  I was not there.

        23    Q.    Okay.  Can we move next to page 14 of this document.  If

        24    it's helpful for people following in hard copy, the number in

        25    the lower right-hand corner ends in 7817.

```
 1              Do you recognize this document?
 2    A.    Yes.
 3    Q.    What is it?
 4    A.    It is a certificate of home health aide completion that
 5    they completed the required course, required by MassHealth.
 6    Q.    Okay.  And this one is for an Adriana Kam O'Donoghue?
 7    A.    Correct.
 8    Q.    I want to read aloud, "This certifies that Adriana Kam
 9    O'Donoghue has successfully completed the HHA required course
12:12 10    of study approved by the State of Massachusetts and is
11    therefore awarded this certificate dated this third day of
12    March 2014," and then it bears Faith Newton's signature at the
13    lower right, correct?
14    A.    Correct.
15    Q.    You said earlier that there were about 300 HHAs at the
16    time you arrived, correct?
17    A.    Yes.
18    Q.    And each of them had a personnel file?
19    A.    Yes.
12:12 20    Q.    Did any of them have certificates like this in it?
21    A.    No.
22    Q.    Okay.  How was the certificate created?
23    A.    I created the certificate.
24    Q.    And this is dated March 3, 2014.  Is that when you created
25    it?
```

1    A.    No.

2    Q.    Okay.  When did you create it?

3    A.    I want to say around 2016 is when I created the

4    certificates.

5    Q.    Okay.  Why did you create it?

6    A.    Because they needed to be in the file to have the file

7    complete.

8    Q.    Okay.  And who told you that they needed to be in the

9    file?

12:13 10    A.    Faith Newton.

11    Q.    Okay.  And why did she tell you that these needed to be in

12    the file and the file needed to be complete?

13    A.    Because if audits were to come through, we would fail if

14    the certificates weren't in there.

15    Q.    So this certificate needed to be able to be shown to

16    anyone coming to audit it?

17    A.    Yes.

18    Q.    Did she say who might come to audit it?

19    A.    MassHealth.

12:13 20    Q.    Why was Ms. Newton's signature on it?  How did it get

21    there?

22    A.    Well, at the time that we knew that we had to create the

23    certificates, I had her sign a piece of paper so she wouldn't

24    have to sign over 700 certificates.  So I copied and pasted it

25    there.

```
 1   Q.   Okay.  And did you discuss that that's what you were going
 2   to do with her?
 3   A.   Yes.
 4   Q.   What did she say about that?
 5   A.   She said okay, and she signed the piece of paper that I
 6   was able to scan and then put onto the certificates.
 7   Q.   Okay.  This statement on there, "Adriana Kam O'Donoghue
 8   has successfully completed the HHA required course of study
 9   approved by the State of Massachusetts," do you know whether
10   that's accurate or not?
11   A.   No.
12           THE DEFENDANT:  Objection.
13           THE COURT:  Basis?
14           THE DEFENDANT:  Hearsay.
15           THE COURT:  No.  That's overruled.
16   Q.   Okay.  And why don't you know whether it's true or not?
17   A.   I was not there at that time.
18   Q.   Okay.  We're looking at one of these certificates.  Did
19   you create more of these certificates than one?
20   A.   Yes.
21   Q.   How many?
22   A.   Probably 600 to 700.
23   Q.   Okay.  Did you create one of these for every home health
24   aide at Arbor?
25   A.   Yes.
```

1  Q.   Did any personnel file when you arrived have one of these

2  certificates already in it?

3  A.   Only a couple.

4  Q.   There were a couple that did have it?

5  A.   Yeah, from the original files, if I remember correctly.

6  Q.   Okay.  And for those hundreds of certificates that you

7  created, do you know whether any of those individuals had

8  actually completed the HHA required course of study?

9  A.   No.

12:15 10  Q.   Okay.  That's not something you verified before?

11  A.   It's not something that I would be able to verify.

12  Q.   Okay.  For each one of those hundreds of certificates, did

13  you backdate each one to the date they were hired?

14  A.   Yes, I did.

15  Q.   Aside from Faith Newton, did anyone else's name appear on

16  these type of certificates you created?

17  A.   At one point Regina Arrey.

18  Q.   Okay.  Why did Ms. Arrey's name appear on the

19  certificates?

12:16 20  A.   At the time that we were creating them she was the

21  director of nursing.

22  Q.   Why did you use Faith Newton's name on this certificate

23  instead?

24  A.   Because Ms. Arrey said she didn't want her name on the

25  certificates anymore.

1    Q.    Did you relay that information to Ms. Newton?

2    A.    Yes, I did.

3    Q.    Okay.  Did Ms. Arrey tell you why she didn't want her name

4    on it?

5    A.    Because she could not verify that these people had

6    actually completed their training, so she didn't want her name

7    up there.

8            THE DEFENDANT:  Objection.  Hearsay.

9            MR. LOONEY:  I'll work backwards.

12:17 10          THE COURT:  So that objection is sustained.  That

11    answer should be disregarded by you.

12    Q.    Okay.  Did you discuss with Ms. Newton why Ms. Newton's

13    name would be on the certificate instead of Ms. Arrey's?

14    A.    Yes.

15    Q.    What did you tell Ms. Newton and what did Ms. Newton tell

16    you about that?

17    A.    I explained that Regina did not want to have her name on

18    those certificates because of her licensing.

19    Q.    Okay.  And what did you tell Ms. Newton about why Ms.

12:17 20    Arrey did not want her name on it?

21    A.    I told her she wants her name off of the certificates

22    because of her licensing.  She can't verify under her licensing

23    as a nurse that they were actually trained.

24    Q.    Okay.  So you told Ms. Newton that Ms. Arrey would not

25    sign these because she couldn't verify the training had taken

 1   place, correct?

 2   A.    Correct.

 3   Q.    What was Ms. Newton's response?

 4   A.    Okay, so we'll put her name on there.

 5   Q.    You'll put her name, meaning Ms. Newton's?

 6   A.    Meaning I'd recreate the other ones and have her name on

 7   there.

 8   Q.    Now, you said earlier that you don't know one way or the

 9   other whether the HHAs for whom you created these certificates

12:18 10   had actually successfully completed the course of study,

11   correct?

12   A.    Correct.

13   Q.    And that's because these were dated before you arrived?

14   A.    Yes.

15   Q.    So you don't know what happened before you arrived?

16   A.    No.

17   Q.    Okay.  Were you familiar with what training was being

18   provided at Arbor at or around the time you arrived at Arbor?

19   A.    At the time I arrived we had what was an orientation,

12:19 20   which was about three to four hours, and we'd have the home

21   health aides come in, fill out their paperwork in the red

22   folder and then also go through videos that Arbor provided.

23   Q.    Okay.  So when new health aides were hired, the training

24   orientation consisted of, I think you said a few hours?

25   A.    Yes.

1    Q.    Like a morning?

2    A.    Yes.

3    Q.    And that was filling out paperwork, filling out the forms

4    they were required to fill out?

5    A.    Yes.

6    Q.    And then they watched a few videos?

7    A.    Yes.

8    Q.    Was any additional training provided at Arbor for new home

9    health aides?

12:19 10   A.    When I started, no.

11   Q.    Okay.  That was the sum and total of the training they

12   were being provided?

13   A.    As far as I know, yes, because they were supposed to be

14   able to go to the patient's house and whoever the skilled nurse

15   was is supposed to make sure that they know what they're doing,

16   give them their details as far as what they're supposed to do.

17   So it was up to the nurse who was assigned to the patient to

18   make sure that the home health aide was available and able to

19   do all of the tasks needed based on their assessment.

12:20 20   Q.    Okay.  But the sum of the classroom training was just this

21   three-hour orientation, correct?

22   A.    Correct.

23   Q.    And was any verification done that the on-site practical

24   training had been completed?

25   A.    There was a checklist that nurses had to fill out, but

1    that was not done at that time.

2    Q.    Okay.  So it was a form that had to be filled out checking

3    off that training had been provided?

4    A.    Yes.

5    Q.    But in your HR role, you didn't verify that at all?

6    A.    No.

7    Q.    Okay.  Ms. Apfel, could we bring up just for the witness

8    and the lawyers and Ms. Newton Exhibit 13.01, please.  Do you

9    see that up there?

12:21 10   A.    Yes.

11   Q.    What is it?

12   A.    It is a PowerPoint that I created in order to go through

13   what the HHA training should be.

14   Q.    Okay.  So you created this?

15   A.    Yes.

16   Q.    And you did so while you were employed at Arbor?

17   A.    Yes.

18   Q.    Okay.  And it was for purposes of -- who did you show it

19   to?

12:21 20   A.    I showed it to the home health aides.  I also gave them a

21   copy after the orientation so they would have an idea what they

22   needed to do.

23        MR. LOONEY:  Okay.  I'd ask this be admitted as

24   Exhibit 13.01.

25        THE COURT:  Any objection?

1           MR. IOVIENO:  Sorry.  Was there a question?

2           THE COURT:  They've moved to admit an exhibit.  I'm

3    asking if she has an objection.

4           THE DEFENDANT:  No objection.

5           THE COURT:  It's admitted.

6           (Exhibit 13.01 admitted into evidence.)

7    Q.   So just to orient the jury now that they can see it, tell

8    me again what this is.

9    A.   This is a PowerPoint that I created for the home health

12:22 10   aide training, meaning I would give it to them during

11   orientation so they would have all the same information that I

12   had.

13   Q.   Okay.  And that orientation you described, at some point

14   in time did you become involved in the training orientation?

15   A.   Yes, I would run the orientations.

16   Q.   How long did the orientation last?

17   A.   Three to four hours when I first started.

18   Q.   Okay.  Could we go to page 6 of this document.  This

19   document is titled, "How Should an HHA Be Trained," correct?

12:23 20   A.   Yes.

21   Q.   And the first bullet is, "Classroom and supervised

22   practical training totaling at least 75 hours," correct?

23   A.   Correct.

24   Q.   And next bullet is, "At least 16 hours devoted to

25   supervised practical training," correct?

A.    Correct.

Q.    And then the third bullet is, "At least 16 hours of classroom training before beginning supervised practical training."

A.    Correct.

Q.    Does this accurately reflect your understanding of what training was required for a new home health aide?

A.    No.

        THE DEFENDANT:  Objection.

Q.    It doesn't reflect your understanding of what was required?

        THE COURT:  Hold on, hold on.  What's the basis of the objection?  "Does this accurately reflect your understanding of what training was required for a new home health aide?"

        THE DEFENDANT:  The training are done by nurses.

        THE COURT:  Okay.  The objection is overruled because they're asking her understanding of the training.  So that's her understanding.

Q.    Okay.  I just want to ask the question again because I think it was a little unclear.

        Does this accurately reflect your understanding of what training was required for a new home health aide?

A.    It reflects my understanding as far as what they're supposed to be trained doing.

Q.    Okay.  At any time you worked at Arbor, did Arbor provide

          1    16 hours of classroom training before any supervised training
          2    that might happen would take place?
          3    A.    No.
          4    Q.    Never?
          5    A.    No.
          6    Q.    During all of your time at Arbor, what was the most
          7    classroom training that Arbor provided to its new home health
          8    aides?
          9    A.    At the end, in 2016, we were able to get about eight hours
12:25    10    of them being there for orientation and training, and we were
         11    able to bring nurses in to come and show them a little bit.
         12    Q.    Okay.
         13    A.    As far as the outside training, I would have no clue about
         14    that.
         15    Q.    Okay.  And let me ask you, prior to that time when you
         16    expanded it to eight hours, were nurses involved in the
         17    training at all onsite?
         18    A.    No.
         19    Q.    No?
12:25    20    A.    No.
         21    Q.    It was just you running an orientation?
         22    A.    Yes.
         23    Q.    Did you discuss the required training of new home health
         24    aides with Ms. Newton?
         25    A.    Yes.

Q.   What did you discuss, if you recall?

A.   As I worked there and I learned more about what it requires, I was asking for more hours and that we have more training.

Q.   I just want to stop you there.  You went to Ms. Newton and told her that we were required to have more training than what you were currently providing?

A.   Yes.

Q.   Okay.  What was Ms. Newton's response to that?

A.   It's okay for right now, or talk to the director of nursing at that time.

Q.   When you say she said, It's okay for right now, what did she mean by that?  What --

A.   That the orientation hours, that the three to four hours were okay, and then we ended up getting more audits and ended up expanding it to eight hours.

Q.   So she told you that we're fine doing what we are doing now, until there was audits, then you expanded it slightly?

A.   Yes.

Q.   I want to change topics slightly to talk about the hiring process.  From your time at Arbor were you familiar with the hiring and on-boarding process for a new home health aide?

A.   For a new home health aide normally --

Q.   Let me just -- just before we get to that, I think you're probably answering my next question.  But you're familiar with

1    it?

2    A.    Yes.

3    Q.    Okay.  What was that process of hiring a new home health

4    aide?  How did that come to happen?

5    A.    A new home health aide would come in with a valid patient

6    who could pass the MassHealth qualifications for us to provide

7    services.  If that patient passed, then they were hired.

8    Q.    So the process was, two people would come in, one could be

9    the home health aide and one could be the MassHealth patient;

12:27 10   is that right?

11   A.    Normally it would just be the home health aide bringing

12   the patient information.

13   Q.    Patient information, okay.  So the home health aide would

14   come with information for a patient?

15   A.    Yes.

16   Q.    And when you said you made sure they were eligible for

17   MassHealth or admitted to MassHealth, what did that mean?

18   A.    That means that whoever was looking into the patient's

19   information would then verify that they would be able to

12:28 20   receive home care services.

21   Q.    Paid for by MassHealth?

22   A.    Paid for by MassHealth.

23   Q.    Okay.  And at that point then I think you said the home

24   health aide would be hired?

25   A.    The home health aide would then be scheduled for

1    orientation and then come to the orientation and fill out their

2    paperwork and be hired.

3    Q.    Okay.  Were there any criteria to ensure the home health

4    aide was eligible to act as a home health aide?

5    A.    It would be just the CORI processing and that it's at the

6    patient's request.

7    Q.    Okay.  The CORI processing was the criminal offender

8    check?

9    A.    Yes, the background check.

12:28 10    Q.    Okay.  So to be hired as a home health aide you had to

11    bring a patient who was eligible for MassHealth, correct?

12    A.    Yes.

13    Q.    And you had to pass a criminal background check, correct?

14    A.    Correct.

15    Q.    Was there any other criteria to be hired as a home health

16    aide?

17    A.    No.

18    Q.    Was any evaluation done of whether a person would be a

19    good home health aide?

12:29 20    A.    Not that I'm aware of before hiring.  As far as I know,

21    that should have been taken care of by the skilled nurse.

22    Q.    Okay.  As part of the hiring process was anything done to

23    determine whether an individual was actually capable of

24    performing the tasks required of a home health aide?

25    A.    No.

```
 1   Q.   Going back to those personnel files for a second, I think
 2   one of the documents listed in there were examinations.
 3   A.   Yes, in the red folder.
 4   Q.   Okay.  And those were examinations given to home health
 5   aides?
 6   A.   Yes, during orientation.
 7   Q.   Okay.  Were you responsible for administering those
 8   examinations?
 9   A.   Yes, we distributed them during orientation.
10   Q.   So you handed them out at the date the individual was
11   hired?
12   A.   Yes.
13   Q.   How were those examinations taken?
14   A.   They were just, we were in a conference room.  They were
15   taken at the desk, and they had the answer keys right
16   underneath them just in case, especially since some of the home
17   health aides didn't speak English.
18   Q.   Okay.  So when you're administering these examinations to
19   determine whether an HHA had the skills of an HHA, you gave
20   them the answer key as well?
21   A.   Yes.
22   Q.   So they could just copy it down?
23   A.   Right.
24   Q.   Okay.  I'm going to switch gears again.  You've talked
25   about personnel records.  Did you help to maintain other
```

```
 1  records at Arbor?
 2  A.    Yes, I helped with the filing of the medical records.
 3  Q.    Okay.  And that means --
 4  A.    That means the Plans of Care for the patients, any changes
 5  with diagnoses or anything.
 6  Q.    Okay.  And I want to focus specifically on those Plans of
 7  Care.  What's a Plan of Care?
 8  A.    A Plan of Care is created by the RN to state what the
 9  patient would need as far as skilled nursing, what their
10  diagnoses are, home health aide hours.
11  Q.    Okay.  Did those Plans of Care need to be signed by
12  someone?
13  A.    Yes, they need to be signed by the primary care physician.
14  Q.    Okay.  At the time that you came to Arbor, did signed
15  Plans of Care exist for all of Arbor's patients?
16  A.    No.
17  Q.    Were you told to do anything about that?
18  A.    At one point we were trying to make sure the doctors did
19  sign off on the Plans of Care that relate.
20  Q.    And before we get to what you were told to do, by whom
21  were you told to do something about this?
22  A.    Faith Newton.
23  Q.    And what did she tell you to do?
24  A.    That we needed to get the Plan of Care -- the Plans of
25  Care signed.  Sorry.
```

1    Q.    So you needed to have -- where there was no signed Plan of

2    Care, you needed to go out and find a doctor to sign them?

3    A.    Yes.  At one point I was directed by Faith Newton to go

4    out and have doctors -- go to doctors' offices and have them

5    sign it.

6    Q.    Okay.  Were those Plans of Care signed before or after the

7    patient received services?

8    A.    After the patient received services.

9    Q.    How long after?

12:32 10    A.    Some were six to eight months.  Maybe longer.  I don't

11    remember the exact dates.

12    Q.    Okay.  Changing topics again, did you ever discuss with

13    Ms. Newton any concerns about whether nurses were showing up to

14    the appointments that were scheduled and shown on the Plans of

15    Care?

16    A.    Yes.

17    Q.    How did that conversation come up?

18    A.    Well, I had been informed that at least one nurse was out

19    of the country and somebody else was covering for her.

12:33 20    Q.    Okay.  Did you raise that issue with Ms. Newton?

21    A.    I raised it both with Ms. Newton and Joseph Muiruri.

22    Q.    Joseph Muiruri.  Who was --

23    A.    He was the director of nursing at that time.

24    Q.    Okay.  So Joseph Muiruri was the director of nursing.  Was

25    Faith Newton his supervisor, sat above him?

1    A.    Yes.

2    Q.    Okay.  When you raised this issue -- sorry.  When you

3    raised this issue with Ms. Newton, how did she respond to it?

4    A.    That they'd take care of it.

5    Q.    That they would take care of it?

6    A.    Mm-hmm.

7    Q.    And do you have any more recall of what Ms. Newton told

8    you about this issue?

9    A.    No, because I was directed to talk to Joseph Muiruri.

12:34 10    Q.    Okay.  And he would deal with it?

11    A.    Yes.

12    Q.    And you were directed to do that by Ms. Newton?

13    A.    Yes.

14    Q.    Okay.  Other than the one where the nurse was out of the

15    country, were there other instances in which you discussed

16    issues about nurses not performing visits with Ms. Newton?

17    A.    Yes, I would bring it up because I would get reports from

18    the patients or the home health aides that nurses weren't there

19    as many times as they were supposed to be based on the Plan of

12:34 20    Care.

21    Q.    Okay.  And you reported that to Ms. Newton?

22    A.    Yes.

23    Q.    And what was her response about what to do about it?

24    A.    It was still the same thing.  All right, take care of it.

25    Q.    She'll take care of it?

```
 1    A.    Mm-hmm.

 2    Q.    You should not do anything about it?

 3    A.    Nope.  I had no responsibility over that.  I just reported

 4    it.

 5    Q.    Okay.  You reported to Ms. Newton.  Were you given any

 6    instructions about whether or not you should record complaints

 7    about whether patients were doing the visits?

 8    A.    Originally what we had started doing in the office was we

 9    were recording complaints on the system was called Axxess

10    point.

11    Q.    Okay.

12    A.    So if we were getting a complaint about a home health aide

13    not showing up, nurse not showing up, we were finding out they

14    were not doing the visits that they were recording for

15    themselves, we would write that in there so that everybody

16    would be able to see it.

17    Q.    So your initial practice was if someone complained that

18    visits weren't happening, you would record that in the Axxess

19    database?

20    A.    Yes.

21    Q.    Okay.  Did you discuss that issue with Ms. Newton?

22    A.    Yes.

23    Q.    What did she tell you to do about that?

24    A.    It was decided we shouldn't do that anymore because

25    MassHealth has access to look at that, and we just started
```

1    recording on paper.

2    Q.   Okay.  So she told you to keep the complaints out of the

3    Axxess database?

4    A.   Yes.

5    Q.   And why did she tell you to keep the complaints out of the

6    Axxess database?

7    A.   Because MassHealth can look at that and then find out,

8    maybe the Plan of Care, say, for example, a home health aide is

9    scheduled for 12 hours, they're only doing two hours.  So if

12:36 10   we're getting a complaint from a patient, then we also need to

11   record that to make sure that we're aware for payroll that this

12   person is putting in for 12 hours and only working two to three

13   hours.

14   Q.   And Ms. Newton wanted you to keep that out of the records

15   that MassHealth had access to?

16   A.   Correct.

17   Q.   Okay.  I want to go back to the home health aide

18   certificates that we talked about earlier.  I'm going to show

19   you a number of these up on screen and just ask you to identify

12:36 20   what they are.

21   A.   Okay.

22   Q.   Can we start with Exhibit 346, please.

23        Do you see that?

24   A.   Yes.

25   Q.   I'm going to show you a bunch and ask you a bunch of

1    questions all at once.  Can we show Exhibit 353.  And then

2    Exhibit 360, and then Exhibit 365, Exhibit 374, and then

3    Exhibit 383, and then Exhibit 387.

4        Do you recognize these documents?

5    A.    Yes.  They're the home health aide certificates.

6    Q.    For a number of home health aides at Arbor?

7    A.    Correct.

8    Q.    Okay.  You said you made several hundreds of these,

9    correct?

12:37 10    A.    Correct.

11    Q.    This is just a small sample?

12    A.    Yes.

13        MR. LOONEY:  I would ask that these be admitted as

14    Exhibits 346, 353, 360, 365, 374, 383 and 387.

15        THE DEFENDANT:  No objection.

16        THE COURT:  They're admitted.

17        (Exhibits 346, 353, 360, 365, 374, 383, 387 admitted

18    into evidence.)

19    Q.    All right.  If we could just run through them again so the

12:38 20    jury can take a look.  Do you want to read those numbers again,

21    Ms. Apfel.  Would that be helpful?  You got them?  All right.

22        All right.  So if you could just tell the jury again, what

23    are these documents we flipped through?

24    A.    These are home health aide certificates that were created

25    to go into the personnel file.

```
 1    Q.    Okay.  So these certificates are created to be placed into
 2    the personnel file?
 3    A.    Correct.
 4    Q.    Who created them?
 5    A.    I did.
 6    Q.    At whose direction did you create them?
 7    A.    Faith Newton.
 8    Q.    The date on each of these certificates, what date was used
 9    for them?
10    A.    The date on each certificate is the date of hire.
11    Q.    Okay.  So it's not when the certificate was actually
12    awarded or any training was performed?
13    A.    Not that I'm aware of.
14    Q.    Okay.  For any of these certificates did you verify that
15    any training of these HHAs had taken place before you created
16    these or certificates like it?
17    A.    No.
18    Q.    Okay.  And Ms. Newton's signature appears on each of
19    these?
20    A.    Yes.
21    Q.    And why was Ms. Newton's signature used?
22    A.    Because she would have been the RN, the director of
23    nursing.
24    Q.    Okay.  And did you discuss the fact with Ms. Newton that
25    her signature would be used?
```

```
 1    A.    Yes.

 2    Q.    And she instructed you to do it?

 3    A.    Yes.

 4    Q.    Okay.  Did Ms. Newton tell you why all of these

 5    certificates we looked at should be created?

 6    A.    Because if we were audited, they needed to be in the HR

 7    file.

 8    Q.    Okay.  So the HR file needed to have these documents in it

 9    so you could show it to anyone auditing it?

10    A.    Yes.

11    Q.    Did she tell you who might be the auditor?

12    A.    All I know is that it was the state.

13    Q.    The state?

14    A.    Mm-hmm, MassHealth.

15          MR. LOONEY:  Thank you.  Nothing further at this

16    point.

17          THE COURT:  Cross?

18    CROSS-EXAMINATION BY MS. NEWTON:

19    Q.    Hello, Gerry.

20    A.    Hi.

21    Q.    How are you?

22    A.    I'm good.  My name is Amanda.

23    Q.    I know you as Gerry.  So when did you move to my house?

24    A.    I moved to your house June of 2014.

25    Q.    And how long did you live there?
```

12:40 (at line 10)
12:41 (at line 20)

```
 1    A.    I lived there for about two years.

 2    Q.    And what did you do when you lived there?

 3    A.    I worked for you.

 4    Q.    Did you pay any bills?

 5    A.    No.

 6    Q.    Okay.

 7    A.    Not until you left.

 8    Q.    Can you see that list?

 9    A.    Yes, yes, I can see that.

12:41 10    Q.    What does it say?

11    A.    CEO, President Administration Nursing Director of Clinical

12    Services.

13    Q.    Who was the CEO of Arbor?

14    A.    Ben Muiruri.

15    Q.    Who was the president of Arbor?

16    A.    I thought you were.

17    Q.    Who was Vannak Kann

18    A.    Oh, Vannak came in a couple -- two years later after I

19    started there.

12:42 20    Q.    Before he came, who was the president?

21    A.    I'm guessing that was Syed, if it wasn't you.  I wasn't

22    given a list of what everybody's stuff was as far as this is

23    concerned.

24    Q.    And who was the administrator?

25    A.    The administrator when I started was Syed Hussain.
```

```
 1    Q.    Who worked in HR department?

 2    A.    HR department, it was run by a couple of different people

 3    because I came in as an HR assistant.

 4    Q.    You say you came in as an assistant, but who was your

 5    supervisor there, if you were an assistant?

 6    A.    Rosa Gonzalez.

 7    Q.    Who?

 8    A.    Rosa Gonzalez and Syed Hussain.

 9    Q.    Okay.  And who ran the company?

 10   A.    You did and Ben.

 11   Q.    The last time you testified, who did you say ran the

 12   company?  Didn't you say it was Ben Muiruri and --

 13   A.    Faith Newton.

 14   Q.    -- Joseph Muiruri?

 15   A.    Joseph Muiruri came in as a director of nursing and that

 16   was --

 17   Q.    When did he --

 18   A.    -- three years after I started there.

 19   Q.    When did he come?

 20   A.    Let's see, 2016.

 21   Q.    When did Joseph come?

 22   A.    Joseph Muiruri came about 2016.

 23   Q.    No.

 24   A.    Okay.

 25            MR. LOONEY:  Objection.
```

1          THE COURT:  Yes.  You can ask her questions but you

2    can't testify.  If you think she has the date wrong, you can

3    say something like --

4          THE DEFENDANT:  The date is wrong.

5          THE COURT:  No.  You have to say, "Isn't it true that

6    that happened on a different date," or, "Isn't it true that

7    happened in a different year," but you have to ask a question.

8    You can't tell her her answer is wrong.  That's you testifying.

9    You can't do that, and that should be disregarded by the jury.

12:44 10    You have to ask a question.

11          THE DEFENDANT:  Okay.

12    Q.    And when you came, who was the director of nursing?

13    A.    Joseph Ouko started maybe a couple of weeks after I did.

14    Q.    Before then can you recall who was the director of nursing

15    before you?

16    A.    Before I came?  When I actually started there I thought

17    you were the director of nursing until Joseph Ouko came.

18    Q.    Do you recall Regina?

19    A.    Regina was a nurse on staff but she was not director of

12:45 20    nursing.

21    Q.    Do you recall Rebecca Muturi?

22    A.    No.

23    Q.    You don't recall what she did or you were not there?

24    A.    As far as I know, no.

25    Q.    So what did you do in HR?

```
 1   A.    HR, I came to help clean up the files to make sure that
 2   they were good for audits.
 3   Q.    What was your job description?
 4   A.    Originally HR assistant.
 5   Q.    So what was your job, did you get your job description?
 6   A.    Yes.
 7   Q.    Who interviewed you and who was teaching you HR?
 8   A.    I was shown a video of how the HR files were supposed to
 9   look.
12:45 10  Q.    Is it right to say that Syed Hussain trained you in HR
11   department?
12   A.    No.  They were part -- they were over me.  They would let
13   me know what needs to be done, and then I also had help from
14   other office workers.
15   Q.    When did you sign -- when did you sign my name on the
16   certificates?
17   A.    I want to say it was 2016.
18   Q.    Why?
19   A.    Because they needed to be in the file.
12:46 20  Q.    Why did they need to be in the file?
21   A.    In order to complete the HR file in case of audit.
22   Q.    2016.  If you hired on 2014, why was that job not done?
23   A.    Because I was unaware that it needed to be in the file
24   until we got audited, and then the person who audited us told
25   us they needed to be in there.
```

```
 1   Q.   Was that not your job responsibility?

 2   A.   It was a learning position.

 3   Q.   Do you recall last time you testified you said you used my

 4   stamp from 2015.  Do you recall that?

 5   A.   It's possible.  I could have created them in 2015.  It's

 6   been almost ten years.

 7   Q.   So you don't recall a lot of stuff, you said.

 8   A.   I recall going into your office, letting you know that

 9   Regina Arrey did not want her name on those certificates, so I

12:47 10   had you sign a piece of paper, and then I told you I was going

11   to scan it and put it on the certificates to make sure that the

12   HR files were correct.

13   Q.   Who took your position when you left your position?

14   A.   What do you mean?  I never left my position.  I was told

15   that I needed to start a new department.

16   Q.   What department was that?

17   A.   The HHA department.

18   Q.   Who was your supervisor there?

19   A.   Joseph Muiruri.

12:48 20   Q.   Do you recall Joseph Watabu was supervisor?

21   A.   Who's --

22   Q.   You don't recall Joseph Watabu, you sat with him every

23   single day in the office when you show up.  Do you remember

24   Joseph Watabu?

25   A.   The LPN, Joe?
```

```
 1    Q.    Yes.

 2    A.    Yeah, I remember Joe.

 3    Q.    Didn't you work with him, he was the HHA supervisor,

 4    wasn't he?

 5    A.    No.

 6    Q.    He wasn't?

 7    A.    No.  He was an LPN backup, so that when I ran the

 8    department, if I had any questions, I can also go to him.

 9    Q.    Didn't you work in the same office?

10    A.    Yes, we did.

11    Q.    What was his job description, do you remember?

12    A.    LPN.

13    Q.    LPN?

14    A.    He was a licensed practitioner nurse.

15    Q.    But did he see patients in the office?

16    A.    No.  He saw them after hours.

17    Q.    So what did he do with you in the HR department, in the

18    HHA department?

19    A.    If you really want to know, nothing.  He didn't do

20    anything.  He sat there.

21    Q.    And what did you do?

22    A.    I was the one taking the patient complaints, the home

23    health aide complaints, trying to get the scheduling done in

24    case of everything.

25    Q.    Who did you report that to?
```

```
 1   A.    I reported it to Joseph Muiruri, if anything, but
 2   otherwise I did everything on my own.
 3   Q.    Did somebody coach you what to say?
 4   A.    No.
 5   Q.    Because you testified different last time.
 6   A.    I said Joseph was there as backup in case I needed it,
 7   especially if a patient called or I needed to know about a Plan
 8   of Care that was not being followed.  So he was actually just
 9   there to reference stuff for me.
10   Q.    So can you recall any director of nursing who worked in
11   Arbor?  Because there was multiple.
12   A.    Yes.  Joseph Ouko, Regina Arrey and then Joseph Muiruri.
13   Q.    And who did you report to?
14   A.    Whoever was the director of the nursing at the time.
15   Q.    Do you recall testifying last time that you never reported
16   to me?
17   A.    I never said I never reported to you.  I would come and
18   sit in your office.
19   Q.    Did you recall testifying last time, saying that I stepped
20   down, out of business?
21   A.    Yes, you stepped away from the business.
22   Q.    2014, did you recall testifying that last time?
23   A.    You stepped away from the business, but that didn't mean
24   you weren't part of the business.
25   Q.    So you recall saying that?
```

```
 1    A.    Yes.

 2    Q.    Today you said --

 3    A.    That's why there's director of nursing.

 4    Q.    Today you said you reported everything to me.  Was that

 5    truthful?

 6    A.    Yes.

 7    Q.    Do you know it's different from what you say the last

 8    time?

 9                THE WITNESS:  Can I respond to her?

12:51 10             THE COURT:  Yes.

11                THE WITNESS:  Okay.

12    A.    We're cousins.  We lived together for a while.  I would

13    see you all the time and tell you what was going on with the

14    business, so you can't say that I didn't tell you anything.

15    Q.    No.  I ask you, do you recall testifying -- we are in

16    court here, not in my house.  Do you recall testifying last

17    time that you never reported to me, that you reported to Joseph

18    Muiruri who was the director of nursing?

19    A.    Yes, at the end of my job, I reported to Joseph Muiruri as

12:52 20    the director of nursing.

21    Q.    Do you recall Joseph Muiruri doing trainings?

22    A.    No.

23    Q.    So there's not certificates signed by Joseph Muiruri?

24    A.    No.

25    Q.    Do you recall Mary Cameu RN doing the training?
```

1    A.    I remember Mary coming in during orientation.  At the end

2    of the orientation they would show the home health aides how

3    they're supposed to wash their hands, they would go over some

4    of the stuff with the videos, show them some objects.

5    Q.    So is it your testimony that Mary Cameu was one of the RN

6    doing training?

7    A.    Mm-hmm.

8    Q.    How about Catherine Macharia?  Do you recall Catherine

9    Macharia?

12:53 10    A.    Yes, she would also come in.

11    Q.    Did she do the training?

12    A.    It's not training when it's an orientation.  That was my

13    whole thing.  If the nurse comes into the orientation and shows

14    them objects, like, okay, well, this is this and this is that,

15    and this is how you wash your hands, that's not actual

16    training.

17    Q.    What is your education?

18    A.    I went to Rutgers for five years.

19    Q.    Are you a registered nurse?

12:53 20    A.    No, I'm not.

21    Q.    Are you an LPN?

22    A.    No, I'm not.  I never claimed to be.

23    Q.    So is it fair to say that you don't have any knowledge of

24    training?

25    A.    That's what I stated before.  I can't verify that they

| | |
|---|---|
| 1 | were trained. All I know is about the paperwork and what |
| 2 | needed to be done in the HR file. |
| 3 | Q. And who told you to do that? |
| 4 | A. Who told me to complete the HR files? |
| 5 | Q. Yes. |
| 6 | A. You. |
| 7 | Q. Why were they not complete? |
| 8 | A. Because the office was a wreck and all the files were not |
| 9 | complete. |
| 12:54 10 | Q. And when was that? |
| 11 | A. 2014 through 2016. |
| 12 | Q. Oh. You said that files had to be completed -- |
| 13 | A. Completed. |
| 14 | Q. Why? |
| 15 | A. Because in case of audit the state comes in and takes a |
| 16 | look at HR files. |
| 17 | Q. Did the state come to Arbor to do any audits? |
| 18 | A. Yes. |
| 19 | Q. When? |
| 12:55 20 | A. At least once a year. |
| 21 | Q. Once a year? Do you have that information? |
| 22 | A. No, I did not keep a record of when the audits were done. |
| 23 | Q. There was no audits done? |
| 24 | A. I never said there were no audits done. There were plenty |
| 25 | of audits done. |

Q.    By MassHealth?

A.    MassHealth, state, whoever it was.

Q.    Are you sure about that?

A.    Yes.

Q.    Can you name any nurse from Arbor, an RN?  You were in HR,
right?  Can you name ten nurses who worked at Arbor?

A.    Can you please name the last ten people I've worked with?
This is ten years ago.

Q.    Is it fair to say that your testimony is questionable or
is not true?  If you can't remember any names of anybody, these
nurses -- how many nurses were there in HR?

A.    There were about 30 to 40 nurses, including RNs an LPNs.

Q.    Is it fair to say that it was over 500 nurses?

A.    No.

Q.    Can you remember -- let's say five.  Can you name five of
them?

A.    I don't think that's an issue for me to name five nurses.
But if you give me my phone, I can read you their phone
numbers.

Q.    Just name five.  Am I a nurse?

A.    Regina Arrey, Joseph Ouko.  Who else?  Becky, Rebecca,
sorry.  Joseph Watabu.  I worked with a bunch of them, but I
don't understand why naming them right now.  It's been ten
years.

Q.    I'm just trying to retrieve your memory.  Can you name

         1    like five LPNs who worked -- you worked in HR.  Can you name
         2    ten home health aides?
         3    A.    Can you please give me my computer so I can pull
         4    everything up?
         5    Q.    I just want you to name --
         6    A.    I'm asking --
         7    Q.    How did you remember everything that I told you?
         8    A.    Because we discussed everything all the time.
         9    Q.    When?
12:58   10    A.    When I lived with you, when I worked with you.
        11    Q.    Okay.  You worked in HR.  Who was the therapist, the
        12    physical therapist there?
        13    A.    I don't remember her name.  It was an older lady.  She had
        14    red hair.
        15    Q.    Who was the occupational therapist, OT?
        16    A.    Same thing because they all worked out of the office.
        17    They didn't work in the office.
        18    Q.    Do you recall the name of the social worker?
        19    A.    No.
12:58   20    Q.    How about the human resources?
        21    A.    Human resources was me.
        22    Q.    Who was Tom Cameu?
        23    A.    Tom came in after me, after I got put over into the HHA
        24    department.
        25    Q.    Can you recall who else worked in HR, do you remember?

A.    Everybody had a part in everything, so it was me, Jenny

Sech, Helen Sech, Joseph Watabu, and the one who did payroll.

Q.    Who did the payroll?

A.    Ianna, Alyssa?  I don't understand why I'm being asked

about employees.

Q.    You worked in HR, right?

A.    Yes.

Q.    I just -- you at least can name people who worked there.

You took care of HHA certificate.  You stamped my name.  How

many did you stamp, and what's the name of the certificates you

did stamp my name?

A.    The home health aide certificate?

Q.    Yeah.  How many?

A.    I did about 800 of them.

Q.    Is it fair to say that the document shows other people's

names on them?

A.    At one point they did.

Q.    Is Joseph Muiruri's name there?

A.    No.

Q.    Is Regina Arrey's name there?

A.    No, because I had to get rid of those and redo them with

your name.

Q.    How about the document showing the information is there?

How do you recall 800?

A.    I'm giving a guesstimate about how many I had to create.

```
 1              THE COURT:  Ms. Newton, how much more do you have for
 2       her?
 3              THE DEFENDANT:  I'm almost done.
 4       Q.   Can you see that document?
 5       A.   Yes.
 6       Q.   Do you recall this document?
 7       A.   Yeah, it's a pull-up of the people that were hired and
 8       when they were hired.
 9       Q.   Do you know what certified nurse's assistant is?
10       A.   A certified nurse's assistant is someone who has gone to
11       school to be a CNA.
12       Q.   Do you know the difference between CNA and home health
13       aide?
14       A.   Yes.
15       Q.   Do you know whether or not CNA are higher or lower than
16       home health aide?
17       A.   A CNA is higher than a home health aide.
18       Q.   Do CNAs need training to be home health aide?
19       A.   A CNA should have higher training than a home health aide.
20       Q.   And did you stamp my name on those CNAs?  Because this
21       document came from you.
22       A.   This document was created based on the system.
23              MR. LOONEY:  Objection.
24              THE COURT:  Mr. Looney, I can't hear you.
25              MR. LOONEY:  I'm just objecting because she's
```

1    represented the provenance of the document and it's unclear

2    what it is.

3            THE DEFENDANT:  It's showing the names of HHAs.

4            THE COURT:  Overruled.

5            MR. LOONEY:  Okay.

6            THE DEFENDANT:  Yeah.

7    Q.   This is a document --

8    A.   Created out of the system.

9    Q.   Yeah.

01:03 10    A.   It was a download from Axxess.

11    Q.   Yes.

12    A.   Based on who was already in the system.

13    Q.   Yes.

14    A.   Mm-hmm.

15    Q.   You sent this to me.  Do you recall doing that?

16    A.   Probably.  I believe I did.

17            THE COURT:  Do you want to move the admission of this

18    document?

19            THE DEFENDANT:  Huh?

01:03 20            THE COURT:  Do you want the jury to see this?

21            THE DEFENDANT:  Yes.

22            THE COURT:  Okay.  She's moving the admission of the

23    document.  Government?

24            MR. LOONEY:  No objection.

25            THE COURT:  It's admitted, 1028.

1           (Exhibit 1028 admitted into evidence.)

2           MR. LOONEY:  Just because we don't have a copy, would

3    it be possible to somehow move it to --

4           THE COURT:  How much more -- it's time for lunch, so

5    if you're almost done.

6           THE DEFENDANT:  I'm done.

7           THE COURT:  Okay.  Are you sure you're done?

8           THE DEFENDANT:  Yeah.  No further questions.

9           THE COURT:  Do you have any redirect?

01:04 10           MR. LOONEY:  No, Your Honor.

11           THE COURT:  All right.  You're excused.  Thank you.

12    We'll have lunch until quarter-of-two.

13                        * * * * *

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Professional Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this 10th day of October, 2024.

/s/ Kelly Mortellite

_____

Kelly Mortellite, RPR, RMR, CRR

Official Court Reporter